## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| LEADINGAGE MINNESOTA, CARE PROVIDERS OF MINNESOTA, and YONA NORTHSTAR, LLC, | Court File No. _____ |
| Plaintiffs, | |
| v. | |
| NICOLE BLISSENBACH, *in her official capacity as the Commissioner of the Minnesota Department of Labor and Industry and as a member of the Minnesota Nursing Home Workforce Standards Board*, and JAMIE GULLEY, *in his official capacity as a member and chairperson of the Minnesota Nursing Home Workforce Standards Board*, | |
| Defendants. | |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

TABLE OF CONTENTS

PAGE

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................2

I.    ABOUT THE PLAINTIFFS. .....................................................2

      A.    LeadingAge and Care Providers Are Trade Associations
            Representing Nursing Homes Across Minnesota. .........................2

      B.    Yona Transacts Business with the Members. ...............................3

II.   THE ACT'S PASSAGE AND THE BOARD'S CREATION. ...................3

III.  THE BOARD'S MAKE-UP AND STATEWIDE AUTHORITY
      OVER NURSING HOMES. ......................................................4

      A.    The Board's Representatives. ...........................................4

      B.    The Board Has Statewide Regulatory Authority Over
            Nursing Homes. ..............................................................6

      C.    The Board Exercises Its Power to Raise Minimum Wages. ..........7

            1.    The minimum wage for nursing home workers. .................7

            2.    The interplay between the Wage Standards and
                  CMS's approval of an increased reimbursement rate..........9

      D.    Mandatory Training. ....................................................... 11

      E.    The Board's Actions Trigger Limited Legislative Oversight
            Only When They Affect the State's Budget. ............................... 12

      F.    Harm to the Members and Yona. ....................................... 13

            1.    The Wage Standards injure the Members and Yona........ 14

                  a.    The financial impact. ............................... 14

            2.    The impact of the training requirements. ......................... 16

            3.    Infringement on the collective bargaining process. .......... 17

i

4.      Burdens on constitutional rights. ...................................... 18

STANDARD OF REVIEW ................................................................. 19

ARGUMENT ................................................................................... 21

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON EACH OF
      THEIR CLAIMS ......................................................................... 21

      A.    The Act Violates the First Amendment by Forcing the
            Members and Yona to Associate with Representatives and
            Public Policies with Which They Disagree. ................................ 23

            1.    Forced association violates the First Amendment. ........... 23

            2.    The *Knight* exception does not apply because the Act
                  imposes representation on private operations. ................. 27

            3.    The Court should apply exacting scrutiny to strike
                  down the Act and Board's structure. ................................ 28

      B.    The Act Denies the Members and Yona Due Process of Law
            by Giving Regulatory Authority to the Board, Which Is
            Composed of Self-interested Individuals with a Financial
            Stake in Their Own Regulations. .................................................. 29

            1.    The Act deprives the Members and Yona of liberty
                  and property without due process of law .......................... 31

      C.    The Act Is Preempted by the Supremacy Clause and the
            Sherman Act Because It Requires Market Participants to
            Collude over Wages, Hours, and Other Subjects of
            Competition in Labor Markets. ..................................................... 36

            1.    The Board requires private market participants to fix
                  wages and training standards across an entire
                  industry. ............................................................................. 36

            2.    The *Parker* exception does not apply because the
                  state does not actively supervise the Board's
                  anticompetitive activities. ................................................. 38

D.    The Act Conflicts with NLRA's Comprehensive and Uniform System for Regulating Labor Relations and Is Therefore Preempted. ................................................. 43

    1.    *Garmon* preemption applies. ............................................. 43

    2.    *Machinists* preemption applies. ......................................... 48

II.    ABSENT INJUNCTIVE RELIEF, PLAINTIFFS WILL SUFFER IRREPARABLE HARM. ........................................................... 50

    A.    The Act and Board Infringe on the Members' and Yona's Constitutional Rights. ................................................. 50

    B.    The Members and Yona Have no Adequate Legal Remedy Because Defendants Enjoy Sovereign Immunity from Paying Compensatory Damages. ................................. 51

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH TOWARDS PLAINTIFFS. ...................................... 52

CONCLUSION .............................................................. 53

## INTRODUCTION

Minnesota's nursing homes and their business partners share a common mission: putting residents and caregivers at the center of care. Yet the Minnesota Nursing Home Workforce Standards Act (the "Act") and its creation, the Minnesota Nursing Home Workforce Standards Board (the "Board"), elevate private interests over resident care and the United States Constitution. The Act: (1) violates the First Amendment's guarantee on freedom of association; (2) violates the Due Process Clause by delegating regulatory power to self-interested private actors; and (3) is preempted by the Sherman Antitrust Act ("Sherman Act") and National Labor Relations Act ("NLRA") under the Supremacy Clause.

The Act, through the Board, inflicts irreparable harm on nursing home providers and their business partners across Minnesota. The providers include the association members of Plaintiffs LeadingAge Minnesota ("LeadingAge") and Care Providers of Minnesota ("Care Providers"), and Yona Northstar LLC ("Yona"), who frequently transacts business with nursing home providers. LeadingAge's and Care Providers' association members are collectively, "Members." The Board, consisting of self-interested and unelected individuals, adopts statewide standards that require nursing homes and their business partners to pay increased minimum wages to their nursing home workers and retain unions to provide training to those same workers. The Board's activities

1

impose an active and continuing burden on the Members' and Yona's constitutional rights, threaten to financially harm nursing homes, and erode resident care.

Those injuries are concrete, severe, and irreparable. This Court should therefore grant preliminary injunctive relief to the Members and Yona. Only preliminary relief can stop enforcement of the unlawful Act and relieve the Members' and Yona's constitutional injuries.

## BACKGROUND

### I.    ABOUT THE PLAINTIFFS.

#### A.    LeadingAge and Care Providers Are Trade Associations Representing Nursing Homes Across Minnesota.

LeadingAge and Care Providers are non-profits organized under Minnesota law, and they each maintain their principal place of business in this state. (Compl. ¶¶ 16–17.) LeadingAge and Care Providers each have numerous member organizations. (*Id.*) The Members provide services along the full spectrum of post-acute care and long-term services and support, including what are commonly referred to as "nursing homes." (*Id.*); Minn. Stat. § 181.211, subd. 7.

LeadingAge and Care Providers have identical policy objectives: educating the Members on industry and legal developments, providing tools and resources to the Members so that they may provide high-quality,

compassionate care to senior citizens, and taking reasonable steps to ensure that the Members are not subject to laws that violate the U.S. Constitution. (Compl. ¶¶ 16–17.) Where necessary, LeadingAge and Care Providers will sue to enjoin enforcement of an unlawful law that harms the Members. (*Id.*)

### B.    Yona Transacts Business with the Members.

Yona is a business partner of the Members. (Compl. ¶ 18.) Yona frequently transacts business with healthcare, senior living, and assisted living communities in Minnesota. (*Id.*) But Yona is not, and has never been, an association member of either LeadingAge or Care Providers. (*Id.* ¶ 19.) Yona contracts with providers who provide nursing home services to Minnesota's older adult population. (*Id.* ¶ 18.) To help serve the state's older adult population, Yona employs a total of 433 employees at 51 client sites and many of its employees work at nursing home facilities in Minnesota. (*Id.*)

## II.    THE ACT'S PASSAGE AND THE BOARD'S CREATION.

Governor Walz signed the Act into law during the 2023–2024 Legislative Session. (Revnew Decl. Ex. A, at 2.) The Act created the Board and provided the Board with powers and duties similar to those of a Minnesota administrative agency. Minn. Stat. §§ 181.212, subd. 1, 181.213, subd. 1, 181.217, subd. 1 (2025). The Board is the first of its kind; no other state has a centralized nursing home workforce board with binding rulemaking authority. (Revnew Decl. Ex. X, at 1.)

3

### III.    THE BOARD'S MAKE-UP AND STATEWIDE AUTHORITY OVER NURSING HOMES.

### A.    The Board's Representatives.

The Board is structured as a tripartite entity with nine Board representatives. Minn. Stat. § 181.212, subd. 1. None of the Board representatives are elected by Minnesota's voting population. As of March 2026, those representatives are as follows:

a. *Government Representatives*

    i.    Nicole Blissenbach, the Commissioner-member from the Minnesota Department of Labor and Industry ("DOLI");

    ii.    Kim Brenne, Director of Nursing Facility Rates and Audits, Department of Human Services; and

    iii.    Maria King, Director, Health Regulation Division, Department of Health.

b. *Employer Representatives*

    i.    Paula Rocheleau, CEO, Partners Senior Living;

    ii.    Mary Swanson, Administrator, Good Samaritan Society; and

    iii.    Katie Lundmark, VP of Operations, Senior Living, Lifespark.

c. *Worker Representatives*

    i.    Jamie Gulley, President, SEIU Healthcare Minnesota and Iowa ("SEIU")[1];

    ii.    Michele Fredrickson, Staffer, United Steelworkers, AFL-CIO; and

    iii.    Michelle Armstrong, Licensed Practice Nurse at The Estates in Lynnhurst and member of Local 1189, United Food and Commercial Workers Union (affiliated with the AFL-CIO).

---

[1] AFL-CIO is SEIU's affiliate partner. (Revnew Decl. Ex. U.)

4

(Revnew Decl. Ex. B.)

Though the Board's private members are styled as representatives, they are not chosen by the people they represent. There is no election or even an informal poll. No evidence exists showing that any Board representative went through the advice and consent process before the Minnesota Senate. (Revnew Decl. Exs. Y *and* Z.) Governor Walz appointed the employer and worker members; the government members are set by the Act. Minn. Stat. § 181.212, subd. 1(a)(1)–(5).

The Board meets monthly to discuss any matter relating to the Act and the Board's administrative regulations, and to vote on the Board's desired actions. (Revnew Decl. Ex. R.) Gulley, who is the President of SEIU, has historically advocated for the exact standards the Board now has implemented. Gulley earlier told MINNPOST that SEIU was "the driving advocacy group for the standards board to exist." (Revnew Decl. Ex. M, at 3.) Gulley is the Board's chairperson and was reelected on September 11, 2025 for a two-year term. (Revnew Decl. Ex. D, at 2.)

Under the Board's Bylaws, Gulley's role as the Board's chairperson gives him additional powers. (Revnew Decl. Ex. V.) Gulley may call a special or emergency meeting of the Board, approve agenda items, be delegated by the Board to appoint committees, and conduct the first pass review of any amendment to the Bylaws. (*See generally id.*) Gulley has also been part of a

5

majority block of worker representatives, which includes Fredrickson and Armstrong. This block has authored and introduced each of the Board's substantive standards. The block has also prevailed in every vote taken in the Board's history, with Gulley largely being on the winning side. (*See, e.g.*, Revnew Decl. Ex. FF, at 2) (stating that Gulley introduced successful motion to amend Board's holiday pay rule); (Revnew Decl. Ex. GG, at 2) (stating that Gulley presented initial set of "union" proposals on minimum wages for nursing home workers).

**B.    The Board Has Statewide Regulatory Authority Over Nursing Homes.**

The Board may take any action with a majority vote of its representatives—*i.e.*, five of nine members. Minn. Stat. § 181.212, subd. 7. At least two members representing the Minnesota government must vote in favor. *Id*.

The Board's statutory charge is to adopt statewide employment standards that are "reasonably necessary and appropriate to protect the health and welfare of nursing home workers[.]" Minn. Stat. § 181.213, subd. 1(a). The Board's standards concern not only the minimum wages that nursing homes must pay their workers, but also mandatory training requirements. *Id*. subd. 1(b), subd. 2, § 181.214, subds. 1–2.

6

The Board's employment standards, once published via a notice of adoption in the Minnesota State Register, have the full force and effect of an administrative regulation issued by any Minnesota state agency. Minn. Stat. § 181.217, subd. 1; Minn. Admin. R. 5200.2000–2090.

## C.    The Board Exercises Its Power to Raise Minimum Wages.

### 1.    The minimum wage for nursing home workers.

On May 9, 2024, Armstrong—one of worker representatives on the Board—moved to approve the draft "Minimum Nursing Home Wage Standards," which was the *original* iteration of what later became the Wage Standards (defined below). (Revnew Decl. Ex. N, at 2 *and* Ex. P.) This proposal originated with the members representing "employees," all of whom are associated with labor unions. (*See* Revnew Decl. Ex. AA) (discussing original "union" proposals for minimum wages). The motion passed with six affirmative votes, three abstentions. (Revnew Decl. Ex. N, at 2.) Blissenbach, Gulley, Fredrickson, and Armstrong voted with the majority. (*Id*.) The minimum wages for general nursing home workers, certified nursing assistants, trained medication aides, and licensed practical nurses in the original iteration were identical to what the Board later adopted. (*Compare* Revnew Decl. Ex. P, at 1–2 *with* Minn. R. Admin. 5200.2080 and .2090).

Then, on June 13, 2024, the Board voted to approve a revised minimum-wage standard. (Revnew Decl. Ex. O, at 2 *and* Ex. Q.) Blissenbach, Gulley,

Fredrickson, and Armstrong voted to approve the revised minimum-wage standard. (Revnew Decl. Ex. O, at 2.)

The revised minimum wage standard later became the "Proposed Expedited Permanent Rules Establishing Minimum Nursing Home Wage Standards; Notice of Intent to Adopt Expedited Permanent Rules Without A Public Hearing" (*i.e.*, the "Wage Standards"), which the Board issued on June 24, 2024. 48 SR 1148–50 (June 24, 2024); (Revnew Decl. Ex. E.) Then, on or around October 28, 2024, following a public comment period, the State Register published the Board's notice that it had adopted the Wage Standards as originally written. 49 SR 443 (Oct. 28, 2024); (Revnew Decl. Ex. F.) Minn. Admin. R. 5200.2060–2090. The Wage Standards are applicable statewide. Minn. R. Admin. 5200.2070, subp. 1. The Wage Standards set the minimum wages for general "nursing home workers" (*see* Minn. Stat. § 181.211, subd. 9), licensed practical nurses, certified nursing assistants, and trained medication aides *higher* than what nursing homes in Minnesota would pay if given the choice. (Benham Decl. ¶ 6; Carley Decl. ¶ 6; Hill Decl. ¶ 8; Struzyk Decl. ¶ 6; Wraalstad Decl. ¶ 10.)

Thirty days after the Centers for Medicare & Medicaid (CMS) approves the reimbursement rate increase paid to nursing homes to implement the minimum wages, the Wage Standards take effect and set the 2026 minimum wage for all covered nursing home workers at $19.00 per hour. Minn. R. Admin.

5200.2070, subp. 3, .2080; (Revnew Decl. Ex. G, at 1.) As of the filing of this lawsuit, CMS has not approved the increased reimbursement rate. (Revnew Decl. Ex. H.) Beginning on January 1, 2027, nursing homes must pay all their covered nursing home workers a minimum wage of $20.50 per hour. Minn. R. Admin. 5200.2080.

Additionally, the Wage Standards require that nursing homes pay individuals in certain occupations a starting minimum wage in 2026, and January 1, 2027, as follows:

| Role | 2026 – These standards will go into effect 30 days after CMS's approval | January 1, 2027 |
|---|---|---|
| Certified Nursing Assistants | $22.50 per hour | $24.00 per hour |
| Trained Medication Aides | $23.50 per hour | $25.00 per hour |
| Licensed Practical Nurses | $27.00 per hour | $28.50 per hour |

Minn. R. Admin. 5200.2090.

### 2. The interplay between the Wage Standards and CMS's approval of an increased reimbursement rate.

CMS approving increased reimbursement rates relating to the 2026 minimum wage is not optional. The Minnesota Medicaid program receives significant funding from the federal government, and so, CMS must approve any increases to the reimbursement rate the state intends to pay. *See* Minn. Stat. §256B.04, subd. 4 and 24; § 256R.03, subd. 1; Minn. R. Admin. 5200.2070.

subp. 2(B), subp. 3. Minnesota allocates Medicaid funding to nursing facilities through a statutory rate structure established by the Minnesota Department of Human Services (Minnesota's designated CMS agency) that uses allowable costs from a cost report with a year ending 15 months prior to the January 1 rate year to calculate a total reimbursement rate. Minn. Stat. §§ 256R.01, subd. 1–2, 256R.02, subd. 41 and 44, 256R.21–.26. Several categories feed into the total reimbursement rate, including "direct care costs," "other care-related costs," and "other operating costs." Minn. Stat. §§ 256R.02, subd. 17 and 34-36, 256R.21, subd. 2(1)–(2). Direct care costs include, "costs for the wages of . . . *licensed practical nurses*, *certified nursing assistants*, *trained medication aides*[.]" Minn. Stat. § 256R.02, subd. 17 (emphasis added). The increased wages of licensed practical nurses, certified nursing assistants, and trained medication aides constitute direct care costs that factor into the total reimbursement rate calculation. Minn. Stat. § 256R.21, subd. 2(1). Other care costs include "the costs for the salaries and wages and associated fringe benefits and payroll taxes of mental health workers, religious personnel, and other direct care employees not specified in the definition of direct care costs." Minn. Stat. § 256R.02, subd. 35. "Other direct care costs" is part of "other care-related costs." *Id*. subd. 34. "Other operating costs" includes wages and benefits for "administrative costs, dietary costs, housekeeping costs, laundry costs, and maintenance and plant operation costs." The wages classified under direct

care, other care-related, and other operating are included a nursing facility's operating rate. The total payment rate is comprised of the operating rate, the external fixed rate, and property rate.  Minn. Stat. § 256R.21.

### D.    Mandatory Training.

The Act also empowers the Board to "certify worker organizations that it finds are qualified to provide training to nursing home workers[.]" Minn. Stat. § 181.214, subd. 1. In July 2025, the Board certified three worker organizations: (1) AFL-CIO; (2) SEIU; and (3) AFSCME Council 65—all unions. (Revnew Decl. Ex. W, at 2.) SEIU and the AFL-CIO are also represented on the Board. (Compl. ¶ 29.)[2] AFSCME Council 65 is another union who openly lobbied for the Act and the Board's creation, who has now become one of the certified worker organizations. (*Compare* Revnew Decl. Ex. I *with* Ex. M, at 3.)

The Board must also establish a training curriculum. Minn. Stat. § 181.214, subd. 2(a). The Board's current curriculum consists of eight parts. *Id*. subd. 2(a)(1)–(8). By 2027, nursing homes must submit written

---

[2] Representative Esther Agbaje, one the legislators who voted for the Act, responded "A little bit of both," when asked whether the Act "was meant more to improve the labor conditions of nursing home workers, or simply increase the number of unionized facilities." (Revnew Decl. Ex. M, at 3.)

documentation to the Board that covered workers who have been employed for at least two years have completed at least one hour's worth of Act-compliant training. *Id*. subd. 6; (Revnew Decl. Ex. J, at 10.) Nursing homes must further compensate their covered workers at their regular hourly rate of wages and benefits for each hour of training completed, as required by the Act. Minn. Stat. § 181.214, subd. 7. If the training is hosted not on the nursing homes' premises, nursing homes must also reimburse their covered workers for reasonable travel expenses. *Id*.

### E. The Board's Actions Trigger Limited Legislative Oversight Only When They Affect the State's Budget.

The Act, as currently written, has a minimal check on the Board's authority. The limited check: the appropriations process through the Minnesota legislature. Minnesota allocates Medicaid funding to nursing facilities through a statutory rate structure established by the Minnesota Department of Human Services that uses allowable costs from a cost report with a year ending 15-months prior to the January 1 rate year to calculate a total reimbursement rate. Minn. Stat. § 256R.01, subd. 1–2, § 256R.02, subd. 41 and 44, §256R.21–.26. The legislature determines the total cost to Medicaid and deducts the amount to be matched by the Federal government. The Federal Medical Assistance Percentage (FMAP) for Minnesota during federal fiscal year 2027 is 51.36%. While the federal government funds about half of

any increase to the Medicaid reimbursement rate, Minnesota pays the non-federal share. Minn. Stat. §§ 256B *et seq.*; 42 U.S.C. § 1396(a)(2). The Minnesota legislature must approve funding to cover the non-federal share. The legislature's check on the Board's power thus only triggers if the Board's standards require a corresponding increase in state appropriations sufficient to cover any increase in the Medicaid reimbursement rate. Minn. Stat. § 181.213, subd. 2a(b)(2), subd. 2b(b).

The appropriations process is why, in June 2025, the Minnesota legislature passed a funding bill that specifically apportioned state funds to cover the increased reimbursement rate due to the Wage Standards. Minn. Stat. § 256R.495; (*see also* Revnew Decl. Ex. T.) In other words, the Board passing the Wage Standards triggered legislative oversight because it required additional appropriations. But the Board's actions as to any training requirements would not trigger legislative oversight, because the Board's actions do not impact the reimbursement rate. Nor would any other standard without fiscal impacts require approval, oversight, or even review.

## F.    Harm to the Members and Yona.

The Members and Yona have already modified, or will modify, their business operations to comply with the Act and the Board's standards. (Compl. ¶¶ 55–62.) The Members have suffered and will continue to suffer irreparable harm.

### 1.    The Wage Standards injure the Members and Yona.

### a.    The financial impact.

Before the Wage Standards went into effect, the nursing home industry already experienced major financial challenges. Nursing homes routinely operate at a loss. (Wraalstad Decl. ¶ 16.) For one nursing home, its financial situation became so dire that it advocated for a carveout that would allow part of its nursing home to be reclassified as a "Critical Access Hospital," so that the nursing home could access an additional $800,000.00 in federal reimbursement. (*Id.* ¶ 24.)

The Members and Yona[3] now must modify how they pay their workers covered by the Wage Standards and how they increase the covered workers' wages—*i.e.*, going from merit-based increases or cost-of-living-adjustments to increases set by law.[4] (Benham Decl. ¶ 6; Carley Decl. ¶ 6; Hill Decl. ¶ 8; Struzyk Decl. ¶ 6; Wraalstad Decl. ¶ 10.) One estimate puts the cost of compliance with the Wage Standards for an individual Member at over $500,000.00. (Benham Decl. ¶ 10.)

---

[3] Because Yona is a business partner of the Members, it suffers some unique harm because of the Act and Board's standards. (Compl. ¶ 58); (Hill Decl. ¶ 8.)
[4] The Members and Yona not complying with the Act or the Board's standards triggers enforcement actions by Blissenbach, or private civil suits by the aggrieved worker. *See generally* Minn. Stat. § 181.217.

14

To try to offset the increased minimum wages imposed by the Wage Standards, within the last six months, the Members have:

- Reduced planned future wage increases. (Carley Decl. ¶ 9(a).)

- Implemented wage compression, which leads to long-term workers receiving lower wage increases over time. (Benham Decl. ¶ 9; Carley Decl. ¶ 9(b); Hill Decl. ¶ 12; Struzyk Decl. ¶ 11; Wraalstad Decl. ¶ 15.)

- Paid out increased wages to covered nursing home workers, despite not being able to recover the increased amount through federal and state-funded reimbursement programs, including Medicaid. (Carley Decl. ¶ 9(c).)

- Expended resources to apply for the temporary rate supplement authorized by the Minnesota Legislature which attempts to offset the higher labor costs associated with the Wage Standards. (Wraalstad Decl. ¶ 17; Struzyk Decl. ¶ 13.)

- Issued an increased tax levy for 2026 to cover the increased costs of compliance. (Wraalstad Decl. Ex. 1.)

- Hired administrative staff to assist with the process of complying with the Wage Standards. (Benham Decl. ¶ 8(c).)

- Delayed or cancelled capital improvements relating to facilities for housing residents and quality-of-life improvements. (Benham Decl. ¶¶ 8(a)–(b); Struzyk Decl. ¶¶ 9(a), 10(c)–(d).)

- Reduced new admissions. (Struzyk Decl. ¶ 10(a).)

- Developed plans to reduce staff-to-resident ratios, which reduces on average the hours spent by staff on resident care. (*Id*. ¶ 10(b).)

To ensure their continued existence, the Members and Yona must implement or at least consider:

- Decreasing staff-to-resident ratios, meaning one staff member is responsible for a higher number of residents. (Carley Decl. ¶ 10(a).)

15

- Further delaying or cancelling capital improvements for housing residents or other investments that improve residents' quality of life. (Carley Decl. ¶ 10(b), (d).)

- Cancelling plans to hire new, non-nursing-home-worker support staff. (Carley Decl. ¶ 10(c).)

- Reducing other forms of incentive pay currently offered to workers, such as bonuses for working additional shifts or shift differential pay offered for working certain hours. (Carley Decl. ¶ 10(f).)

- Reducing the employer-paid portion of benefit programs offered to workers. (Carley Decl. ¶ 10(g).)

- Limiting new admissions into the nursing home. (Benham Decl. ¶ 7.)

- Limiting or shutting down operations, which undoubtedly harms residents. (Hill Decl. ¶ 10; Wraalstad Decl. ¶¶ 12–13.)

Moreover, the Medicaid reimbursement from the state or federal government does not rectify the irreparable harm created by compliance with the Wage Standards. Even without the mandatory increases to the minimum wage, the Medicaid reimbursement rate already fails to fully reimburse the Members for their operating costs. (Benham Decl. ¶ 12(b)–(c); Carley Decl. ¶ 12(b)–(c); Struzyk Decl. ¶ 12 (b); Wraalstad Decl. ¶ 16(b)–(c).) Compliance with the Wage Standards will only increase this existing gap. (Benham Decl. ¶ 12(c); Carley Decl. ¶ 12(c); Wraalstad Decl. ¶ 16(d)–(e).)

### 2. The impact of the training requirements.

The Members and Yona must allow one of three certified worker organizations (*i.e.*, unions) to train their nursing home workers. Minn. Stat.

§ 181.214, subds. 1 *and* 6. Compliance with the training requirements relating to covered workers impose financial and operational burdens on the Members and Yona because they must:

- Pay workers for their time spent in training. (Benham Decl. ¶ 17(a); Carley Decl. ¶ 17(a); Hill. Decl. ¶ 17(a); Struzyk Decl. ¶ 18(a); Wraalstad Decl. ¶ 21(a).)

- Either provide a training site on premises or pay for the workers' expenses associated with offsite training. (Benham Decl. ¶ 17(b); Carley Decl. ¶ 17(b); Hill Decl. ¶ 17(b); Struzyk Decl. ¶ 18(b); Wraalstad Decl. ¶ 21(b).)

- Arrange for coverage in their nursing home facilities while workers are receiving training. (Benham Decl. ¶ 17(c); Carley Decl. ¶ 17(c); Hill Decl. ¶ 17(c); Struzyk Decl. ¶ 18(c); Wraalstad Decl. ¶ 21(c).)

- Pay administrative personnel to maintain records of training, track which workers have received the training, and provide required records to the Board and the worker organization providing the training. (Benham Decl. ¶ 17(d); Carley Decl. ¶ 17(d); Hill Decl. ¶ 17(d); Struzyk Decl. ¶ 18(c); Wraalstad Decl. ¶ 21(d).)

The cost of compliance can range from around $1,175.00 to $110,000.00. (Benham Decl. ¶ 18; Carley Decl. ¶ 18; Hill Decl. ¶ 18; Struzyk Decl. ¶ 19; Wraalstad Decl. ¶ 22.)

### 3.    Infringement on the collective bargaining process.

Yona and some of Members have active collective bargaining agreements ("CBAs") with various unions. (Carley Decl. ¶ 7; Hill Decl. ¶ 9; Struzyk Decl. ¶ 7; Wraalstad Decl. ¶ 11.) Those CBAs cover various employees subject to the Act. (Carley Decl. ¶ 7; Hill Decl. ¶ 9; Struzyk Decl. ¶ 7; Wraalstad Decl. ¶ 11.) The CBAs arose out of the bargaining process. (Carley Decl. ¶ 7; Hill Decl. ¶ 9;

Struzyk Decl. ¶ 7; Wraalstad Decl. ¶ 11.) The Board's standards amend those CBAs by demanding compliance with the Board's minimum wage and working condition standards. Minn. Stat. § 181.213, subd. 6(2). And the Wage Standards require that the Members and Yona pay higher minimum wages than what they bargained for in the CBAs. (Carley Decl. ¶ 7; Hill Decl. ¶ 9; Struzyk Decl. ¶ 7; Wraalstad Decl. ¶ 11.)

### 4. Burdens on constitutional rights.

The First Amendment protects a citizen's right not to associate for expressive purposes with public policies the person disagrees with. The Act forces the Members and Yona to associate with representatives on the Board they did not choose and would prefer not to associate with. (Benham Decl. ¶ 21; Carley Decl. ¶ 21; Hill Decl. ¶ 21; Struzyk Decl. ¶ 22; Wraalstad Decl. ¶ 26.) It also forces them to associate with a collective standard-setting process that they believe harms their businesses, their workers, their residents, and their communities. (*Id*.) They do not want to associate themselves with that process and would disassociate with it if given the choice. (*Id*.) The Act, however, forces them to accept representation in the process and therefore to associate with public policies they oppose. (*Id*.)

Likewise, the Act denies the Members and Yona due process of law. As explained below, due process guarantees, among other things, a neutral decisionmaker. It guarantees that a person will not be subject to state power

wielded by a self-interested regulator. The Act denies the Members and Yona that right. The Act places state power in the hands of self-interested Board representatives who can exercise—and have exercised—that power to benefit themselves. The Act therefore deprives the Members and Yona of property and liberty without due process of law. *See, e.g.*, *State of Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121–22 (1928) (striking down zoning ordinance that allowed construction of certain facilities only with consent or neighboring property owners); *Eubank v. City of Richmond*, 226 U.S. 137, 143 (1912) (striking down city ordinance that allowed property owners to regulate set-off requirements for their neighbors' lots).

These injuries are ongoing and irreparable. Every day that passes represents a new injury to the Members' and Yona's constitutional rights. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025) (same); *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (same).

## STANDARD OF REVIEW

A preliminary injunction lasts until a trial on the merits can be held. *Heartland Academy Comm. Church v. Waddle*, 335 F.3d 684, 691 (8th Cir. 2003). The driving force of a preliminary injunction: preserve the status quo.

*West Plains, L.L.C. v. Retzlaff Grain Company Inc.*, 870 F.3d 774, 785 (8th Cir. 2017). The status quo is "the last peaceable uncontested status preceding the present controversy[.]" *Mastrio v. Sebelius*, 768 F.3d 116, 121 (2d Cir. 2014) (per curiam).

The period before the Act and Board existed was the last moment of peace, because all irreparable harm to the Members and Yona stems from their creation.

In deciding whether to grant a preliminary injunctive relief to Plaintiffs, the Court weighs the following factors:

(1)     Whether Plaintiffs are likely to succeed on the merits of their claims;

(2)     Whether Plaintiffs are likely to suffer irreparable harm absent injunctive relief;

(3)     Whether the balance of equities tips in favor of Plaintiffs; and

(4)     Whether the injunction furthers public interest.

*Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

The Act qualifies as a "duly enacted" state law. Accordingly, Plaintiffs must first make a threshold showing they are likely to succeed on the merits. *Planned Parenthood Minnesota v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (en banc). The Court then considers the remaining *Dataphase* factors. *Id.* at 732 (citation omitted). Because Defendants are government entities who

presumably will oppose injunctive relief, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[5]

## ARGUMENT

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON EACH OF THEIR CLAIMS.

Plaintiffs are likely to succeed on the merits of their claims. The Act is unconstitutional for four reasons. Each of these reasons alone would be sufficient to render the Act invalid.

***First***, the Act violates the First Amendment. The First Amendment gives every person the right to refuse to engage in "expressive" association. The Board's structure forces nursing home workers and employers into a representative relationship with the Board's representatives, and they bargain over public policy. The Board's structure therefore forces the Members and Yona to associate with representatives and policies with which they disagree, thus violating the First Amendment.

***Second***, the Act violates the Due Process Clause of the Fourteenth Amendment. The Due Process Clause guarantees, among other things, that a

---

[5] The Court should exercise its discretion and waive any security requirement because Defendants cannot show how the Court granting injunctive relief causes them monetary harm. FED. R. CIV. P. 65(c); *Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016).

person may not be deprived of liberty or property without the benefit of a disinterested decisionmaker. The Act delegates regulatory power to the Board, and the union representatives have dominated the Board's actions. The union representatives are not disinterested: they have a direct financial interest in the Board's activities, including its power to certify worker organizations to delivery mandatory training. The union representatives have used this power to impose regulatory burdens on the Members and Yona. By giving the union representatives this power, the Act violates the Due Process Clause of the Fourteenth Amendment. *See Roberge*, 278 U.S. at 121–22; *Eubank*, 226 U.S. at 143.

**Third**, the Act is preempted under the Sherman Act and the Supremacy Clause. The Sherman Act forbids competitors from, among other things, colluding over wages, hours, and other working conditions. Yet the Act authorizes the Board, composed of competing private actors and dominated by union representatives, to agree on fixed wages, training requirements, and other uniform labor standards. In effect, the Act cartelizes the nursing home labor market. And because the state does not actively supervise the Board's anticompetitive activities, the state-action exception to anticompetitive activities does not apply. *See N. Carolina State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 506, 515–16 (2015); *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 638 (1992) ("Where prices or rates are set as an initial matter by private

parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or rate setting scheme.").

**Fourth**, the Act is preempted by the NLRA and the Supremacy Clause. The NLRA creates a comprehensive, uniform system for regulating labor relations, including worker representation and collective bargaining. Because the NLRA is comprehensive, it prevents states from establishing alternative or parallel regulatory schemes. The Board creates a parallel scheme under which workers and employers are represented on an industry board and bargain over subjects already regulated by the NLRA. This scheme lacks essential safeguards built into the NLRA's structure, including organizing campaigns, secret-ballot elections, and the right to bargain to impasse. By overriding these safeguards, the Act not only conflicts with exclusive federal policy, but also erodes the bargaining process designed by Congress. It is therefore preempted.

### A. The Act Violates the First Amendment by Forcing the Members and Yona to Associate with Representatives and Public Policies with Which They Disagree.

#### 1. Forced association violates the First Amendment.

The First Amendment protects not only the freedom to speak, but also the freedom not to speak. *Nat'l Inst. of Fam. & Life Advocs. (NIFLA) v. Becerra*,

585 U.S. 755, 766 (2018); *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475 U.S. 1, 13–14, 16 (1986). No person can be forced to endorse a view he or she disagrees with. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988). And for the same reason, no person can be forced to associate herself with a group when the act of association would convey a message. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 916 (2018) ("Freedom of association . . . plainly presupposes a freedom not to associate." (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984))).

That is, if group membership is "expressive"—*i.e.*, a group that expresses ideas or engages in advocacy relating to public policy—then forced group membership is as much a First Amendment injury as forced speech. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Jaycees*, 468 U.S. at 636–38 (O'Connor, J., concurring).

That principle has been extended to unions. In *Janus*, the Supreme Court held that a person could not be forced to pay a public-sector union's dues. 585 U.S. at 916. The Supreme Court reasoned that the dues went toward the union's bargaining costs. *Id*. at 887. And in the public sector, union bargaining is tied up in public policy: bargaining affects public budgets and the allocation of scarce public resources. *Id*. at 912–14. So in the public sector, bargaining is inherently political. *See id*. at 914 (noting that even union handling of grievances can affect state budgets and therefore implicates public policy). And

24

no person can be forced to pay for political speech. *See id.* at 891–92 (collecting cases).

The Supreme Court also recognized that forced representation violates the First Amendment. *Id.* at 892. The Supreme Court noted that public sector unions typically have an exclusive right to bargain for their union members. *Id.* at 898. The members cannot bargain for themselves; they must accept the union's representation whether they want it or not. This kind of representation, the Supreme Court recognized, was a form of association. And forced association was a "burden" on First Amendment rights. *See id.* at 916 (describing exclusive representation as "a significant impingement on associational freedoms that would not be tolerated in other contexts").

Under those principles, the Act violates the Members' First Amendment rights. The Act imposes representatives on all nursing home employers and workers in Minnesota. Employers and workers have no say over who these members are or what they do. Nor do employers or workers have the choice to opt out. They are represented whether they want to be or not. *See* Minn. Stat. § 181.212, subd. 1 (providing for appointment of representatives by governor with no provision for involvement by the people represented).

This representation is a form of association even though the represented workers and employers have no choice. In *Janus*, the Supreme Court recognized that exclusive representation for collective bargaining is a form of

25

association. *See* 585 U.S. at 916. In exclusive representation systems, some workers are by definition forced to accept representation that they did not choose. The exclusive representative speaks for all workers in a bargaining unit, even for workers who voted against the representative or did not vote at all. *See Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 200 (1944) ("The minority members of a craft are thus deprived by the statute of the right, which they would otherwise possess, to choose a representative of their own, and its members cannot bargain individually on behalf of themselves as to matters which are properly the subject of collective bargaining."); *Emporium Capwell Co. v. W. Addition Cmty. Org.*, 420 U.S. 50, 68–69 (1975) (recognizing same point under NLRA). So too here—the Board's representatives speak for all nursing home workers and employers regardless of the workers' or employers' desires. *See* Minn. Stat. § 181.212, subd. 1. That kind of representation, even though mandatory, is a form of association cognizable under the First Amendment. *See Janus*, 585 U.S. at 916 (recognizing exclusive representation for collective bargaining as a burden on associational rights that would not be tolerated in other contexts).

This representation is also expressive. It involves developing uniform minimum standards for the entire nursing home industry. *See* Minn. Stat. § 181.213, subd. 1. Those standards take the form of regulations and are therefore by definition public policy. They also directly implicate public

26

finances, as any fiscal impact is borne in part by the state itself. *See* Minn. Stat. § 181.213, subd. 2a (incorporating rate adjustments under Minn. Stat. § 265R.495). These same connections to public policy led the Supreme Court in *Janus* to conclude that public-sector collective bargaining was expressive. *See* 585 U.S. at 907–08 (pointing to effect of bargaining on public finances as evidence of its expressive character). That logic applies here.

### 2. The *Knight* exception does not apply because the Act imposes representation on private operations.

Defendants cannot defend the Act under the exception articulated in *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984). In *Knight*, the Supreme Court upheld a consultation scheme for public universities. *See id.* at 273–75 (describing scheme under Minn. Stat. §§ 179.61 *et seq.* (1982)). The state created a scheme to solicit feedback about policy issues in public universities. To facilitate consultation, the state appointed a single representative to voice concerns on behalf of the faculty. *Id.* at 280–81. That decision, the Supreme Court reasoned, did not burden any faculty member's First Amendment rights because no faculty member had a right to consult with the state in the first place. The state had chosen voluntarily to solicit feedback; and having made that choice, it could also choose which voices to listen to. *See id.* at 285.

That logic is inapposite here. Under the Act, Minnesota has not simply chosen its own bargaining partner. The Act imposes representatives on private people to negotiate over the minimum terms and conditions in their own workplaces. The Board set standards for all nursing homes in the state, including purely private operations. *See* Minn. Stat. § 181.213, subd. 1(a). Left to their own devices, these operations would set their terms and conditions through private negotiation; they would speak for themselves. (Benham Decl. ¶ 21; Carley Decl. ¶ 21; Hill Decl. ¶ 21; Struzyk Decl. ¶ 22; Wraalstad Decl. ¶ 26.) But the Act eliminates that option, moves standard-setting to the Board, and imposes Board representatives on private persons. Accordingly, *Knight*'s logic cannot save the Act from First Amendment scrutiny.

### 3.    The Court should apply exacting scrutiny to strike down the Act and Board's structure.

Because the Act imposes expressive association on the Members and Yona, the Court must apply *Janus's* "exacting scrutiny" standard. 585 U.S. at 916. Exacting scrutiny "is just short of strict scrutiny," and requires a substantial relationship between the Act forcing the Board's representation and a sufficiently important government interest. *Dakotans for Health v. Noem*, 52 F.4th 381, 389 (8th Cir. 2022) (citations omitted). The strength of the governmental interest "must reflect the seriousness of the actual burden on First Amendment rights." *Doe v. Reed*, 561 U.S. 186, 196 (2010). The

government action must be narrowly tailored to the government's asserted interest. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021).

The state cannot advance a single "sufficiently important governmental interest" that justifies forced representation by the Board. *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 875–77 (8th Cir. 2012) (applying exacting scrutiny and ordering a preliminary injunction because the state could not advance any relevant correlation between its identified interests and the burden on speech). And the state had less burdensome means available: passing traditional legislation that mandated increased wages for nursing home workers. *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 204–205 (1999) (striking down Colorado's petition-circulator law under exacting scrutiny because the state had less problematic means to achieve its asserted interest). Accordingly, applying exacting scrutiny, the Court should rule that the Plaintiffs are likely to succeed in showing that forced representation by the Board violates the First Amendment's guarantee on the freedom of association.

### B.   The Act Denies the Members and Yona Due Process of Law by Giving Regulatory Authority to the Board, Which Is Composed of Self-interested Individuals with a Financial Stake in Their Own Regulations.

Under the Due Process Clause of the Fourteenth Amendment, no person can be deprived of life, liberty, or property without due process of law. U.S.

Const. amend. XIV. Due process requires, among other things, a neutral decisionmaker: any person who uses government power must be disinterested in the matter to be decided. *See, e.g., Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016); *Tumey v. Ohio*, 273 U.S. 510, 531, 534 (1927); *Calder v. Bull*, 3 U.S. 386, 388 (1798) (describing "law that makes a man a Judge in his own cause" as contrary to due process). If the person has a direct interest in the matter—especially a financial interest—he or she cannot be expected to act for the public interest alone. *In re Murchison*, 349 U.S. 133, 136 (1955). So allowing such a person to decide the matter violates due process of law. *Ward v. Vill. of Monroeville*, 409 U.S. 57, 61–62 (1972) (state violated due process by assigning adjudication to decisionmaker (a mayor) with financial interest in case).

That principle applies not only to adjudication, but also to regulation. Just as a judge cannot have a financial interest in a case, a regulator cannot have a financial interest in a regulation or standard. *State of Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121–22 (1928) (striking down zoning ordinance that allowed construction of certain facilities only with consent or neighboring property owners); *Eubank v. City of Richmond*, 226 U.S. 137, 143 (1912) (striking down city ordinance that allowed property owners to regulate set-off requirements for their neighbors' lots). The regulator, no less than the judge, must use his or her authority for the public good. And the regulator cannot be expected to do that when he or she has

money at stake. *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (striking down statute allowing large coal operators and unions to collectively regulate wages and working conditions in their industry, including for their competitors); *Gen. Elec. Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1455 (2d Cir. 1991) ("[A] legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property in which other individuals have a property interest, without supplying standards to guide the private parties' discretion."); *cf. Remington Arms Co. v. G.E.M. of St. Louis, Inc.*, 102 N.W.2d 528, 533 (Minn. 1960) ("We have never understood that the legislature may enact an open-ended type of regulation which will give to a private party the arbitrary right to exercise an option to make a law operative on his own terms.").

> ### 1. The Act deprives the Members and Yona of liberty and property without due process of law.

Here Minnesota gave regulatory power to self-interested individuals who now can regulate their competitors. The Act appoints private representatives to seats on a regulatory body, where they can wield state power to advance their own financial interests and undermine the interests of their competitors. The Board's very structure violates due process.

The Board is dominated by self-interested members. Six of its nine members represent workers and employers, all of whom have a direct financial

stake in labor standards in the nursing home industry. *See* Minn. Stat. 181.212, subd. 1. Three of those members, the "worker" representatives, have close ties to labor unions that have existing CBAs with various Members and Yona. (Carley Decl. ¶ 7; Hill Decl. ¶ 9; Struzyk Decl. ¶ 7; Wraalstad Decl. ¶ 11.) These unions benefit from higher minimum wages, more generous leave provisions, and restricted access to training certifications. Higher minimum wages and more generous leave provisions help them insulate organized workplaces, where wages and benefits tend to be higher, from competition by unorganized firms.[6] And restrictive training certifications allow them to seize an effective monopoly over a now-mandatory service—rights training for nursing home workers. *See* Minn. Stat. 181.214. subd. 6 (requiring all nursing home employers to provide training by a certified worker organization).

In practice, the union-associated representatives have exercised that power to their own benefit. They have raised wages to levels comparable with unionized workplaces. *See* Minn. R. 5200.2090; (Compl. ¶ 62(a)(i).) They have

---

[6] This interrelation between union wages, competition, and public policy is well documented. Liya Palagashvili & Revana Sharfuddin, *Do More Powerful Unions Generate Better Pro-Worker Outcomes?*, GEO. MASON UNIV. MERCATUS CTR. (May 7, 2025), https://www.mercatus.org/research/working-papers/do-more-powerful-unions-generate-better-pro-worker-outcomes (last visited Mar. 8, 2026).

also certified a select group of unions to provide training—the same unions with whom they are associated. At least one of the certified worker organizations (a union), in turn, have told providers that it will offer training only if they represent the workers to be trained. (Compl. ¶ 62(b)(i).) In other words, they have leveraged their status as certified trainers as an organizing tool. And the Members and Yona, who must coordinate the delivery of the training, have no choice but to accede to whatever concessions these unions demand in exchange for providing the training—which, again, nursing-home employers are required by law to obtain.

These flaws in the Board's structure and internal incentives closely resemble those condemned in *Ass'n of American Railroads v. U.S. Department of Transportation*, 821 F.3d 19 (D.C. Cir. 2016). In *American Railroads*, the D.C. Circuit considered a challenge to regulatory power given to Amtrak, a for-profit entity that operated in the railroad industry. *Id*. at 23. Amtrak had been given legal authority to regulate its competitors, including the power to give track priority to its own trains. The D.C. Circuit ruled that this power violated due process because Amtrak was a self-interested entity that had rulemaking authority over its competitors. *Id*. at 27, 31. It did not matter, the court explained, that Amtrak was a quasi-public entity: due process required a disinterested decisionmaker regardless of the decisionmaker's public or private status. *See id*. at 32.

33

So too here. Like Amtrak, the Board is self-interested in two ways. First, it is dominated by self-interested worker representatives, who represent various unions. Those unions benefit from standards allowing them to be certified to provide training. Again, they benefit from both costly minimum standards and restrictive training certifications. Their interests are as obvious as Amtrak's, if not more so. And in practice, they have controlled the Board's functions: they have both originated its substantive policies and won every contested vote.

Second, the employer representatives have similar interests. While higher minimum standards increase labor costs, they also homogenize those costs. Because every employer must pay the same (high) wage, wages become more uniform. And because wages are uniform, they are not a subject of competition.[7] In other words, the self-interested employer representatives on the Board can regulate what their competitors pay in wages. The same is also true of working conditions more broadly. Scheduling, training, and even

---

[7]    Cynthia    Estlund,    *Why    Sectoral    Co-Regulation?*,    ONLABOR, https://onlabor.org/part-ii-why-sectoral-co-regulation/ (May 22, 2024) (last visited Mar. 8, 2026).

physical working conditions become homogenized.[8] They are taken out of competition, which relieves employers of the need to change them to compete for workers.[9] In short, employers are also interested in the Board's standards, and their interests do not necessarily counteract the unions' interests. (*See* Revnew Decl. Ex. BB) (stating that employer-representatives did not oppose higher minimum wages, but instead, opposed them only if they were unaccompanied by state subsidies fully covering their costs).

Finally, the unions, nursing homes, and the Minnesota government work together to adopt metrics and standards that impact the entire nursing home industry—just like how AmTrak and the FRA in *Railroads* worked together to adopt metrics and standards that impacted the railroad industry.

Accordingly, the Court should rule that the Plaintiffs are likely to succeed in proving that the Act and its delegation of regulatory power over

---

[8] Cynthia Estlund, *Sectoral Solutions That Work: The Case for Sectoral Co-Regulation*, 98 CHI.-KENT L. REV. 539, 559 (2023).

[9] Ctr. For Labor & a Just Economy, *Building Worker Power in Cities and States – A Toolkit for State and Local Labor Policy Innovation*, HARVARD LAW SCHOOL, https://clje.law.harvard.edu/app/uploads/2024/08/2024.08.29_CLJE_Toolkit-DIGITAL_FINAL.pdf, at 18 (September 2024) (last visited Mar. 8, 2026).

competitors to self-interested people on the Board violates the Due Process

Clause of the Fourteenth Amendment.

      **C.**     **The Act Is Preempted by the Supremacy Clause and the Sherman Act Because It Requires Market Participants to Collude over Wages, Hours, and Other Subjects of Competition in Labor Markets.**

          **1.**     **The Board requires private market participants to fix wages and training standards across an entire industry.**

The Sherman Act forbids all contracts, combinations, or conspiracies to

restrain trade. 15 U.S.C. § 1. In practice, the Sherman Act forbids nearly all

agreements to limit competition, divide markets, or fix prices—in both product

markets and in labor markets. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594

U.S. 69, 88–92 (2021) (applying antitrust laws to apply to restraints on benefits

for college athletes—a market in which the harmed consumers were suppliers

of labor). Price-fixing labor is a "textbook antitrust problem because it

extinguishes the free market in which individuals can otherwise obtain fair

compensation for their work." *Alston*, 594 U.S. at 110 (Kavanaugh, J.,

concurring) (citation omitted). When competing employers agree to pay the

same wages or provide the same benefits, they violate the Sherman Act, just

like if they agreed to charge the same prices. *See, e.g.*, *Catalano, Inc. v. Target

Sales, Inc.*, 446 U.S. 643, 647 (1980) ("It has long been settled that an

agreement to fix prices is unlawful *per se*."); *Todd v. Exxon*, 275 F.3d 191, 198

(2d Cir. 2001) (wage-fixing by purchasers of labor can be per se illegal); *Law v. Nat'l Coll. Athletic Ass'n*, 134 F.3d 1010, 1017 (10th Cir. 1998) (finding that NCAA rule limiting salary of basketball coaches would ordinarily be a *per se* violation of § 1 of the Sherman Act); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d. 130, 157 (N.D.N.Y. 2010) ("Generally, price-fixing [or in this case wage-fixing] agreements are considered a *per se* violation of the Sherman Act.") (alterations in original) (internal quotations and citations omitted).

Again, a majority of Board representatives are private market participants. Three of the representatives represent employers and three represent workers, all of whom participate in the market for nursing home labor. The Act directs these representatives to collectively adopt standards relating to wages and training that allow competing employers to agree on fixed employment conditions that apply across the entire Minnesota nursing home industry. If the representatives had done the same thing on their own, they would be guilty of a per se antitrust violation. *See Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring) (describing wage fixing as a "textbook antitrust problem[.]"). That they do so through a quasi-public standard-setting process is no defense. *See City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1180 (8th Cir. 1982) (stating that anticompetitive actions are not immune simply because they are taken in accordance with state law).

2.   **The *Parker* exception does not apply because the state does not actively supervise the Board's anticompetitive activities.**

In some cases, states may displace competition with regulation, sometimes known as the "*Parker* exception." *Parker v. Brown*, 317 U.S. 341, 350–51 (1943). This exception is narrow. *See FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013); *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992). It only applies only when the anticompetitive conduct can be fairly attributed to the state itself. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 790–91 (1975). The state must show: (1) that it has articulated a clear and affirmative policy to displace competition with regulation, and (2) that the state actively supervises the anticompetitive activity. *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980). The state bears the burden of proof on both points. *Teladoc, Inc. v. Texas Medical Board*, No. 1:15-cv-343-RP, 2015 WL 8773509, at *6 (W.D. Tex. Dec. 14, 2015) ("[I]n application state action immunity has been treated as a defense to be proved by the purported state actor."). If the state fails to prove either, the *Parker* exception does not apply, and the anticompetitive activity is fully subject to federal antitrust law. *See Patrick v. Burget*, 486 U.S. 94, 101, 103 (1988) (no state-action immunity when state failed to show that state officials actively supervised anticompetitive admitting-privilege decisions by doctors); *Chamber of Com. of the U.S. of Am. v. City of Seattle*, 890 F.3d 769, 783 (9th Cir. 2018)

38

(no state-action immunity when defendants failed to show that the state had articulated a clear policy of displacing competition among rideshare drivers with collusive wage-setting through bargaining between drivers and app-based platform operators).

Here, the state cannot show that the exemption applies because it cannot meet the active supervision requirement. To meet that requirement, the state cannot simply point to the possibility of supervision. Theoretical supervision is not enough. Instead, the state must show that state officials actually review, modify, or veto anticompetitive decisions. They must get their hands dirty; they must make the anticompetitive activity the state's own. *See Ticor Title*, 504 U.S. at 638 ("Where prices or rates are set as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme.").

That kind of supervision is nowhere to be seen. Again, the Board is dominated by a block of representatives associated with private labor unions. These members have originated the Board's proposals, formulated its policies, and prevailed in every substantive vote. They have proposed and passed standards fixing wages, dictating holiday schedules, and prescribing training standards. (*See* Revnew Decl. Ex. AA) (describing original wage proposals,

dubbed "Union A" and "Union B"); Minn. R. § 5200.2090 (enacting union proposals as Board regulations). They have selected their own unions to provide mandatory training, conferring an effective monopoly on their own constituents. (Revnew Decl. Ex. I.) And they have done so with no substantive check by the state. Throughout the Board's history, the Board's state representatives have never opposed the union representatives' proposals. (*See generally* Revnew Decl. Ex. CC.) The state members have simply rubber stamped those decisions as they slid along a glidepath to the regulatory register. Some examples:

- May 9, 2024: Armstrong moved to approve the initial draft of the Wage Standards, Blissenbach seconded, and all state members with the worker-representatives voted to approve. (Revnew Decl. Ex. N, at 2.)

- June 13, 2024: Fredrickson moved to approve the revised draft of the Wage Standards, Armstrong seconded, and all state members with the worker-representatives voted to approve. (Revnew Decl. Ex. O, at 2.)

- August 8, 2024: Blissenbach moved to have the Board's proposed holiday certification and posting rules adopted as drafted and to authorize DOLI to publish the notice of intent to adopt without a hearing, Brenne seconded, and all state members with the worker-representatives voted to approve. (Revnew Decl. Ex. DD, at 2.)

- October 10, 2024: Armstrong moved to have the holiday certification and posting rules formally adopted in the register, Blissenbach seconded, and all state members with the worker-representatives voted to approve. (Revnew Decl. Ex. EE, at 3.)

That is not active supervision. Though state representatives sit on the Board, their mere presence is not enough to cloak the Board in immunity. *See*

*Teladoc*, 2015 WL 8773509, at *10 (explaining that the "mere presence of some state involvement or monitoring does not suffice"). The representatives must instead dig into the merits of these decisions, scrutinize their merits, and make them the state's own. *See SmileDirectClub, LLC v. Battle*, 969 F.3d 1134, 1143 (11th Cir. 2020) ("This is the exact sort of *potential* for active supervision—without *actual* supervision—that the Supreme Court has repeatedly held is insufficient to satisfy the active supervision requirement."), *on reh'g en banc,* 4 F.4th 1274 (11th Cir. 2021).

Nor can Defendants point to supervision by the legislature. While some Board standards take effect only when the legislature appropriates funds, that kind of reactive legislative ratification has never satisfied active-supervision requirement. *See Teladoc*, 2015 WL 8773509, at *10 (period sunset review by legislature not active supervision); *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 345 n.7 (1987) ("periodic reexamination" by legislature was not active supervision of liquor price scheme under *Midcal* test). *Cf. SmileDirectClub*, 969 F.3d at 1143 (nominal review by governor insufficient where governor failed to review and modify substance of anticompetitive decision and instead merely reviewed process through which decision was reached). If it were, no state law would ever violate the Sherman Act, because every state law can be theoretically amended by lawmakers. But even if it were enough, it would still fall short of immunizing the full range of the Board's anticompetitive activity. Legislative

41

ratification is required for only a subset of the Board's standards. It is not required for any standard that can be implemented without new state funds. *See* Minn. Stat. § 181.213, subds. 1, 2a. Nor is it required for the Board's training certifications, which the Board has used to confer legal monopolies on a handful of favored unions. (Revnew Decl. Ex. I.) The legislature has no say in those decisions, no oversight over their merits, and no involvement in the day-to-day policy decisions producing these anticompetitive effects. *Cf. Teladoc*, 2015 WL 8773509, at \*9 (sunset review by legislature insufficient when legislature did not "veto or modify any rule" adopted by defendant board members).

The *Parker* exception is narrow for a reason. It is meant to ensure that immunity extends only to anticompetitive decisions resulting from the state's own decisions. It does not extend to anticompetitive decisions like the Board's, which reflect only the preferences of a select group of private market participants. *See Bd. of Dental Examiners*, 574 U.S. at 505 ("[A]ctive market participants cannot be allowed to regulate their own markets free from antitrust accountability"); *SmileDirect*, 969 F.3d at 1140 ("When a State empowers a group of active market participants to decide who can participate in its market, and on what terms, the need for supervision is manifest."). Accordingly, Plaintiffs are likely to succeed in showing that the Sherman Act preempts the Act and Board's structure.

42

**D.    The Act Conflicts with NLRA's Comprehensive and Uniform System for Regulating Labor Relations and Is Therefore Preempted.**

The Act creates a state scheme where employers, unions, and the government bargain over the wages and working conditions of nursing home workers. This scheme intrudes on territory regulated exclusively by the NLRA. It is therefore preempted.

### 1.    *Garmon* preemption applies.

The NLRA strikes a deliberate balance in rights and responsibilities between workers, labor management, and the public. *Vance v. Ball State Univ.*, 570 U.S. 421, 434 n.7 (2013). The NLRA, not any state law, comprehensively regulates labor matters throughout the United States. *See San Diego Building Trades Council* v. *Garmon*, 359 U.S. 236, 245 (1959) (forbidding states from regulating activity that the NLRA protects, prohibits, or arguably protects or prohibits) ("*Garmon* preemption").

There need not be interference with *active* bargaining negotiations for *Garmon* preemption to apply; the state law need only conflict with what "the NLRA protects, prohibits, or arguably protects or prohibits." *See Wisconsin Dep't of Industry, Labor and Human Relations v. Gould, Inc.*, 475 U.S. 282, 286 (1986). *Garmon* "prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited

or arguably prohibited by the Act." *Id. Garmon* is intended to prevent conflict "*in* [*the*] *broadest sense*" with the "complex and interrelated federal scheme of law, remedy, and administration," and any conflict in potential remedies "can be fully as disruptive to the system Congress erected as conflict in overt policy." *Id.* (emphasis added). Where there is "potential for conflict" between "two separate remedies" on the same activity, such conflict necessarily results in preemption of the State statutory scheme. *Id.* at 289.

The Act contradicts the NLRA's policy by establishing an alternative forum for collective bargaining and worker representation. The Act appoints representatives to speak for workers and employers, then directs these representatives to develop standards for workplaces across the state. *See* Minn. Stat. §§ 181.212, subd. 1(a)(4)–(5), 181.213, subd. 1(a). In short, it creates a new system for negotiating over and dictating terms in private-sector workplaces. *See id.* But the state has no power to adopt such a system. Courts have recognized for decades that the NLRA represents the sole, comprehensive system for regulating bargaining and worker representation in covered workplaces. Congress designed that process to be exclusive. States cannot design alternative systems, nor can they undermine the NLRA's exclusivity by assigning responsibility to their own boards. *See, e.g.*, *Bethlehem Steel Co. v. N.Y. State Lab. Rels. Bd.*, 330 U.S. 767, 771–72 (1947) (state had no power to exercise jurisdiction over matters within NLRB's jurisdiction through parallel

44

state board); *Guss v. Utah Labor Relations Board*, 353 U.S. 1, 10–11 (1957) (same); *Amazon.com Servs. LLC v. N.Y. State Pub. Emp. Rels. Bd.*, No. 1:25-cv-05311, slip op. at 8–11 (E.D.N.Y. Nov. 26, 2025) (holding that New York could not transfer jurisdiction over private-sector labor relations subject to NLRB's jurisdiction to a state board) (Revnew Decl. Ex. HH); *N.L.R.B. v. California*, No. 2:25-cv-02979, slip op. at 6, 15–16 (E.D. Cal. Dec. 26, 2025) (reaching same conclusion regarding California law purporting to authorize state board to regulate worker representation and unfair labor practices); (Revnew Decl. Ex. II).

This conflict is more than a matter of jurisdiction; it is a matter of substance. The Act creates a scheme that not only supplements (improperly) the NLRA, but one that also deviates from the NLRA's carefully calibrated protections. Four deviations warrant special mention:

*First*, the NLRA requires that "employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through *representatives of their own choosing*[.]" 29 U.S.C. § 157 (emphasis added). The state cannot interfere with workers' right to choose which union represents them. *Brown v. Hotel and Rest. Employees and Bartenders Intern. Union Local 54*, 468 U.S. 491, 509–510 (1984) (explaining that employees' right to choose a "particular labor union as their collective-bargaining representative" remains valid law). The Act does not allow any nursing home

45

workers to choose a union. Governor Walz appoints "three members who represent nursing home workers or worker organizations[.]" Minn. Stat.§ 181.212, subd. 1(a)(5). Governor Walz appointed Board representatives from SEIU, AFL-CIO, and United Food and Commercial Workers Union (an affiliate of the AFL-CIO) without advice and consent from the Minnesota senate. The Act forces nursing home workers in Minnesota to accept three Walz-appointed unions as their collective bargaining representatives on the Board. *See Cannon v. Edgar*, 33 F.3d 880, 884–85 (7th Cir. 1994) (applying *Garmon* preemption and striking down an Illinois state law that constituted state intrusion into the collective bargaining process); *Bechtel Const., Inc. v. United Bhd. of Carpenters & Joiners of Am.*, 812 F.2d 1220, 1225 (9th Cir. 1987) (finding that minimum-wage law for apprentices distorted bargaining process and was therefore preempted under *Garmon*). The three unions bargain with other Board representatives on wages, training, and other conditions of employment for the entire Minnesota nursing home industry. The nursing home workers are then subject to whatever standards that their *unchosen* unions bargained for.

**Second**, the NLRA likewise provides employers with the corresponding right to choose who represents them in bargaining negotiations. *See* 28 U.S.C. § 158(b)(1)(B); *Gen. Elec. Co. v. NLRB*, 412 F.2d 512, 516–17 (2d Cir. 1969). The Act and Board's structure conflict with the employer's right to choose. The

46

Members and Yona are forced to accept the employer-representatives appointed by Governor Walz, appointed without advice and consent of the Minnesota senate. Minn. Stat. § 181.212, subd. 1(a)(4).

**Third**, the Act removes the bargaining safeguards provided by the NLRA for selecting the workers' bargaining representative. The NLRA requires that workers' bargaining representative be selected through an election. 29 U.S.C. §§ 157, 159(a); *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33, 57 (1937). Workers' choice of representation must be made by secret ballot. *See* 29 U.S.C. § 159(c)(1) ("If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof."). The Act does not allow nursing home workers to undergo any election process, much less one with secret ballots. Instead, the nursing home workers must accept representation by whichever individual Governor Walz appoints.

**Fourth**, the Act allows the Board to supplement the workers' remedies under the NLRA for an alleged grievance, which is not permissible. *Gould, Inc.*, 475 U.S. at 286–87 (recognizing that *Garmon* precludes states from enacting even supplemental remedies). Under the NLRA, the NLRB may award backpay or other "affirmative action." 29 U.S.C. § 160(c). These remedies are only equitable remedies designed to promote the public interest in labor peace. *See Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719, 728 (5th Cir. 2025); *NLRB v.*

*Starbucks Corp.*, 125 F.4th 78, 95–96 (3d Cir. 2024). By contrast, the Board's standards may be enforced through damages, including liquidated damages, as well as costs, disbursements, and attorneys' fees. *See* Minn. Stat. § 181.217, subd. 3(b). These remedies are unavailable under the NLRA. *See* 29 U.S.C. § 160(c).

### 2. *Machinists* preemption applies.

The Act and Board's structure are separately preempted under *Lodge 76, International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976) ("*Machinists* preemption"). In *Machinists*, the Supreme Court recognized that Congress intended certain conduct to be unregulated by government and left to "the free play of economic forces," and that "Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." *Id.* at 140 n.4; *see also Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008) (citation omitted). In short, *Machinists* prevents state interference with policies implicated by the structure of the NLRA. *Metro. Life Ins. v. Massachusetts*, 471 U.S. 724, 749 (1985).

The NLRA is clear that parties in the bargaining process need only bargain in good faith; they need not reach an agreement. 29 U.S.C. § 158(d). The NLRA leaves the bargaining process itself "largely to the parties." *Golden*

*State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 616–17 (1986). The NLRA "does not purport to set any time limits on negotiations or economic struggle. Instead, the [NLRA] provides a framework for the negotiations; it is concerned primarily with establishing an equitable process for determining terms and conditions of employment." *Id.* (internal quotations omitted) (citation omitted). State law cannot impose conditions on the bargaining process between the employer and workers. *Id.*; *Cannon*, 33 F.3d at 885–86.

Here the Act empowers the Board to mandate that nursing home employers provide their workers with wages and working conditions adopted by the Board, or face consequences. Minn. Stat. § 181.213, subd. 1(a), .217. The Wage Standards effectively amend all CBAs between nursing homes and unions in Minnesota and mandate that the nursing homes pay the minimum wages set by the Wage Standards, not by what the parties bargained for. Minn. Stat. § 181.213, subd. 6(2). So too with how the Act empowers the Board to amend every CBA to incorporate the Act's training requirements and to retain the Board's selected certified worker organizations. The Members and Yona with active CBAs with unions must comply with whatever requirements imposed by the Board, even if they bargained for something different. The state here has impermissibly intruded on the collective bargaining process between nursing homes and unions.

49

In conclusion, because *Garmon* and *Machinists* preemption apply, the Court should rule that Plaintiffs are likely to succeed on their NLRA preemption claim.

## II.    ABSENT INJUNCTIVE RELIEF, PLAINTIFFS WILL SUFFER IRREPARABLE HARM.

### A.    The Act and Board Infringe on the Members' and Yona's Constitutional Rights.

Irreparable harm arises when the government infringes on one's constitutional rights. *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 866–67 (8th Cir. 1977) ("Also, Planned Parenthood's showing that the ordinance interfered with the exercise of its constitutional rights and the rights of its patients supports a finding of irreparable injury."). That is especially true when the government infringes on one's First Amendment rights. *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025) (explaining that plaintiffs who show their First Amendment rights are likely to be violated generally satisfy the other preliminary injunction factors and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (internal quotations omitted) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) ("Generally, if a party shows a 'likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are . . . deemed to have been satisfied.'") (citation

50

omitted) (citing *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc)). Here Plaintiffs have shown the Act and Board infringe on Members' and Yona's constitutional rights under the Due Process Clause, First Amendment, and Supremacy Clause, thus satisfying the irreparable harm requirement.

### B.  The Members and Yona Have no Adequate Legal Remedy Because Defendants Enjoy Sovereign Immunity from Paying Compensatory Damages.

Irreparable harm also exists if the Members and Yona lack an adequate legal remedy—*i.e.*, no ability to recover monetary damages. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."). Defendants, in their capacity as government actors, enjoy sovereign immunity and the Members and Yona cannot sue them to recover compensatory damages. U.S. CONST. amend. XI; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984) ("[W]hen a plaintiff sues a state official alleging a violation of federal law, the federal court may . . . not . . . award[ ] retroactive monetary relief."); *Missouri v. Trump*, 128 F.4th 979, 996 (8th Cir. 2025) (explaining that irreparable harm exists because the plaintiff could not "recoup that financial loss through a damages award because of sovereign immunity, so this constitutes an irreparable injury."); *Dover Elevator Co. v. Ark. State*

51

*Univ.*, 64 F.3d 442, 447 (8th Cir. 1995) (noting that a state official can be sued for prospective injunctive relief but not retroactive monetary relief); *Baker v. Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (finding irreparable harm and reinstating the preliminary injunction because sovereign immunity barred recovery of money damages from the government). Because the Members and Yona cannot recover compensatory damages against Defendants, they lack an adequate legal remedy.

### III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH TOWARDS PLAINTIFFS.

The balance of equities and public interest favor protecting constitutional rights. *Schmitt*, 148 F.4th at 970; *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (explaining the public's interest in protecting freedom of expression under the First Amendment) (citation omitted). The Act and the Board infringe on the Members' and Yona's constitutional rights. Blissenbach has no legitimate interest in enforcing an unconstitutional law. *Pavek v. Simon*, 467 F. Supp.3d 718, 762 (D. Minn. 2020) ("Minnesota, on the other hand, does not suffer at all because a 'State has no interest in enforcing laws that are unconstitutional . . . [and] an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the State.'") (citation omitted) (brackets in original). Blissenbach and Gulley, in their capacities as Board representatives, have no legitimate interest in continuing

to adopt standards that regulate the Members and Yona, because their authority to do so arises out of an unconstitutional law. Accordingly, the balance of equities and public interest weigh towards preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction that:

- Prevents Blissenbach and all her respective officers, agents, servants, employees, and attorneys, and any person in active concert or participation with them who receive actual notice of the Court's injunction from enforcing any part of the Act or the Board's standards against the Members and Yona.

- Bars Blissenbach and Gulley and any of their agents, representatives, respective officers, agents, servants, employees, and attorneys, and any person in active concert or participation with them who receive actual notice of the Court's injunction from adopting any additional standards that regulate the Members and Yona.

Dated:  March 11, 2026              */s/ Thomas R. Revnew*

Thomas R. Revnew, MN Bar No. 0295620
Lehoan T. Pham, MN Bar No. 0397635
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South Eighth Street
Minneapolis, MN 55401
612.630.1000
trevnew@littler.com
hpham@littler.com

Alex T. MacDonald (pro hac vice movant)
LITTLER MENDELSON, P.C.
Workplace Policy Institute
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006-4046
202.772.2505
amacdonald@littler.com

***Attorneys for Plaintiffs***

4933-0877-9657 / 131787.1001