UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

LEADINGAGE MINNESOTA,
CARE PROVIDERS OF
MINNESOTA, and YONA
NORTHSTAR LLC,

          Plaintiffs,

v.

NICOLE BLISSENBACH, *in her
official capacity as the
Commissioner of the Minnesota
Department of Labor and Industry
and as a member of the Minnesota
Nursing Home Workforce Standards
Board*, and JAMIE GULLEY, *in his
official capacity as a member and
chairperson of the Minnesota
Nursing Home Workforce Standards
Board*,

          Defendants.

Court File No. _____

**COMPLAINT FOR INJUNCTIVE
RELIEF**

**EXPEDITED RELIEF
REQUESTED**

---

Plaintiffs LeadingAge Minnesota ("LeadingAge"), Care Providers of

Minnesota ("Care Providers"), and Yona Northstar LLC ("Yona") through their

attorneys, assert these claims against Defendants Commissioner Nicole

Blissenbach ("Blissenbach") in her *official capacity* as the commissioner of the

Minnesota Department of Labor and Industry ("DOLI") and as a member of

the Minnesota Nursing Home Workforce Standards Board (the "Board"), and

against Jamie Gulley, in his *official capacity* as a Board member and its current chairperson:

## INTRODUCTION

1.      LeadingAge invokes the federal constitution and statutory rights of its association members and seeks a judgment: (1) declaring that the Minnesota Nursing Home Workforce Standards (the "Act"), codified as Minn. Stat. §§ 181.211 *et seq.*, and the Board's structure and actions are unconstitutional, violate the Sherman Antitrust Act, as well as being preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151, *et seq.*; and (2) imposing a statewide injunction that enjoins enforcement of the Act, the Board's standards, and that bars Blissenbach and Gulley from adopting additional standards.

2.      Care Providers invokes the federal constitution and statutory rights of its association members and seeks a judgment: (1) declaring that the Act and the Board's structure and actions are unconstitutional, violate the Sherman Antitrust Act, as well being as preempted by the NLRA; and (2) imposing a statewide injunction that enjoins enforcement of the Act, the Board's standards, and that bars Blissenbach and Gulley from adopting additional standards.

3.      The association members of LeadingAge and Care Providers are collectively, the "Members."

2

4.    Yona invokes the federal constitution and statutory rights in its individual capacity and seeks a judgment: (1) declaring that the Act and the Board's structure and actions are unconstitutional, violate the Sherman Antitrust Act, as well being as preempted by the NLRA; and (2) imposing a statewide injunction that enjoins enforcement of the Act, the Board's standards, and that bars Blissenbach and Gulley from adopting additional standards.

5.    The Act created the Board and provided the Board with powers and duties. Minn. Stat. § 181.212, subd. 1(a) (2025). The Board has the authority to "adopt rules establishing minimum nursing home employment standards that are reasonably necessary and appropriate to protect the health and welfare of nursing home workers, to ensure that nursing home workers are properly trained about and fully informed of their rights under sections 181.211 to 181.217, and to otherwise satisfy the purposes of sections 181.211 to 181.217." Minn. Stat. § 181.213, subd. 1(a).

6.    Because the Act is unconstitutional, its creation of the Board violates the law. Accordingly, the resulting structure and actions taken by the Board, including the adoption of the Proposed Expedited Permanent Rules Establishing Minimum Nursing Home Wage Standards; Notice of Intent to Adopt Expedited Permanent Rules Without A Public Hearing ("Wage

Standards") are tainted due to the Board's unconstitutional origin. *See* 48 SR 1148–50.

7.    The Board's very existence is unconstitutional. The Board enacts an unprecedent experiment in workplace regulation. It collects representatives from labor, management, and the government to bargain over sector-wide standards in the nursing home industry. It then applies these standards to all covered workplaces as a matter of law. It is meant to replace existing approaches to workplace regulation, such as private collective bargaining. In effect, it removes bargaining from the workplace and transfers it to a tripartite board.

8.    This model is both novel and unlawful. The Act's creation of the Board, and the Board's resulting structure and actions, violate the U.S. Constitution in at least four ways.

9.    **First Amendment.** First, the Act violates the First Amendment by imposing representatives on the Members and Yona for expressive purposes. The First Amendment gives every person the right to refuse to engage in "expressive" association. When a person is represented by another person in workplace bargaining, the representation is a form of association. And when association implicates public policy, the association is expressive. The Board's structure requires just that kind of association. It forces nursing home workers and employers into a representative relationship with the

4

Board's representatives, and those representatives bargain over public policy. The Board's structure therefore forces the Members, Yona, and their workers to associate with representatives and policies with which they may disagree, thus violating the First Amendment.

10.     **Due Process.** Second, the Act violates the Due Process Clause of the Fourteenth Amendment by delegating regulatory power over competitors to self-interested people—*i.e.*, the Board's private members, and in particular, a block of "worker" representatives affiliated with major labor unions. The Due Process Clause forbids a state from giving unsupervised regulatory power to a person with a financial interest in the subject of regulation. A majority of the Board's representatives come from labor or private industry. All these representatives have a financial stake in the Board's regulations. And together, they can enact new standards without the substantive review and approval of a disinterested public official. The Board's structure therefore gives regulatory power to self-interested parties and violates due process. *See State of Wash. ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121–22 (1928); *Eubank v. City of Richmond*, 226 U.S. 137, 143 (1912).

11.     **Supremacy Clause (Sherman Antitrust Act).** Third, the Act requires private market participants to collude over wages, hours, and other working conditions. It therefore violates the Sherman Antitrust Act ("Sherman Act"), and thus the Act is preempted under the Supremacy Clause. The

Sherman Act forbids competitors from, among other things, colluding over wages, hours, and other working conditions. While the Sherman Act does exempt some anticompetitive activity taken at a state's direction, that exemption applies only when the state actively supervises the anticompetitive activity. And here, the state does not in fact actively supervise the anticompetitive activity; its review is only nominal and potential, not substantive and actual. The state-action exception therefore does not apply, and the Act violates the Sherman Act and is preempted under the Supremacy Clause.

12.   **Supremacy Clause (NLRA).** Fourth, the Act is preempted under the Supremacy Clause and the NLRA. The NLRA creates a comprehensive, uniform system for regulating labor relations, including worker representation and collective bargaining. Because the NLRA is comprehensive, it prevents states from establishing alternative or parallel regulatory schemes for regulating worker representation and collective bargaining. Here, the Board creates a parallel scheme under which workers and employers are represented on an industry board and bargain over subjects already regulated by the NLRA. The Board therefore intrudes on territory occupied exclusively by federal law and is preempted.

13.   These violations are overlapping but independently sufficient. They each establish that the Act is unlawful.

14. The Board has already adopted standards that are harming the Members and Yona, with future harm on the immediate horizon. The Act also continues to harm the Members' and Yona's constitutional rights to be free of forced association and invalid regulatory burdens.

15. The only adequate remedy to prevent these harms from continuing is an injunction. Plaintiffs therefore ask this Court to enjoin Blissenbach from enforcing the Act and any of the Board's standards; and enjoin Blissenbach and Gulley from operating the Board's processes in a way that contravene federal law.

## THE PARTIES

16. LeadingAge is a non-profit corporation organized under Minnesota law and headquartered in Minnesota. LeadingAge is a trade association that represents numerous member organizations across Minnesota, including organizations providing services along the full spectrum of post-acute care and long-term services and support, including what are commonly referred to as "nursing homes." *See* Minn. Stat. § 181.211, subd. 7. A full list of benefits that LeadingAge provides its association members may be found on its website and incorporated herein.[1] LeadingAge's policy objectives include educating its association members on industry and legal developments, providing tools and

---#

[1] *About*, LEADINGAGE MINNESOTA, https://www.leadingagemn.org/about-us (last visited Mar. 8, 2026).

7

resources to association members so that they may provide compassionate care to older adults, and taking reasonable steps to ensure that their association members are not subject to laws that violate the U.S. Constitution. Where LeadingAge must sue to enjoin enforcement of an unlawful law that harms its association members, it will do so, as demonstrated by this action.

17.    Care Providers is a non-profit corporation organized under Minnesota law and headquartered in Minnesota. Care Providers is a trade association that represents numerous member organizations across Minnesota, including organizations providing services along the full spectrum of post-acute care and long-term services and support, including what are referred to as "nursing homes." *See* Minn. Stat. § 181.211, subd. 7. A full list of benefits that Care Providers provides its association members may be found on its website and incorporated herein.[2] Care Providers' policy objectives include educating its association members on industry and legal developments, providing tools and resources to association members so that they may provide compassionate care to older adults, and taking reasonable steps to ensure that their association members are not subject to laws that violate the U.S. Constitution. Where Care Providers must sue to enjoin enforcement of an

--------------------------------#

[2] *Leading members to excellence*, CARE PROVIDERS OF MINNESOTA, https://careproviders.org/CPM/CPM/About-Us/Over.aspx?hkey=15f320d6-479f-491f-baef-d3d01d473520 (last visited Mar. 8, 2026).

unlawful law that harms its association members, it will do so, as demonstrated by this action.

18.     Yona is a Minnesota limited liability company that frequently transacts business with healthcare, senior living, and assisted living communities in Minnesota. Yona is a business partner of the Members. Yona contracts with providers who provide nursing home services to Minnesota's older adult population. To help serve the state's older adult population, Yona employs a total of 433 employees at 51 client sites across Minnesota. These employees qualify as "nursing home workers" because they are non-direct care staff, including housekeepers, laundry aides, floor care technicians, cooks and dietary aides who work at Minnesota's nursing home facilities. Minn. Stat. § 181.211, subd. 9. And by extension, Yona is a "nursing home employer." Minn. Stat. § 181.211, subd. 8.

19.     Yona is not, and has never been, an association member of either LeadingAge or Care Providers.

20.     Blissenbach is the commissioner of DOLI. Blissenbach is also the DOLI-commissioner member on the Board.

21.     The Board is an entity established by statute to regulate nursing home workers and employers. *See* Minn. Stat. § 181.211, subd. 2, § 181.212. The Board is the first of its kind in the country. There is no other centralized nursing home workforce board with rulemaking authority.

22. Jamie Gulley is the current chairperson of the Board and is one of the members representing nursing home workers or worker organizations appointed by Governor Walz.

## JURISDICTION AND VENUE

23. This case arises out of federal statutory and constitutional law. This Court has federal question jurisdiction under 29 U.S.C. § 1331 and 42 U.S.C. § 1983. This Court also has jurisdiction under 28 U.S.C. § 1337 because the case arises under an act of Congress regulating commerce. This Court has authority to issue declaratory relief under 28 U.S.C. § 2201.

24. The Members are directly and adversely impacted by the Act and the Board's standards. The Members qualify as "nursing homes" and "nursing home employers" under the Act. Minn. Stat. § 181.211, subd. 7 and 8. The Members likewise employ "nursing home workers." *Id*. subd. 9. Yona qualifies as a "nursing home employer" and employs "nursing home workers." *Id*. subd. 8 and 9. As the representative Declarations make clear, the Members have individual standing to sue. Those Declarations are attached to and incorporated into this Complaint. FED. R. CIV. P. 10(c).

25. The Act and Board are at odds with each LeadingAge's and Care Providers' policy objectives, and this legal challenge is germane to those objectives. None of the claims asserted nor the relief requested requires individual association members to participate in the suit.

26.    The Act and the Board inflict direct harm on Yona and it has individual standing to sue. Yona's Declaration is attached and incorporated into this Complaint. FED. R. CIV. P. 10(c).[3]

27.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to this action occurred in this judicial district and because the Defendants reside or are found in this judicial district.

## BACKGROUND

### I.    THE MINNESOTA NURSING HOME WORKFORCE STANDARDS BOARD.

28.    The Board was established in 2023. It is structured as a "tripartite" entity. The Board has nine representatives: three representing the Minnesota government, three representing nursing home employers, and three representing nursing home workers or worker organizations.

29.    As of March 2026, the Board representatives were as follows:

a.    *Government Representatives*

i.    Blissenbach, Commissioner-member from DOLI;
ii.   Kim Brenne, Director of Nursing Facility Rates and Audits, Department of Human Services; and
iii.  Maria King, Director, Health Regulation Division, Department of Health.

———————————————————#

[3] Plaintiffs also attach and incorporate the Declaration of Thomas Revnew into this Complaint. FED. R. CIV. P. 10(c).

11

b.   *Employer Representatives*

i.     Paula Rocheleau, CEO, Partners Senior Living;
ii.    Mary Swanson, Administrator, Good Samaritan Society; and
iii.   Katie Lundmark, VP of Operations, Senior Living, Lifespark.

c.   *Worker Representatives*

i.     Gulley, President, SEIU Healthcare Minnesota and Iowa ("SEIU");
ii.    Michele Fredrickson, Staffer, United Steelworkers, AFL-CIO; and
iii.   Michelle Armstrong, a Licensed Practical Nurse at The Estates in Lynnhurst and member of Local 1189, United Food and Commercial Workers Union (affiliated with the AFL-CIO).

30.   No evidence exists showing that any Board representative went through the advice and consent process before the Minnesota Senate. Governor Walz appointed the employer and worker members; the government members are set by the Act. Minn. Stat. § 181.212, subd. 1.

31.   The Board meets monthly to discuss any matters relating to the Act and the Board's administrative regulations, and to vote on the Board's desired actions. Gulley, who is the President of SEIU, has historically advocated for the exact standards the Board now has implemented. Gulley earlier told MINNPOST that SEIU was "the driving advocacy group for the

12

standards board to exist."[4] Gulley was reelected as Chairperson on September 11, 2025 for a two-year term.

32. According to the Board's Bylaws, Gulley as the chairperson, has additional powers, including calling a special or emergency meeting of the Board, approving agenda items, being delegated by the Board to appoint committees, and conducting the first pass review of any amendment to the Bylaws.[5]

33. Under the Act, the Board must adopt statewide employment standards for nursing home workers. These standards include any standard that is "reasonably necessary and appropriate to protect the health and welfare of nursing home workers." Minn. Stat. § 181.213, subd. 1(a).

34. The Board also must adopt statewide standards covering mandatory "rights" training. The Board must establish a training curriculum and certify "worker organizations" to deliver the training. Minn. Stat. § 181.214, subd. 1.

---

[4] Matthew Blake, *A New Deal Revival: Why Labor Unions Love the Minnesota Nursing Home Workforce Standards Board*, MINNPOST, https://www.minnpost.com/state-government/2025/10/a-new-deal-revival-why-labor-unions-love-the-minnesota-nursing-home-workforce-standards-board/ (Oct. 16, 2025).

[5] Minnesota Nursing Home Workforce Standards Board Bylaws, MINN. DEP'T OF LAB. AND INDUS., https://www.dli.mn.gov/sites/default/files/pdf/nhwsb_bylaws.pdf (Aug. 8, 2024).

35.     The Act provides no review of these certification decisions. The Act likewise provides no review of the Board's employment standards, unless the Board's actions impact the Medicaid reimbursement rate paid to nursing homes.

36.     Once adopted, the Board's standards are treated as regulations. They are published in the state's official regulatory compilation, the Minnesota Administrative Rules. They apply to all covered nursing home employers and workers as a matter of law. *See* Minn. Stat. § 181.213, subd. 1; Minn. Admin. R. 5200.2000–5200.2090.

37.     The Board may take any action with a majority vote of its representatives—*i.e.*, five of nine—including actions necessary to establish minimum nursing home employment standards under section 181.213. Minn. Stat. § 181.212, subd. 7. At least two of the five affirmative votes must be cast by two board members representing the Minnesota government. *Id.*

38.     During the 2025–2026 legislative session, lawmakers introduced H.F. 500, which would have repealed the Act, in its entirety, thus eliminating the Board.[6] During the same session, the state legislature later considered an amendment that saved the Act.[7] Under the amendment, the Board's standards

---

[6] HF 500, *Introduction*, OFFICE OF THE REVISOR OF STATUTES, https://www.revisor.mn.gov/bills/94/2025/0/HF/500/versions/0/ (Feb. 11, 2025).

[7] HF 500, *Second Engrossment*, OFFICE OF THE REVISOR OF STATUTES,

14

that would require additional appropriations from the state would not take effect until the state approved such appropriations. Yet H.F. 500 never became law.

39.     The Act, as currently written, has a minimal check on the Board's authority. The limited check: the appropriations process through the Minnesota legislature. Minnesota allocates Medicaid funding to nursing facilities through a statutory rate structure established by the Minnesota Department of Human Services that uses allowable costs from a cost report with a year ending 15-months prior to the January 1 rate year to calculate a total reimbursement rate. Minn. Stat. § 256R.01, subd. 1–2, § 256R.02, subd. 41 and 44, §256R.21–.26. The legislature determines the total cost to Medicaid and deducts the amount to be matched by the Federal government. The Federal Medical Assistance Percentage (FMAP) for Minnesota during federal fiscal year 2027 is 51.36%. While the federal government funds about half of any increase to the Medicaid reimbursement rate, Minnesota pays the non-federal share. Minn. Stat. §§ 256B *et seq.*; 42 U.S.C. § 1396(a)(2). The Minnesota legislature must approve funding to cover the non-federal share. The legislature's check on the Board's power thus only triggers if the Board's standards require a corresponding increase in state appropriations sufficient

———————————————#
https://www.revisor.mn.gov/bills/94/2025/0/HF/500/versions/2/ (Mar. 10, 2025).

15

to cover any increase in the Medicaid reimbursement rate. Minn. Stat. § 181.213, subd. 2a(b)(2), subd. 2b(b).

40. The Board's government representatives do not provide an additional check. On paper, two government representatives must approve a proposed standard before the standard can be adopted by the Board. But in practice, the government representatives virtually always approve standards and other actions proposed by the "worker" representatives affiliated with unions. These union representatives have largely originated the Board's material policies and dictated the Board's agenda. One of them, Gulley, is the Board's chair. The union representatives have been in the winning majority in every vote taken in the Board's history. The government representatives do not appear to have ever voted against the union representatives' proposals, modified or vetoed the union representatives' proposals, or even raised significant questions about the union representatives' agenda. The government representatives provided no additional check.

41. To date, the Board has adopted standards on minimum wages, training, and holiday pay. The wage standards set minimum wages higher than the state minimums for certain classes of nursing home workers. The holiday-pay rules require time-and-a-half pay for nursing home workers on eleven state holidays. The training standards specify criteria for certifying

16

worker organizations to provide rights training. *See* Minn. Admin. R. 52000.2000 to 5200.2090.

42. On May 9, 2024, Armstrong—one of the worker representatives on the Board—moved to approve the draft "Minimum Nursing Home Wage Standards," which was the *original* iteration of what later became the Wage Standards. This proposal originated with the representatives representing "employees," all of whom are associated with labor unions. Blissenbach, Gulley, Fredrickson, and Armstrong voted with the majority. The minimum wages for general "nursing home workers,"[8] certified nursing assistants, trained medication aides, and licensed practical nurses in the original iteration were identical to what the Board later adopted.

43. Then, on June 13, 2024, the Board voted to approve a revised minimum-wage standard. Blissenbach, Gulley, Fredrickson, and Armstrong voted to approve the revised minimum-wage standard.

44. The revised minimum wage standard then formally became the Wage Standards, when the Board issued notice of its intent to adopt the rules

---

[8] The Act defines "nursing home worker" as any worker who provides services in a nursing home in Minnesota, including direct care staff, non-direct care staff, and contractors, but excluding administrative staff, medical directors, nursing directors, physicians, and individuals employed by a supplemental nursing services agency." Minn. Stat. § 181.211, subd. 9.

on June 24, 2024.[9]  Then, on or around October 28, 2024, and following a public comment period, the State Register published the Board's notice that it had adopted the Wage Standards as originally written.[10] Minn. Admin. R. 5200.2060–2090. The Wage Standards are applicable statewide. Minn. R. Admin. 5200.2070, subp. 1. The Wage Standards set the minimum wages for general nursing home workers, licensed practical nurses, certified nursing assistants, and trained medication aides higher than what nursing homes would pay, if given the choice.

45.    Thirty days after the Centers for Medicare & Medicaid (CMS) approves the reimbursement rate increase paid to nursing homes to implement the minimum wage, the Wage Standards will set the 2026 minimum wage for all covered nursing home workers at $19.00 per hour. As of the filing of this lawsuit, CMS still has not approved the increased reimbursement rate.

46.    Beginning on January 1, 2027, nursing homes must pay all of their covered nursing home workers a minimum wage of $20.50 per hour. Minn. R. Admin. 5200.2080.

---

[9] 48 SR 1148–50, MINN. STATE REGISTER, https://mn.gov/admin/assets/SR48_52_tcm36-628525.pdf (June 24, 2024).
[10] 49 SR 443, MINN. STATE REGISTER, https://mn.gov/admin/assets/SR49_18_tcm36-650570.pdf (Oct. 28, 2024).

47.   The Wage Standards separately require that nursing homes pay individuals in certain occupations a starting minimum wage in 2026, and January 1, 2027 as follows:

| Role | 2026 - These standards will go into effect 30 days after CMS's approval | January 1, 2027 |
|---|---|---|
| Certified Nursing Assistants | $22.50 per hour | $24.00 per hour |
| Trained Medication Aides | $23.50 per hour | $25.00 per hour |
| Licensed Practical Nurses | $27.00 per hour | $28.50 per hour |

Minn. R. Admin. 5200.2090.

48.   The Minnesota Medicaid program receives significant funding from the federal government, and so, CMS must approve any increases to the reimbursement rate the State intends to pay. *See* Minn. Stat. §256B.04, subd. 4 and 24; § 256R.03, subd. 1; Minn. R. Admin. 5200.2070. subp. 2(B), subp. 3. Minnesota allocates Medicaid funding to nursing facilities through a statutory rate structure established by the Minnesota Department of Human Services (Minnesota's designated CMS agency) that uses allowable costs from a cost report with a year ending 15 months prior to the January 1 rate year to calculate a total reimbursement rate. Minn. Stat. §§ 256R.01, subd. 1–2, 256R.02, subd. 41 and 44, 256R.21–.26. Several categories feed into the total reimbursement rate, including "direct care costs," "other care-related costs,"

and "other operating costs." Minn. Stat. §§ 256R.02, subd. 17 and 34-36, 256R.21, subd. 2(1)–(2). Direct care costs include, "costs for the wages of . . . *licensed practical nurses*, *certified nursing assistants*, *trained medication aides*[.]" Minn. Stat. § 256R.02, subd. 17 (emphasis added). The increased wages of licensed practical nurses, certified nursing assistants, and trained medication aides constitute direct care costs that factor into the total reimbursement rate calculation. Minn. Stat. § 256R.21, subd. 2(1). Other care costs include "the costs for the salaries and wages and associated fringe benefits and payroll taxes of mental health workers, religious personnel, and other direct care employees not specified in the definition of direct care costs." Minn. Stat. § 256R.02, subd. 35. "Other direct care costs" is part of "other care-related costs." *Id*. subd. 34. "Other operating costs" includes wages and benefits for "administrative costs, dietary costs, housekeeping costs, laundry costs, and maintenance and plant operation costs." The wages classified under direct care, other care-related, and other operating are included a nursing facility's operating rate. The total payment rate is comprised of the operating rate, the external fixed rate, and property rate.  Minn. Stat. § 256R.21.

49.    The Wage Standards increasing the 2026 labor costs for nursing homes requires CMS to approve the change and increase to the reimbursement rate under Medicaid.

20

50.     Likewise, Minnesota must authorize appropriations to cover the state-funded share of the increased reimbursement rate. That is why in June 2025, the Minnesota legislature passed a funding bill (later signed by Governor Walz) that specifically apportioned state funds to cover the increased reimbursement rate caused by the Wage Standards. Minn. Stat. § 256R.495.[11] In other words, the Board adopting the Wage Standards triggered legislative oversight because it required additional appropriations. But the Board's actions as to any training requirements would not trigger legislative oversight, because the Board does not need money to impose training requirements.

51.     The Act also empowers the Board to "certify worker organizations that it finds are qualified to provide training to nursing home workers[.]" Minn. Stat. § 181.214, subd. 1. The Board selected these three certified nursing worker organizations in July 2025[12]: (1) AFL-CIO; (2) SEIU; and (3) AFSCME Council 65—all labor unions.[13] SEIU and the AFL-CIO are also represented on the Board.

---

[11] HF 3, *Status in the House - 94th Legislature, 2025 1st Special Session*, OFFICE OF REVISOR OF STATUTES,
https://www.revisor.mn.gov/bills/94/2025/1/HF/3/ (June 9, 2025).
[12] Meeting Minutes: *Nursing Home Workforce Standards Board*, MINN. DEP'T OF LAB. AND INDUS.,
https://www.dli.mn.gov/sites/default/files/pdf/nhwsb_minutes_071025.pdf (July 10, 2025).
[13] *Current list of certified worker organizations*, MINN. DEP'T OF LAB. AND INDUS., https://www.dli.mn.gov/sites/default/files/pdf/nhwsb_current_list_of_c ertified_worker_organizations_1225.pdf (Dec. 2025).

52.    The Board likewise establishes a training curriculum. Minn. Stat. § 181.214, subd. 2(a). The curriculum consists of eight parts. *Id*. subd. 2(a)(1)–(8). Amongst other topics, the curriculum includes informing nursing home workers about: (1) the applicable compensation and working conditions in the standards established by the Board; (2) anti-retaliation protections; and (3) how to report violations of the Act. *Id*. subd. 2(a)(1)–(3). By 2027, nursing homes must submit written documentation to the Board that their covered workers, who have been employed for at least two years, have completed at least one hour's worth of Act-compliant training. *Id*. subd. 6.[14] Nursing homes must further compensate their covered workers at their regular hourly rate of wages and benefits for each hour of training completed, as required by the Act. Minn. Stat. § 181.214, subd. 7. If the training is not hosted on the nursing homes' premises, nursing homes must also reimburse their covered workers for reasonable travel expenses. *Id*.

53.    Certification offers these labor organizations many benefits. For example, once certified, an organization can regularly contact nursing home workers through state-mandated training. The organization can also demand a worker's personal contact information, which the worker's employer must

---

[14] *Certificate of Worker Organizations and Worker Training Guide*, MINN. DEP'T OF LAB. AND INDUSTRY, https://www.dli.mn.gov/sites/default/files/pdf/n hwsb_draft_certification_training_guide_010925.pdf (Jan. 9, 2025).

provide unless the worker opts out in writing. These rights give the labor organization an opportunity to build a rapport with the worker, speak with the worker about unionization, and potentially recruit the worker as a union member. *See* Minn. Stat. § 181.214 subds. 5 and 6.

54.     These advantages are intentional. The Board was created in part to increase unionization in the nursing home industry. When asked whether the Board was meant to improve labor standards or increase unionization, the sponsor of the Board's enabling legislation, Rep. Esther Agbaje, DFL-Minneapolis, said, "A little of both."[15]

## II.     HARM TO THE MEMBERS AND YONA.

55.     The Members operate nursing home facilities in Minnesota. Yona contracts with providers who provide nursing home services and has employees working at nursing home facilities. In those facilities, the Members and Yona employ workers who qualify as nursing home workers under the Board's authority. As to those workers, the Members and Yona are subject to the Act and the Board's standards and must comply with the Board's requirements. Failure to comply with the Act and the Board's standards leads

---

[15] Matthew Blake, *A New Deal Revival: Why Labor Unions Love the Minnesota Nursing Home Workforce Standards Board*, MINNPOST, https://www.minnpost.com/state-government/2025/10/a-new-deal-revival-why-labor-unions-love-the-minnesota-nursing-home-workforce-standards-board/ (Oct. 16, 2025).

to enforcement action by Blissenbach, or a civil suit by an allegedly aggrieved nursing home worker. Minn. Stat. §§ 181.216(c), 181.217, subds. 2–3; Minn. Stat. § 177.27, subd. 4.

56.    The Board's standards directly harm the Members. As a result of the Wage Standards and within the six months before the filing of this lawsuit, the Members have:

a.    Reduced planned future wage increases.

b.    Implemented wage compression, which leads to long-term workers receiving lower wage increases over time.

c.    Paid out increased wages to nursing home workers, despite not being able to recover the increased amount through federal and state-funded reimbursement programs, including Medicaid.

d.    Expended resources to apply for the temporary rate supplement authorized by the Minnesota Legislature which attempts to offset the higher labor costs associated with the Wage Standards.

e.    Issued an increased tax levy for 2026 to cover the increased costs of compliance.

f.    Hired administrative staff to assist with the process of complying with the Wage Standards.

g.    Delayed capital improvements relating to facilities for housing residents and delaying investments in quality-of-life improvements, such as new furniture, equipment, or services, for residents.

h.    Modified retirement benefits structure as a cost-containment measure in response to the Wage Standards; going *from* an automatic five percent employer contribution to the workers' retirement accounts regardless of their contributions *to* a discretionary employer match of up to five percent, available only if a worker contributes to the plan.

24

i.    Reduced new admissions.

j.    Gave employees not covered by the Wage Standards a lower wage increase compared to what workers covered by the Wage Standards would receive.

k.    Developed plans to reduce staff-to-resident ratios, which reduces on average the hours spent by staff on resident care.

57.    To ensure their continued existence, the Members must implement

or at least consider:

a.    Decreasing staff-to-resident ratios, meaning one staff member is responsible for a higher number of residents.

b.    Further delaying or cancelling capital improvements for housing residents or other investments that improve residents' quality-of-life.

c.    Cancelling plans to hire new, non-nursing-home-worker support staff.

d.    Planning on raising the private pay rates higher than expected for residents living in assisted living facilities.

e.    Reducing other forms of incentive pay currently offered to workers, such as bonuses for working additional shifts or shift differential pay offered for working certain hours.

f.    Reducing the employer-paid portion of benefit programs offered to workers.

g.    Limiting new admissions into the nursing home.

h.    Shutting down operations.

58.    The Board's standards harm Yona by requiring that it:

a.    Conform its behavior to the Board's standards.

b.    Pay its employees a higher minimum wage than what is set by default federal, state, or local law, or market factors.

    c.      Adjust how it prices its contracts with nursing home providers in Minnesota.

    d.      Suffer a shortfall in revenue. Yona had various contracts with nursing home providers in Minnesota with fixed prices and durations, which pre-date the Wage Standards. Yona could not have accounted for the Wage Standards—indisputably increasing wages for covered nursing home workers compared to the prevailing market—when it negotiated those contracts.

    e.      Impose wage compression on its workforce and pay its more senior employees less than it might otherwise if the Wage Standards did not exist.

    f.      At least consider limiting or shutting down operations.

59.    The Members and Yona must also navigate new burdens. These burdens are ongoing, and include recordkeeping, scheduling, and reporting requirements relating to covered nursing home workers:

    a.      Scheduling workers for mandatory rights training once every two years and compensate them as required by law.

    b.      Either hosting the mandatory training onsite or cover the workers' reasonable travel expenses for attending offsite training.

    c.      Ensuring that they have coverage in their facilities while the workers are being trained.

    d.      Keeping records showing that the workers attended the training. They must provide those records to the Board.

    e.      Providing employee contact information to the worker organization that conducts the training on request.

    f.      Refusing to provide a worker's contact information only if the worker opts out in writing.

    g.      Tracking any opt-outs to demonstrate compliance.

60.    The Members and Yona also suffer competitive injuries:

26

a. The Board's structure allows private market participants to fix wage rates. The Members and Yona are direct purchasers of nursing home workforce labor and therefore suffer directly from this wage-fixing system through higher costs.

b. The Board's structure allows a small group of labor organizations to certify themselves as worker organizations, limiting the Members' and Yona's choice of organizations to deliver training. The Members and Yona are direct users of training services and so suffer from the reduction in choice.

c. The Board's structure allows private market participants to impose new administrative and scheduling requirements on the Members and Yona to their detriment. Again, the Members and Yona are direct purchasers of nursing home worker labor and so suffer from the reduction in flexibility and higher costs imposed by these requirements.

d. The Board's requirements are complex and novel. They require administrative resources to implement. They are more difficult for smaller facilities to manage, leaving them at a disadvantage in comparison with large facilities, which have more sophisticated compliance apparatuses and can more easily spread out their costs. They also raise the Members' and Yona's overall costs and hurt their ability to deliver quality service to Minnesota's older adult population.

61. The Members and Yona also suffer associational injuries. The Board's structure forces the Members and Yona to be represented in negotiations over standards with appointed representatives. These representatives were not chosen by the Members or Yona, and do not represent the Members or Yona's views. The Members and Yona believe that the Board's standards have been harmful to the industry. They also believe that the standard-setting process is continuing to harm them, their workers, and/or their residents, all of whom would be better served by market-based

27

negotiations. The Members and Yona object to their representation on the Board and wish to disassociate from the Board's processes. By forcing them to associate, the Board's structure injures their First Amendment freedom of association.

62. At bottom:

a. The Members and Yona seeking to pay covered nursing home workers wages that are less than what the Wage Standards require would violate the Wage Standards and subject themselves to the penalties prescribed by the Act.

    i. Through the union representatives' influence on the Board, non-unionized Members now must pay wages to their workers comparable to unionized workplaces.

b. Non-unionized Members would not engage any "certified worker organizations" or any labor union, to provide training to their covered nursing home workers. Because of the Act and the Board's standards, however, these non-union Members must engage various labor unions to provide the Act-mandated training or face the Act's consequences.

    i. Moreover, one of the certified worker organizations (a labor union) stated to a Member that it will not conduct the mandated training for this Member's workers, because the labor union does not currently represent this Member's workers.

c. If neither the Act nor the Board existed, the Members and Yona would not provide any of the required training. But under the current law, the Members and Yona must comply with all training requirements and related reporting requirements or face the Act's consequences.

d. Finally, the Members and Yona are forced to accept representation on the Board for the purpose of negotiating over and adopting collective standards for nursing-home workplaces. The Members and Yona do not want that representation and do not want to

associate with the Board's process, which they believe harms their businesses, their workers, their residents, and their communities. They object to this association and wish to disassociate themselves from the process.

## CAUSES OF ACTION

### Count I: Violation of the First Amendment

63.   Plaintiffs incorporate the preceding paragraphs by reference.

64.   The First Amendment protects the freedom of association. That freedom embraces both the right to associate and the right not to associate. *See* U.S. Const. amend. I; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 636–38 (1984) (O'Connor, J., concurring).

65.   The Supreme Court has recognized that representation is a form of association. When the government forces a person to accept another's representation in bargaining over wages, hours, or working conditions, it burdens the person's associational rights. That burden is especially acute when the subjects of bargaining implicate public policy. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council* 31, 585 U.S. 878, 916 (2018).

66.   The Supreme Court has also recognized that a state may designate a person or group to present views on behalf of a broader group. That exception is premised on the idea that in this context, the state is merely soliciting views for its own benefit. So it may choose the voices it will listen to. *See Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271, 280–81 (1984).

29

67. But that exception applies only when the state is soliciting views to set its own public policy or when it is choosing its own bargaining partner. The exception does not apply when the state injects a bargaining agent into an otherwise private negotiation. In the latter case, the state is forcing the parties to associate with that agent, not merely soliciting views for itself. *See id.* at 285 (basing conclusion on premise "the state must be free to consult or not to consult whomever it pleases").

68. The Act forcing the Board's representation on nursing homes, nursing homes' business partners, and workers does not fall under any exception. The Act forces the Members and Yona to associate with representatives and policies against their will. The Board requires the Members and Yona to accept representatives designated by the state. The Board likewise requires the same from the nursing home workers. These representatives do not simply inform the state so the state can make its own policy decisions. Rather, the representatives negotiate standards on behalf of private parties, including the Members, Yona, and their respective workers. *See* Minn. Stat. §§ 181.212, 181.213, subd. 1(a).

69. The Members and Yona object to the standards adopted by the Board, which they believe harm their residents and/or their workers. They also object to the standard-setting process as a pernicious influence in the nursing home industry. The Members and Yona wish to disassociate from the Board's

30

process and their assigned representatives. But they cannot do so because the Board's structure gives them no option to opt out. *See* Minn. Stat. §§ 181.212, 181.213, subd. 1(a).

70.    This forced representation is expressive because it implicates public policy. The Board's standards are by definition public policy because they are adopted as regulations. They apply to all nursing home workers and employers as a matter of law. They even override the regulations adopted by other public agencies. *See id.* § 181.213, subd. 5.

71.    The Board's structure forces the Members, Yona, and their workers to associate with representatives and public policies with which they may disagree. The structure therefore burdens their associational rights. *See Janus*, 585 U.S. at 916 (describing exclusive representation in collective bargaining as "a significant impingement on associational freedoms that would not be tolerated in other contexts").

72.    Defendants cannot justify that burden. To justify a burden on associational rights, they must show that the Board's forced representation scheme survives "exacting scrutiny." That is, they must show that the scheme serves a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms. *See id.* at 894; *see also Knox v. SEIU, Loc. 1000*, 567 U.S. 298, 310 (2012) (applying "exacting" scrutiny to "mandated association" scheme).

73.    The Board fails both requirements.

74.    First, the Board serves no compelling interest. As its legislative chief author admits, it was created at least in part to boost unionization. Boosting membership for a private organization is not a compelling state interest. If it were, all compelled association would pass exacting scrutiny. And that is not the law. *See Janus*, 585 U.S. at 897 ("free rider" concerns insufficient to justify compelled association through mandatory dues-scheme in public employment); *Knox*, 567 U.S. at 311 ("free rider" concerns insufficient to justify compelled association in private-sector).

75.    Second, the Board's goals could have been achieved through means less burdensome of associational freedoms. Any standard adopted by the Board could have been adopted by normal legislation. That is, same goals could have been achieved with no forced representation at all. *See Janus*, 585 U.S. at 901 (compelled association through mandatory "fair share" payments failed exacting scrutiny when less restrictive means were available to accomplish state's goals).

76.    The Court should thus strike down the Act and the Board because they cannot survive exacting scrutiny.

### Count II: Violation of the Due Process Clause

77.    Plaintiffs incorporate the preceding paragraphs by reference.

78.    Under the Due Process Clause of the Fourteenth Amendment, no person can be deprived of life, liberty, or property without due process of law. Due process of law requires, among other things, a neutral decision maker. Any person who uses government power to deprive a person of life, liberty, or property must be neutral. If a person has an interest in the matter at hand—especially a financial interest—the person cannot decide the matter consistent with due process. *See* U.S. Const. amend. XIV; *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016); *Ward v. Vill. of Monroeville*, 409 U.S. 57, 61–62 (1972); *Tumey v. Ohio*, 273 U.S. 510, 531, 534 (1927); *Calder v. Bull*, 3 U.S. 386, 388 (1798).

79.    That principle applies to legislation and regulatory power. The Supreme Court has held that under the Fourteenth Amendment, self-interested people cannot exercise regulatory power over their peers or competitors. *State of Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121–22 (1928) (striking down zoning ordinance that allowed construction of certain facilities only with consent or neighboring property owners); *Eubank v. City of Richmond*, 226 U.S. 137, 143 (1912) striking down city ordinance that allowed property owners to regulate set-off requirements for their neighbors' lots); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (striking down statute allowing large coal operators and unions to collectively regulate wages and working conditions in their industry, including for their competitors).

80. The Supreme Court has allowed the government to delegate some regulatory decision-making to private parties. But such delegations satisfy due process only when the private party is subordinate to a disinterested public official. The public official must be able not only to review the private party's decision, but also to reject the decision or amend its substance. *Compare Carter Coal*, 298 U.S. at 311, *with Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940), *and Walmsley v. Fed. Trade Comm'n*, 117 F.4th 1032, 1038 (8th Cir. 2024).

81. The Act's creation of the Board's structure violates these principles. The Act delegates regulatory power to self-interested private people. Those people exercise regulatory power over their peers and competitors. They are not subordinate to any public official.

82. A majority of the Board's representatives, six of nine, are private people. These people are nursing home workers, officials from various unions, or officials from nursing home employers.

83. Together, the representatives may adopt a broad range of standards regulating not only their own workplaces, but workplaces where competing workers, unions, and employers operate. *See* Minn. Stat. § 181.213, subd. 1(a).

84. The Board's representatives have already used their power to adopt standards for minimum pay, holiday pay, and training. These standards

regulate nursing home workers and employers who did not participate in the standard-making process, including the Members. *See* Minn. Admin. R. f5200.2000–5200.2090.

85.   The standards benefit incumbents on the Board and disadvantage their competitors. For example, the Board has used its authority to certify three labor organizations as "worker organizations" authorized to conduct rights training. SEIU and AFSCME Council 65 lobbied for the Board's creation. SEIU and AFSCME Council 65 are two of the three certified worker organizations. SEIU is represented on the Board. SEIU's affiliate partner, AFL-CIO, likewise is represented on the Board.[16]

86.   The representatives are not subordinate to any disinterested public official. The Board may adopt a standard by majority vote, and a majority of the board members are private, self-interested people. Though the votes of two government representatives are needed to adopt a standard, the three government representatives do not in practice review, revise or reject a standard that is supported by the union-affiliated private representatives. They instead rubber stamp the policies and proposals advanced by private representatives—namely, the union-affiliated block led by Gulley.

_____#

[16] Mia Jacobs, *SEIU Joins AFL-CIO to Build Unprecedented Worker Power, Win Unions for All Workers*, AFL-CIO, https://aflcio.org/press/releases/seiu-joins-afl-cio-build-unprecedented-worker-power-win-unions-all-workers (Jan. 8, 2025).

87.   If a standard has a fiscal effect on the state's budget, the standard takes effect only after the state legislature appropriates the necessary funds. But if a standard has no fiscal effect—for example, the Board's training standards—the Board may adopt the standard unilaterally. *See* Minn. Stat. § 181.213, subds. 1(a), 2(c)–(d) and 2(a).

88.   Because the Board's structure allows self-interested people to regulate their peers and competitors without adequate control by any disinterested public official, the Board's structure violates due process. *See Carter Coal*, 298 U.S. at 311; *Roberge*, 278 U.S. at 121–22; *Eubank*, 226 U.S. at 143. #

## Count III: Preemption under the Sherman Act

89.   Plaintiffs incorporate the preceding paragraphs by reference.

90.   The Sherman Act forbids all contracts, combinations, or conspiracies in restraint of trade. It forbids nearly all agreements to limit competition, divide markets, or fix prices. It applies equally in both product and labor markets. In both kinds of markets, an agreement to limit competition is illegal. *See* 15 U.S.C. § 1; *NCAA v. Alston*, 594 U.S. 69, 88–92 (2021) (applying antitrust laws to apply to restraints on benefits in market for college athletes—a labor market).

91.   The Sherman Act makes an exception for state action. But that exception is narrow. It applies only when the state (a) adopts an explicit state

36

policy to displace competition with regulation, and (b) actively supervises the resulting anticompetitive activity. *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1110 (2015); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 791–92 (1975).

92.   The Act empowers the Board to adopt standards that restrict competition. The Board forces private market participants—unions, employers, and workers—to collectively dictate wages, hours, and working conditions in their industry. It also requires them to collectively restrict the market for training services by deciding which worker organizations can conduct the training. *See* Minn. Stat. §§ 181.213. subd. 1(a); § 181.214.

93.   These terms would otherwise be subject to open competition in the market. By setting uniform standards, the Board necessarily restricts competition.

94.   These restrictions are naked restraints on trade. They fix wages and the terms of work in a labor market. They therefore violate the Sherman Act on their face.[17] *Chamber of Commerce of the U.S. v. City of Seattle*, 890 F.3d 769, 780 (9th Cir. 2018) (treating city law allowing rideshare workers to

---#

[17] *Antitrust Guidelines for Business Activities Affecting Workers*, U.S. DEP'T OF JUSTICE AND THE FEDERAL TRADE COMM'N, https://www.ftc.gov/system/files/ftc_gov/pdf/p251201antitrustguidelinesbusin essactivitiesaffectingworkers2025.pdf (Jan. 2025).

collectively negotiate fares as a price-fixing arrangement condemned by Sherman Act).

95. The Board does not qualify for the state-action exemption because it is not actively supervised by the state. Again, the Board can adopt standards with a majority vote. A majority of the Board's voting representatives are active market participants. These market participants adopt anticompetitive standards without actual and substantive review from any state official. The Board's union representatives drive the Board's policy agenda, and the government representatives never modify, veto, or even question that agenda. Their supervision is merely potential, not actual.

96. Standards that affect the state's budget do not take effect until the legislature appropriates the necessary funds and the state receives CMS approval. But other standards, such as the training standards, may be adopted unilaterally. These standards are equally anticompetitive because they collectively dictate working conditions in the industry and block competition over those conditions. *See* Minn. Stat. § 181.213, subd. 1(a), 2(c)–(d) and (2a). It is irrelevant that they may not involve an explicit monetary component. *See Deslandes v. McDonald's USA, LCC,* 81 F.4th 699, 704–05 (7th Cir. 2023) (no-poach arrangement among franchises, which had no explicit monetary component, triggered review under Sherman Act); *Martinez v. NCAA,* No. 2:25-cv-2678049, 2025 WL 2678049, at *9–10 (D. Nev. Sept. 18, 2025) (treating

nonmonetary limitation on college-athlete eligibility as a labor-market restraint subject to antitrust scrutiny).

97.   The Board is not exempt from antitrust scrutiny because of its quasi-public status. The antitrust analysis does not focus on whether an entity is an agency of the government. It focuses on whether the entity involves anticompetitive activity by private market participants, as the Board does. *See Goldfarb*, 421 U.S. at 791–92 ("The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members.").

98.   Because the Act empowers the Board to engage in anticompetitive activity by private market participants and is not actively supervised by the state, it violates the Sherman Act and is preempted under the Supremacy Clause. *See N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1115 (state board created to regulate dental practice did not qualify for state-action exemption when it was not actively supervised by state officials).

**Count IV: Preemption under the National Labor Relations Act**

99.   Plaintiffs incorporate the preceding paragraphs by reference.

100.   The NLRA establishes a uniform and comprehensive regulatory system for union organizing, worker representation, and collective bargaining. It is the exclusive regulatory system for activities within its sphere, and it precludes any alternative or parallel state systems. States have no power to

establish their own systems of regulating private-sector labor relations within the Board's jurisdiction. *See* 29 U.S.C. § 151–169; *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246 (1959); *Guss v. Utah Lab. Rels. Bd.*, 353 U.S. 1, 9 (1935); *see also Amazon.com Servs. LLC v. N.Y. State Pub. Emp. Rels. Bd.*, No. 1:25-cv-05311, slip op. at 8–11 (E.D.N.Y. Nov. 11, 2025) (concluding that New York could not transfer authority over union-representation petitions and unfair labor practices to state agency).

101. The Act's creation of the Board sets up such an alternative system. The Board replicates collective bargaining by gathering representatives of management, labor, and workers to bargain over the terms and conditions of work. These are the same terms and conditions that would ordinarily be subject to collective bargaining under the NLRA. The Board therefore establishes a parallel, alternative system of workplace negotiation. *Compare* Minn. Stat. §181.213, subd. 1(a) (authorizing Board representatives to establish "employment standards," including wages), *with* 29 U.S.C. § 158(d) (requiring parties to bargain in good faith over "wages, hours, and other terms and conditions of employment").

102. The Board's alternative system deviates from the NLRA in material ways. For example, it establishes a different system for choosing bargaining representatives. Under the NLRA, bargaining representatives are chosen either by designation or certification. Designation occurs when workers

choose their representative through a non-election mechanism, such as card check. Certification occurs when workers choose a representative through a secret-ballot election overseen by the National Labor Relations Board ("NLRB"). *See* 29 U.S.C. § 159; 29 C.F.R. pt. 102, subp. C (establishing procedures for representation proceedings).

103.   The Board, however, designates representatives by appointment. Representatives are appointed by the state governor. Workers have no way to choose their representatives for themselves. Nor do they have any way to influence the representative's positions in bargaining. *See* Minn. Stat. § 181.212, subds. 1–2.

104.   Similarly, the NLRA guarantees an employer a right to choose its own representative in bargaining. *See* 29 U.S.C. § 158(b)(1)(B). But the Board denies the employer that right. Instead, like workers, the employer must accept the representative appointed to it. *See* Minn. Stat. § 181.212, subd. 1.

105.   The Board also establishes an alternative enforcement scheme. Under the NLRA, labor violations are policed through an administrative system overseen by the NLRB. Only the NLRB's general counsel can pursue a complaint. And only the NLRB can adjudicate that complaint on the merits. *See* 29 U.S.C. § 160(a), (c).

106.   By contrast, the Board enforces its standards through the Minnesota Department of Labor and Industry. The Department may

investigate and enforce the Board's standards through its own enforcement powers. Similarly, nursing home workers may enforce the Board's standards through a private right of action—an option not available under the NLRA. *See* Minn. Stat. §§ 181.217; 181.1721. *Cf.* 29 U.S.C. § 160(a), (c).

107.   The Act offers different remedies compared to the NLRA. Under the NLRA, the NLRB may award backpay or other "affirmative action." 29 U.S.C. § 160(c). These remedies are only equitable remedies designed to promote the public interest in labor peace. *See Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719, 728 (5th Cir. 2025); *NLRB v. Starbucks Corp.*, 125 F.4th 78, 95-6 (3d Cir. 2024). By contrast, the Act allows the Board's standards to be enforced through damages, including liquidated damages, as well as costs, disbursements, and attorneys' fees. *See* Minn. Stat. § 181.217, subd. 3(b). These remedies are unavailable under the NLRA. *See* 29 U.S.C. § 160(c); s*ee also Wis. Dep't of Indus., Lab. & Human Rels. v. Gould, Inc.*, 475 U.S. 282, 291 (1986) (holding that the NLRA's remedies are exclusive and cannot be supplemented by state law).

108.   The Board's structure undermines and conflicts with the NLRA and federal labor policy. It undermines the system by drawing collective bargaining out of the workplace and into an industry-wide forum. It also undermines the system by shifting the balance of power between management and labor. It gives labor new avenues of access to workplaces and workers

through mandatory training. It also gives labor a mechanism for imposing union standards across the industry instead of organizing and bargaining for standards workplace by workplace. *See, e.g.*, *Cannon v. Edgar*, 33 F.3d 880, 885–86 (7th Cir. 1994) (finding law preempted because it "meddle[d] with" the bargaining process); *Thunderbird Mining Co. v. Ventura*, 138 F. Supp. 2d 1193, 1197-98 (D. Minn. 2001) ("[A]ny state attempt to interfere, directly or indirectly, with the bargaining parties' economic weapons is preempted by federal law."); *Bechtel Const., Inc. v. United Bhd. of Carpenters & Joiners of Am.*, 812 F.2d 1220, 1225 (9th Cir. 1987) (finding that minimum-wage law for apprentices distorted bargaining process and was therefore preempted).

109.    Minnesota has no authority to create an alternative, overlapping system for regulating labor relations. It cannot replicate and distort the NLRA's system by moving bargaining into an alternative, state-created forum. *See Guss*, 353 U.S. at 9 (state could not maintain its own labor board with jurisdiction over matters within jurisdiction of NLRB); *Amazon.com Servs. LLC*, No. 1:25-cv-05311, slip op. at 8–11 (same).

110.    The Act and the Board's structure conflict with the NLRA and are thus preempted.

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiffs request the following relief:

43

a.  Declaring that the Act violates the First Amendment and Fourteenth Amendment of the U.S. Constitution, conflicts with the Sherman Act, and is preempted by the NLRA.

b.  Declaring the following as to the Board's structure and actions:

   i.  Deny the Members and Yona of life, liberty, or property without due process of law by subjecting them to regulatory power wielded by self-interested persons who are not subordinate to any disinterested government official;

   ii.  Violate the First Amendment of the U.S. Constitution by compelling the Members, Yona, and their workers to associate with representatives and public policies with which they may disagree;

   iii.  Violate the Sherman Antitrust Act by allowing private market participants to fix wages, hours, and other working conditions in the labor market for nursing home workers in Minnesota; and

   iv.  Are preempted by the NLRA because the Board creates an alternative, parallel system for regulating labor relations, worker representation, and collective bargaining.

c.  Injunctive Relief:

   i.  Prevents Blissenbach and all her respective officers, agents, servants, employees, and attorneys, and any person in active concert or participation with them who receive actual notice of the Court's injunction from enforcing any part of the Act or the Board's standards against the Members and Yona.

   ii.  Bars Blissenbach and Gulley and any of their agents, representatives, respective officers, agents, servants, employees, and attorneys, and any person in active concert or participation with them who receive actual notice of the Court's injunction from adopting any additional standards that regulate the Members and Yona.

44

d.  The waiver of any security and/or bond requirement applicable to the Members and Yona.

e.  Attorneys' fees and costs to the fullest extent provided by law, including 42 U.S.C. § 1983.

f.  For such other and further relief as this Court deems just and proper.


Dated: March 11, 2026

/s/ Thomas Revnew
Thomas Revnew, MN Bar No. 0295620
Lehoan Pham, MN Bar No. 0397635
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South Eighth Street
Minneapolis, MN 55401
612.630.1000
trevnew@littler.com
hpham@littler.com

Alex MacDonald (pro hac vice movant)
LITTLER MENDELSON, P.C.
Workplace Policy Institute
815 Connecticut Avenue, NW
Suite 400
Washington, DC  20006-4046
202.772.2505
amacdonald@littler.com

**Attorneys for Plaintiffs**

4912-9033-1781 / 131787.1001