UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LEADINGAGE MINNESOTA, CARE PROVIDERS OF MINNESOTA, and YONA NORTHSTAR LLC, | Court File No. _____ |
| Plaintiffs, | |
| v. | **DECLARATION OF DANIEL HILL** |
| NICOLE BLISSENBACH, *in her official capacity as the Commissioner of the Minnesota Department of Labor and Industry and as a member of the Minnesota Nursing Home Workforce Standards Board*, and JAMIE GULLEY, *in his official capacity as a member and chairperson of the Minnesota Nursing Home Workforce Standards Board*, | |
| Defendants. | |

STATE OF <u>ILLINOIS</u>          )

COUNTY OF <u>LAKE</u>          )

I, Daniel Hill, state and declare as follows:

1.     I currently serve as the Chief Operating Officer of Yona NorthStar, LLC ("Yona"). I offer this Declaration based on my personal knowledge, and in support of the Complaint and Plaintiffs' Motion for a Preliminary Injunction.

2.    Founded in 2021, Yona has been a registered limited liability company in Minnesota since October 11, 2021. Yona's registered office is located at 1010 Dale Street North, Saint Paul, Minnesota.

3.    Yona is not, and has never been, an association member of LeadingAge Minnesota or Care Providers of Minnesota.

4.    Yona contracts with healthcare, senior living, and assisted living communities to provide dining, housekeeping, and laundry services, including providers who provide nursing home services. Yona is a critical partner for facilities that care for Minnesota's elderly population.

5.    To help serve the state's elderly population, Yona employs a total of 433 employees at 51 client sites across Minnesota. These employees include housekeepers, laundry aides, floor care technicians, cooks and dietary aides who work at nursing home facilities.

6.    Because Yona's employees work in nursing home facilities, it is considered a "nursing home employer" under the Minnesota Nursing Home Workforce Standards Act (the "Act"). The Act's definition of "nursing home worker" encompasses "any worker who provides services in a nursing home in Minnesota, including . . . non-direct care staff," which includes Yona's employees. Yona must therefore comply with the Act and any published administrative standards issued by the Minnesota Nursing Home Workforce Standards Board (the "Board"), including the "Proposed Expedited Permanent

Rules Establishing Minimum Nursing Home Wage Standards; Notice of Intent to Adopt Expedited Permanent Rules Without A Public Hearing," for which the Board published a notice of adoption on October 28, 2024 (collectively, the "Wage Standards").

7.    For the 2026 minimum wage, the Wage Standards require that within thirty days of the Centers for Medicare & Medicaid (CMS) approving the reimbursement rate increase paid to nursing homes to implement the minimum wage, Yona must pay all of its covered nursing home workers a minimum wage of $19.00 per hour. Beginning on January 1, 2027, Yona must pay all of its covered nursing home workers a minimum wage of $20.50 per hour.

8.    The rates required by the Wage Standards are higher than the minimum rates maintained by Yona before the Wage Standards were adopted. To comply with the Wage Standards, Yona will have to pay higher rates to some nursing home workers. As a result, Yona will incur additional and ongoing costs. The Board's creation and its corresponding authority to regulate Yona forces it to modify how it sets the minimum wages of its employees. For years before the Board's creation, for non-union employees, Yona would provide the minimum wage (*i.e.*, starting wage) set by default federal, state, or local law and market factors. Non-union employees would earn increases to their hourly wage through performance reviews. Yona's process (from before

the Wage Standards' effective date) for setting the hourly wages (described above) applied to its covered nursing home workers. The Wage Standards now set the applicable minimum wages higher than what default federal, state, and local law require, and the Wage Standards provide for automatic increases to the minimum wage.

9. Yona is subject to various collective bargaining agreements ("CBAs") including SEIU Healthcare Minnesota and Iowa (IA) ("SEIU") and other union organizations. Yona's CBAs with these unions cover the individuals subject to the Wage Standards. Yona and the workers' certified bargaining representatives negotiated and agreed on the CBAs. Under most CBAs, the starting minimum wage ranges from $16–$17.50 per hour. The Wage Standards set the starting minimum wage for each of these occupations significantly higher than what the CBA requires.

10. Yona is an entity of limited means. Yona's revenue derives from its contracts with healthcare facilities, including nursing homes. These entities primarily rely on Medicare and Medicaid for funding. Yona's contracts with those entities have fixed contract prices and durations, and Yona did not budget for the wage increases from the Act when it negotiated those contracts. The Wage Standards force Yona into an impossible choice: (1) comply with the Wage Standards and make difficult financial decisions, which may include limiting or shutting down operations; or (2) refuse to comply with the Wage

4

Standards and face the corresponding penalties imposed by law, including a private civil action by a nursing home worker or administrative enforcement.

11.   If Yona had to shut down or limit its operations, doing so could have devastating rippling effects throughout Minnesota. Nursing homes across the state rely on Yona for critical services. These facilities would struggle to continue to serve the needs of the state's elderly population without Yona.

12.   Yona also expects that the Wage Standards will compress wage rates within its workforce. Yona's wage rates are dictated in part by the contracts it negotiates with the healthcare facilities. As mentioned, these contracts are for fixed contract prices and durations, and when Yona negotiated the prices for these existing contracts, it did not budget in the increased wages from the Act. To offset higher minimum wages, Yona will be forced to pay more senior employees less than it otherwise might. This wage compression will eliminate incentives for long-term employees by reducing wage differentiation between more and less experienced employees. In Yona's experience, more senior employees will be dissatisfied with the lack of wage progression and will be more likely to leave for other jobs. The result will be higher turnover, a less experienced workforce, and worse service for the healthcare facilities where Yona's employees work.

13.   Because Yona does not receive its revenues from the state, but instead through its contracts with nursing home facilities, it cannot offset

increased labor costs by applying for any supplemental funds made available by the state. It must either absorb the cost increases or raise the rates it charges to its nursing home clients. The latter option is not necessarily available in every case, or indeed in any case. Yona cannot raise its rates unilaterally; it must instead negotiate new rates with its clients. And those same clients have seen their costs rise as a result of the Board's standards.

14.     Yona is also subject to the Act's training requirements. The Act empowers the Board to design and mandate annual training for covered nursing home workers. This training must meet the Board's minimum criteria and must be delivered by a "certified worker organization" certified by the Board. The training covers subjects dictated by the Board, including employees' rights under the Board's standards and information about the Board itself. It is Yona's understanding based upon information published by the Minnesota Department of Labor and Industry that the current "certified worker organizations" consist of three labor unions.[1]

15.     To comply with the Act's training requirements, Yona must identify covered nursing home workers and arrange for those employees to receive training. This training may occur either on Yona's property or at

---

[1] A copy of the publication can be found at:
https://www.dli.mn.gov/sites/default/files/pdf/nhwsb_current_list_of_certified_worker_organizations_1025.pdf

another location. But if the training occurs at another location, Yona must pay workers' travel expenses.

16.    By law, Yona is required to pay a worker his or her normal hourly rate for the time it takes to complete the training. Yona is also required to keep records of the training and provide those records to the Board. It is also required to provide contact information for employees to the worker organization that conducted the training on request unless a worker opts out in writing. If the worker opts out, Yona must keep a record of the written opt-out.

17.    To comply with the above-cited training requirements, Yona will incur financial costs and operational burdens relating to covered nursing home workers:

    a.    Paying employees the time they spend in training;

    b.    Providing a training site on its own premises;

    c.    Arranging for coverage at its client sites while employees are receiving training; and

    d.    Paying administrative personnel to maintain records of training, track which employees have received the training, and provide required records to the Board and the worker organization providing the training.

18.   Yona estimates that these new expenses could result in a significant financial burden. Yona employs 433 covered nursing home workers. Yona estimates it would have to pay, ***at least***, $7,971.53 in training costs because of the Wage Standards. That figure does not account for additional administrative expenses.

19.   In 2027, Yona must certify that its covered nursing home workers have completed the mandated training.

20.   Yona expects that when the Board adopts standards and regulations in the future, it will be required to comply with those standards and regulations. It expects that these standards and regulations will impose expenses and regulatory burdens similar to those already imposed by the Board's existing standards.

21.   Yona would rather negotiate wages and working conditions through private negotiation with its non-union workers, or through the collective bargaining process with its unionized workers—as it always did before the Act's passage. But that is not a current option. Instead, the Act forces Yona to accept that "[m]embers representing nursing home employers or employer organizations" will represent Yona's interests on the Board. Yona did not vote for or select any Board member. Yet Yona has no choice but to associate with those employer-representatives on the Board. Yona is then subject to the Board's collective standard-setting process, which as described

above, has already or will inflict harm onto Yona, its workers, residents, and the larger community. Yona does not want to associate with the employer-representatives or the Board's structure and process, and would disassociate if Yona could choose. The Act, however, forces Yona to accept the employer-representatives' representation on the Board and to associate with public policies (*e.g.*, the Wage Standards and the Board's training requirements) that Yona opposes.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Dated: __March 9ᵗʰ__, 2026

Printed Name: Daniel Hill