UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LEADINGAGE MINNESOTA, CARE PROVIDERS OF MINNESOTA, and YONA NORTHSTAR LLC, | Court File No. _____ |
| Plaintiffs, | |
| v. | **DECLARATION OF FRED STRUZYK** |
| NICOLE BLISSENBACH, *in her official capacity as the Commissioner of the Minnesota Department of Labor and Industry and as a member of the Minnesota Nursing Home Workforce Standards Board*, and JAMIE GULLEY, *in his official capacity as a member and chairperson of the Minnesota Nursing Home Workforce Standards Board*, | |
| Defendants. | |

STATE OF <u>MINNESOTA</u>          )

COUNTY OF <u>STEARNS</u>          )

I, Fred Struzyk, state and declare as follows:

1.     I currently serve as the Chief Financial Officer of Premier Healthcare Management Services. Premier Healthcare Management Services was formed under Minnesota law on February 10, 2012, as a for-profit corporation. Premier Healthcare Management Services maintains its principal

place of business at 701 Stearns Ave., Paynesville, MN  56362.  Premier Healthcare Management Services is currently a member of Care Providers of Minnesota. I offer this Declaration based on my personal knowledge, and in support of the Complaint and Plaintiffs' Motion for a Preliminary Injunction.

2.      Premier Healthcare Management Services provides nursing home services to older adults in Minnesota. To serve that population, Premier Healthcare Management Services employs a total of 1,347 employees in Minnesota, and these employees include certified nursing assistants, trained medication aides, licensed practical nurses, and other personnel.

3.      Premier Healthcare Management Services must comply with the Minnesota Nursing Home Workforce Standards (the "Act") and any published administrative rules issued by the Minnesota Nursing Home Workforce Standards Board (the "Board"), including the "Proposed Expedited Permanent Rules Establishing Minimum Nursing Home Wage Standards; Notice of Intent to Adopt Expedited Permanent Rules Without A Public Hearing," for which the Board published a notice of adoption on October 28, 2024 (collectively, the "Wage Standards").

4.      For the 2026 minimum wage, the Wage Standards require that within thirty days of the Centers for Medicare & Medicaid (CMS) approving the reimbursement rate increase paid to nursing homes to implement the minimum wage, Premier Healthcare Management Services must pay all of its

2

covered nursing home workers a minimum wage of $19.00 per hour. Beginning on January 1, 2027, Premier Healthcare Management Services must pay all of its covered nursing home workers a minimum wage of $20.50 per hour.

5.    The Wage Standards also require that Premier Healthcare Management Services pay certain occupations—*i.e.*, certified nursing assistants, trained medication aides, and licensed practical nurses—a higher minimum wage in 2026, and January 1, 2027:

| Role | 2026 - These standards will go into effect 30 days after CMS's approval | January 1, 2027 |
|---|---|---|
| Certified Nursing Assistants | $22.50 per hour | $24.00 per hour |
| Trained Medication Aides | $23.50 per hour | $25.00 per hour |
| Licensed Practical Nurses | $27.00 per hour | $28.50 per hour |

6.    The rates required by the Wage Standards are higher than the minimum rates maintained by Premier Healthcare Management Services before the Wage Standards were adopted. To comply with the Wage Standards, Premier Healthcare Management Services will have to pay higher rates to some nursing home workers. As a result, Premier Healthcare Management Services will incur additional and ongoing costs. The Board's creation and its corresponding authority to regulate Premier Healthcare Management Services forces Premier Healthcare Management Services to modify how it sets the

3

minimum wages of its covered nursing home workers. For years before the Board's creation, for non-union employees, Premier Healthcare Management Services would provide the minimum wage (*i.e.*, starting wage) set by default federal, state, or local law and market factors. Non-union employees would earn increases to their hourly wage through a discretionary increase due to performance or a cost-of-living adjustment. Premier Healthcare Management Services's process (from before the Wage Standards' effective date) for setting the hourly wages (described above) applied to its covered general nursing home workers, certified nursing assistants, trained medication aides, and licensed practical nurses. The Wage Standards now set the applicable minimum wages higher than what default federal, state, and local law require, and the Wage Standards provide for automatic increases to the minimum wage.

7.      Premier Healthcare Management Services is a signatory to the following collective bargaining agreements, which are currently in effect: AFSCME 65 and United Steel Workers District 11. Those CBAs cover employees who are also subject to the Wage Standards. The Wage Standards will require Premier Healthcare Management Services to pay rates above the minimum rates established in the CBAs, which were collectively bargained with the workers' certified bargaining representatives.

8.      Premier Healthcare Management Services is an entity of limited means. The primary sources of funding for Premier Healthcare Management

Services come from: Medicare, Medicaid, insurance companies, and private pay. The Wage Standards force Premier Healthcare Management Services into an impossible choice: (1) comply with the Wage Standards and make difficult financial decisions including wage scale compression, reduction of hours for employees, and reduction of staffing levels in departments; or (2) refuse to comply with the Wage Standards and face the corresponding penalties imposed by law, including a private civil action by a nursing home worker or administrative enforcement.

9. As a result of the Wage Standards and within the last six months before the filing of this lawsuit, Premier Healthcare Management Services has done the following:

a. Delayed renovations to its facility that would increase comfort for the resident population; specifically, Premier postponed the submission of replacement and renovation project applications for exceptions to Minnesota's moratorium on nursing homes for its sites in Monticello and Melrose, Minnesota.

b. Started development of Centralized Services with the goal of reducing staff in non-nursing departments.

c. Notified its privately-paying resident population that prices are going to significantly increase because of the increased costs and

rates associated with the Wage Standards and compliance with Minnesota's rate equalization policy.

10. These actions not only affect Premier Healthcare Management Services and its employees, including nursing home workers, but also residents. In particular, because of the Wage Standards and other costs of compliance related to the Board's activities, Premier Healthcare Management Services has (within the six months before the filing of this lawsuit):

a. Reduced new admissions;

b. Developed plans to reduce staff-to-resident ratios, reducing on average 35 hours a day for resident care for a 50-bed facility;

c. Delayed capital improvements related to facilities housing residents; and

d. Canceled investments in quality-of-life improvements, such as new flooring and furniture.

11. Premier Healthcare Management Services also expects that the Wage Standards will compress wage rates within Premier's workforce. Premier's wage rates are dictated in part by federal reimbursement rates, which are paid on a per-resident basis. Its revenue is therefore largely fixed. So to offset higher minimum wages, Premier Healthcare Management Services will be forced to pay more senior employees less than it otherwise might. This wage compression will eliminate incentives for long-term employees by

reducing wage differentiation between more and less experienced employees. In Premier's experience, more senior employees will be dissatisfied with the lack of wage progression and will be more likely to leave for other jobs. For example, in 2026 employees above the new minimum wage standards will receive less than we had previously planned for. The result will be higher turnover, a less experienced workforce, and worse service for Premier's residents.

12.     Like most licensed nursing facilities in Minnesota, Premier Healthcare Management Services receives public financial support for residents enrolled in Medical Assistance, the state's Medicaid program. But that support is inadequate to offset all costs increases resulting from the Board's rules:

   a.     First, the Board's rules require all covered nursing home workers to be paid higher rates. But those covered workers serve all residents, not just those enrolled in Medical Assistance. Medical Assistance reimbursement rates are calculated on a resident-per-day basis. In addition, as a condition of participation in the Medicaid program, Minnesota's policy of "rate equalization" (256R.06) requires "Medical assistance rates not to exceed private pay residents' rates." So even if the reimbursement rates covered 100% of costs of service to Medical Assistance enrollees, Minnesota

nursing facility reimbursement policy both shifts the higher costs of providing service to non-enrollees by using total resident days from the cost report used to set annual rates, and prohibits the nursing facility from raising private pay rates above the Medicaid rates established by the state of Minnesota.

b.  Second, Medical Assistance reimbursement rarely covers the full cost of service even to enrolled residents. According to public estimates, revenue from public support covers approximately 97% of all facility costs. So even if every resident were enrolled in Medical Assistance, state reimbursements would still fall short of covering the full cost of the Wage Standards.  In fact, since reimbursement rates are set based upon the reporting period ending fifteen months prior to the rate year, the increased costs associated with the minimum wage rates, overtime, and holiday pay will not be immediately factored into the state's Medical Assistance's reimbursement rates until later years, if at all.

13.  In 2025, the Minnesota Legislature authorized a temporary supplement to per-day reimbursement rates to offset higher costs associated with the Wage Standards. The 2026 and January 1, 2027 minimum wage standards both have temporary rate supplements. But to receive either supplement, a nursing home employer must apply to the Minnesota

Department of Human Services. Both temporary supplements expire two years after implementation. For example, Premier Healthcare Management Services applied for the funds and received approval for the 2026 rate year and an estimate of the rate supplement. However, the estimated rate supplement will expire on December 31, 2028. The Wage Standards, by contrast, are permanent. The 2025 legislature also passed operating rate caps that will limit the absorption of the minimum wage standard costs that are funded by the temporary rate supplements. Regardless, Premier Healthcare Management estimates that complying with the Wage Standards will cost it about $160,000.00 ***more than*** the amount it will receive as part of the rate supplement.

14.    Premier Healthcare Management Services is also subject to the Act's training requirements. The Act empowers the Board to design and mandate annual training for covered nursing home workers. This training must meet the Board's minimum criteria and must be delivered by a "certified worker organization" certified by the Board. The training covers subjects dictated by the Board, including workers' rights under the Board's standards and information about the Board itself. It is Premier Healthcare Management Services's understanding based upon information published by the Minnesota

9

Department of Labor and Industry that the current "certified worker organizations" consist of three labor unions.[1]

15.    Several of Premier Healthcare Management Services facilities do not currently have any collective bargaining agreement with any union. Premier Healthcare Management Services does not have any unionized labor in those facilities. If the Act did not exist, Premier Healthcare Management Services would not engage any labor union to train its nursing home workers at those facilities.

16.    To comply with the Act's training requirements, Premier Healthcare Management Services must identify covered nursing home workers and arrange for those workers to receive training. This training may occur either on Premier's property or at another location. But if the training occurs at another location, Premier Healthcare Management Services must pay workers' travel expenses.

17.    By law, Premier Healthcare Management Services is required to pay a covered worker his or her normal hourly rate for the time it takes to complete the training. Premier Healthcare Management Services is also required to keep records of the training and provide those records to the Board.

---

[1] A copy of the publication can be found at:
https://www.dli.mn.gov/sites/default/files/pdf/nhwsb_current_list_of_certified_worker_organizations_1025.pdf

10

It is also required to provide contact information for employees to the worker organization that conducted the training on request unless a worker opts out in writing. If the worker opts out, Premier Healthcare Management Services must keep a record of the written opt-out.

18.    To comply with the above-cited training requirements, Premier Healthcare Management Services will incur financial costs and operational burdens relating to covered nursing home workers:

a.    Paying employees the time they spend in training;

b.    Providing a training site on its own premises;

c.    Arranging for coverage in its nursing home facilities while employees are receiving training; and

d.    Paying administrative personnel to maintain records of training, track which employees have received the training, and provide required records to the Board and the worker organization providing the training.

19.    Premier Healthcare Management Services estimates that these new expenses could result in a significant financial burden. Premier Healthcare Management Services employs over 1,100 covered nursing home workers. Budgeting one hour of training time for each worker, Premier Healthcare Management Services estimates it will spend at least $25,000.00. That figure does not account for additional administrative expenses.

20.    In 2027, Premier Healthcare Management Services must certify that its covered nursing home workers have completed the mandated training.

21.    Premier Healthcare Management Services expects that when the Board adopts rules and regulations in the future, it will be required to comply with those rules and regulations. It expects that these rules and regulations will impose expenses and regulatory burdens similar to those already imposed by the Board's existing rules.

22.    Premier Healthcare Management Services would rather negotiate wages and working conditions through private negotiation with its non-union workers, or through the collective bargaining process with its unionized workers—as it always did before the Act's passage. But that is not a current option. Instead, the Act forces Premier Healthcare Management Services to accept that "[m]embers representing nursing home employers or employer organizations" will represent Premier Healthcare Management Services' interests on the Board. Premier Healthcare Management Services did not vote for or select any Board representative. Yet Premier Healthcare Management Services has no choice but to associate with those employer-representatives on the Board. Premier Healthcare Management Services is then subject to the Board's collective standard-setting process, which as described above, has already or will inflict harm onto Premier Healthcare Management Services, its workers, residents, and the larger community. Premier Healthcare

12

Management Services does not want to associate with the employer-representatives or the Board's structure and process, and would disassociate if Premier Healthcare Management Services could choose. The Act, however, forces Premier Healthcare Management Services to accept the employer-representatives' representation on the Board and to associate with public policies (*e.g.*, the Wage Standards and the Board's training requirements) that Premier Healthcare Management Services opposes.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Dated: March 5 , 2026

Printed Name: Fred Sturzyk

13