UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

LEADINGAGE MINNESOTA,
CARE PROVIDERS OF
MINNESOTA, and YONA
NORTHSTAR LLC,

               Plaintiffs,

    v.

NICOLE BLISSENBACH, *in her official capacity as the Commissioner of the Minnesota Department of Labor and Industry and as a member of the Minnesota Nursing Home Workforce Standards Board*, and JAMIE GULLEY, *in his official capacity as a member and chairperson of the Minnesota Nursing Home Workforce Standards Board*,

               Defendants.

Court File No. _____

**DECLARATION OF KIMBER L. WRAALSTAD**

---

STATE OF <u>MINNESOTA</u>    )

COUNTY OF <u>COOK</u>    )

I, Kimber L. Wraalstad, state and declare as follows:

1. I currently serve as the Chief Executive Officer and Administrator of Cook County Hospital District a/k/a North Shore Health ("North Shore"). I offer this Declaration based on my personal knowledge, and in support of the Complaint and Plaintiffs' Motion for a Preliminary Injunction.

2.    "North Shore Health" became the assumed name of Cook County Hospital District on or about April 1, 2016. Cook County Hospital District has operated in Minnesota, in some form, dating back to the 1950s. North Shore currently maintains its principal place of business at 515 W. 5th Ave., Grand Marais, MN 55604.

3.    North Shore is currently an association member of LeadingAge Minnesota.

4.    North Shore is a small, rural, remote health care organization comprised of a sixteen-bed Critical Access Hospital, a thirty-seven-bed skilled nursing facility, a home health agency and an ambulance service, all located in Grand Marais, Minnesota. North Shore is critical to serving the needs of the local residents and all the visitors across the county—indeed, there are areas of Cook County, such as Grand Portage Reservation and the Gunflint Trail, that are over an hour away from Grand Marais.

5.    North Shore is also the only nursing home in Cook County. The next closest is the veterans' nursing home in Silver Bay, Minnesota (roughly sixty miles away) and the next closest hospital is over eighty miles away in Two Harbors, Minnesota. There are no other assisted living facilities anywhere in Cook County. Cook County has the second oldest population of all eighty-seven Minnesota counties. The elderly population in Cook County routinely depends on North Shore for healthcare needs.

6.    To serve the elderly population, North Shore employs a total of 131 in Minnesota, and these employees include certified nursing assistants, trained medication aides, licensed practical nurses, and other personnel.

7.    North Shore must comply with the Minnesota Nursing Home Workforce Standards Act (the "Act") and any published administrative standards issued by the Minnesota Nursing Home Workforce Standards Board (the "Board"), including the "Proposed Expedited Permanent Rules Establishing Minimum Nursing Home Wage Standards; Notice of Intent to Adopt Expedited Permanent Rules Without A Public Hearing," for which the Board published a notice of adoption on October 28, 2024 (collectively, the "Wage Standards").

8.    For the 2026 minimum wage, the Wage Standards require that within thirty days of the Centers for Medicare & Medicaid (CMS) approving the reimbursement rate increase paid to nursing homes to implement the minimum wage, North Shore must pay all of its covered nursing home workers a minimum wage of $19.00 per hour. Beginning on January 1, 2027, North Shore must pay all of its covered nursing home workers a minimum wage of $20.50 per hour.

9.    The Wage Standards also require that North Shore pay certain occupations—*i.e.*, certified nursing assistants, trained medication aides, and

3

licensed practical nurses—a starting minimum wage in 2026, and January 1, 2027 as follows:

| Role | 2026 - These standards will go into effect 30 days after CMS's approval | January 1, 2027 |
|---|---|---|
| Certified Nursing Assistants | $22.50 per hour | $24.00 per hour |
| Trained Medication Aides | $23.50 per hour | $25.00 per hour |
| Licensed Practical Nurses | $27.00 per hour | $28.50 per hour |

10.    The rates required by the Wage Standards are higher than the minimum rates maintained by North Shore before the Wage Standards were adopted. To comply with the Wage Standards, North Shore will have to pay higher rates to some nursing-home workers. As a result, North Shore will incur additional and ongoing costs. The Board's creation and its corresponding authority to regulate North Shore forces it to modify how it sets the minimum wages of its employees. For years before the Board's creation, for non-union employees, North Shore would provide the minimum wage (i.e., starting wage) set by default federal, state, or local law and market factors. Non-union employees would earn increases to their hourly wage through longevity increases. North Shore's process (from before the Wage Standards' effective date) for setting the hourly wages (described above) applied to its covered general nursing home workers, certified nursing assistants, trained

4

medication aides, and licensed practical nurses. The Wage Standards now set the applicable minimum wages higher than what default federal, state, and local law require, and the Wage Standards provide for automatic increases to the minimum wage.

11.    North Shore is a signatory to a collective bargaining agreement ("CBA") with SEIU Healthcare Minnesota and Iowa (IA) ("SEIU"), with a term of January 1, 2024 through December 31, 2026. North Shore's CBA with SEIU covers the individuals subject to the Wage Standards. North Shore and the workers' certified bargaining representatives negotiated and agreed on the CBA. Under the CBA, as of January 1, 2026, certified nursing assistants' starting minimum wage is $20.57 per hour; trained medication aides' starting minimum wage is $21.07 per hour; and licensed practical nurses' minimum wage is $26.25 per hour. The Wage Standards set the starting minimum wage for each of these occupations significantly higher than what the CBA requires.

12.    North Shore is an entity of limited means. The primary sources of funding come from Medicare, Medicaid, commercial insurance, private pay and tax levy. The Wage Standards force North Shore into an impossible choice: (1) comply with the Wage Standards and make difficult financial decisions, which may include shutting down operations; or (2) refuse to comply with the Wage Standards and face the corresponding penalties imposed by law,

5

including a private civil action by a nursing home worker or administrative enforcement.

13.    North Shore shutting down operations would create devastating ripple effects across Cook County and the surrounding area. As stated above, North Shore is the only nursing home in Cook County. Without North Shore, the elderly and vulnerable population who live in Cook County would have to travel at least sixty miles to find the next closest nursing home, which is in Silver Bay. That being said, the nursing home in Silver Bay is open only to senior citizens eligible for veterans' benefits. If North Shore does not operate, then senior citizens who otherwise would stay at North Shore may have to compete against one another for rooms at closer facilities. That increased competition would likely make it harder for senior citizens to find a place to stay near family and friends.

14.    North Shore qualifies as a special taxing district under Minnesota law because it operates as a hospital district. Accordingly, North Shore may levy taxes in an amount sufficient to pay its operating expenses. As a result of the Wage Standards' requirements, and in combination of other factors, North Shore has increased its levy for taxes payable in 2026 to $2,182,000.00. The 2026 tax levy amount is $284,500.00 higher than the 2025 tax levy. Attached as **Exhibit 1** is a true and correct copy of the letter dated September 5, 2025 that North Shore sent to Cook County's Auditor, Braidy Powers.

6

15. North Shore also expects that the Wage Standards will compress wage rates within its workforce. North Shore's wage rates are dictated in part by federal reimbursement rates, which are paid on a per-resident basis. Its revenue is therefore largely fixed. To offset higher minimum wages, North Shore will be forced to pay more senior employees less than it otherwise might. This wage compression will eliminate incentives for long-term employees by reducing wage differentiation between more and less experienced employees. In North Shore's experience, more senior employees will be dissatisfied with the lack of wage progression and will be more likely to leave for other jobs. For example, in 2026 employees already above the new minimum wage standards will receive a lower raise than North Shore had previously planned for. The result will be higher turnover, a less experienced workforce, and worse service for North Shore's residents.

16. Like most licensed nursing facilities in Minnesota, North Shore receives public financial support for residents enrolled in Medical Assistance, the state's Medicaid program. But that support is inadequate to offset all cost increases resulting from the Board's standards:

a. First, the Board's standards require all covered nursing home workers to be paid higher rates. But those workers serve all residents, not just those enrolled in Medical Assistance. Medical Assistance reimbursement rates are calculated on a resident-per-

day basis. In addition, as a condition of participation in the Medicaid program, Minnesota's policy of "rate equalization" (256R.06) requires "Medical assistance rates not to exceed private pay residents' rates." So even if the reimbursement rates covered 100% of costs of service to Medical Assistance enrollees, Minnesota nursing facility reimbursement policy both shifts the higher costs of providing service to non-enrollees by using total resident days from the cost report used to set annual rates, and prohibits the nursing facility from raising private pay rates above the Medicaid rates established by the state of Minnesota.

b. Second, Medical Assistance reimbursement rarely covers the full cost of service even to enrolled residents. According to public estimates, revenue from public support covers approximately 97% of all facility costs. So even if every resident were enrolled in Medical Assistance, state reimbursements would still fall short of covering the full cost of the Wage Standards. In fact, since reimbursement rates are set based upon the reporting period ending fifteen months prior to the rate year, the increased costs associated with the minimum wage rates, overtime, and holiday pay will not be immediately factored into the state's Medical Assistance's reimbursement rates until later years, if at all.

8

c.  Even before the Wage Standards became effective, during the prior reimbursement cycle, North Shore's operating costs already exceeded the reimbursement rate in three categories:

| Category | North Shore's Operating Cost | Reimbursed Amount |
|---|---|---|
| Direct Care | $306.06 | $238.73 |
| Other Care-related | $36.16 | $28.21 |
| Other Operating | $181.81 | $107.88 |

d.  The shortfall between North Shore's operating costs and the reimbursed amount will only increase because of the Wage Standards' requirements.

e.  Indeed, the nursing home within North Shore has operated at a loss over the past twenty years, at an average amount of $1,500,000.00 per year. In 2025, for instance, the nursing home operated at a loss of over $2,000,000.00.

17.  In 2025, the Minnesota Legislature authorized a temporary supplement to per-day reimbursement rates to offset higher costs associated with the Wage Standards. The 2026 and January 1, 2027 minimum wage standards both have temporary rate supplements. But to receive either supplement, a nursing home employer must apply to the Minnesota Department of Human Services. North Shore applied for the funds on October 1, 2025, and expects to receive a $1.67 rate supplement. North Shore does not currently expect that the 2026 temporary rate supplement will cover the

increased cost of compliance with the Wage Standards, and the temporary supplements expire two years after implementation. The Wage Standards, by contrast, are permanent. The 2025 legislature also passed operating rate caps that will limit the absorption of the minimum wage standard costs that are funded by the temporary rate supplements.

18. North Shore is also subject to the Act's training requirements. The Act empowers the Board to design and mandate annual training for covered nursing home workers. This training must meet the Board's minimum criteria and must be delivered by a "certified worker organization" certified by the Board. The training covers subjects dictated by the Board, including employees' rights under the Board's standards and information about the Board itself. It is North Shore's understanding based upon information published by the Minnesota Department of Labor and Industry that the current "certified worker organizations" consist of three labor unions.[1]

19. To comply with the Act's training requirements, North Shore must identify covered nursing home workers and arrange for those employees to receive training. This training may occur either on North Shore's property or

---

[1] A copy of the publication can be found at:
https://www.dli.mn.gov/sites/default/files/pdf/nhwsb_current_list_of_certified_worker_organizations_1025.pdf

10

at another location. But if the training occurs at another location, North Shore must pay workers' travel expenses.

20. By law, North Shore is required to pay a worker his or her normal hourly rate for the time it takes to complete the training. North Shore is also required to keep records of the training and provide those records to the Board. It is also required to provide contact information for employees to the worker organization that conducted the training on request unless a worker opts out in writing. If the worker opts out, North Shore must keep a record of the written opt-out.

21. To comply with the above-cited training requirements, North Shore will incur financial costs and operational burdens relating to covered nursing home workers:

a. Paying employees the time they spend in training;

b. Providing a training site on its own premises;

c. Arranging for coverage in its nursing home while employees are receiving training; and

d. Paying administrative personnel to maintain records of training, track which employees have received the training, and provide required records to the Board and the worker organization providing the training.

22.    North Shore estimates that these new expenses could result in a significant financial burden. North Shore employs 51 covered nursing home workers: (1) 11 certified nursing assistants; (2) 1 licensed practical nurse; (3) 1 trained medication aide; and (4) 38 other covered nursing home employees. Applying an average of $23 per hour for employees covered by the Wage Standards who work for North Shore and one hour's worth of training time, North Shore would have to pay, *at least*, $1,173.00 in training costs because of the Wage Standards. That figure does not account for additional administrative expenses.

23.    In 2027, North Shore must certify that its covered nursing home workers have completed the mandated training.

24.    In addition and to attempt to remain viable to continue to provide services to the community, North Shore earlier asked the legislature to allow a portion of the skilled nursing home to become part of the hospital as swing beds. Because a Critical Access Hospital is part of North Shore, the applicable regulations allow North Shore to obtain a 101% reimbursement rate for the hospital's reasonable costs rather than allocate costs to the nursing home that are over the reimbursement limits and therefore are not reimbursed; resulting in yearly losses of over $1,500,000.00. North Shore's nursing home is attached to a Critical Access Hospital. Accordingly, to allow for this opportunity, legislation was introduced (House File No. 1912/Senate File No. 1861) and was

incorporated into the House Health Omnibus Bill (House File No. 2435) and Senate Health and Human Services Omnibus Bill (Senate File No. 2669). *See* Minn. Stat. 144.5621 (2025). In short, North Shore sought a carveout that would allow it to reclassify one-half of its nursing home as a Critical Access Hospital. One-half of the nursing home, upon reclassification, would have "swing beds," which are available to patients who need acute care or a post-hospital skilled nursing facility care. Generally, before a patient can use a swing bed, the applicable regulations require that the patient stay in the hospital for three consecutive days. As part of the reclassification, North Shore also asked the legislature to waive any requirement relating to a prior hospital stay, waive the swing bed length of stay limitations and allow for the ability to have Medicaid provide reimbursement for swing bed care in the hospital level for nursing home type residents. Upon reclassification, North Shore projects that it could obtain an additional $800,000.00 in Medicare reimbursement, at no cost to Minnesota. This reclassification does not increase the burden on the Minnesota taxpayer; this reclassification simply allows North Shore to receive increased federal reimbursement. This reclassification also does not impose any burden on the nursing home residents. Residents would stay in their current room receiving care from their current caregivers. There will be no physical change to the building or beds. The residents will stay in their same room in their same bed. The only thing that will change is the name of the

location—*i.e.*, the residents would be staying in a hospital versus a nursing home.

25.    North Shore expects that when the Board adopts standards and regulations in the future, it will be required to comply with those standards and regulations. It expects that these standards and regulations will impose expenses and regulatory burdens similar to those already imposed by the Board's existing standards.

26.    North Shore would rather negotiate wages and working conditions through private negotiation with its non-union workers, or through the collective bargaining process with its unionized workers—as it always did before the Act's passage. But that is not a current option. Instead, the Act forces North Shore to accept that "[m]embers representing nursing home employers or employer organizations" will represent North Shore's interests on the Board. North Shore did not vote for or select any Board member. Yet North Shore has no choice but to associate with those employer-representatives on the Board. North Shore is then subject to the Board's collective standard-setting process, which as described above, has already or will inflict harm onto North Shore, its workers, residents, and the larger community. North Shore does not want to associate with the employer-representatives or the Board's structure and process, and would disassociate if North Shore could choose. The Act, however, forces North Shore to accept the

14

employer-representatives' representation on the Board and to associate with public policies (*e.g.*, the Wage Standards and the Board's training requirements) that North Shore opposes.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

Dated: March 9 , 2026

_Kimber L. Wraalstad_

Printed Name: Kimber L. Wraalstad

4918-0765-1462.4 / 131787.1001

15

# EXHIBIT 1



515 W 5TH AVE
GRAND MARAIS, MN 55604-3017
(218) 387-3040

September 5, 2025

Braidy Powers
Cook County Auditor
Cook County Minnesota
Grand Marais, MN  55604

Re:  Levy Request

Dear Braidy:

The Cook County Hospital District Board set the levy for taxes payable in 2026 at $2,182,000.  The levy amount for 2026 is increasing by $284,500 from the 2025 levy.

The meeting at which the final budget will be determined is scheduled for:

December 18, 2025

The meeting will begin at 9:30 a.m. and will be held in the Board Room at the Hospital.  If the room location is changed for any reason, information will be posted to guide attendees to the meeting location.

Should taxpayers have any questions, they may contact me at 218-387-3260 or via email at Kimber.wraalstad@northshorehealthgm.org.

Sincerely,

Kimber L. Wraalstad, FACHE
CEO/Administrator

Ex. 1, p. 001

www.northshorehospital.com