LeadingAge Minnesota, Care
Providers of Minnesota, and Yona
Northstar LLC,

      Plaintiffs,

      vs.

Nicole Blissenbach, in her official
capacity as Commissioner of the
Minnesota Department of Labor and
Industry, the Minnesota Department of
Labor and Industry and as a member of the
Minnesota Nursing Home Workforce
Standards Board, and Jamie Gulley, in his
official capacity as a member and
chairperson of the Minnesota Nursing
Home Workforce Standards Board,

      Defendants.

Civil File No. 26-cv-01816 (NEB/DJF)

**DEFENDANTS' MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS
COMPLAINT**

## INTRODUCTION

In this lawsuit, Plaintiffs LeadingAge Minnesota ("LeadingAge") and Care

Providers of Minnesota ("Care Providers") try for a second time, joining with Yona

Northstar LLC ("Yona Northstar"), to challenge minimum labor standards established by

the Minnesota Nursing Home Workforce Standards Board ("the Board"). First, Plaintiffs'

claims that the Board is unconstitutional, specifically that it violates the First Amendment

and due process and is preempted by the Sherman Antitrust Act and the National Labor

Relations Act ("NLRA"), all fail as a matter of law. Second, Plaintiffs LeadingAge

Minnesota and Care Providers are barred under res judicata from using a second lawsuit to

challenge the Board that promulgates the very rules they previously, unsuccessfully challenged. This Court should therefore dismiss Plaintiffs' claims with prejudice.

**FACTS**

*Minnesota Nursing Home Workforce Standards Board*

The Minnesota legislature established the Minnesota Nursing Home Workforce Standards Board in 2023. Minn. Stat. §§ 181.211-.217 ("the Act"); 2023 Minn. Laws ch. 53, art. 3, §§ 1-10. The Board has nine voting members: the Commissioner of the Minnesota Department of Human Services (or a designee), the Commissioner of the Minnesota Department of Health (or a designee), the Minnesota Department of Labor and Industry ("DLI") Commissioner (or a designee), and six other members who are appointed by the governor to the Board. Minn. Stat. § 181.212, subd. 1(a) (2024).

By statute, these six other members consist of: "three members who represent nursing home employers or employer organizations, appointed by the governor" and "three members who represent nursing home workers or worker organizations, appointed by the governor." Minn. Stat. § 181.212, subd. 1(a)(4)-(5). When appointing the nursing home employer members, the governor "shall consider the geographic distribution of nursing homes within the state." *Id*., subd. 1(b). These six appointed members of the Board serve four-year terms "following the initial staggered-lot determination. Minn. Stat. § 181.212, subd. 2(a). A member serves until a successor is appointed. *Id*., subd. 2(c).

The Board holds meetings that are subject to Minnesota's Open Meeting Law, Minnesota Statutes chapter 13D. *See* Minn. Stat. § 181.212, subd. 6. The Legisture directed that the Board is to hold public hearings on, and investigate, working conductions

2

in the nursing home industry. *Id.*, subd. 8. Information on the Board, including meeting minutes, is available publicly online at *https://www.dli.mn.gov/about-department/boards-and-councils/nursing-home-workforce-standards-board* (last visited Apr. 8, 2026); *see, e.g.*, ECF No. 9-1, Declaration of Thomas R. Revnew. The Board is required to vote to take any action, including establishing minimum employment standards. Minn. Stat. § 181.212 subd. 7. For a vote to pass, there must be at least five affirmative votes and at least two of those votes must be from commissioner members or their designees. *Id.*

The Board is statutorily mandated to adopt rules establishing minimum nursing home employment standards, including initial standards for wages for nursing home workers. Minn. Stat. § 181.213 subd. 1. To set wage standards, the Board is directed to investigate the market conditions and existing wages, benefits, and working conditions. *Id.*, subd. 2. The Board is instructed to consider specific information, including wage rate and benefit data, wages and benefits paid to nursing home workers in relevant geographic areas, relevant collective bargaining agreements, and testimony from current and former nursing home workers, employers, and their organizations. *Id.* The Board must also determine the impact of any wage increase on nursing home operating payment rates. *Id.*, subd. 1(c). Then, any resulting increase in the payment rate is required to be reported to the legislature and any minimum wage standard is contingent on appropriation by the legislature. *Id.* Further, any employment standards that are determined to exceed the current payment rates under Minn. Stat. §§ 256R.21 and 256R.25, also require federal approval. *Id.*, subd. 2a(b). Lastly, the legislature provided for a rate adjustment to

3

compensate for increased pay rates for the years 2026 and 2027, in anticipation of the higher pay rates.  Minn. Stat. § 256R.495 (2024).

In addition, consistent with its statutory authority, the Board established a required curriculum for training nursing home workers and the Board must certify the worker organizations that provide the training. Minn. Stat. § 181.214; *see also id.* § 181.211, subd. 10 (defining "worker organization").  Section 181.214 sets out required topics for the training curriculum, duties of the certified worker organizations, and duties of the nursing home employers surrounding the trainings.  *Id.*

### *Promulgated Standards*

The Board voted to approve proposed rules establishing minimum holiday pay standards for nursing homes in May 2024.  (ECF No. 9-1, Ex. N.)  Accordingly, in August 2024, the Board published a notice of intent to adopt in the State Register, and in December 2024, adopted the holiday pay standards.  49 Minn. Reg. 191 (Aug. 26, 2024); 49 Minn. Reg. 628 (Dec. 9, 2024).  The holiday pay rule went into effect on January 1, 2025.  Minn. R 5200.2010 (2025).  The Board has also promulgated the standards for applying and qualifying as a certified worker organization.  Minn. R. 5200.2030-2040; 49 Minn. Reg. 191 (Aug. 26, 2024); 49 Minn. Reg. 628 (Dec. 9, 2024).

The Board voted to approve proposed rules establishing minimum wages for nursing home workers in June 2024.  (ECF No. 9-1, Ex. O.)  The Board discussed the minimum wage standards at its open meetings.  *See* Minn. Stat. § 181.212, subd. 6.  For example, on May 9, 2024, the Board discussed the costs for implementing minimum wage standards.  (ECF No. 9-1, Ex. N.)  In addition to the Board members' contributions to the discussion,

the meeting minutes reflect that members of the public, specifically Todd Bergstrom[1] and Jeff Bostic[2], were invited to join the discussion. *Id.* These non-Board members shared their opinions that the Board needed consider wage compression, other operating costs, and the up-front costs of implementation to the facilities. *Id.* In June 2024, the proposed rules establishing minimum nursing home wages were published in the Minnesota State Register. 48 Minn. Reg. 52 (June 24, 2024). The notice of adoption of these rules was published in October 2024. 49 Minn. Reg. 18 (Oct. 28, 2024). The wage standards will go into effect thirty days after federal approval. Minn. R. 5200.2070, subp. 3; Minn. Stat. § 181.213, subd 2a(b).

***LeadingAge and Care Providers' Previous Challenge to the Board's Holiday Pay Rule***

In November 2024, LeadingAge and Care Providers filed a complaint challenging the Board's holiday pay rules in *LeadingAge Minnesota et al. v. Blissenbach*, D. Minn. No. 24-CV-04282 (LMP/JFD) and 8th Cir. No. 25-2252 ("*LeadingAge I*"). LeadingAge and Care Providers filed an amended complaint in January 2025, alleging the holiday pay rules were preempted by the NLRA and unconstitutionally vague. The district court granted Defendant Commissioner Blissenbach's motion to dismiss, denied the plaintiffs'

---

[1] Based on publicly available information, it appears Todd Bergstrom is the Director of Research and Data Analysis for Care Providers of Minnesota. *See Care Providers of Minnesota Staff,* Care Providers of Minnesota, https://www.careproviders.org/CPM/CPM/About/CPMStaff.aspx (last visited Apr. 9, 2026).

[2] Based on publicly available information, it appears Jeff Bostic is the Director of Data and Financial Policy for LeadingAge. *See Our Team,* LeadingAge Minnesota, https://www.leadingagemn.org/about-us/our-team/ (last visited Apr. 9, 2026).

motion for a preliminary injunction as moot, and dismissed the amended complaint without prejudice; judgment was entered on May 27, 2025. *See LeadingAge I*, No. 24-CV-04282 (LMP/JFD) (D. Minn., ECF Nos. 50-51). LeadingAge Minnesota and Care Providers appealed, and the matter is currently pending before the Eighth Circuit. *See LeadingAge Minnesota et al. v. Blissenbach*, No. 25-2252 (8th Cir.).

### *Procedural History*

Plaintiffs filed their Complaint in this matter in March 2026, challenging the Act and the creation and structure of the Board generally. (ECF No. 9.) The Complaint alleges that the Act and the Board violate the First Amendment and due process rights of Plaintiffs and their member organizations, and are preempted by both the National Labor Relations Act and the Sherman Antitrust Act.

## STANDARD OF REVIEW.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b), a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding such a motion, a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations or a plaintiff's legal conclusions drawn from the facts alleged. *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

A plaintiff must plead facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The court must grant a motion to dismiss when the complaint does not allege "enough facts to state a claim to relief that is plausible on its face" rather than merely "conceivable." *Id*. at 570. In addition, Rule 12(b)(6) allows a court to dismiss a claim based on a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). In reviewing a motion to dismiss, a court may consider matters of public record, exhibits attached to the pleadings, and materials embraced by the pleadings. *Mulvenon v. Greenwood*, 643 F.3d 653, 656-57 (8th Cir. 2011).

## ARGUMENT

This Court should dismiss Plaintiffs' claims in their entirety. Plaintiffs attempt to stretch established principles of the First Amendment, due process, the NLRA, and the Sherman Antitrust Act. Plaintiffs do so to ask this Court to take the drastic step of stopping a statutorily established state board from establishing minimum employment standards for nursing home workers and from stopping DLI from enforcing those standards. Plaintiffs' disagreement with the minimum standards established does not render those standards or their creation and enforcement unconstitutional.

Plaintiffs' constitutional challenges are facial challenges to the Act. Generally, a plaintiff cannot succeed on a facial challenge to a law unless they "establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745, (1987). In First Amendment cases, however, the question is whether "a substantial number of its applications are unconstitutional, judged in relation to the statute's

7

plainly legitimate sweep." *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021). Although less demanding, it is still a rigorous standard. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

First, each of their claims fail as a matter of law. The Act and the Board do not violate the First Amendment or due process. And the Board's structure and procedures are not preempted by either the Sherman Antitrust Act or the NLRA. The Board is setting minimum labor standards, a well-established bedrock of state government. Second, LeadingAge and Care Providers are barred by from raising facial constitutional challenges to the Act and the Board under res judicata.

## I. PLAINTIFFS FAIL TO STATE A FIRST AMENDMENT CLAIM AS A MATTER OF LAW

Plaintiffs bring a novel First Amendment claim which, if accepted, has far-reaching implications. Plaintiffs argue that the makeup of the Board violates their First Amendment rights because they are allegedly being forced "to associate with representatives and policies against their will" and "to accept representatives designated by the state," and that they wish to "dissociate" from the Board's process and representatives because they disagree with the rules promulgated by the Board. (ECF No. 9 at ¶¶ 68-69.) This Court should dismiss Plaintiffs' First Amendment claim because they fail to plausibly allege a violation of their First Amendment free association rights and even if they did, the State of Minnesota has compelling interests in having a board comprised of both industry members and state officials that sets workforce standards for nursing home workers.

**A. Legal Standard for Free Association.**

The First Amendment confers an associational right to engage in speech, assembly, petition for redress, and religious exercise. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). This associational right encompasses a freedom not to associate. *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018). The freedom of association right may be implicated when laws compel speech, a person is forced to subsidize the speech of others, a group is required to take in members they do not want, individuals are punished for their political affiliations, an organization's members are denied benefits based on the organization's message, or where there is certain compelled disclosure of affiliation with groups engaged in advocacy. *Id.* at 892-94; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021). This freedom is not absolute, however, and where implicated, it can be overridden by a compelling state interest unrelated to the suppression of ideas and that cannot be achieved through significantly less restrictive means. *Dale*, 594 U.S. at 648.

**B. Plaintiffs Have Not Plausibly Alleged Any Violation of their First Amendment Associational Right.**

This Court should dismiss Plaintiffs' First Amendment claim with prejudice for at least four reasons. First, Plaintiffs have not plausibly alleged an infringement of their free association rights as a matter of law because they do not identify any intrusion on their expressive activity that has been found to have violated the First Amendment. Here, Plaintiffs do not allege that they have been forced to accept a member into their groups, that they have been compelled to speak, that they have been forced to pay union dues or

otherwise subsidize speech with which they disagree, or that they have been punished for their association with a group or the group's message. Plaintiffs also rely on cases that are inapposite and that present facts that are not at issue here. For instance, Plaintiffs rely on *Janus*, which involved requiring non-union members to pay union fees and thus subsidize speech with which they disagree. Plaintiffs also rely on *Dale*, which involved the forced inclusion of an unwanted member in a group. As the alleged facts underlying Plaintiffs' challenge do not fit within any category of forced expressive activity found to have violated the First Amendment, their claim should be rejected.

Second, there is no violation of Plaintiffs' First Amendment rights to free association when they remain free to associate to voice their disapproval of the Board's representatives and standards. *See Bierman v. Dayton*, 227 F. Supp. 3d 1022, 1029-30 (D. Minn. 2017) (finding no violation of associational rights where the plaintiffs were free to voice their disapproval of an exclusive representative's message, and nothing about the state law affected the composition of any group formed by the plaintiffs by making such group membership less desirable) (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 69-70 (2006)), *aff'd*, 900 F.3d 570 (8th Cir. 2018). For instance, the Board has regular public meetings and also holds public hearings. *See* Minn. Stat. § 181.212, subds. 6 & 8; (*see also* ECF No. 9-1 at p. 20 (Board meeting minutes attached as Exhibit D to the complaint, with update on a public hearing workgroup and public forums)). Plaintiffs remain free to attend the Board's open meetings and also to participate in public hearings.

10

Plaintiffs also have the opportunity to comment on the rules promulgated by the Board, and to voice their opposition to or express their concerns about such rules. *See* Minn. Stat. §§ 181.213 (describing Board authority to set standards), 14.389 (2024) (describing notice and comment process for expedited rulemaking). It appears Plaintiffs LeadingAge and Care Providers have done so in the past, and remain free to do so in the future. (*See* ECF No. 9-1 at pp. 363-64 (in Board meeting minutes attached as Exhibit EE to the complaint, discussion of public comments, including a letter submitted by a law firm on behalf of LeadingAge and Care Providers about the NLRA, and a comment by Care Providers about the rulemaking process)); *see also In the Matter Adoption of Expedited Permanent Rules Governing Certification Criteria, Notice Posting Requirements, and Holiday Pay Rules for Nursing Home Workers*, No. 28-9001-40213, 2024 WL 4720325 (Minn. Office Admin. Hrgs. Oct. 31, 2024) (addressing commenters' arguments that the Board's proposed rules are preempted by the NLRA and unconstitutional because they allegedly impair contracts).

Given their ability to attend public meetings, participate in public hearings, voice opposition to or concerns about the Board's proposed rules, and also to otherwise engage in advocacy in opposition to the Board and its rules, it is unclear how Plaintiffs maintain there is an infringement of their associational rights under the First Amendment. To the extent Plaintiffs maintain that the use of the word "represent" in section 181.212 to refer to the nursing home employer and nursing home worker members of Board means that they are somehow being forced to associate with people and conduct which they disagree,

Plaintiffs' claim is implausible given the various fora available to express opposition to the Board's actions and in which they have indeed expressed their opposition.

Even though there is no plausible allegation in the complaint about the appearance or impression of association with Board members or policies with which Plaintiffs disagree[3]—particularly given Plaintiffs' ability to voice their opposition to the Board—a mere impression of association should not be sufficient to maintain a First Amendment claim. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457 n.9 (2008) (distinguishing cases that involved "*actual* association" and explaining that, "We are aware of no case in which the mere *impression* of association was held to place a severe burden on a group's First Amendment rights, but we need not decide that question here").

Because Plaintiffs remain free to associate to voice their opposition to the Board and the Board's rules, and to associate with others who also oppose the Board without consequences, and they are not otherwise being forced to subsidize speech with which they

---

[3] As Plaintiffs include groups that represent nursing home employers and Yona Northstar, which is a company and employer that provides staff for nursing homes, Plaintiffs plainly do not have standing to represent the associational rights of nursing home workers.

As to the nursing home employer representatives on the board, it is curious that Plaintiffs LeadingAge and Care Providers indicate they do not want to associate with the Board members. It is a matter of public record that the nursing home employer representatives on the Board are currently Paula Rocheleau, Mary Swanson, and Katie Lundmark. *See NHWSB Members*, Minn. Dep't of Labor & Indus., https://www.dli.mn.gov/about-department/boards-and-councils/nhwsb-members; (last visited Apr. 9, 2026). Based on publicly available information, it appears Paula Rocheleau sits on the Board of Directors of Care Providers of Minnesota. *See Meet the Board of Directors!*, Care Providers of Minnesota, https://www.careproviders.org/CPM/CPM/About-Us/BOD/MeetTheBOD.aspx (last visited Apr. 9, 2026).

disagree, they have not plausibly alleged a violation of their First Amendment free association rights.

Third, although this case is fundamentally different from the collective bargaining cases Plaintiffs rely upon, the state designating an exclusive representative to meet and confer with the state does not violate the First Amendment. As an initial matter, Plaintiffs extensively rely on cases involving unions and collective bargaining such as *Janus* and *Knox*, but these cases are inapposite because the Board is not a collective bargaining entity or union. Rather, it is a state board comprised of different members (including state officials) with authority to set statewide standards for nursing home workers and to hold public hearings to investigate working conditions. That the board sets such workforce standards and has some union members, does not make the board a union.

But even if, for the sake of argument, the Board is somehow analogous to the cases that involve exclusive representation, Plaintiffs have failed to allege a First Amendment violation as a matter of law. As the Supreme Court recognized in *Knight*—which remains good law after *Janus*, *see Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018)—the Constitution does not give members of the public generally a right to be heard by public bodies making policy decisions. *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283-84 (1984). The Court recognized that the unique status of an exclusive representative amplifies that representative's voice in the policymaking process, but such amplification does not impair an individual's First Amendment rights. *Id*. at 288; *see also Bierman*, 227 F. Supp. 3d at 1029 (finding that simply because the State had chosen to listen to a union

13

on issues related to the plaintiffs' employment did not mean that the plaintiffs were forced to associate with the union).

Plaintiffs unsuccessfully attempt to distinguish *Knight* in their complaint by arguing that the *Knight* exception applies only when the state is soliciting views to set its own public policy or is choosing its own bargaining power, and not when "the state injects a bargaining agent into an otherwise private negotiation." (ECF No. 9 at ¶¶ 66-68.) Such legal conclusions in the complaint are not entitled to the presumption of truth, and are otherwise unavailing. A state board comprised of different members tasked with holding hearings and investigating workplace conditions, and setting statewide workplace standards, is of course soliciting views to set the state's public policy. Although *Knight* concerns exclusive representatives in the bargaining context, choosing such representatives does not violate the associational rights of those that disagree with the exclusive representative.

Fourth, Plaintiffs' challenge does not sound in First Amendment principles, but instead in mere disagreement with the public policy decisions made by a state board. In essence, Plaintiffs appear to argue their First Amendment free association rights are violated because they disagree with board members and the standards voted upon by the Board. Federal courts are especially reluctant to intervene in disputes of this nature. For instance, in *Bierman*, the district court expressly stated that it "remains mindful of its role as a federal court being asked to interfere with a state's policy decision of how to gather information in order to make Medicaid policy," noting the federalism and separation-of-powers concerns implicated by intruding into state policymaking in such a manner. 227 F. Supp. 3d at 1030 (discussing *Knight*, 465 U.S. at 285).

14

Similarly, Plaintiffs ask this Court to intervene in state law on the basis that they disagree with certain representatives of a state board and the public policy decisions that the Board is making consistent with its authority under state law. This is an extreme argument raising significant federalism and separation-of-powers concerns. Indeed, there is little to distinguish Plaintiffs' First Amendment claims about the Board from a party asking a federal court to enjoin enforcement of state standards promulgated by a state agency because the party disagrees with the views of the state agency commissioner. This Court should decline to extend free association protections to a novel theory rooted in disagreement with a state's policy decision to use a board to set standards protecting nursing home workers.

For the reasons discussed above, Plaintiffs failed to allege an infringement of their First Amendment rights as a matter of law. Because there is no violation of the First Amendment, Defendants need not demonstrate any special justification to support the laws at issue here. *See Bierman*, 227 F. Supp. 3d at 1031 (citing *Univ. of Pa. v. EEOC*, 493 U.S. 182, 201 (1990)); *see also Pro-Life Action Ministries v. City of Minneapolis*, 700 F. Supp. 3d 687, 700 (D. Minn. Oct. 30, 2023) ("It is not necessary to reach whether less restrictive means are available to the City here because Plaintiffs do not plausibly state a claim of violation of their right to associate."). Accordingly, this Court should dismiss their First Amendment claim with prejudice.

15

**C.** **The Board's Structure and Authority Satisfy the Exacting Scrutiny Standard.**

Even if Plaintiffs plausibly stated a First Amendment violation (which they do not), this Court should still dismiss their First Amendment claim because the Board's structure and authority satisfy the exacting level of scrutiny identified by Plaintiffs. As explained above, the First Amendment associational right is not absolute and can be overridden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 530 U.S. at 623; *see also Dale*, 530 U.S. at 648.

The Board and the regulations promulgated by the Board serve compelling state interest unrelated to the suppression of ideas. The legislature created the Board to establish minimum nursing home employment standards to protect the health and welfare of nursing home workers. Minn. Stat § 181.213, subd. 1. In addition to the three state agency representatives, the legislature composed the Board with nursing home employers and workers assisting with formulating the standards governing those occupations. Minn. Stat. § 181.212, subd. 1. Within the context of Chapter 214 of Minnesota statutes, which governs certain examining and licensing boards, analogous to this Board, the legislature has stated that "it is desirable for boards composed primarily of members of the occupations so regulated to be charged with formulating the policies and standards governing the occupation." Minn. Stat. § 214.001, subd. 1. (providing policy for regulating certain occupations).

Accordingly, the Board is one of many boards in Minnesota with members with experience in the relevant field. *See, e.g.*, Minn. Stat. §§ 151.02 (including three public members and six pharmacists on the Minnesota State Board of Pharmacy); 122A.07, subd. 2 (including teachers from different schools, geographic areas, and specialties on the Professional Educator Licensing and Standards Board); 182.664, subd. 1 (including members that represent management, labor, and the general public on the Minnesota Occupational Safety and Health Review Board); 179A.041, subd. 1 (including members on the Public Employment Relations Board that represent public employees, public employers, and the public at large). *See also State ex rel. Associated Master Barbers & Beauticians of Minn. v. Eischen*, 76 N.W.2d 385, 386-87 (1956) (acknowledging that many state boards require experience in the occupation as the basis for appointment to a board). It is therefore not unusual in Minnesota state government for boards, like the Board, to have members from the relevant industry that are appointed by the governor.

Additionally, these compelling state interests cannot be achieved through less restrictive means. It should be noted that it is not entirely clear if Plaintiffs take issue with the Board itself, its structure, or its rules, and as noted above, there has been no restriction or infringement on Plaintiffs' First Amendment rights. But for the sake of argument, Plaintiffs contend that the standards adopted by the Board could have been adopted through normal legislation. (ECF No. 9, ¶ 75.) This argument ignores the fact that the Legislature established the Board and mandated it promulgate rules. Further, the creation of the Board serves the compelling interests of creating standards that protect nursing home workers and allowing input from state officials, nursing home employers, and nursing home workers in

setting such standards.  Moreover, the Board's rules are promulgated through a rulemaking process that provides notice of the proposed rules and allows for public comment.  *See* Minn. Stat. § 14.389.  Finally, the legislature provides oversight of the Board as the Board must report on these rules to the legislature annually.  *See id*. § 181.212, subd. 11.  In addition, the minimum wage increases require legislative appropriation before they go into effect.  Minn. R. 5200.2070, subp. 2.

The Board's structure and its authority to set workplace standards serve compelling state interests unrelated to the suppression of ideas, and cannot be achieved through less restrictive means; and thus, satisfies the level of scrutiny needed to overcome any alleged infringement of Plaintiffs' associational rights.  This Court should therefore dismiss Plaintiffs' First Amendment claim.

## II.    PLAINTIFFS DUE PROCESS CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs do not specify whether they raise a substantive or procedural due process challenge.[4]  A Fourteenth Amendment procedural due process claim is cognizable only if the government deprives an individual of a recognized interest in liberty or property.  *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972).  Before depriving an individual of a liberty or property interest, the government must provide sufficient minimum procedures to

---

[4] To the extent that Plaintiffs attempt to assert a substantive due process right, they do not state a claim as a matter of law because they do not allege conduct that would violate a substantive due process right.  For instance, the Supreme Court has denied a substantive due process right to operate a business free from regulation, stating "the activity of doing business, or the activity of making a profit is not property in the ordinary sense." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (emphasis in original).

protect the interest.  *See Washington v. Harper*, 494 U.S. 210, 220 (1990).  A government entity that provides these procedures gives a citizen constitutionally adequate procedural due process.  *Id*.

Plaintiffs seem to assert a claim that the Act and the Board violate procedural due process by including employer and worker representatives on the Board.  To establish a procedural due process claim, a plaintiff must allege: (1) the deprivation of a protected liberty or property interest and (2) a lack of adequate procedures to protect that interest. *Bd. of Regents*, 408 U.S. at 570-71.  Plaintiffs do neither. Instead, Plaintiffs broadly argue that the Act and the Board violate due process by claiming that the Board's decisions are made by non-neutral decision-makers.

The Board is not a self-interested decision-maker, but rather a group of industry representatives (including both nursing home employers and nursing home workers) *with* neutral, government Commissioner members, specifically, the commissioners, or their designees, of human services, health, and DLI.  Minn. Stat. § 181.212 subd. 1(a).  Any vote that is passed by the Board requires an affirmative vote from at least two of these commissioner members.  *Id.* at subd. 7.  In adopting initial wage standards, a task mandated to the Board to complete by November 1, 2024, the Board was authorized to proceed under the expedited rulemaking process in Minnesota Statutes section 14.389.  Minn. Stat. § 181.213 subd. 1(b).  The Board discussed and voted on these standards in open meetings where the public had the opportunity to participate.  (ECF No. 9-1, Ex. N.)  The Board is also authorized by statute to promulgate certification criteria for certifying worker organizations.  Minn. Stat. § 181.214 subd. 1(b); Minn. Stat. § 14.389.

Still, Plaintiffs assert that the Board members are not neutral decision-makers or regulators in violation of their due process rights. (ECF No. 9 at ¶¶ 78-81.) Each of Plaintiffs' cited authorities in their complaint is inapplicable. Plaintiffs cite to *State of Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121–22 (1928), where private owners of less than one-half of the land in proximity of a proposed building had final authority to withhold consent for any self-interested or arbitrary reason; *Eubank v. City of Richmond*, 226 U.S. 137, 143 (1912), where a city ordinance allowed property owners to establish set-off requirements neighboring lots; and *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), where a provision allowed a majority of coal producers and miners to set wages and working conditions regardless of the minority's opinion. None of these cases are determinative here. The Board consists not only of employer and worker members, but also three neutral commissioner members. No majority of worker or employer representatives can dictate the outcome of the promulgated rules or standards as two of the commissioner members are required to vote in the affirmative for any measure to pass. Further, the statutory scheme, legislative oversight, and rule promulgation processes add additional process to any vote or opinion to which the worker or employer representatives contribute.

To the extent that Plaintiffs rely on *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19 (D.C. Cir. 2016), the case is inapposite. The Passenger Rail Investment and Improvement Act assigned Amtrak, a for-profit corporation, and the Federal Railroad Administration with developing performance metrics to "enforc[e] Amtrak's statutory priority over other trains." *Id.* at 23. If Amtrak and the Federal Railroad Administration

disagreed on the standards, they would petition for an arbitrator to resolve the dispute through binding arbitration. *Id.* The court concluded that, because the arbitrator could put into effect Amtrak's proposed standards, effectively removing the approval and permission of a neutral federal agency, the scheme violated due process. *Id.*

First, this case is not an appropriate comparison to the Act and the Board's rules here, because the Board's rules, while voted on by the Board members, go through a statutory notice and comment procedure. The Board follows open meeting laws, meaning that members of the public, including Plaintiffs and other interested parties, have the right to attend the Board's meetings and hear the discussions and development of the rules. Then, the voted-upon rules are issued for comment and published in the State Register.

Further, when this matter was back before the D.C. Circuit Court two years later in 2016, the D.C. Circuit Court severed the arbitration provision and the result was that the statute did not violate due process. *Ass'n of Am. Railroads v. United States Dep't of Transportation*, 896 F.3d 539, 541 (D.C. Cir. 2018) ("*American Railroads II*"). The *II* court concluded that, without binding arbitration, "[a]dministration independently determined that those standards were in the public interest—not just Amtrak's interests—Amtrak's proposals would hit a dead-end." *Id.* at 546. The Act and Board here are distinguishable from this line of cases given the Board, like in *American Railroads II*, ensures independent agency approval of the Board's actions. Here, two of the commissioner representative Board members must vote with the affirmative to pass a rule and move forward with promulgation. As such, even under the *American Railroads* jurisprudence, the Board and its structure do not violate due process.

The Board, in following its legislative mandate, requires the approval of at least two commissioner members to establish a minimum standard for nursing home workers. Further, the standards set by the Board are discussed and agreed to at open meetings during which non-Board members are able to share their perspectives. The promulgated standards are then published for comment in the State Register. Plaintiffs' due process challenge fails as a matter of law.

## III. THE BOARD IS NOT PREEMPTED BY THE SHERMAN ANTITRUST ACT.

Under the Sherman Act, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" is illegal. 15 U.S.C. § 1. A state statute is preempted by the Sherman Act, and a party may enjoin its enforcement, only if, on its face, the statute irreconcilably conflicts with federal antitrust law. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). A statute is preempted "only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Id.* A statute that *might* have an anticompetitive effect, or that could hypothetically lead a private party to violate antitrust laws, is not preempted. *Id.*

### A. The Board Does Not Conflict with Federal Antitrust Law.

First and foremost, the Board does not conflict with federal antitrust law because it is not controlled by active market participants. *See N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 574 U.S. 494, 502-03, 510 (2015) (recognizing that a nonsovereign actor controlled by active market participants, who possess strong private interests, poses a high risk of self-dealing.) The Board is comprised of three members who represent

22

nursing home employers or employer organizations, three members who represent nursing home workers or worker organizations, and the commissioners of the departments of human services, health, and labor and industry (or their designees). Minn. Stat. § 181.212, subd. 1. Each member is appointed to the Board by the governor. *Id.* The governor also appoints the health, human services, and labor and industry commissioners. Minn. Stat. §§ 144.011, 245.03, subd. 1, and 175.001, subd. 1. Though nursing home workers and nursing home employers may operate in the same labor market, they presumably hold divergent perspectives and interests, minimizing the likelihood of any collusion or self-dealing. And because the nursing home workers and employers are represented equally on the Board, with three members each, no one group of private market participants controls decisions by the Board.

Moreover, even if the six worker and employer members could be considered to be participants in the same private market, the state commissioner members ultimately control all Board decisions. An affirmative vote by five of the nine Board members is required for the Board to take any action, and at least two of the affirmative votes must be cast by the state commissioner members or their appointees. Minn. Stat. § 181.212, subd. 7. Thus, the state, through the commissioner members, can effectively veto all Board decisions and actions. Neither the commissioner members nor the state itself are active market participants in the nursing home industry or labor market. Thus, even if the three worker members and the three employer members shared private interests, there is no risk of collusion or self-dealing that could run afoul of antitrust laws because those members cannot control the Board's decisions without state approval. The Board cannot, for

23

example, implement any minimum wages, workplace safety standards, or training requirements, without the affirmative votes of a majority of the state commissioner members. The state, therefore, retains ultimate control over all Board decisions. Because no active market participants can control Board decisions without approval of a majority of the state commissioner members, the Board does not violate federal antitrust laws.

Moreover, the allegation that the state commissioner members have voted for certain proposals in the short time the Board has been in existence is insufficient to establish any improper collusion between the state and certain market participants, or that there would be any risk of self-dealing that would implicate antitrust laws. Over time, commissioners change, as do their agencies' missions, goals, and priorities. Any prediction of future votes by the commissioner members is, therefore, purely speculative. For these reasons, active market participants cannot control the decisions of the Board, and the Board does not irreconcilably conflict with federal antitrust policies. *See Rice*, 458 U.S. at 659.

**B.     State Action Immunity Applies.**

Given the state's control over all Board decisions, Defendants are also entitled to state action immunity. The Supreme Court has held that federal antitrust laws were not intended to apply to states acting in their sovereign capacities. *Parker v. Brown*, 317 U.S. 341, 352 (1943). State action immunity, also known as *Parker* immunity, applies when the alleged restraint on trade is "clearly articulated and affirmatively expressed as state policy," and is "actively supervised by the State." *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980); *see also Grand River Enterprises Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 939 (8th Cir. 2009).

24

Here, the Act and the Board represent the clearly articulated and affirmatively expressed policy of the state. The legislature drafted and passed the Act, which created the Board and empowered it to set minimum nursing home employment and compensation standards for nursing home workers in Minnesota. Minn. Stat. § 181.213, subd. 1. The Board and the Act therefore represent the affirmative policy of the state. Moreover, because the state commissioner members control every vote, the Board cannot take any action or make any decision without approval by the state through its commissioner members. Plaintiff does not appear to dispute that the Act and Board satisfy the first prong of *Parker* immunity. (ECF Nos. 5, 9.)

The Act and Board also satisfy the second prong of *Parker* immunity, which "requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Patrick v. Burget*, 486 U.S. 94, 101 (1988). State supervision ensures that private parties' anticompetitive conduct promotes state policy, rather than their own private interests. *Id.* Though "the inquiry regarding active supervision is flexible and context dependent," the Supreme Court has identified several requirements to establish a state's active supervision: (1) the state reviews the substance of the anticompetitive decision, not merely the procedures followed to produce it; (2) the state has the power to veto or modify decisions to ensure they accord with state policy; (3) the mere potential for state supervision is insufficient; and (4) the state supervisor may not itself be an active market participant. *N. Carolina State Bd. of Dental Examiners*, 574 U.S. at 515.

Here, the Act and Board satisfy all requirements of state supervision. By requiring a majority of state commissioner members to vote in favor of every Board decision and action, the state retains the power to review all such decisions and actions to ensure they promote state policy and to prevent private market participants from adopting standards that merely serve their own private interests. The state commissioner members can effectively veto any decision or action that they determine not to be aligned with the state's policy goals and interests. That power is more than merely hypothetical or potential; two of the three commissioner members *must* vote in favor of any decision or action. And finally, the state commissioner members are not active market participants themselves; they are appointed to their respective positions, both as state agency commissioners and as board members, by the Governor. They are not members of the private labor market for nursing homes in Minnesota but are representatives of the state, which regulates that market. Defendants are therefore entitled to state action immunity.

## IV. THE BOARD IS NOT PREEMPTED BY THE NLRA.

The NLRA preempts states from regulating activity that is reserved for the jurisdiction of the National Labor Relations Board ("NLRB") or the free market. *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U.S. 218, 226–27 (1993). To protect the primary jurisdiction of the NLRB, the United States Supreme Court has found that the NLRA preempts state regulations that govern conduct that is arguably protected or prohibited by section 7 or section 8 of the NLRA. *San Diego Bldg. Trades Council Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236 (1959) ("*Garmon*"). Additionally, to protect against activity reserved for the free

26

market, the Supreme Court has found that the NLRA preempts state regulation that governs conduct that Congress intended to leave unregulated. *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Relations Comm'n*, 427 U.S. 132 (1976) ("*Machinists*"). Because the Board neither imposes on the NLRB's jurisdiction nor the free market, it is not preempted under the NLRA.[5]

## A.     The Act Is Not Preempted Under *Garmon*.

Plaintiffs alleged that the Act is preempted under *Garmon* because the Act's creation of a Board established an alternative forum for collective bargaining, worker representation, employer representation, enforcement remedies. (ECF No. 9 ¶¶ 101-109.) Plaintiffs' claims fail as a matter of law.

First, the Board does not engage in collective bargaining. It is well established that state laws dealing with issues of fundamental state concerns such as health, safety, or welfare do not impermissibly interfere with the collective bargaining process. *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 22 (2006) (concluding that a state law requiring severance pay for all employees in the event of a plant closing was not preempted by the NLRA); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 758 (1985) (concluding that a state law requiring minimum health benefits for workers was not preempted by the NLRA); *N.Y. Tel. Co. v. N.Y. State Dep't of Labor,* 440 U.S. 519 (1979) (concluding that a state unemployment compensation scheme as applied to striking workers was not

---

[5] Plaintiffs' Complaint cites only to *Garmon* preemption, but their Memorandum of Law In Support of their Motion for a Preliminary Injunction argues preemption under *Garmon* and *Machinists*. (*Compare* ECF No. 9 at ¶100 with ECF No. 5 at 43-50.)

preempted by the NLRA). The Act here provides the Board with the authority to establish minimum employment standards, to ensure nursing home workers are properly trained on rights under the Act, and to otherwise satisfy the purposes of the Act. Minn. Stat. § 181.213, subd. 1(a).

Moreover, the Board's structure and voting requirements prevents the Board from becoming a forum for collective bargaining. The Board's membership includes three state commissioner representatives, at least two of which must vote affirmatively for any vote to pass. Minn. Stat. § 181.212, subds. 1, 7. Because two commissioner representatives are required for all Board actions, the employer and employee representatives do not have ultimate authority to determine labor issues.

Plaintiffs use general language from several cases to suggest that the Board is an alternative system for regulating activity that the NLRA protects or prohibits. But those cases are inapposite because the local relation boards in those cases were substantially similar to the NLRB. *See Bethlehem Steel Co. v. New York State Labor Relations Bd.*, 330 U.S. 767, 768-69 (1947) (addressing state board's enforcement of the New York Labor Relations Act which was similar to the NLRA); *Guss v. Utah Labor Relations. Board*, 353 U.S. 1, 5 (1935) (utilizing the Utah Labor Relations Board to address claims of unfair labor practices); *Amazon.com Servs. LLC v. N.Y. State Pub. Emp. Rels. Bd.*, No. 1:25-cv-05311, 2025 WL 3295071 *1 (E.D.N.Y. Nov. 26, 2025) (**"**the State Public Employment Relations Board…served as a state analogue to the NLRB."); *N.L.R.B. v. California, et al.*, No. 2:25-cv-02979, slip. op. at 6 (E.D. Cal. Dec. 26, 2025) ("[Public Employment Relations Board] is 'an expert, quasi-judicial administrative agency modeled after the [NLRB]'"). Here, the

28

Board is not modeled after the NLRB and does not perform the same duties as the local labor relation boards in the cited cases. Rather, the Board acts as an agency, promulgating standards and carrying out the processes the legislature established for those standards.

An agency's establishment of minimum labor standards through rule promulgation is not prohibited by the existence of the NLRA. *Nat'l Ass'n of Manufacturers v. Perez*, 103 F. Supp. 3d 7, 25 (D.D.C. 2015). In *National Association of Manufacturers*, trade groups challenged a rule promulgated by the U.S. Department of Labor. *Id.* at 10. Following an executive order requiring that each government contractor post a notice of employee's rights under federal labor law, the Secretary of Labor delegated the task of implementing this executive order to the department's Office of Labor Management Standards. *Id.* at 11. The office used an informal notice-and-comment rulemaking process to promulgate the challenged posting rule. *Id.* In addition to their asserted *Garmon* and *Machinists* challenges, the trade groups introduced a broader preemption argument that, because the NLRB lacked authority to require Notice posting, the Department of Labor would not have such authority. *Id.* at 24-25. The trade groups alleged, similar to Plaintiffs here, that Congress intended the NLRA to occupy the field of labor concerns. The court rejected those arguments, reiterating that the NLRA was not intended to "sweep[ ] away state-court jurisdiction over conduct traditionally subject to state regulation" and prevent states from regulating labor. *Id.* at 25 (quoting *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 364 (D.C. Cir. 2003)).

Plaintiffs also allege that the Board's organization prevents employees and employers from selecting the bargaining representative of their choosing and bypasses an

election process for selecting the representatives. Because the Board is not collectively bargaining, employees and employers are not entitled to select the members of the Board. Each member is appointed to the Board by the governor in the same or similar manner provided for as other board appointments. Minn. Stat. § 181.212, subd. 1; *see also* Minn Stat. § 15.066.

Finally, Plaintiffs allege that the Act provides an alternative enforcement scheme for enforcing the Board rules, which is not permitted under the NLRA. However, a state's ability to enforce minimum labor standards is not preempted by the NLRA. *Fort Halifax Packing Co.,* 482 U.S. at 1 (upholding minimum labor standard); *Metro. Life,* 471 U.S. at 471 (upholding minimum labor standard); *N.Y. Tel. Co. v. N.Y. State Dep't of Labor,* 440 U.S. 519 (1979) (upholding minimum labor standard).

Once again, the cases cited by the Plaintiffs are inapposite as they address the NLRB's authority to award remedies for NLRA violations; not a state's enforcement scheme for minimum labor standards. *See Hiran Mgmt., Inc. v. NLRB*, 157 F.4th 719 (5th Cir. 2025) (holding that the NLRB violated the NLRA when ordering employer pay non-equitable remedies); *NLRB v. Starbucks Corp.*, 125 F.4th 78, 95-6 (3d Cir. 2024) (discussing the remedies available when the NLRB finds unfair labor practices).

Similarly, Plaintiffs' reliance on *Wisconsin Department of Industry, Labor and Human Relations v. Gould, Inc* is misplaced. 475 U.S. 282, 291 (1986). In *Gould*, the Supreme Court determined that a state statute prohibiting private parties from contracting with businesses with multiple NLRA violations was preempted, reasoning that the statute added a remedy to those already in the NLRA. *Id.* That statute created an additional

consequence for businesses found to have violated the NLRA. *Id.* That is not the case here. The Act authorizes the Commissioner of DLI to investigate and workers to bring civil actions for violations of the Act. Minn. Stat. § 181.217.

Because *Garmon* preemption does not bar state agencies from setting minimum labor standards, the Act and the actions of the Board in following the Act, setting and enforcing minimum labor standards, the NLRA claim fails under *Garmon*.

### B. The Act Is Not Preempted Under *Machinists*.

*Machinists* preemption protects against state interference with the policies implicated by the NLRA by preempting state laws concerning conduct that Congress intended to be unregulated. *Metro. Life*, 471 U.S. at 749. The NLRA is primarily concerned with establishing an equitable process for determining terms and conditions of employment, not the particular substantive terms of the bargain when parties are negotiating from relatively equal positions. *Id.* at 753. Essentially, *Machinists* preemption protects the collective bargaining process itself from interference. *Thunderbird Mining Co.*, 138 F. Supp. 2d at 1197.

It is well-established, however, that state laws dealing with issues of fundamental state concerns such as health, safety, or welfare do not impermissibly interfere with the collective bargaining process. *Fort Halifax Packing Co.,* 482 U.S. at 1 (concluding a state law requiring severance pay for all employees in the event of a plant closing was not preempted by the NLRA); *Metro. Life,* 471 U.S. at 471 (concluding a state law requiring minimum health benefits for workers was not preempted by the NLRA); *N.Y. Tel. Co. v. N.Y. State Dep't of Labor,* 440 U.S. 519 (1979) (concluding a state unemployment

31

compensation scheme as applied to striking workers was not preempted by the NLRA). The Board is statutorily authorized to establish minimum labor standards and is not preempted under *Machinists*.

Plaintiffs allege the Board's structure shifts the balance of power between management and labor by giving unions a new avenue to access workers through the training required under the Board rules. (ECF. No. 9, ¶ 108.) The worker organizations are mandated to provide training to the nursing home employers under a curriculum directed by the legislature and the Board. Plaintiffs cite no authority establishing that training workers on their rights "undermines the system by shifting the balance of power" between labor and management. *Id.* In fact, training has been interpreted as ensuring minimum employment standards. *Associated Builders & Contractors of S. California, Inc. v. Nunn*, 356 F.3d 979, 989 (9th Cir. 2004) ("California's apprenticeship standards target a vulnerable group of entry-level workers, establish a minimum wage package for their services (if they register with state-approved programs), and ensure that training and education are available . . . .").

Plaintiffs cite multiple cases for the proposition that the Board interferes with the bargaining process. (ECF No. 9, ¶ 108.). Once again, these cases are inapposite here as the state regulations in those cases significantly shifted the bargaining power of the parties. *See Cannon v. Edgar*, 33 F.3d 880, 885 (7th Cir. 1994) (finding that the state law intruded upon the bargaining process by requiring the parties to negotiate and agree upon a specific condition concerning a pool of workers during labor disputes or face sanctions); *Bechtel Const., Inc. v. United Bhd. of Carpenters & Joiners of Am.*, 812 F.2d 1220, 1226 (9th Cir.

32

1987) (finding that the state law was not a minimum labor standard like those protected under *Metropolitan Life* because it allowed a reduction of the state-imposed wage with approval of the state agency); *Thunderbird Mining Co. v. Ventrua*, 138 F. Supp. 2d 1193, 1195 (D. Minn. 2001) (concluding that the state statute provided the unions with a powerful bargaining tool by allowing the joint committee's employee members control over company resources).

Because the Act merely sets up the Board to establish minimum labor standards, it does not interfere with conduct Congress intended to leave unregulated and is not preempted by the NLRA under *Machinists.*

## V. LEADINGAGE AND CARE PROVIDERS ARE BARRED FROM BRINGING ADDITIONAL FACIAL CONSTITUTIONAL CHALLENGES UNDER RES JUDICATA.

Res judicata may be raised as an affirmative defense at the motion to dismiss stage if it is apparent from the face of the complaint, and any materials embraced by the complaint and matters of public record, that the defense applies. *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 763-64 (8th Cir. 2012); *Magee v. Hamline Univ.*, 1 F. Supp 3d 967, 972-73 (D. Minn. 2014), *aff'd*, 775 F.3d 1057 (8th Cir. 2015). Res judicata, or claim preclusion, bars claims if "(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involved the same cause of action; and (4) both suits involved the same parties or their privies." *Lovell v. Mixon*, 719 F.2d 1373, 1376 (8th Cir. 1983). This includes claims that either were actually or could have been litigated in the first suit. *Id.* (citing *Federated Dep't Stores v. Moitie*, 452 U.S. 394 (1981); *Allen v. McCurry*, 449 U.S. 90 (1980)). Alleging a

33

new legal theory does not create a new cause of action so as to overcome the principle of res judicata. *Chicot County v. Baxter State Bank*, 308 U.S. 371, 375-78 (1940). Facial challenges to statutes are barred by res judicata when a prior facial constitutional challenge was dismissed on the merits. *See Gherardi v. New York*, 161 F. App'x 60, 61 (2d Cir. 2005) (stating that because "[a] prior action challenging the facial constitutionality of the Act by a majority of the plaintiffs in the instant case was dismissed on the merits . . ." res judicata barred "claims that should have been raised in the prior action because they involve the same 'nucleus of operative fact'").

In *LeadingAge I*, LeadingAge and Care Providers sued Commissioner Blissenbach, raising facial constitutional challenges to the Board's holiday rule on the grounds that the rule was preempted under the NLRA and that the rule and Act were unconstitutionally vague. *LeadingAge I*, No. 24-CV-04282 (LMP/JFD) (D. Minn., ECF No. 22.) LeadingAge and Care Providers ultimately voluntarily dismissed their vagueness due process claim. *LeadingAge I*, No. 24-CV-04282 (LMP/JFD), (D. Minn., ECF No. 50, p 44.) However, the Court addressed the NLRA preemption claim on its merits and dismissed the preemption claim following thorough briefing and a hearing on the motion. *LeadingAge I*, No. 24-CV-04282 (LMP/JFD) (D. Minn., ECF No. 50). The matter is currently pending before the Eighth Circuit. *See LeadingAge Minnesota et al. v. Blissenbach*, No. 25-2252 (8th Cir.).

In the current matter, LeadingAge and Care Providers have asserted facial constitutional challenges to the Act based on the same nucleus of operative facts that were known to them and could have been asserted in *LeadingAge I*. The legislature passed the

legislation creating the Board, and specifying its structure and authority, in 2023. Thus, at the time they filed their amended complaint in *LeadingAge I*, LeadingAge and Care Providers were aware of the facts they rely on here for their constitutional challenges to the Act. In fact, LeadingAge and Care Providers' amended complaint in *LeadingAge I* cited to the 2023 statutes establishing the creation and structure of the Board. *LeadingAge I* (ECF No. 22 at ¶23.) In addition, the certification and minimum wage rules that LeadingAge and Care Providers challenge were also known to them when they filed their amended complaint in *LeadingAge I* in 2025. *See* 48 Minn. Reg. 52 (June 24, 2024) (issuing the proposed wage standards); 49 Minn. Reg. 191 (Aug. 26, 2024) (issuing the proposed modified certification criteria, notice posting requirements, and holiday pay rule); 49 Minn. Reg. 18 (Oct. 28, 2024) (adopting minimum wage standards); 49 Minn. Reg. 628 (Dec. 9, 2024) (adopting modified certification criteria, posting requirements, and the holiday pay rule).

All of the pertinent facts of this lawsuit, including the structure of the board and the established standards that Plaintiffs collaterally challenge now, were available for LeadingAge and Care Providers to raise in their first lawsuit. Because LeadingAge and Care Providers chose not to bring all of the claims available to them in *LeadingAge I*, res judicata bars them from doing so here.

While, generally, a res judicata defense is not available when the prior matter is dismissed without prejudice, *Pohlmann v. Bil–Jax, Inc.*, 176 F.3d 1110, 1112 (8th Cir.1999), here, the motion to dismiss was decided on the merits. *See, Gherardi*, 161 F. App'x at 61. In *LeadingAge I*, the complaint was dismissed based on the merits of the

NLRA claims. Whether the holiday pay rules promulgated by the Board are preempted by the NLRA is final. LeadingAge and Care Providers had full notice of the statutory structure of the board and the Board's establishment of minimum standards for nursing home workers when they brought a facial challenge to the board's rules in 2025 and that challenge which was dismissed on the merits. At the time the LeadingAge and Care Providers brought *LeadingAge I*, they could have challenged the constitutionality of the Board itself. They did not do so and should not get a second chance to do so here. As such, all of LeadingAge and Care Providers' claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully requests that the Court grant their motion and dismiss Plaintiffs' complaint with prejudice because Plaintiffs' claims fail as a matter of law.

Dated: April 9, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ Scott A. Grosskreutz
SCOTT A. GROSSKREUTZ
Assistant Attorney General
Atty. Reg. No. 0392714
(651) 757-1402 (Voice)
scott.grosskreutz@ag.state.mn.us

LINNEA VANPILSUM-BLOOM
Assistant Attorney General
Atty. Reg. No. 0403783
(651) 757-1212 (Voice)
linnea.vanpilsum-bloom@ag.state.mn.us

445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 297-4139 (Fax)

ATTORNEYS FOR DEFENDANT