# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

LEADINGAGE MINNESOTA, CARE
PROVIDERS OF MINNESOTA, and
YONA NORTHSTAR LLC,

Court File No. 0:26-cv-01816-NEB-DJF

          Plaintiffs,

    v.

NICOLE BLISSENBACH, in her official
capacity as the Commissioner of the
Minnesota Department of Labor and
Industry and as a member of the Minnesota
Nursing Home Workforce Standards
Board, and JAMIE GULLEY, in his
official capacity as a member and
chairperson of the Minnesota Nursing
Home Workforce Standards Board,

          Defendants,

and SERVICE EMPLOYEES
INTERNATIONAL UNION
HEALTHCARE MINNESOTA AND
IOWA,

          Intervenor-Defendant.

---

**BRIEF OF INTERVENOR SEIU HEALTHCARE MINNESOTA AND IOWA IN
OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION AND SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................ii

INTRODUCTION..............................................................................................1

BACKGROUND.................................................................................................2

    A.     The Nursing Home Workforce Standards Board.......................................2

    B.     The Board's Minimum Employment Standards ......................................4

    C.     The Act's Training Program ..................................................................7

    D.     The Workers Harmed By This Lawsuit ..................................................7

    E.     The Plaintiffs' Prior Lawsuit..................................................................10

ARGUMENT ....................................................................................................10

    I.     Plaintiffs Are Not Likely to Prevail on The Merits. ................................11

        A.     Association Plaintiffs' claims are barred by res judicata. .........11

        B.     The Act does not violate the First Amendment. ..........................14

        C.     The Act does not violate due process. ...........................................17

        D.     The Act is not preempted by federal antitrust laws. ...................22

        E.     The Act is not preempted by the NLRA. ......................................26

            1.     *Machinists* preemption does not apply.............................26

            2.     *Garmon* preemption does not apply.................................29

    II.    Plaintiffs Have Not Shown They Will Suffer Irreparable Harm Absent An Injunction ..........................................................................33

    III.   An Injunction Will Cause Severe Irreparable Harm to Nursing Home Workers and Is Against the Public Interest. ...............38

    IV. Any Injunctive Relief Must Be Limited. ...........................................39

CONCLUSION .................................................................................................39

**TABLE OF AUTHORITIES**

*Abdurrahman v. Dayton*,
No. 16-CV-4279 (PAM/HB), 2016 WL 7428193 (D. Minn. Dec. 23,
2016) ........................................................................................................ 37

*Akers v. Maryland State Educ. Ass'n*,
990 F.3d 375 (4th Cir. 2021) ................................................................. 15

*Am. Hotel & Lodging Ass'n v. City of Los Angeles*,
834 F.3d 958 (9th Cir. 2016) ................................................................. 28

*Amazon.com Servs. LLC v. New York State Pub. Emp. Rels. Bd.*,
2025 WL 3295071 (E.D.N.Y. Nov. 26, 2025) ....................................... 30

*Associated Builders & Contractors of S. California, Inc. v. Nunn*,
356 F.3d 979 (9th Cir. 2004) ................................................................. 28

*Association of American Railroads v. U.S. Department of Transportation*,
821 F.3d 19, 32 (D.C. Cir. 2016) ................................................ 17, 21, 22

*Bauer v. Pennsylvania State Bd. of Auctioneer Examiners*,
154 A.3d 899 (Pa. Commw. Ct. 2017) ................................................... 26

*Beber v. NavSav Holdings, LLC*,
140 F.4th 453 (8th Cir. 2025) ...................................................... 33, 34, 37

*Bechtel Const., Inc. v. United Bhd. of Carpenters & Joiners of Am.*,
812 F.2d 1220 (9th Cir. 1987*)* .............................................................. 32

*Bennett v. AFSCME Council 31*,
991 F.3d 724 (7th Cir. 2021) ................................................................. 15

*Bethlehem Steel Co. v. New York State Lab. Rels. Bd.*,
330 U.S. 767 (1947) .............................................................................. 30

*Bierman v. Dayton*,
900 F.3d 570 (8th Cir. 2018) ............................................................ 15, 16

*Blomker v. Jewell*,
831 F.3d 1051 (8th Cir. 2016) ............................................................... 10

*Boardman v. Inslee*,
978 F.3d 1092 (9th Cir. 2020) ............................................................... 15

*Cannon v. Edgar*,
33 F.3d 880 (7th Cir. 1994) ................................................................. 32

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) .............................................................. 17, 18, 20

*Chamber of Com. of U.S. v. Brown*,
554 U.S. 60 (2008) ............................................................................. 29

*Concerned Home Care Providers, Inc. v. Cuomo*,
783 F.3d 77 (2d Cir. 2015) ................................................................ 28

*Currin v. Wallace*,
306 U.S. 1 (1939) ............................................................................... 20

*Dobrovolny v. Moore*,
126 F.3d 1111 (8th Cir. 1997) ........................................................... 16

*Elbert v. Carter*,
903 F.3d 779 (8th Cir. 2018) ........................................... 11, 12, 13, 14

*Electrical Inspectors, Inc. v. Village of East Hills*,
320 F.3d 110 (2d Cir. 2003) .............................................................. 24

*Eubank v. City of Richmond*,
226 U.S. 137 (1912) ..................................................................... 17, 18

*In re Ewing*,
852 F.2d 1057 (8th Cir. 1988) ........................................................... 11

*F.T.C. v. Ticor Title Ins. Co.*,
504 U.S. 621 (1992) ..................................................................... 23, 24

*FCC v. Consumers' Research*,
606 U.S. 656 (2025) ................................................................ 19, 20, 21

*Federated Dep't Stores, Inc. v. Moitie*,
452 U.S. 394 (1981) ........................................................................... 11

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987) ......................................................................... 27, 28

*Friedman v. Rogers*,
440 U.S. 1 (1979) ............................................................................... 22

*Gibson v. Berryhill*,
  411 U.S. 564 (1973) ........................................................................................ 21

*Gold Cross Ambulance & Transfer v. City of Kansas City*,
  705 F.2d 1005 (8th Cir. 1983) ........................................................................ 25

*Goldstein v. Prof. Staff Cong./CUNY*,
  96 F.4th 345 (2d Cir. 2024) ............................................................................ 15

*Guss v. Utah Lab. Rels. Bd.*,
  353 U.S. 1 (1957) ............................................................................................ 30

*Hawaii Housing Authority v. Midkiff*,
  467 U.S. 229 (1984) ........................................................................................ 19

*Healthcare Ass'n of N.Y. State, Inc. v. Pataki*,
  471 F.3d 87 (2d Cir. 2006) ............................................................................. 31

*Hendrickson v. AFSCME Council 18*,
  992 F.3d 950 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 423 (2021) ............... 15

*Hoover v. Ronwin*,
  466 U.S. 558 (1984) ........................................................................................ 25

*Indus. Welfare Com. v. Superior Ct.*,
  27 Cal.3d 690 (1980) ...................................................................................... 29

*Int'l Ass'n of Firefighters of St. Louis v. City of Ferguson*,
  283 F.3d 969 (8th Cir. 2002) .......................................................................... 31

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  585 U.S. 878 (2018) ............................................................................. 14, 15, 16

*Kohls v. Ellison*,
  166 F.4th 728 (8th Cir. 2026) ......................................................................... 34

*Lane v. Peterson*,
  899 F.2d 737 (8th Cir. 1990) .......................................................................... 12

*LeadingAge Minnesota v. Blissenbach*,
  791 F.Supp.3d 913 (D. Minn. 2025)........................................................*passim*

*Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin
  Emp. Rels. Comm'n*,
  427 U.S. 132 (1976) ............................................................... 10, 27, 28, 29

*Metropolitan Life v. Insurance Co. v. Massachusetts*,
   471 U.S. 724 (1985) ........................................................................ 27, 28, 31

*Micklus v. Greer*,
   705 F.2d 314 (8th Cir. 1983) .................................................................. 14

*Midwest Disability Initiative v. JANS Enters., Inc.*,
   929 F.3d 603 (8th Cir. 2019) .................................................................. 13

*N. Carolina State Bd. of Dental Examiners v. F.T.C.*,
   574 U.S. 494 (2015) ........................................................................ 23, 24, 26

*Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*,
   53 F.4th 869 (5th Cir. 2022) .................................................................. 20

*New Motor Vehicle Board of California v. Fox Co.*,
   439 U.S. 96 (1978) .................................................................................. 19

*NLRB v. California*,
   No. 2:25-cv-02979, slip op. (E.D. Cal. Dec. 26, 2025) .............................. 30

*Parker v. Brown*,
   317 U.S. 341 (1943) ................................................................................ 23

*Peltz-Steele v. UMass Fac. Fed'n*,
   60 F.4th 1 (1st Cir. 2023), *cert. denied*, 143 S. Ct. 2614 (2023) ................ 15

*Planned Parenthood Minn., N. D., S. D. v. Rounds*,
   530 F.3d 724 (8th Cir. 2008) .................................................................. 11

*Rest. L. Ctr. v. City of New York*,
   90 F.4th 101 (2d Cir. 2024) .................................................................... 28

*State of Washington ex rel. Seattle Title Trust Co. v. Roberge*,
   278 U.S. 116 (1928) ........................................................................ 17, 18

*SmileDirectClub, LLC v. Battle*,
   969 F.3d 1134 (11th Cir. 2020) .............................................................. 24

*Southern Motor Carriers Rate Conference, Inc. v. United States*,
   471 U.S. 48 (1985) .................................................................................. 23

*St. Thomas St. John Hotel & Tourism Ass'n. v. Gov't. of U.S. Virgin
   Islands*,
   218 F.3d 232 (3rd Cir. 2000) .................................................................. 29

*Stahl v. U.S. Dep't of Agric.*,
  327 F.3d 697 (8th Cir. 2003) ...................................................................... 5

*Sunshine Anthracite Coal Co. v. Adkins*,
  310 U.S. 381 (1940) ....................................................................... *passim*

*Thompson v. Marietta Educ. Ass'n*,
  972 F.3d 809 (6th Cir. 2020) .................................................................... 15

*Town of Hallie v.City of Eau Claire*,
  471 U.S. 34 (1985) ................................................................................. 25

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................................ 39

*Turner v. Virginia Dep't of Medical Assistance Servs.*,
  230 F.Supp.3d 498 (W.D. Va. 2017)........................................................ 26

*U.S. v. Florida East Coast Ry. Co.*,
  410 U.S. 224 (1973) ................................................................................ 22

*U.S. v. Rock Royal Co-Op*,
  307 U.S. 533 (1939) ................................................................................ 20

*United States v. Gurley*,
  43 F.3d 1188 (8th Cir. 1994) ................................................................... 13

*Viceroy Gold Corp. v. Aubry*,
  75 F.3d 482 (9th Cir. 1996) ..................................................................... 31

*Wisconsin Dept. of Industry v. Gould Inc.*,
  475 U.S. 282 (1986) .......................................................................... 29, 33

*Yankton Sioux Tribe v. U.S. Dep't of Health & Hum. Servs.*,
  533 F.3d 634 (8th Cir. 2008) ................................................................... 12

**Statutes**

29 U.S.C.
  §157 ............................................................................................. 29, 31, 33
  §158 ...................................................................................................... 33
  §160(c).................................................................................................. 33

Cal. Lab. Code §70.1.................................................................................. 3

Minn. Stat. §147.01 ................................................................................. 16

Minn. Stat. §148.181 ........................................................................................ 16

Minn. Stat. §150A.02 ....................................................................................... 16

Minn. Stat. §154.001 ........................................................................................ 16

Minn. Stat. §§181.211-.217 ......................................................................... 31, 32

Minn. Stat. §181.212, subd. 1 ....................................................... 3, 4, 14, 17, 26

Minn. Stat. §181.212, subd. 2(a) ....................................................................... 4

Minn. Stat. §181.212, subd. 5 ............................................................................ 3

Minn. Stat. §181.212, subd. 6 ............................................................................ 3

Minn. Stat. §181.212, subd. 7 .................................................................... *passim*

Minn. Stat. §181.212, subd. 9 ............................................................................ 3

Minn. Stat. §181.213 ....................................................................................... 35

Minn. Stat. §181.213, subd. 1 ........................................................ 2, 18, 23, 25, 30

Minn. Stat. §181.213, subd. 2 ........................................................................ 3, 4

Minn. Stat. §181.213, subd. 2a.......................................................................... 3

Minn. Stat. §181.213, subd, 3 ............................................................................ 3

Minn. Stat. §181.213, subd. 6 ........................................................... 3, 6, 7, 29

Minn. Stat. §181.214, subd. 1 ............................................................................ 7

Minn. Stat. §181.214, subd. 2 ............................................................................ 7

Minn. Stat. §181.214, subd. 6 ............................................................................ 7

Minn. Stat. §181.217, subd. (3)(b) ................................................................... 33

Minn. Stat. §256R.02 ...................................................................................... 37

Minn. Stat. §256R.06 ...................................................................................... 35

Minn. Stat. §256R.21 ...................................................................................... 37

Minn. Stat. §256R.495 .................................................................................... 35

Minn. Stat. §326B.435 ........................................................................................ 16

Minn. Stat. §626.841 ......................................................................................... 16

N.Y. Lab. Law §674-a ......................................................................................... 3

Nev. Rev. Stat. §608.610 ..................................................................................... 3

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ......................................................... 11

Federal Rules of Evidence
    Rule 201(b) ...................................................................................................... 5
    Rule 201(c) ...................................................................................................... 5

**Other Authorities**

Minn. R. 5200.2010 ............................................................................................. 6

Minn. R. 5200.2070 ........................................................................................ 6, 34

Minn. R. 5200.2080 ............................................................................................. 6

Minn. R. 5200.2090 ............................................................................................. 6

49 Minn. Reg. 628 (Dec. 9, 2024) ................................................................... 5, 6

2025 Human Services Omnibus Finance Bill, Minnesota Session Law, 1st
    Special Session Ch. 9 art. 1, sec. 1 ................................................................ 35

## INTRODUCTION

Plaintiffs' complaint must be dismissed and their preliminary injunction motion denied. As a threshold matter, the claims of the two nursing home trade association plaintiffs ("Association Plaintiffs") are precluded. Association Plaintiffs previously sued to challenge nursing home employment standards adopted through the process established by the Minnesota legislature, and lost. Association Plaintiffs could have brought all of their newly asserted federal constitutional and statutory claims in that prior lawsuit, but they chose not to. This attempt to get a second bite at the apple is improper: This Court's dismissal of their earlier case on the merits operates as a final judgment that precludes the claims they assert in this new complaint.

The claims of the sole remaining plaintiff, Yona Northstar, are specious and fail as a matter of law. Those claims all rely on a fundamental misunderstanding of the 2023 Minnesota Nursing Home Workforce Standards Act ("Act"), which established a government board charged with adopting minimum standards for the nursing home industry (called the Minnesota Nursing Home Workforce Standards Board or "Board"). This Board gives the decisive votes on the adoption of any such standards to specified government officials who are members of the Board. Plaintiffs complain that the Board also includes members from employer and employee constituencies, but there is nothing illegal about that inclusion. Representation of affected constituencies on a government board infringes no First Amendment right. There can be no due process claim or antitrust challenge where, as here, government officials approve any standard before it takes effect. And courts have repeatedly rejected federal labor law preemption challenges to states' adoption of minimum labor standards.

Besides being based on frivolous legal claims, Plaintiffs' request that this Court take the extraordinary step of preliminarily enjoining a duly enacted state law rests on conclusory and flawed assertions of potential future economic harm that are entirely speculative. The federal government has delayed indefinitely implementation of the minimum wage standards on which Plaintiffs' assertions of harm are based: On April 8, 2026, the Centers for Medicaid and Medicare ("CMS") declined to approve the Medicaid rate increases that are necessary for the wage standards to take effect, and postponed further decision on those increases for at least 90 days—or longer, pending receiving sufficient information responses from the State. When a final decision is eventually made, federal approval of the standards may be denied entirely. And even if the standards are approved, reimbursement rates will increase to compensate nursing homes. Plaintiffs thus fail to show their asserted harms are imminent or even likely.

For these reasons, Service Employees International Union Healthcare Minnesota and Iowa ("SEIU Minnesota"), which represents thousands of nursing home workers who benefit from raising employment standards, respectfully requests that the Court deny Plaintiffs' preliminary injunction motion and grant State Defendants' motion to dismiss.

**BACKGROUND**

**A. The Nursing Home Workforce Standards Board**

The Board's purview is to "adopt rules establishing minimum nursing home employment standards that are reasonably necessary and appropriate to protect the health and welfare of nursing home workers [and] to ensure that nursing home workers are properly trained about and fully informed of their rights." *Id*. §181.213, subd. 1. Its jurisdiction covers more than 26,000 nursing home workers statewide. Dkt. 9-1 (Revnew Decl.) Ex. AA at 6. Like other administrative agencies, the Board is authorized to issue

2

regulations pursuant to notice-and-comment procedures, Minn. Stat. §181.213, subds. 2, 3, and is required to comply with the state's open meeting laws, *id.* §181.212, subd. 6 (citing Ch. 13D).

The Board has nine members. *Id.* §181.212, subd. 1. Three are state agency officials: the commissioner of human services, commissioner of health, and commissioner of labor and industry (or their designees). *Id.* The affirmative vote of at least two of these commissioner members is required for the Board to take any action. *Id.* §181.212, subd. 7. The other six members are appointed by the Governor according to the Act's criteria: three members from the constituency of nursing home employers/employer organizations and three members from the constituency of nursing home workers/worker organizations. *Id.* §181.212, subd. 1. This model is similar to many other tripartite government boards around the country.[1]

When appointing Board members, the Governor must follow the general state rules for appointing members to multimember boards or agencies. Minn. Stat. §181.212, subd. 6 (citing §15.0597). Board members, like members of other administrative boards, are paid by the state for their time spent on Board matters. *Id.* §181.212, subd. 5 (citing §15.075). Staff support for the Board is provided by the Department of Labor and Industry ("Department"). *Id.* §181.212, subd. 9.

---

[1] *See, e.g.*, Cal. Lab. Code §70.1 (state wage board to set minimum labor standards composed of two labor members, two employer members, and one member from the general public); N.Y. Lab. Law §674-a (Farm Laborers Wage Board: farm bureau member, AFL-CIO member, and one member from the general public); Nev. Rev. Stat. §608.610 (Home Care Employment Standards Board: Nevada Labor Commissioner, three employer members, three employees members, and three members representing people who receive homecare services).

**B. The Board's Minimum Employment Standards**

The Act authorized and required the Board to establish minimum wage standards for nursing home workers by November 1, 2024. Minn. Stat. §181.212, subd. 1(b). To determine the appropriate wage standards, the Board was required to conduct a detailed investigation into market conditions and the existing wages of nursing home workers, and to evaluate the impact of any standards on Medicaid reimbursement rates for nursing home employers. *Id.* §181.213, subd. 2(a)-(c). Based on that information, the Board was to "adopt minimum nursing home employment standards that meet or exceed existing industry conditions for a majority of nursing home workers in the relevant geographic area and nursing home occupation." *Id.* §181.212, subd. 2(a). However, no wage standard that increases Medicaid reimbursement rates can take effect until both the Minnesota Legislature approves funding to cover the state's share of the increased rates *and* CMS approve the rate increase. *Id.* §181.213, subds. 2(c), (d), 2a.

To comply with the Act, the Board undertook a year-long process to develop wage standards and a related holiday pay standard. *See* Dkt. 9-1 (Revnew Decl.) Exs. CC, EE, FF.[2] The Board held 13 full board meetings, 25 workgroup meetings, and five public forums where 224 people attended and 71 attendees (employers, workers, and members of the public) spoke. Revnew Decl. Ex. FF at 1-2. It reviewed data collected from nursing homes about the wages of more than 9,000 employees and questionnaire responses from 205 workers, employers, and members of the public. *Id.* Exs. N at 2, AA, FF at 2. Board members also heard presentations from the State Departments of Labor and Industry, Employment and Economic Development, and Human Services. *Id.* Ex. FF at 2. The

---

[2] *See* https://www.dli.mn.gov/sites/default/files/pdf/nhwsb_overview.pdf (Board's first meeting in September 2023)

Board considered at least three different wage standards proposals. *Id.* Ex. AA. Of those proposals, the Board's analysis showed that the proposal for the wage standards that were ultimately issued best met the Act's requirement for standards that "meet or exceed existing industry conditions for a majority of nursing home workers." *Id.* at 1, 6-9, 11-12.

The commissioner members of the Board participated actively in the Board's deliberations and development of the wage standards.[3] The employer members failed to submit any realistic alternative wage proposal: Their proposal "did not include minimum wages, so it was impossible to analyze whether it met the majority benchmark or improved the welfare of nursing home workers." Revnew Decl. Ex. FF at 2 (April 29, 2024 meeting minutes); *id.* Ex. AA at 11. Instead, the employer members' "proposal" demanded statutory changes by the Legislature. *Id.* Ex. FF at 2. The employer members also refused to participate in substantive votes regarding the wage standards. *See, e.g.*, Revnew Decl. Ex. N at 2, Ex. DD at 2, Ex. EE at 3, Ex. FF at 3 (collectively, Board meeting minutes showing employer members abstaining from all major votes on minimum wage and holiday pay standards).

The Board issued minimum wage standards on October 28, 2024. *See* Revnew Decl. Ex. F at 1, 7; 49 Minn. Reg. 628 (Dec. 9, 2024). Those standards will substantially increase wages for thousands of nursing home workers across the state. *See* Revnew Decl. Ex. AA at 6, 7, 9 (Board's analysis estimating more than 16,000 (53%) of nursing

---

[3] *See, e.g.*, Revnew Decl. Ex. D at 2, Ex. N at 2, Ex. O at 2, Ex. FF at 3; Leyton Decl. Ex. 2 at 2 Ex. 3 at 2, Ex. 4 at 2, Ex. 5 at 2, Ex. 6 at 2, Ex. 7 at 2, Ex. 8 at 3, Ex. 9 at 2, Ex. 10 at 2, Ex. 11 at 2, Ex. 12 at 2 (collectively, Board meeting minutes exemplifying state agency Board members making independent motions, collaborating with employers, and engaging in independent commentary and discussion on Board issues). As public records of a government agency, these documents are properly subject to judicial notice and consideration on a motion to dismiss. Fed. R. Evid. 201(b), (c); *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).

home workers' wages fall at or below the wage standards); Dkt. 47 (Sharif Decl.) ¶¶9-12. The wage standards increased the minimum nursing home wage to $19/hour (compared to the $11.41/hour statewide minimum wage),[4] with additional increases for three job categories. Minn. R. 5200.2080, .2090. Taking into account higher local minimum wages, the wage standards are estimated to increase hourly wages for large categories of workers, including certified nurse assistants, trained medication, dietary aids, activities aides, and housekeeping and laundry workers, by $2 to $3 above the median wage for their jobs. Revnew Decl. Ex. AA at 7-9.

The Legislature passed appropriations to fund Medicaid rate increases to specifically compensate employers for compliance with the 2026 and 2027 standards. *See infra* at 35-36. But the wage standards have not yet taken effect, because they are not effective until the CMS approves those Medicaid rate increases. Minn. R. 5200.2070, subps. 2(B), 3. On April 8, 2026, CMS delayed the deadline for its rates decision by at least 90 days while requesting more information from the State.[5]

The Board issued the holiday pay standard on December 9, 2024. *See* 49 Minn. Reg. 628 (Dec. 9, 2024). That standard, which became effective January 2025, requires nursing home employers to pay time-and-a-half to employees who work on eleven holidays. Minn. R. 5200.2010, subp. 1.

*///*

*///*

---

[4] *See* Minn. R. 5200.2080; Minn. Dep. of Labor and Industry, *Minimum Wage in Minnesota*, https://www.dli.mn.gov/minwage

[5] *See* Minnesota Post, *Trump administration temporarily blocks Minnesota's historic wage floor for nursing home workers* (April 9, 2026), https://www.minnpost.com /state-government/2026/04/trump-blocks-minnesota-nursing-home-workers-wage/

## C. The Act's Training Program

The Act established a training program under which each nursing home worker must complete one hour of training every two years. Minn. Stat. §181.214, subd. 6. The trainings inform workers of their rights under minimum wage, workplace safety, and antiretaliation laws, and how workers can participate in Board proceedings. *Id.* §181.214, subd. 2. The training must be provided by a certified training organization that meets the Act's specifications. *Id.* §181.214, subd. 6. The Board is responsible for establishing curriculum requirements and certifying qualified organizations. *Id.* §181.214, subds. 1, 2. The Board has certified three training organizations, each by unanimous vote (including the employer members). Revnew Decl. Ex. W at 1-2. Nursing home employers do not need to certify that their employees have completed the training until January 2027.[6]

## D. The Workers Harmed By This Lawsuit

Nursing home workers in Minnesota perform essential work caring for some of the State's most vulnerable residents. Dkt. 44 (Hasher Decl.) ¶3; Dkt. 46 (Chouanard Decl.) ¶4. Nursing assistants and other caregivers assist elderly and disabled residents to meet their basic daily needs, such as bathing, eating, dressing, and staying active, with dignity. Chouanard Decl. ¶4; Dkt. 43 (Gbieor Decl.) ¶4; Dkt. 42 (Ayuka Decl.) ¶4. Other workers perform the vital tasks of cooking, cleaning, and maintaining the homes where residents live. Sharif Decl. ¶1; Hasher Decl. ¶3. The work is emotionally and physically demanding. Chouanard Decl. ¶13; Gbieor Decl. ¶6; Ayuka Decl. ¶4; Hasher Decl. ¶5. Yet the wages for this important work are very low, and many nursing home workers struggle financially. Chounard Decl. ¶6; Ayuka Decl. ¶¶5-6; Hasher Decl. ¶¶6-7; Gbieor Decl.

---

[6] *See Guidance for certification of worker organizations and worker training* (Mar. 2025), https://www.dli.mn.gov/sites/default/files/pdf/nhwsb_cert_of_worker_orgs_ worker_trng_guide.pdf

¶11. Indeed, it is not uncommon for workers to work two full-time jobs just to make ends meet. Ayuka Decl. ¶¶5-6; Gbieor Decl. ¶3.

The nursing home industry's low wages also exacerbate difficulties recruiting and retaining workers, as nursing home work is so difficult that many workers will simply not do it for the low pay. Ayuka Decl. ¶9; Hasher Decl. ¶¶4-6. This traps workers in a perpetual problem: Persistent staffing shortages lead to an increased workload for too few workers, acutely stressful working conditions, and worse outcomes for residents, which in turn leads more workers to quit. Sharif Decl. ¶15; Gbieor Decl. ¶16; Dkt. 48 (Johnson Decl., Ex. B (Duffy Decl.)) ¶11; Dkt. 44 (Hasher Decl.) ¶4; Ayuka ¶¶9-10. This is the spiral that the Board's wage standards aim to arrest, by ensuring higher wages that will improve staff retention and reduce turnover. Sharif Decl. ¶15; Ayuka Decl. ¶9; Hasher Decl. ¶6.

The wage standards would significantly increase the pay for approximately 2,000 SEIU members, including members at unionized nursing homes, and thousands more nursing home workers who are not unionized. Sharif Decl. ¶¶10-11. Those increases will help nursing home workers improve their quality of life by supplementing their general wages and helping them pay for basic necessities. Chouanard Decl. ¶5; Gbieor ¶11-12; Hasher ¶8; Ayuka ¶6. And all workers, even those whose wages are not raised by the standard, will benefit because of the increased level and consistency of staffing. Sharif Decl. ¶15; Ayuka ¶¶9-10.

The Board's holiday pay standard provides additional support for workers during some of the "most difficult" times in nursing homes. Dkt. 48 (Johnson Decl., Ex. D (Scheck Decl.)) ¶¶10-12. Over the holidays, staffing shortages are exacerbated, as many workers opt out of work to spend time with their own families, yet residents require

8

additional support due to the increase in activities, visits, and excitement. *Id.*; Gbieor Decl. ¶10; Ayuka Decl. ¶7. By ensuring workers receive premium pay on significantly more holidays than employers previously recognized, the standard facilitates sufficient staffing on those days, which improves resident care. Gbieor Decl. ¶¶15-17; Dkt. 48 (Johnson Decl., Ex. C (Moon Decl.)) ¶7; Duffy Decl. ¶7; Scheck Decl. ¶13. The additional pay is also a meaningful source of income for nursing home workers. Gbieor Decl. ¶¶9-13; Chouanard Decl. ¶¶5-7; Hasher Decl. ¶8; Scheck Decl. ¶14; Duffy Decl. ¶7.

The Act's training requirements are critical to informing nursing home workers of the rights they hold in their workplaces. Dkt. 45 (Jensen Decl.) ¶¶15-18; Sharif Decl. ¶17. Many workers are unaware of their rights and afraid to speak out about safety hazards or potential violations because of fear of retaliation. Jensen Decl. ¶12; Ayuka Decl. ¶11; Chouanard Decl. ¶¶9-10, Gbieor Decl. ¶18; Hasher ¶9. Workers who have not yet received the Act's required training are eager to receive it. Ayuka Decl. ¶11; Chouanard Decl. ¶9; Gbieor Decl. ¶18; Hasher ¶9. Without this training, nursing home workers are less likely to identify workplace legal violations and hazards, seek out appropriate assistance, and organize to improve or confront the violation. Jensen Decl. ¶¶19-21; Sharif Decl. ¶17.

Overall, the standards the Board has adopted will help "make[] nursing homes places that people want to work, which improves staffing and helps ensure that residents are well taken care of." Chouanard Decl. ¶13. Eliminating the Board and its standards would "make the lives of nursing home workers even harder," and worsen care of some of Minnesota's most vulnerable individuals. Gbieor Decl. ¶19; *see also* Hasher Decl. ¶11.

**E.  The Plaintiffs' Prior Lawsuit**

In November 2024, the two Association Plaintiffs in this lawsuit— LeadingAge Minnesota and Care Providers of Minnesota—sued the Board, Commissioner Blissenbach, and the Department challenging the holiday pay standard. *See LeadingAge Minnesota v. Blissenbach*, 791 F.Supp.3d 913 (D. Minn. 2025) ("*LeadingAge I*"); *see also LeadingAge I*, Case No. 24-cv-4282, Dkt. 1 (Complaint). Association Plaintiffs argued in *LeadingAge I* that the holiday pay standard was NLRA preempted, including based on *Machinists* arguments similar to those raised in this case, and that the holiday pay standard was unconstitutionally vague. *See LeadingAge I*, 791 F.Supp.3d at 928-42. Association Plaintiffs moved for a preliminary injunction and the government defendants moved to dismiss the complaint for failure to state a claim. *LeadingAge I* Dkts. 8, 16, 17.

The court's order carefully and thoroughly analyzed the Association Plaintiffs' NLRA preemption claims and held that they failed to state a claim as a matter of law because the holiday pay standard "does nothing more than create a new minimum labor standard" that "provides benefits that affect union and nonunion employees equally [and] does not encourage nor discourage the collective-bargaining processes." *LeadingAge I*, 791 F.Supp.3d at 942 (quotation omitted). Association Plaintiffs agreed that their unconstitutional vagueness claims should be dismissed for failure to state a claim. *Id.* at 920 n.1. The court accordingly denied the preliminary injunction and dismissed the case on the merits. *Id.* at 942. The Association Plaintiffs have appealed the dismissal.

## ARGUMENT

Plaintiffs' claims should be dismissed because they fail to state a claim as a matter of law. *See Blomker v. Jewell*, 831 F.3d 1051, 1057 (8th Cir. 2016). And Plaintiffs' motion for a preliminary injunction should be denied because Plaintiffs are not likely to

prevail on the merits and the balance of harms and public interest do not favor an injunction. *See Planned Parenthood Minn., N. D., S. D. v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008).

## I. Plaintiffs Are Not Likely to Prevail on The Merits.

### A. Association Plaintiffs' claims are barred by res judicata.

Association Plaintiffs' claims are precluded by their earlier lawsuit, *LeadingAge I*, because they either brought or could have brought the claims they now assert. "The doctrine of res judicata, or claim preclusion, applies when (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action." *Elbert v. Carter*, 903 F.3d 779, 782 (8th Cir. 2018) (quotation omitted). All four factors are met here.

*LeadingAge I* resulted in a final judgment—dismissal on the merits—and was properly based on federal question jurisdiction. *See LeadingAge I*, 791 F.Supp.3d at 942; *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.2 (1981) ("The dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a judgment on the merits.").[7] Although some of the legal theories were different, *LeadingAge I* was also based on the same claims as this lawsuit. "[W]hether two claims are the same for res judicata purposes depends on whether the claims arise out of the same nucleus of operative fact or are based upon the same factual predicate." *Elbert*, 903 F.3d at 782 (quotation omitted). Res judicata "precludes the parties or their privies from relitigating

---

[7] Although the *LeadingAge I* dismissal is on appeal, "[i]t is well established … that the pendency of an appeal does not diminish the res judicata effect of a judgment." *In re Ewing*, 852 F.2d 1057, 1060 (8th Cir. 1988) (quotation omitted).

issues that were *or could have been raised* in [the first] action." *Id.* (quotation omitted, emphasis added).

Here, both actions arise out of the Act and its establishment of a Board to issue minimum employment standards. *LeadingAge I* was based on the Board's issuance of a minimum employment standard pursuant to the Act. *See LeadingAge I*, 791 F.Supp.3d at 921-23. This case is based on "[t]he Act's creation of the Board, and the Board's resulting structure and actions," Dkt. 9 (Compl.) ¶¶1-8, including issuance of minimum employment standards. Association Plaintiffs' constitutional and preemption challenges in this case are facial challenges to the Act itself and thus were clearly available to them at the time of their first lawsuit. *See id.* ¶¶9-12, 63-110 (alleging that the Board's structure set forth in the Act violates the First Amendment and Due Process Clause and is preempted by antitrust laws and the NLRA). Because Association Plaintiffs could have raised those challenges in their first action attacking the Board's authority to issue the holiday pay standard, they are precluded from raising them here. Under res judicata, "[p]arties are bound, not only as to every matter which was offered and received to sustain or defeat the claim or demand [in the first action], but as to any other admissible matter *which might have been offered for that purpose.*" *Yankton Sioux Tribe v. U.S. Dep't of Health & Hum. Servs.*, 533 F.3d 634, 640 (8th Cir. 2008) (emphasis added); *see also Lane v. Peterson*, 899 F.2d 737, 744 (8th Cir. 1990) ("reliance … on different substantive law and new legal theories does not preclude the operation of res judicata").

In seeking to avoid claim preclusion, Association Plaintiffs may argue that this case seeks relief for purportedly "new harm based on facts unavailable earlier." Dkt. 23 at 1. But the only facts they identify that post-date the filing of *LeadingAge I* are their own members' declarations asserting recent, self-inflicted harm allegedly due to the wage

standards. *Id.* at 1-2; *see infra* at 37. New harms arising out of the same claim previously asserted do not justify a second action. *See Midwest Disability Initiative v. JANS Enters., Inc.*, 929 F.3d 603, 607-08 (8th Cir. 2019) (plaintiff was precluded from bringing second action challenging new instances of ADA violations that were or could have been encompassed in prior lawsuit); *United States v. Gurley*, 43 F.3d 1188, 1196 (8th Cir. 1994) ("new evidence of injury differs from a new wrong"). The Board issued the wage standards *before* Association Plaintiffs filed their first action (indeed, even before the Board issued the holiday pay standard challenged in the first action). *See* Revnew Decl. Ex. F at 7 (wage standards issued Oct. 28, 2024); *LeadingAge I* Dkt. 1 (Nov. 26, 2024 complaint); *LeadingAge I*, 791 F.Supp.3d at 921 (holiday pay standard issued Dec. 9, 2024); Dkt. 22 (Jan. 8, 2025 amended complaint). Moreover, Plaintiffs' challenges in this case to the Act and the Board's structure do not raise any legal arguments specific to the wage standards. *See* Compl. ¶¶63-110. Nor do they arise from any *Board actions* that took place after the first lawsuit. *See id.*; PI Br. 3-9 (neither relying on any Board actions after the first lawsuit). And their asserted First Amendment and due process harms, PI Br. 51, arose as soon as the Act was passed. Because Association Plaintiffs only assert legal theories that could have been raised in *LeadingAge I*, both suits arise from the same claims.

Both suits also involve the same parties or those in privity with them. Although "'privity' once referred to specific substantive legal relationships, … it has come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Elbert*, 903 F.3d at 783 (quotation omitted). Thus, "claim preclusion applies if the new defendant is closely related to a defendant from the original action[.]" *Id.* at 783 (quotation omitted).

Defendant Blissenbach, in her official capacity as Commissioner of the Department, is named as a defendant in both lawsuits. *See* Compl. at 1; *LeadingAge I* Dkt. 1 at 1. Jamie Gulley, in his official capacity as a Board member, is "closely related" to her for purposes of res judicata. *Elbert*, 903 F.2d at 783. Defendant Gulley is being sued in his official capacity solely because the structure of the Board is purportedly unlawful. The Board itself was originally a named defendant in *LeadingAge I. See LeadingAge I*, Dkt. 1 ¶9. Commissioner Blissenbach is by statute also a member of the Board. *See* Minn. Stat. §181.212, subd. 1. "A plaintiff may not sue a succession of state employees on the same claim solely on the ground that each employee is not 'identical' to previously sued employees." *Micklus v. Greer*, 705 F.2d 314, 317 (8th Cir. 1983) (affirming claim preclusion); *see also id.* ("There is added force for this holding … where all defendants were sued in their official capacities for acts expressly alleged to have been committed by the state itself."). Association Plaintiffs' cannot "get[] a second bite at the apple" by adding a slightly different but related Board defendant after their first lawsuit failed. *Elbert*, 903 F.3d at 784 (quotation omitted).

### B. The Act does not violate the First Amendment.

Plaintiffs' First Amendment argument lacks merit: The Act neither compels nor restricts Plaintiffs' speech or association and in fact does not even implicate the First Amendment.

Plaintiffs rely on *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 916 (2018), which held that requiring public employees to pay fees to public sector unions (their exclusive bargaining representatives) was "compelled subsidization of private speech," subject to heightened scrutiny. *Id.* at 894-95. Citing *Janus*, Plaintiffs make a convoluted argument that the Act unconstitutionally designates

the Board as their exclusive representative, forcing association with Board members. PI Br. 25.

Plaintiffs, however, can point to no "compelled subsidization" of the Board. Unlike the public sector union members in *Janus*, who were required to pay certain fees to unions as a condition of their public employment, 585 U.S. at 893, 930, the Board collects no mandatory fees from nursing homes and none of Plaintiffs' members are required to contribute funds or any other resources to the Board's work. Absent any "mandatory fee," *Janus* has no relevance. *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018).

Nor is the Board's purported "exclusive representation" sufficient to show a First Amendment violation. Nothing in *Janus* stands for the proposition that exclusive representation itself violates the First Amendment, 585 U.S. at 930, and the Eighth Circuit (like all other circuits) has rejected any such theory, *Bierman*, 900 F.3d at 574 (holding that *Janus* does not disturb precedent rejecting First Amendment challenges to state recognition of union as exclusive representative).[8]

Further, even if exclusive representation itself *did* implicate First Amendment concerns, the Board—a government body with appointed members like any other—is not akin to an "exclusive representative." Unlike employees who elect an exclusive

---

[8] *See, e.g.*, *Goldstein v. Prof. Staff Cong./CUNY*, 96 F.4th 345, 347, 351 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1044 (2025); *Peltz-Steele v. UMass Fac. Fed'n*, 60 F.4th 1, 4-8 (1st Cir. 2023), *cert. denied*, 143 S. Ct. 2614 (2023); *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 968–70 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 423 (2021); *Bennett v. AFSCME Council 31*, 991 F.3d 724, 732-35 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 424 (2021); *Akers v. Maryland State Educ. Ass'n*, 990 F.3d 375, 382 n.3 (4th Cir. 2021); *Boardman v. Inslee*, 978 F.3d 1092, 1115 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 387 (2021); *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 813-15 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 2721 (2021).

representative for their bargaining unit, who are thereby precluded from independently negotiating with their employer, *Janus*, 585 U.S. at 887, Plaintiffs' members' ability to advocate for their interests to, and to associate or not associate with, *any* group—nursing home workers, other employers, unions, elected officials, or anyone else—are "in no way restrained" by the existence of the Board or the Governor's appointment of members (including from nursing home employers) to that Board. *Bierman*, 900 F.3d at 574 (quoting *Knight*, 465 U.S. at 288). Indeed, a finding that the requirement that the Board include representatives of nursing home employers violates those employers' First Amendment rights would have wide reaching implications for all other government bodies with appointed members from certain constituencies or professions.[9]

Because Plaintiffs cannot show any way that the Act impinges (or even affects) their members' speech or association rights, the Act does not implicate the First Amendment. *Cf. Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997) (a law that does not "in any way impact the communication of [a person's] political message or otherwise restrict…their ability to communicate with voters" or "regulate the content of [the person's] political speech" does not implicate First Amendment rights).

---

[9] In Minnesota alone, similar boards with Governor-appointed members of particular professions or constituencies include the Board of Peace Officer Standards and Training, Minn. Stat. §626.841 (composed of two country sheriffs, four peace officers including two chiefs of police, and other specified law enforcement officials); Plumbing Board, *id.* §326B.435 (two commissioners and twelve appointees of particular professional backgrounds); Board of Nursing, *id.* §148.181 (sixteen members, eight of whom are required to be registered nurses); Board of Barber Examiners, *id.* §154.001 (four barber members and one public member); Board of Medical Practice, *id.* §147.01 (including eleven licensed medical practitioners of specified professional backgrounds); and Board of Dentistry, *id.* §150A.02 (two public members, five dentists, one dental assistant, and a dental hygienist), among others.

### C. The Act does not violate due process.

Plaintiffs' claim that the structure of the Board violates due process by impermissibly delegating legislative authority to self-interested private individuals also lacks merit. PI Br. 30-31.

As an initial matter, Plaintiffs' argument is premised on conflating the exercise of authority by the Board—a *government* body that is statutorily required to include appointed members of specified constituencies—with delegation to private parties. Those two are not equivalent, and the Act does not delegate *any* authority to private individuals or businesses. The Board's members are *all* appointed by the Governor, a democratically elected official, Minn. Stat. §181.212, subd. 1 (4)-(5); they operate as part of a "presumptively disinterested" official body, *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); and the worker and industry members share, with the commissioner members, an "official duty," *State of Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 122 (1928).

Those facts distinguish the Board's wielding of regulatory power from that most "obnoxious" delegation of authority to private individuals, operating in their private capacity, that the Court recognized in *Carter Coal*, 298 U.S. at 283-84, 311. *See also Eubank v. City of Richmond*, 226 U.S. 137, 141 (1912) (private landowners); *Roberge*, 278 U.S. at 118 (private property owners). Unlike in *Association of American Railroads v. U.S. Department of Transportation*, where Amtrak was mandated by Congress to "maximize company profits," 821 F.3d 19, 32 (D.C. Cir. 2016), or private actors "whose interests may be and often are adverse to the interests of others in the same business," *Carter Coal*, 298 U.S. at 311, every Board member is obligated by statute to "adopt rules … that are reasonably necessary and appropriate to protect the health and welfare of

nursing home workers, to ensure that nursing home workers are properly trained about and fully informed of their rights under sections 181.211 to 181.217, and to otherwise satisfy the purpose of sections 181.221 to 181.217." Minn. Stat. §181.213, subd. 1(a).

Even were the non-government members of the Board considered private actors, moreover, Plaintiffs' claim suffers from another fatal flaw: It fails to account for the Act's requirement that a majority of the Board's commissioner members (government officials) must vote affirmatively for "any action" the Board takes. Minn. Stat. §181.212, subd. 7. That requirement distinguishes the Supreme Court cases on which Plaintiff relies, which hold that delegation of regulatory power to private entities to issue binding rules on other private actors may run afoul of due process, but *only* in instances where there is insufficient government oversight or review. The earliest cases involved challenges to ordinances that authorized private property owners to restrict the activities of other landowners by popular vote. In both cases, the landowners exercised regulatory power that left other residents "impotent" against the restriction, *Eubank*, 226 U.S. at 143-44, and without any "provision for review"—the landowners' decision was "final," and even government housing authorities were bound by their decisions, *Roberge*, 278 U.S. at 122.

By contrast, where government officials have a meaningful oversight role (like the three commissioner Board members), the Supreme Court has upheld the involvement of private actors in lawmaking. Two cases are illustrative. In *Carter Coal*, the Court struck provisions of the Bituminous Coal Conservation Act of 1935 that gave coal producers the power to fix prices and set wages by majority vote in designated districts. 298 U.S. at 283, 310-12 (noting the delegation was particularly offensive as it was made not "to an official or an official body, presumptively disinterested, but to private persons whose

18

interest may be and often are adverse to the interests of others in the same business"). Shortly after *Carter Coal*, however, Congress enacted and the Supreme Court *upheld* a new Bituminous Coal Conservation Act of 1937, which granted coal producers approximately the same power but empowered the National Bituminous Coal Commission to "approve[], disapprove[], or modif[y]" the prices they set. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940). With such involvement, the Court concluded, Congress did not "delegate[] its legislative authority to the industry" but rather "[t]he members of the code function[ed] subordinately to the Commission" and under its "surveillance." *Id.* at 399. Where "law-making [was] not entrusted to the industry, th[e] statutory scheme [was] unquestionably valid." *Id.* at 399.

Since *Adkins*, the Supreme Court has consistently upheld private involvement in regulation when the private actors perform advisory roles and government officials retain authority to approve, disapprove, or modify their recommendations. Most recently, in *FCC v. Consumers' Research*, 606 U.S. 656 (2025), the Supreme Court rejected a due process challenge to the Federal Communication Commission's delegation of administrative management of a statutory mandate to a private nonprofit corporation, because the corporation "play[ed] an *advisory* role" and "the Commission alone ha[d] decision-making authority." *Id.* at 669-70, 693-94 (emphasis added). "As long as an agency [] retains decision-making power," the Court explained, "it may enlist private parties to give it recommendations." *Id.* at 692.[10]

---

[10] The Court has similarly rejected due process challenges to laws that authorize private individuals to vote on or petition to initiate a public process, so long as a government agency or department has final decisionmaking authority. *See Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 243 n.6 (1984); *New Motor Vehicle Board of California v. Fox Co.*, 439 U.S. 96, 109 (1978). Many circuits have agreed that legislatures may delegate rulemaking authority to private actors that "'function[] subordinately' to an agency with

Here, too, the Act ensures that the government officials on the Board retain ultimate "decision-making power," and all other Board members function subordinately to government officials, by requiring two of the three commissioner members (or their appointees)—government officials—to vote affirmatively for any action. *See* Minn. Stat. §181.212, subd. 7. As with the commissions in *Adkins* or in *FCC*, which retained authority to approve or disapprove of the recommendations of private actors, the "presumptively disinterested" public officials on the Board retain authority to approve or disapprove recommendations made by any combination of the members representing nursing home workers or employers. *See Carter Coal*, 298 U.S. at 311. Thus, the private industry Board members do not have the "final word" on nursing home regulations. *Black*, 53 F.4th at 887.[11]

Plaintiffs' reliance on *Association of American Railroads* is accordingly misplaced. There, the law at issue gave Amtrak, a Congressionally created for-profit corporation with the status of a government entity, joint authority with the Federal

---

'authority and surveillance' over" them. *Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 881 & n.21 (5th Cir. 2022) (collecting cases from the Fifth, Fourth, Third, and D.C. circuits).

[11] Insofar as the participation of non-commissioner members is required for a Board action, the Supreme Court has consistently found such involvement of industry actors constitutional. In *Currin v. Wallace*, for example, the Supreme Court upheld statutory provisions authorizing the Secretary of Agriculture to designate specific markets only where two-thirds of the growers in the applicable area voted in favor of the designation. The Court explained that the law simply established "a restriction upon its own regulation by withholding its operation as to a given market unless two-thirds of the growers voting favor it," contrasting it with the "case where a group of producers may make the law and force it upon a minority." 306 U.S. 1, 15-16 (1939) (quotation omitted); *see also U.S. v. Rock Royal Co-Op*, 307 U.S. 533, 577 (1939) (no due process violation to require two-thirds vote of interested producers in a specified market area before a regulation would take effect).

Railroad Administration ("FRA") to set general performance metrics and standards for freight carriers, including Amtrak competitors. 821 F.3d at 23. Under the statutory scheme, if Amtrak and the FRA could not agree on a standard, either could petition the Surface Transportation Board to appoint an arbitrator to assist the parties and, if necessary, issue a final standard. *Id.* at 24. The court premised its due process conclusion on the fact that the FRA was ultimately "powerless to overrule Amtrak," *id.* at 35, because Amtrak could take any dispute to the arbitrator to obtain the standard that Amtrak wanted. The government members of the Board have no such powerlessness in their ability to override all other members in official Board actions.[12]

Finally, inappropriately analogizing to rules governing judges and adjudicators, Plaintiffs argue that the participation of worker and industry Board members in setting standards that may affect their financial interests violates due process. But Plaintiffs cite *no* authority to support their novel argument that regulators must meet the same standard for pecuniary disinterest as adjudicators. PI Br. 29-31. Nor could they. The Supreme Court has declined to extend its ruling that due process forbids those with "substantial pecuniary interests" from *adjudicating* a proceeding to *regulatory* bodies exercising *legislative* power. *Compare Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973) (finding

---

[12] To the extent Plaintiffs accuse the government members of "rubber stamping" the actions of the non-government Board members, *FCC* is clear that government officials are free to adopt the advice of private parties in its entirety:

> "the relevant legal question [for the purposes of due process] is not how often the [government oversight body] revises the [private actor's actions], just as in [*Adkins*] it was not how often the agency rejected the coal companies' pricing advice. It is sufficient in such schemes that the private party's recommendations … cannot go into effect without an agency's say-so, *regardless of how freely given*."

*FCC*, 606 U.S. at 695 (emphasis added).

bias among private practitioner optometrists on the state board violated due process when such board members adjudicated complaints against individual optometrists) *with Friedman v. Rogers*, 440 U.S. 1 (1979) (the same bias on different state board that issued *regulations* did *not* violate due process). There is "*no constitutional right* to be regulated by a Board that is sympathetic" to a plaintiff's professional background. *Friedman*, 440 U.S. at 898 (emphasis added). This rule makes good sense: The bias of regulatory bodies in a democratic system is assumed, *see Ass'n of Am. R.R.*, 821 F.3d at 30, but also blunted by broadly applicable rules and standards that are less able to specifically target political opponents or economic competitors, *cf. U.S. v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245-46 (1973) (discussing the difference in administrative law between rules "applicable across the board" and adjudicating the facts of a particular case).

Ultimately, with government official approval required for every Board action, and the Governor's appointment of every member to a public commission with statutory duties, the Act has not "entrusted [law-making] to the industry" and Plaintiffs cannot establish any due process violation. *Adkins*, 310 U.S. at 399.

**D. The Act is not preempted by federal antitrust laws.**

Like due process, Plaintiffs' antitrust claim rests on a misunderstanding of the Board's structure and applicable doctrine. Because any action by the Board requires the approval of two of the three commissioner members, there is no antitrust issue. While the Board does have other members, its structure is no different for antitrust purposes than if the private parties were on an advisory board that made recommendations to the three government officials, because no action is effective unless affirmatively approved by the government officials. Because it requires government officials' *affirmative approval* before any standard takes effect, this structure provides far more assurance that any

regulation is government-approved than numerous regulatory structures that provide only for a government official's *veto*, which nonetheless have repeatedly been upheld by the Supreme Court.

*Parker* immunity, named after *Parker v. Brown*, 317 U.S. 341, 350-51 (1943), "is premised on the assumption that Congress, in enacting the Sherman Act, did not intend to compromise the States' ability to regulate their domestic commerce," including in ways that would otherwise violate antitrust laws. *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56 (1985).

There is no dispute over *Parker*'s first requirement—clear articulation. PI Br. 38-39. Nor could there be: The statute expressly grants the Board authority to establish employment standards including compensation standards. Minn. Stat. §181.213, subd. 1; *see Southern Motor Carriers*, 471 U.S. at 63-64 (state need not anticipate specific form that rate-setting would take so long as it "made clear its intent" that the "rates would be determined by a regulatory agency, rather than by the market"); *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 574 U.S. 494, 507 (2015) ("*Dental Examiners*") (policy of displacing competition may be "implicit[]" or "defined at so high a level of generality as to leave open critical questions about how and to what extent the market should be regulated").

Instead, Plaintiffs argue that the Board does not meet the active supervision requirement, which mandates "that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Dental Examiners*, 574 U.S. at 507. The purpose of this requirement is to ensure that "the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *F.T.C. v.*

23

*Ticor Title Ins. Co.*, 504 U.S. 621, 634-35 (1992). It is satisfied if a state official has "the power to veto or modify particular decisions to ensure they accord with state policy," and *actually* makes a decision rather than merely having the potential ability to intervene. *Dental Examiners*, 574 U.S. at 515 (citations and internal quotations omitted).

The Board's structure provides for far more assurance that any standard is the "product of deliberate state intervention" than a mere government veto: Two of the three commission members must *affirmatively approve* any standard before it may take effect. *See supra* at 18. Plaintiffs protest that the commissioner Board members exercise only "theoretical" and not "actual" supervision. PI Br. 39-41. But that argument fails as a facial matter. The distinction between theoretical and actual supervision comes from cases in which the relevant government official had *veto* authority—so that a measure could take effect through government *inaction. See Ticor Title*, 504 U.S. at 638 (requiring a showing that state officials have actually exercised supervisory authority in situation "[w]here prices or rates are set as an initial matter by private parties, subject *only to a veto if the State chooses to exercise it*") (emphasis added).[13] Here, by contrast, no substantive provision may take effect without "the affirmative vote" of two of the three commissioner Board members. Minn. Stat. §181.212, subd. 7.

The mere fact that the commissioner members have consistently approved proposals supported by labor unions does not in any way establish that they failed to give

---

[13] Similarly, in *SmileDirectClub, LLC v. Battle*, 969 F.3d 1134, 1143 (11th Cir. 2020), *vacated en banc on other grounds*, 4 F.4th 1274 (2021), the record showed the Governor "did not exercise [his] power" to *substantively* review the standard at issue but "examined only the procedural question of whether the amended rule was within the Board of Dentistry's statutory power to propose the rule change." *See also Electrical Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110, 129 (2d Cir. 2003) (citing *Ticor* and holding a "mere 'negative option' to replace the Board at any time is alone likely inadequate supervision").

substantive and affirmative approval of the proposals. Plaintiffs explicitly acknowledge that the commissioner members "voted to approve" each of the standards listed. PI Br. 40. It was not state officials' "mere presence" *but their actual votes* that allowed the standards to take effect. *Id.* Plaintiffs cannot turn their disagreement with state officials into an antitrust problem.

In any event, if it *did* matter (which it does not)*,* the record shows that the commissioner members actively participated in discussions and made and seconded motions for Board action. *See supra* at 5, n.3. And the commissioner members are statutorily obligated to consider substantive standards. *See* Minn. Stat. §181.213, subd. 1. Plaintiffs' assertions regarding the commissioner members' support for proposals by the Board's worker representatives does not show an antitrust violation, any more than a state legislature's or state labor commissioner's consistent approval of worker or union proposals would.

Finally, even if the Act did *not* require the affirmative vote of two of the three commissioner members for approval of a standard, it would not violate the antitrust laws. Actions by subordinate state bodies like agencies, boards, commissions, and municipalities are not subject to the active supervision requirement, and under the Act, the Board should be analyzed as a state commission, not as a body dominated by private market participants. *See Hoover v. Ronwin*, 466 U.S. 558, 568–69 (1984); *Town of Hallie v.City of Eau Claire*, 471 U.S. 34, 45-47 (1985) (municipalities are arms of the state); *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005, 1014-15 (8th Cir. 1983) (municipal officials need not show state supervision). Plaintiffs rely on *Dental Examiners* to argue that the Board is controlled by private interests and so should not be treated as a subordinate state body. But in *Dental Examiners*, seven of the eight members

of the state regulatory board were required to be licensed, practicing dentists or dental hygienists and *were elected by* other licensed dentists or hygienists. 574 U.S. at 499-500, 510. By contrast, here, not only do state officials comprise a significant portion of the Board, but *all* of the remaining Board members are appointed by the Governor—not selected by the constituent groups themselves. Minn. Stat. §181.212, subd. 1(a)(4), (5).[14] Further, the Board's tripartite composition means it is not dominated by a single interest group, so does not present the same "risk of self-dealing" or danger of acting like a private trade association "empower[ed] … to decide who can participate in its market, and on what terms" that was present in *Dental Examiners*, 574 U.S. at 511. Because no particular bloc can "take any action" without the votes of another, Minn. Stat. §181.212, subd. 7 (requiring "[t]he affirmative vote of five board members"), the Board is not "controlled" by any one particular set of private interests.

## E. The Act is not preempted by the NLRA.

### 1. *Machinists* preemption does not apply.

The *LeadingAge I* court already correctly rejected Plaintiffs' arguments that the holiday pay standard is *Machinists* preempted. *See* 791 F.Supp.3d at 935-42. For the same reasons, the Act itself is not preempted.

---

[14] In similar circumstances, courts have held the state supervision requirement inapplicable. *See*, *e.g.*, *Turner v. Virginia Dep't of Medical Assistance Servs.*, 230 F.Supp.3d 498, 505–06 (W.D. Va. 2017) (holding exempt from active state supervision an eleven-member board with five medical providers and six state residents, two of whom were required to have professional experience in the field of medical fraud); *Bauer v. Pennsylvania State Bd. of Auctioneer Examiners*, 154 A.3d 899, 911 (Pa. Commw. Ct. 2017) (supervision requirement inapplicable to a board with five of nine members required to be from certain regulated professions, when Board members were appointed by the state and were applying state statutes, and their actions were subject to judicial review).

*Machinists* preemption prohibits states from imposing restrictions on labor's and management's "economic weapons" (e.g., strikes and lock-outs) that were left unregulated by the NLRA because Congress intended for the conduct "to be controlled by the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wisconsin Emp. Rels. Comm'n*, 427 U.S. 132, 140-41 (1976). Plaintiffs argue that the Act is preempted because it authorizes the Board to issue minimum employment standards that nursing home employers must follow. PI Br. 49. But the Supreme Court has expressly rejected the argument that the NLRA preempts states from issuing such state minimum employment standards. *See Metropolitan Life v. Insurance Co. v. Massachusetts*, 471 U.S. 724, 750-58 (1985); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20-23 (1987).

In *Metropolitan Life*, insurers challenged a state statute requiring health insurance policies to provide minimum mental health care benefits. The insurers contended that the statute "in effect mandate[d] terms of collective-bargaining agreements," and thus ran afoul of Congress' intent "to leave the choice of terms in collective-bargaining agreements to the free play of economic forces." *Id.* at 748. The Supreme Court disagreed. The Court held that Congress did not intend the NLRA to "disturb the myriad state laws … that set minimum labor standards," including "[c]hild labor laws, minimum and other wage laws, [and] laws affecting occupational health and safety." *Id.* at 756. Such laws do not interfere with the goals of the NLRA because "[t]he NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." *Id.* at 753. "Minimum state labor standards affect union and nonunion employees equally, and

27

neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA." *Id.* at 755.

The Supreme Court affirmed that principle two years later in *Fort Halifax*. Employers contended that a state statute requiring severance payments to employees impermissibly "intrude[d] on the bargaining activities of the parties." 482 U.S. at 20. The Supreme Court held that the statute was not *Machinists* preempted. *Id.* at 20-23. Although the "statute [gave] employees something for which they otherwise might have to bargain," "[t]hat is true … with regard to any state law that substantively regulates employment conditions." *Id.* at 21. "Both employers and employees come to the bargaining table with rights under state law that form a backdrop for their negotiations." *Id.*. "[T]he mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption[.]" *Id.*

*Metropolitan Life* and *Fort Halifax* control the outcome here. The *only* reason Plaintiffs contend the Act "intrude[s] on the collective bargaining process" is that it provides for minimum nursing home employment standards on matters—wages, training, and other working conditions—over which the parties are free to bargain. PI Br. 49. But courts routinely and consistently hold that such minimum employment standards are not *Machinists* preempted. *See Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 114 (2d Cir. 2024) (just-cause employment standard for fast food workers not preempted); *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016) (minimum wage and time-off standard for hotel employees not preempted); *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77 (2d Cir. 2015) (standard setting minimum compensation rate for homecare aids not preempted); *Associated Builders & Contractors of S. California, Inc. v. Nunn*, 356 F.3d 979, 990 (9th Cir. 2004) (statute setting minimum

total wage/benefit package for construction apprentices not preempted); *St. Thomas St. John Hotel & Tourism Ass'n. v. Gov't. of U.S. Virgin Islands*, 218 F.3d 232, 246 (3rd Cir. 2000) (just-cause employment standard not preempted); *Indus. Welfare Com. v. Superior Ct.*, 27 Cal.3d 690, 726 (1980) (state wage board that set minimum labor standards and included employer and labor members was not preempted).

Plaintiffs' assertion that the Act "empowers the Board to amend every CBA" is patently false. PI Br. 49. The Board has no ability to amend any collective bargaining agreement. The Act expressly does not "limit the rights of parties to a collective bargaining agreement to bargain and agree with respect to nursing home employment standards," or "diminish the obligation of a nursing home employer to comply with any [CBA] that meets or exceeds, and does not conflict with, the minimum standards" establish by the Act or the Board  Minn. Stat. §181.213, subd. 6(1), (2). Because Plaintiffs fail to identify any intrusion upon the collective bargaining *process*, their *Machinists* preemption claim must fail.

### 2. *Garmon* preemption does not apply.

Plaintiffs' *Garmon* preemption claim also lacks merit. "*Garmon* preemption forbids States to 'regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits.'" *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 65 (2008) (quoting *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 286 (1986)). *Garmon* preemption applies when "it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by §7 of the [NLRA], or constitute an unfair labor practice under §8." *Gould*, 359 U.S. at 244.

Plaintiffs' *Garmon* arguments depend on a mischaracterization of the Act as establishing an alternative collective bargaining system. PI Br. 43-47. The Board,

however, in no way intrudes into collective bargaining between employers and employees. Rather, the Board simply sets minimum labor standards like countless other government agencies across the country. While the Act directs the Governor to appoint Board members from certain constituencies, and those members have a role in developing minimum employment standards, the state government is the ultimate decisionmaker: A majority of the government members on the Board must vote in favor of any standard. Minn. Stat. §181.213, subd. 1. Thus, even if the members of this government body from employer and employee constituencies were somehow engaging in collective bargaining (which they most definitely are not), those non-state official members of the Board have no authority to reach an agreement to establish wages or other working conditions.

Plaintiffs' cited authorities concern very different state conduct and do not support *Garmon* preemption. Unlike the laws at issue in those cases, which involved the state determining who represents workers for purposes of collective bargaining with their employers and adjudicating unfair labor practices, the Act does not set up a system of labor relations regulation that duplicates or conflicts in any way with the NLRA. *See Bethlehem Steel Co. v. New York State Lab. Rels. Bd.*, 330 U.S. 767, 775 (1947) (state labor relations act and labor relations board that "conduct[ed] hearings, supervis[ed] elections, and determine[ed] appropriate units for bargaining" and adjudicated unfair labor practice complaints under state law was preempted as to employees within the NLRB's jurisdiction); *Guss v. Utah Lab. Rels. Bd.*, 353 U.S. 1, 9 (1957) (state board's adjudication of unfair labor practices was preempted).[15]

---

[15] *See also Amazon.com Servs. LLC v. New York State Pub. Emp. Rels. Bd.*, 2025 WL 3295071, at *1 (E.D.N.Y. Nov. 26, 2025) (extending state labor relations act to private employees within NLRB's jurisdiction was likely preempted); *NLRB v. California*, No.

Plaintiffs' argument that the Act is inconsistent with the purported general "policy" of the NLRA (PI Br. 44) is insufficient to establish *Garmon* preemption. *See Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d 87, 96 (2d Cir. 2006) ("We must … begin by identifying whether *any specific provision of sections 7 or 8 of the NLRA* actually or arguably prohibits or protects the conduct that is the subject of state regulation.") (emphasis added). At any rate, there is no conflict with any NLRA policy. Congress intended the NLRA to operate against the backdrop of minimum labor standards. *See Metropolitan Life*, 471 U.S. at 755-56.

Plaintiffs' attempt to identify conflicts with specific provisions of Sections 7 or 8 also fail. *See* PI Br. 45-48. As an initial matter, Plaintiffs, as nursing home employers and associations, cannot assert preemption based on NLRA Section 7, which confers rights on *employees* only. *See Int'l Ass'n of Firefighters of St. Louis v. City of Ferguson,* 283 F.3d 969, 973 (8th Cir. 2002) (prudential standing requires that plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"); *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 489 (9th Cir. 1996) (employer bringing preemption claims "does not have standing to assert the NLRA rights of its employees"); *Healthcare Ass'n of N.Y. State*, 471 F.3d at 96 (refusing to consider employer associations' Section 7 preemption argument because section 7 only confers rights on employees").

And even if Plaintiffs could assert their employees' Section 7 rights to select collective bargaining representatives, Plaintiffs' arguments are legally and factually incorrect. Nothing in the Act prevents nursing home workers from choosing a union to

2:25-cv-02979, slip op. at 1, 6, 15-16 (E.D. Cal. Dec. 26, 2025) (Revnew Decl. Ex. II) (state law requiring state board to adjudicate unfair labor practices within the NLRB's jurisdiction was likely preempted).

31

represent them in collective bargaining under the NLRA—or requires them to do so. *See* Minn. Stat. §§181.211-.217. Indeed, more than 2,500 workers are currently represented by SEIU Minnesota; thousands of others are not represented by any union at all. Sharif Decl. ¶¶3, 7. Plaintiffs' statement that "[t]he Act does not allow any nursing home workers to choose a union" is simply false. PI Br. 45-46.[16] Plaintiffs' statement that Governor Walz has appointed "three unions" to represent all nursing home workers in collective bargaining, *id.* at 46, also misstates the facts—three *individuals*, not three unions, were appointed to the Board—and they were appointed to engage *as Board members* in the Board's legislative standard-setting, not to collectively bargain.

The Act similarly does not put any limitations on nursing home *employers'* freedom to select their own representatives for collective bargaining under the NLRA. *See* Minn. Stat. §§181.211-.217; *contra* PI Br. 46-47.

Plaintiffs' cited cases are again inapposite. In *Cannon v. Edgar*, 33 F.3d 880, 882 (7th Cir. 1994), a state law improperly required that the union and employer negotiate and reach agreement on a particular CBA term: a pool of workers to perform religious burials when the union went on strike. In *Bechtel Const., Inc. v. United Bhd. of Carpenters & Joiners of Am.*, 812 F.2d 1220, 1225 (9th Cir. 1987*)*, the court observed in dicta that it would be problematic if a state conditioned parties opting out of a minimum wage standards on state approval of the terms of their CBA. Here, the Act does not purport to exercise, or allow the Board to exercise, any such interference with the terms of privately negotiated CBAs.

---

[16] Nothing in the Act prevents those unions from being selected in compliance with the NLRA's selection procedures. *Contra* PI Br. 47.

Finally, the Act indisputably does not, as Plaintiffs contend, "supplement the workers' remedies under the NLRA for an alleged grievance." PI Br. 47. The NLRA does not provide remedies for *grievances* at all.[17] The NLRA provides remedies for violations of the NLRA. *See* 29 U.S.C. §160(c). Although additional state remedies for violations of the NLRA may be *Garmon* preempted, *see Gould*, 475 U.S. at 286, the Act does not authorize or impose any additional remedies for NLRA violations (or for any grievances). The only remedies in the Act are for violations of the Board's standards. Minn. Stat. §181.217, subd. (3)(b). Violations of state minimum labor standards are not prohibited under Sections 7 or 8 of the NLRA. *See* 29 U.S.C. §157, 158. *Garmon* preemption has no applicability to such remedies.

## II. Plaintiffs Have Not Shown They Will Suffer Irreparable Harm Absent An Injunction

"The absence of irreparable harm is sufficient grounds for [denying] a preliminary injunction." *Beber v. NavSav Holdings, LLC*, 140 F.4th 453, 463 (8th Cir. 2025) (quotation omitted). "To demonstrate irreparable harm, the movant must show harm that is certain and great and of such imminence that there is a clear and present need for equitable relief." *Id.* Because the Association Plaintiffs' claims are precluded, Plaintiffs can only rely on harm to Plaintiff Yona. But even considering all the harms claimed by Plaintiffs, Plaintiffs fail to show they will suffer "certain," "great," and "imminent" irreparable injury if the Act is not enjoined. *Id.*

Initially, Plaintiffs' assertion of irreparable harm based on their purported constitutional injuries depends entirely on the merits of their claims. PI Br. 50. Because

---

[17] Grievances are disputes between labor and management regarding violations of a CBA. They proceed according to a contractual, internal grievance procedure in which the NLRB is not involved.

the law is crystal clear that establishment of a government board to regulate nursing homes does not infringe Plaintiffs' First Amendment or due process rights, those claims lack merit. *See supra* at 14-22.

Plaintiffs' claim of severe financial harm from the wage standards also fails. For several reasons, those injuries are not certain, imminent, or great.

First, the wage standards are not yet in effect and may never take effect. *See* Revnew Decl. Ex. H. It is undisputed that the wage standards are contingent on CMS approval of the related increased Medicaid reimbursement rates, Minn. R. 5200.2070 subp. 2.A, 3. CMS recently declined to approve the increased rates and delayed the deadline for its final decision pending further investigation of issues raised with State. *See supra* at 6, n.5. It is uncertain whether or when (if ever) CMS will approve the rates. Plaintiffs certainly put forth no evidence showing approval is likely or imminent.[18] That alone dooms their request for the "extraordinary remedy" of a preliminary injunction. *See Kohls v. Ellison*, 166 F.4th 728, 732 (8th Cir. 2026).

Second, "[e]conomic loss, on its own, is not an irreparable harm so long as the losses can be recovered." *Beber*, 140 F.4th at 461. That is the case here: Plaintiffs' economic harm arguments completely disregard the actions taken by the Minnesota

---

[18] Indeed, CMS, has recently taken other actions to *withhold* Minnesota Medicaid funding. *See* CMS, *Notice of Opportunity for Hearing on Compliance of Minnesota State Plan Provisions Concerning Program Integrity and Fraud, Waste, and Abuse With Title XIX (Medicaid) of the Social Security Act*, 91 Fed. Reg. 1539 (Jan. 14, 2026), https://www.govinfo.gov/content/pkg/FR-2026-01-14/pdf/2026-00512.pdf (withholding $515 million in quarterly Medicaid payments); CMS, *Trump Administration Prioritizes Affordability by Announcing Major Crackdown on Health Care Fraud*, https://www.cms.gov/newsroom/press-releases/trump-administration-prioritizes-affordability-announcing-major-crackdown-health-care-fraud (deferring $250 million in Medicaid funds).

legislature to ensure that nursing home employers would recoup any increased labor costs imposed by the Board's 2026 and 2027 standards and so effectively be held harmless.

To compensate nursing homes for the 2026 and 2027 wage standards (which have not yet taken effect), the legislature adopted legislation in 2025 to provide nursing homes a *higher* Medicaid reimbursement rate increase,[19] and to fund that rate increase *sooner* than the Medicaid rate increase otherwise contemplated by the Act. 2025 Human Services Omnibus Finance Bill, Minnesota Session Law, 1st Special Session Ch. 9 art. 1, sec. 1 (amending Minn. Stat. §181.213), sec. 23 (amending Minn. Stat. §256R.495); Revnew Decl. Ex. T. The effect of advancing these rate increases is to mitigate against any delay in increased costs being reflected in the federal Medicaid rate, with the express intent of reimbursing employers for compliance with the anticipated 2026 and 2027 standards. And to ensure that this recoupment was sufficient, at the behest of the nursing home lobby, the legislature actually provided for a rate increase substantially higher (almost 30% higher in 2026) than Minnesota DHS had calculated was necessary to reimburse employers for cost increases caused by the wage standards. *See* Minnesota

///

///

---

[19] Most of nursing homes' income is dictated by Medicaid reimbursement rates, which are set by the Minnesota Department of Human Services ("DHS") pursuant to statute. *See* Minnesota House Research Department, *Nursing Facility Reimbursement and Regulation* (Dec. 2023), https://www.house.mn.gov/hrd/pubs/nfreimb.pdf at 1 (Medicaid funded 56% of nursing home days in 2022); Kaiser Family Foundation, *Distribution of Certified Nursing Facility Residents by Primary Payer Source,* http://bit.ly/4c0RNHg (Medicaid funded 53% of residents in 2025, Medicare funded 11% and private pay funded 36%); Dkt. 22 (Carley Decl.) ¶¶11-12; Dkt. 9-3 Hill Decl. ¶10; Dkt. 9-2 (Benham Decl.) ¶9; Revnew Decl. Ex. S at 6, 13. Minnesota's policy of "rate equalization" requires that private payor rates may not exceed Medicaid rates for similar services. Minn. Stat. §256R.06.

Senate, *Human Services Omnibus Budget Spreadsheet* (July 15, 2025) at 7 (compare spreadsheet lines 355 (final appropriation) and 363 (DHS calculation)).[20]

In fact, if anything, Plaintiffs stand to recoup financial *benefits* in the event that CMS approves the Medicaid rate increases (which is, of course, speculative). Any CMS approval would be retroactive to January 1, 2026. *See* Leyton Decl. Exhibit 11 (Dec. 11, 2025 Board minutes) at 2-3; *see also id.* (facilities have been able to bill private-pay residents at the increased rates since January 1, 2026). The wage standards, however, would take effect only 30 days *after* CMS approval. *Id.* Thus, even if the wage standards were to take effect this year, nursing homes would receive a substantial rate *increase* for several months (or more) during which they were not obligated to pay increased wages.

Nor do Plaintiffs' declarations from a handful of nursing homes, purporting to establish future harms from the purported increase in labor costs, meet the applicable standard. Initially, they are entirely speculative, stating only that nursing homes *may* take future actions if the wage standards go into effect. *See* Carley Decl. ¶¶9, 10 (nursing home is "considering" future actions); Dkt. 9-4 (Struzyk Decl.) ¶¶8, 9.b (home "start[ing]

---

[20] *Available at* https://www.senate.mn/tracking/2025; https://assets.senate.mn/fiscalpol/tracking/2025/2025-HS-Spreadsheet-Special-Session-Chapter-9.pdf. Plaintiffs provide no basis for their conclusory assertions that the wage standards will somehow "increase" the alleged gap between Medicaid rates and their costs or that more general concerns about Medicaid rates being insufficient mean that the legislative reimbursement scheme here is inadequate. *See* PI Br. 16. Indeed, even under Plaintiffs' telling, the general "shortfall" in "public support" for nursing homes is 3%, *see* Benham Decl. ¶12.b., which would translate to cents per hour. For nursing home employers with *millions of dollars* in annual revenue, this simply cannot constitute "great" financial harm. *See* Pro Publica, https://projects.propublica.org/nonprofits/organizations/ 411531892 (Benedictine Health System 2024 IRS filing: *$82.5 million revenue*); Pro Publica, https://projects.propublica.org/nonprofits/organizations/ 410872240 (Glenwood Village Care Center 2024 IRS filing: *$11.3 million in revenue*); Carley Decl. ¶1; Benham Decl. ¶1.

development" of a "goal" to reduce staff); Dkt. 9-5 (Wraalstad Decl.) ¶12 (referring to unspecified "difficult financial decisions"); *see also* Benham Decl. ¶9; Struzyk Decl. ¶10; Carley Decl. ¶11, Wraalstad Decl. ¶15 (all: "expect[ing]," but not committing to, "wage compression").[21] That some employers are "considering" future action or may need to make certain decisions at some unspecified future time is not "certain" harm justifying injunctive relief. *Beber*, 140 F.4th at 463. Further, the nursing homes report voluntary measures taken in anticipation of potential approval. *See, e.g.*, Benham Decl. ¶8, Struzyk Decl. ¶¶9-10, Carley Decl. ¶9 (all: listing voluntary actions that a few nursing homes have chosen to take in anticipation of wage standards, such as delaying capital improvements and hiring administrative staff). But "self-inflicted" injury does not support injunctive relief. See, *e.g., Abdurrahman v. Dayton*, No. 16-CV-4279 (PAM/HB), 2016 WL 7428193 (D. Minn. Dec. 23, 2016), *aff'd*, 903 F.3d 813 (8th Cir. 2018). Still other reported actions are not harms at all. *See, e.g.*, Struzyck Decl. ¶9.c (citing as irreparable harm that it notified private payors their rates would increase commensurate with Medicaid—thereby increasing nursing home's own revenue); Wraalstad Decl. ¶14 (citing fact that nursing home imposed increased tax levy to offset wage standard costs). And some claimed harms are simply implausible. Carley Decl. ¶9.c (claiming nursing home already increased wages to workers "[a]s a result of the wage

---

[21] Plaintiff Yona claims to face "unique" harm because it is not *directly* reimbursed through Medicaid rates. PI Br. 14 n.3. But Yona contracts with facilities that receive Medicaid reimbursements at rates that include the costs of contracting for Yona's services. *See* Minn. Stat. §256R.02, subds. 17, 34-36, §256R.21. Yona fails to demonstrate that it will be unable to recoup any future increased costs associated with the wage standards through its contracts with facilities. The wage standards have been public for almost two years, Revnew Decl. Ex. E, giving Yona ample time to contract for their potential implementation, and Yona provides no evidence that it tried but was unable to do so.

standards," but standards have not taken effect). Plaintiffs have not carried their evidentiary burden to show actual, great, and imminent irreparable harm. [22]

## III. An Injunction Will Cause Severe Irreparable Harm to Nursing Home Workers and Is Against the Public Interest.

Thousands of nursing home workers have an interest in the Board continuing to operate to protect the workers' health and welfare. *See supra* at 7-9. Plaintiffs' bid to enjoin the Board and its standards based on claims of speculative economic harms would deprive workers of the benefits of the standards issued to date as well as any future standards, and would undermine the public interest and the Minnesota Legislature's goals in establishing the Board.

The Board's standards already have, and will continue to, substantially improve nursing home workers' security and quality of life. *See id.* In particular, the increased wage rates under the holiday pay standard and the wage standards are incredibly meaningful to these workers, many of whom are overworked and struggle to support their families on their current wages. *See id.* Missing out on the pay required under the Board's standards while this case is litigated would be highly detrimental to them. *See id.*

///

---

[22] Plaintiffs' complaints about needing to pay workers one hour every two years to attend training also fail to identify any "great" financial harm and cannot justify preliminary relief. Tellingly, despite nursing home employers' claiming that they cannot afford to pay workers more, they have no trouble expending substantial resources to oppose worker organizing. *See* Columbia University Labor Lab, *Democracy Denied at the Bedside* (Mar. 5, 2026), https://laborlabcu.org/wp-content/uploads/2026/03/Union-Avoidance-Report-2026-03-05.pdf; Labor Lab, *The Price of Repression: Estimating the Costs of Five Union-Busting Campaigns in Minnesota's Nursing Home Sector* (April 2026), https://laborlab.us/minnesota-nursing-homes-could-have-given-workers-a-raise-they-chose-union-busting-instead/ (estimating five homes spent roughly $250,000 to $450,000 ($2500 to $7000 per worker) opposing worker organizing).

These workers provide vital care and services to thousands of Minnesota's most vulnerable citizens. *See id.* The public has an interest in the sufficiency of nursing home workers' wages and working conditions so that they can provide effective care to residents. Nursing homes are chronically understaffed and turnover is high. *See id*. That shortfall places additional burdens on workers in an already demanding job and is harmful to the residents who receive less staff attention and continuity as a result. *See id.* An injunction that delays improvements in working conditions that will attract workers to the profession harms the public's interest in high-quality nursing home care.

**IV. Any Injunctive Relief Must Be Limited.**

For the aforementioned reasons, no injunctive relief should issue. If it does, such relief should be limited to any non-precluded plaintiff that remains in the case. *See Trump v. CASA, Inc.*, 606 U.S. 831, 852-53 (2025) (injunctions may be no broader than necessary to provide complete relief to plaintiffs in case).

**<u>CONCLUSION</u>**

For the above reasons, State Defendants' motion to dismiss should be granted and Plaintiffs' motion for a preliminary injunction should be denied.

Dated: April 14, 2026                     Respectfully submitted,

*/s/ Stacey M. Leyton*
Stacey M. Leyton (CA Bar #203827)*
Barbara J. Chisholm (CA Bar #224656)*
Corinne F. Johnson (CA Bar #287385)*
Katherine G. Bass (CA Bar #344748)*
Altshuler Berzon LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151
sleyton@altshulerberzon.com

bchisholm@altshulerberzon.com
cjohnson@altshulerberzon.com
kbass@altshulerberzon.com

*Pro hac vice pending*

<u>/s/ Justin D. Cummins</u>
Justin D. Cummins, #276248
Cummins & Cummins, LLP
920 Second Avenue South, Suite 1245
Minneapolis, MN 55402
(612) 465-0108
justin@cummins-law.com

***Attorneys For SEIU Minnesota***

40