UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

LEADINGAGE MINNESOTA, CARE PROVIDERS OF MINNESOTA, and YONA NORTHSTAR, LLC,

Court File No. 0:26-cv-01816-NEB-DJF

Plaintiffs,

v.

NICOLE BLISSENBACH, *in her official capacity as the Commissioner of the Minnesota Department of Labor and Industry and as a member of the Minnesota Nursing Home Workforce Standards Board*, and JAMIE GULLEY, *in his official capacity as a member and chairperson of the Minnesota Nursing Home Workforce Standards Board*,

Defendants,

Service Employees International Union Healthcare Minnesota and Iowa,

Intervenor-Defendant.

---

**CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

PAGE

ARGUMENT ....................................................................................................4

I.  STANDARD OF REVIEW....................................................................4

    A.  Rule 12(b)(6)..........................................................................4

    B.  Preliminary Injunctive Relief...............................................5

II.  THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS AND GRANT PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION. ...........................................................6

    A.  Plaintiffs Plausibly State Violation of their First Amendment Rights and Are Likely to Succeed on Their First Amendment Claim. ........................................................6

        1.  Plaintiffs have shown an intrusion into their First Amendment right of disassociation. ....................................6

        2.  Plaintiffs voicing disapproval for the Board's actions is not the same freely disassociating from the Board..............9

        3.  The Board's actions and structure do not survive exacting scrutiny............................................................. 12

    B.  Plaintiffs Plausibly State a Violation of Their Procedural Due Process Rights and Are Likely to Succeed on Their Due Process Claim................................................................. 15

        1.  The Board's government representatives have never vetoed any union representatives' proposals, exemplifying the Board's lack of neutrality. ..................... 15

        2.  Defendants cite no case ruling that a comparable scheme to the Board squares with due process of law...... 20

    C.  Plaintiffs Plausibly State the Sherman Act Preempts the Act and Are Likely to Succeed on Their Sherman Act Preemption Claim. ............................................................................... 26

1.    The Board is controlled by self-dealing private market participants that pass standards that fix wages and employment conditions. ...................................................... 26

2.    Defendants' efforts to invoke *Parker* immunity ring hollow because the government fails to engage in active supervision. .......................................................... 27

D.    Plaintiffs Plausibly State that the NLRA Preempts the Act and Are Likely to Succeed on Their NLRA Preemption Claim. .................................................................................. 32

1.    *Garmon* preemption applies because the Act regulates the relationships between unions, employers, and the government........................................................................ 32

2.    *Machinists* preemption applies because the Act interferes with the bargaining process by overwhelmingly shifting power towards the union representatives.................................................................. 38

E.    State Defendants Have Inflicted Irreparable Constitutional Harm on Plaintiffs and Plaintiffs Lack an Adequate Legal Remedy. .................................................................................. 42

1.    Plaintiffs have suffered irreparable constitutional harm. ......................................................................... 42

2.    Plaintiffs lack an adequate legal remedy against State Defendants. ................................................................. 44

F.    Balance of Harms Weighs in Favor of Plaintiffs......................... 45

III.    RES JUDICATA DOES NOT BAR PLAINTIFFS' CLAIMS................. 46

A.    About *LeadingAge I*. ................................................................... 46

B.    New Harm Caused by the Board's Specific Actions and the Facts Substantiating this Harm did not Exist During *LeadingAge I*. ............................................................................ 49

1.    The Wage Standards inflict new harm on LeadingAge's and Care Providers's association members that post-dates *LeadingAge I*. ............................. 49

2. The Board's selection of certain unions, which post-dated *LeadingAge I*, inflicted a new due process harm. ................................................................... 49

3. SEIU bolsters Yona's unique claim of harm. .................... 50

C. LeadingAge's and Care Providers's Claims Before this Court Were Not Ripe in *LeadingAge I*, Depriving Them of Standing to Sue on These Claims and the *LeadingAge I*-court of Subject Matter Jurisdiction .......................................... 51

1. The claims now before this Court were not ripe during *LeadingAge I*. ........................................................ 51

2. LeadingAge and Care Providers also lacked standing to sue on the claims before this Court in *LeadingAge I*. ................................................................... 54

D. LeadingAge and Care Providers Seek to Relief Based on New Harms that Post-date *LeadingAge I* and There is no Common Nucleus of Operative Fact. ........................................... 55

E. Gulley Is not in Privity with Blissenbach Due to Diverging Interests. ................................................................... 58

F. *LeadingAge I* Was Dismissed Without Prejudice, and so, There is No Final Judgment on the Merits. .............................. 62

CONCLUSION ..................................................................... 65

The Minnesota Nursing Home Workforce Standards Board (the "Board") is unprecedented. It imposes a novel regime that forces nursing home employers and workers in Minnesota's nursing home industry to associate with governor-appointed representatives. Though the Board has nine members, its agenda, direction, and policies are directed by the three union-affiliated representatives. These union representatives are inherently self-dealing, not only because of their affiliation, but also because they are statutorily required to "represent nursing home workers or worker organizations." And while the Board also includes three government-affiliated representatives, not once have those representatives contradicted—much less vetoed—the union representatives' policies.

Through the Board's processes, the union members have translated those policies into state law. The government and union representatives unanimously passed the Wage Standards[1] and training requirements that upend the entire nursing home industry by forcing nursing home employers to pay starting minimum wages well above the market rate and force employers to retain unions to train their workforce. They have done so for their own interest and benefit and to the exclusion of any potential rivals in the market.

---

[1] Plaintiffs incorporate the definition of "Wage Standards" from their Moving Memorandum in Support of a Preliminary Injunction. (Dkt. 5, at 12.) Plaintiffs cite the *ECF-stamped page* numbers, not the document's original page number.

In short, they have behaved just as self-interested regulators would be expected to behave.

That structure violates federal law. It forces nursing-home workers and employers to associate for expressive and political purposes with representatives in violation of the First and Fourteenth Amendments. It licenses self-interested private people to enact binding regulations without adequate government review in violation of the Fourth Amendment's Due Process Clause. It authorizes private market participants to restrain competition in violation of the Sherman Antitrust Act. And it erects an alternative forum for collective bargaining between nursing-home workers and employers in violation of the National Labor Relations Act.

To stop these ongoing violations of their constitutional rights, Plaintiffs LeadingAge Minnesota ("LeadingAge"), Care Providers of Minnesota ("Care Providers"), and Yona Northstar LLC ("Yona," who with LeadingAge and Care Providers are "Plaintiffs") sue Defendants Nicole Blissenbach and Jamie Gulley ("State Defendants").[2] They ask this Court for injunctive relief—the only relief that can prevent further irreparable harm. And they ask this Court for a declaration to recognize the Board's unconstitutional structure, design, and function.

---

[2] (*See generally* Dkt. 5.)

In substance, State Defendants, aided by Intervenor-Defendant SEIU (who with State Defendants are, "Defendants"), have no adequate response. On each claim, they misconstrue Plaintiffs' claims or ignore controlling law. Defendants assert that the First Amendment is no bar because Plaintiffs suffer no burden to their associational rights, even though the Supreme Court has recognized such a burden. They argue that the state adequately supervises the union representatives even though they cannot cite to a single instance where such supervision occurred. And they argue that the Board does not involve collective bargaining, even though in substance that is exactly what the Board does. These responses are inadequate, do not support Defendants' Motion to Dismiss, and cannot justify the burden on Plaintiffs' constitutional rights.

Defendants also argue that LeadingAge's and Care Providers's claims in this case are barred by res judicata because they could have raised the same claims in *LeadingAge Minnesota et al. v. Blissenbach* (24-cv-4282-LMP-JFD)) ("*LeadingAge I*"). That is incorrect. Had LeadingAge and Care Providers raised these claims in *LeadingAge I*, these claims would not have been ripe, and their association members would not have yet suffered the requisite harm to confer standing. The res judicata argument fails due to lack of subject matter jurisdiction. Likewise, LeadingAge and Care Providers now seek different relief based on new harms that occurred after the *LeadingAge I*-court entered judgment. No common nucleus of operative facts exist between this case and

3

*LeadingAge I*. And there was no "final" judgment on the merits in *LeadingAge I*, because the *LeadingAge I*-court dismissed *without prejudice.*

Gulley is also not in privity with Blissenbach from *LeadingAge I* due to his diverging interests, and so, res judicata does not bar any of LeadingAge's and Care Providers's claims against him.

Finally, as Defendants acknowledge, Yona was not a party to *LeadingAge I*. So even if res judicata applied, it could not bar this Complaint as to Yona.

In conclusion, all of Plaintiffs' claims survive dismissal, and Plaintiffs have shown they are entitled to a preliminary injunction.[3]

## **ARGUMENT**

### I. STANDARD OF REVIEW.

#### A. Rule 12(b)(6).

Dismissal under Rule 12(b)(6) "'is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Ulrich v. Pope County*, 715 F.3d 1054, 1058 (8th Cir. 2013) (citing *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996)). The Court accepts all well-pleaded factual allegations in the Complaint as true and

---

[3] Plaintiffs incorporate the background information they provided in their Moving Memorandum in Support of the Motion for a Preliminary Injunction. (Dkt. 5, at 6–23.)

construes all reasonable inferences in Plaintiffs' favor. *Core & Main, LP v. McCabe,* 62 F.4th 414, 419 (8th Cir. 2023) (citation omitted). Plaintiffs need only plead enough facts to state a plausible claim on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## B. Preliminary Injunctive Relief.

The reasons why the Court should deny Defendants' Motion to Dismiss are inextricably intertwined with why the Court should grant a preliminary injunction to Plaintiffs. *Yockey v. Ilenda*, No. Civ.04–3958 JRT/RLE, 2004 WL 2801597, at *3 (D. Minn. Nov. 23, 2004) ("In light of the Court's [granting of] the preliminary injunction, however, the Court denies the defendants' motion to dismiss[.]"); *Pavek v. Simon,* 467 F. Supp. 3d 718, 752, 765 (D. Minn. 2020) (denying defendants' motion to dismiss for failure to state a claim and then granting plaintiffs' motion for a preliminary injunction). State Defendants filing two nearly identical briefs, one in support of their Motion to Dismiss, the other in opposition to Plaintiffs' Motion for a Preliminary Injunction, confirms that the Court may consider the two motions inextricably intertwined.

**II.** **THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS AND GRANT PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION.**

**A.** **Plaintiffs Plausibly State Violation of their First Amendment Rights and Are Likely to Succeed on Their First Amendment Claim.**

**1.** **Plaintiffs have shown an intrusion into their First Amendment right of disassociation.**

The First Amendment guarantees the right to express disagreements with government action. *Mills v. Alabama,* 384 U.S. 214, 218–19 (1966) (explaining that the First Amendment protects discussion about "the manner in which government is operated or *should be operated*, and all such matters relating to political processes") (emphasis added). The government cannot force its citizens to associate with viewpoints they find objectionable. *See Boy Scout of Am. v. Dale,* 530 U.S. 640, 648, 656–57 (2000) (ruling that forced inclusion of an unwanted person in the group infringed on the group's freedom of expressive association where that person "affects in a significant way the group's ability to advocate public or private viewpoints.") (citations omitted). That is where the freedom to disassociate comes in: citizens must be able to leave groups that espouse views that they disagree with. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 916 (2018) ("Freedom of association . . . plainly presupposes a freedom not to associate.").

The freedom of association extends to representation for bargaining—especially when bargaining intersects with public policy. In *Janus*, the Supreme Court held that imputing an "exclusive bargaining agent [on]

employees . . . [is] a significant impingement on associational freedoms that would not be tolerated in other contexts." *Id*. at 916. In other words, bargaining representation is association, and forced representation is an associational burden. *See id*.

By design, the Board foists representatives on parties who have no way to opt out. And the Board's activities are inseparable from public policy. Acting in the name of all nursing-home employers and their employees, the Board bargains for and adopts standards for wages, training, and other conditions across the industry. *See* Minn. Stat. §§ 181.213(a), subd. 2, 181.214, subds. 1–2. These standards are public policy: they bind with the force of regulations. *See* Minn. Stat. § 181.213(b), subd. 5. And the Board compels nursing home employers and their employees to accept representation from governor-appointed representatives on an industry-wide body. § 181.212, subd. 1(a)(1)–(5). In other words, it compels Plaintiffs to accept representatives for a policy-laden bargaining process they do not want and would rather avoid. It is precisely the kind of burden the Supreme Court identified in *Janus*. *See* 585 U.S. at 916.

Defendants identified no distinction between the exclusive bargaining agent in *Janus* (the labor union) and the exclusive bargaining agent here (the Board) that would prevent *Janus* from controlling this dispute. (Dkt. 35, at 10–13; Dkt. 56, at 24.) Nor could they. Just as a union represents employees in

collective bargaining over wages, hours, and working conditions, the Board represents workers and employers in negotiating those same matters. The Board's decisions have full force and effect of law, which makes disassociation from the Board either impossible or unlawful. *See* Minn. Stat. § 181.217, subd. 1; Minn. Admin. R. 5200.2000–2090.

Unable to distinguish *Janus*, Defendants try to limit the decision to its facts. They argue that *Janus* involved only agency fees in public sector employment—a form of "compelled subsidy" for union activities. But that argument misses the point. *Janus* found compelled subsidies unconstitutional because of the nature of the activity. *Janus* explained that because public-sector unions bargain with the government, their bargaining implicated public policy. *See* 585 U.S. at 910–13 (surveying how public workplace bargaining implicates public policy). Here the Board's activities necessarily implicate public policy because the Board adopts regulatory standards for the whole industry. *Janus* also recognized that exclusive representation itself is a burden on associational rights—one the government must justify under exacting scrutiny. *See id.* at 916. *See also id.* at 887 ("Designating a union as the employees' exclusive representative substantially restricts the rights of individual employees."). The Board is a form of exclusive representation: it assigns representatives to unwilling parties to negotiate over workplace

standards. Defendants have not shown, and cannot show, that this representation passes constitutional muster.

SEIU tacitly acknowledges this burden by listing groups that Plaintiffs are free to "not associate with." (Dkt. 56, at 25.) But SEIU does not expressly list the Board. Nor could it: association with the Board and its representatives is mandatory. The Board's structure violates Plaintiffs' First Amendment rights to disassociate. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association . . . plainly presupposes a freedom not to associate.").

### 2. Plaintiffs voicing disapproval for the Board's actions is not the same freely disassociating from the Board.

State Defendants next argue that Plaintiffs can cure their own First Amendment injury by stating their disapproval of the Board elsewhere. (Dkt. 35, at 10); (Dkt. 39, at 10). The law is otherwise. *See, e.g., Pac. Gas & Elec. v. Pub. Utils. Comm'n of Cal.,* 475 U.S. 1, 9, 15–16 (1986) (rejecting argument that state commission could require utility to include third party's leaflet in utility's newsletter simply because the utility remained free to say what it wanted in the newsletter); *United States v. United Foods, Inc. (UFI),* 533 U.S. 405, 411 (2001).

Defendants' argument was rejected in *United Foods*. There, the respondent, UFI, refused to pay a mandatory assessment on fresh mushrooms. *Id*. at 408–09. The assessment funded generic advertising, which UFI contended violated its First Amendment rights. *Id*. at 409. The government

argued that the assessments did not violate the First Amendment because there was "no restraint on the freedom of an objecting party to communicate its own message; the program does not compel an objecting party (here a corporate entity) itself to express views it disfavors; and the mandated scheme does not compel the expression of political or ideological views." *Id.* at 411. The Supreme Court rejected that argument and ruled that the mandatory assessments violated UFI's First Amendment rights, because, "mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity." *Id.* at 413 (citations omitted).

Just like the government in *United Foods*, State Defendants argue that "there is no violation of Plaintiffs' First Amendment rights to free association when they remain free to associate to voice their disapproval of the Board's representatives and standards." (Dkt. 35, at 10); (Dkt. 39, at 10). Though Plaintiffs can object to the Board's actions, just like UFI needing to fund the mandatory assessments, Plaintiffs must remain associated with the Board and comply with the Board's standards, as mandated by law. No mechanism exists for Plaintiffs to disassociate from the Board, and refusing to comply with the Board's standards will trigger the Act's penalties, which include

administrative penalties or a private action by an aggrieved worker. Minn. Stat. § 181.217, subd. 1–3; Minn. Stat. § 177.27, subd. 4, subd. 7.

*Bierman v. Dayton* says nothing to the contrary. *Bierman* involved circumstances in which Minnesota deemed certain homecare providers to be state employees for collective bargaining purposes, subjecting them to the Public Employment Labor Relations Act ("PELRA"). 900 F.3d 570, 572 (8th Cir. 2018). Those employees then voted to select SEIU as their exclusive representative. *Id.* at 573. The Eighth Circuit concluded the plaintiffs (homecare providers) had no forced association with SEIU because they were not required to join the union. *Id.* at 574. The relationship involved public employees and the state as an employer, with the union's role limited to bargaining over state-controlled compensation. *Id.* *Bierman* relied on *Minn. State Bd. for Cmty. Colls. v. Knight,* 465 U.S. 271 (1984), a case in which the Supreme Court held there is no injury where a state decides to bargain with one party over another where there is no duty to bargain in the first place.

The reasoning from *Bierman* and *Knight* does not apply here. There, the government was simply picking its own bargaining partner. Here, it is doing something more: it is appointing bargaining representatives for *private* employers and their employees. And those same bargaining agents negotiate for wages, training, and the conditions of employment in private workplaces. *See* Minn. Stat. § 181.212, subd. 1, subd. 7, subd. 1(b), subd. 2, § 181.214, subds.

11

1–2. All the while, neither the employers nor their employees have any say on who their bargaining representatives may be. That system is nothing like the procedures approved in *Bierman* and *Knight*, which were less like private bargaining and more like a public listening forum. *See Knight*, at 288 ("A person's right to speak is not infringed when government simply ignores that person while listening to others."). Those cases do not apply.

### 3. The Board's actions and structure do not survive exacting scrutiny.

The Board's actions and structure cannot survive exacting scrutiny. The government can override the First Amendment's associational right only "'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Dale*, 530 U.S. at 648 (citing *Roberts*, 468 U.S. at 623. No Defendant has cited a single case approving an entity like the Board. Instead, State Defendants argue that the Board's propriety is self-evident: it serves the state's compelling interest in establishing minimum nursing home employment standards. (Dkt. 39, at 16.) But that argument is circular: even if the legislature has a compelling interest in minimum wages, it has many other ways to accomplish its ends. Most obviously, it could raise wages through normal legislation. That approach has is tried and true: it is employed every time a government adopts a minimum wage for any industry. And more important, it burdens no one's associational rights.

12

Defendants list various other governor-appointed boards in Minnesota and claim the Board is no different. (Dkt. 56, at 25 n.9; Dkt. 39, at 17.) This chart shows the Board's unique powers compared to the cited governor-appointed boards:

| Name of the Governor-appointed Board | Authority to Adopt Administrative Rules Setting Minimum Wages for the Regulated Industry? | Authority to Require Employers in their Regulated Industry to Retain Specific Unions to Provide Statutorily Mandated Training? |
|---|---|---|
| Nursing Home Workforce Standards Board | Y | Y |
| Board of Peace Officer Standards and Training | N | N |
| Plumbing Board | N | N |
| Board of Nursing | N | N |
| Board of Barber Examiners | N | N |
| Board of Medical Practice | N | N |
| Board of Dentistry | N | N |
| Board of Pharmacy | N | N |
| Professional Educator Licensing and Standards Board | N | N |
| Occupational Safety and Health Review Board | N | N |
| Public Relations Board | N | N |

No other board, therefore, implicates public policy—and First Amendment expression—like this one. *See Janus*, 585 U.S. at 910–13, 916

(finding a burden on expression when unions' activities implicated state public policy).

State Defendants do not even dispute that the legislature could have followed the standard legislative process to pass laws regulating minimum wages or training requirements in the nursing home industry. (Dkt. 39, at 16–17); *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 876–77 (8th Cir. 2012) (applying exacting scrutiny and ruling "Minnesota can accomplish any disclosure-related interests—providing the electorate and shareholders information concerning the source of corporate political speech, deterring corruption, and detecting violations of campaign finance laws—[t]hrough less problematic measures, such as requiring reporting whenever money is spent, as the law already requires of individuals[.]") (internal citations and quotations omitted). Nor do they argue that the legislature passing those laws would be less effective to achieve its compelling state interest in establishing minimum nursing home employment standards. *See McDonald v. Longley*, 4 F.4th 229, 246–47 (5th Cir. 2021) (applying exacting scrutiny and explaining that states directly regulating an occupation, versus deferring to a state-created board, is an example of a significantly less restrictive burden on associational freedoms). State Defendants suggest that the legislature prefers or it is more administratively convenient for the Board to assume responsibility for regulating the nursing home industry's

14

employment standards and argues that the legislature "finds that the interests of the people of the state are served by the regulation of certain occupations." Minn. Stat. § 214.001, subd. 1. Legislative preference or administrative convenience will not satisfy exacting scrutiny. *See, e.g., Ams. for Prosperity Found. v. Bonta,* 594 U.S. 595, 614–15 (2021) (applying exacting scrutiny to strike down a California regulation because "the prime objective of the First Amendment is not efficiency" nor does "[m]ere administrative convenience" justify intrusion on First Amendment rights) (citation omitted).

The Board flunks exacting scrutiny. Defendants foisted representatives on Plaintiffs and burdened their associational rights. Defendants can point to no reason for that burden other than preference or convenience. The Constitution cannot be so lightly dismissed. *See id.* (explaining that "administrative convenience does not remotely reflect the seriousness" of a burden on First Amendment rights (internal quotation marks omitted)).

**B. Plaintiffs Plausibly State a Violation of Their Procedural Due Process Rights and Are Likely to Succeed on Their Due Process Claim.**

**1. The Board's government representatives have never vetoed any union representatives' proposals, exemplifying the Board's lack of neutrality.**

The Board violates core principles of due process. For centuries, due process has protected the right of every person to a neutral decisionmaker. (Dkt. 5, at 34.) That right applies not only in court, but also in the halls of the legislature and in the offices of administrators. Regulatory power cannot be

given to self-interested people with a financial stake in the outcome. (*Id.*) The Board gives power to just such interested people. It is systemically biased, improperly assembled, and unconstitutional.

To exemplify the lack of the Board's neutrality, Plaintiffs cited concrete examples demonstrating that the Board's government representatives failed to veto any of the union representatives' proposals. (Dkt. 5, at 44.) In response, State Defendants argue that the Board's government representatives, "can effectively veto all Board decisions and actions." (Dkt. 39, at 23.) State Defendants cite no instance in the Board's history where *one* government representative voted against proposals by the union representatives. (*See generally* Dkt. 39).

SEIU attaches eleven meeting minutes taken from the Board's meetings. (Dkt. 57, Ex. 2–12.) With these meeting minutes, SEIU has not cited, because it cannot cite, any instance of the government representatives voting against or vetoing the union representatives.

To further emphasize that the government representatives fail to act as legitimate check on the union representatives, they have voted together to shut down the employer representatives' proposals:

- April 29, 2024: the employer representatives all voted to approve the "Amend Time and Half Proposal"; the government and union representatives uniformly voted against the proposal. (Dkt. 9-1, at 367.)

16

- August 8, 2024: the employer representatives all voted to push back the effective date of the Holiday Pay Rule; the government and union representatives uniformly voted against the proposal. (Dkt. 9-1, at 359.)

    o Blissenbach then moved to adopt the Holiday Pay Rule without delaying the effective date (*i.e.*, an effective date of January 1, 2025)[4], and the motion passed with all government and union representatives voting together. (*Id.*); (Dkt. 9-1, at 111); Unsurprisingly, the Holiday Pay Rule was originally a union-backed proposal. (Dkt. 9-1, at 336–337, 367–68.)

In addition, there is no serious question that the Board burdens protected property interests. *See Marler v. Mo. State Bd. of Optometry,* 102 F.3d 1453, 1456 (8th Cir. 1996). Plaintiffs have a property interest in their money. *See Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 571–72 (1972). The Board has already compelled Plaintiffs to pay or plan to pay for higher wages, implement specified training, and pay for the corresponding administrative burdens to their financial detriment; violating the Board's rules also leads to severe monetary consequences.  (Dkt. 9, ¶¶ 56–57, 59, 62.) This is sufficient to establish a deprivation of a property interest. *See Mickelson v.*

---

[4] Minn. R. Admin. 5200.2010, subp. 2.

*County of Ramsey,* 823 F.3d 918, 924 (8th Cir. 2016) (concluding there was a property interest for purpose of due process claim in a $25.00 fee).

The Board burdens these interests through a systemically biased process. *Roth*, 408 U.S. at 569–70 ("When protected interests are implicated, the right to some kind of prior hearing is paramount."); *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir. 1999) (explaining that the Due Process Clause requires a "fair and impartial tribunal"). The Board is composed of nine members, six of whom are private industry or labor representatives. These individuals all have a financial stake in the Board's activities. And the presence of three government representatives does not extinguish those interests. While the Board's enabling law facially requires affirmative votes from two government representatives, that limitation is illusory. Throughout the Board's history, the government representatives have *never* voted against the union representatives. (*Supra*, at 16–17.) The union representatives have originated and pushed through their own self-interested policies, and the Board's government representatives have voted with them in lockstep. (*Supra*, at 16–17.) The government representatives uniformly vote with the union representatives to strike down the employer representatives' proposals. (*Supra*, at 16–17.) In effect, they have disclaimed any supervisory authority and outsourced policymaking to the private, union-affiliated members.

That kind of outsourcing is unconstitutional. Decades ago, the Supreme Court struck down provisions in the Bituminous Coal Conservation Act of 1935 under the Fifth Amendment's Due Process Clause because the legislature gave private coal producers power to fix prices and set wages by majority vote. *Carter v. Carter Coal Co.*, 298 U.S. 238, 310–11 (1936). The legislature gave private coal producers the majority "power to regulate the affairs of an unwilling minority." *Id.* at 311. The Supreme Court called that legislative delegation "obnoxious" and "so clearly a denial of rights safeguarded by the due process clause" that it brooked no serious debate. *Id.* at 311–12.

Since at least *Carter Coal*—and likely long before[5]—it has been clear that a legislature may not delegate regulatory power to private actors who have majority power over an unwilling minority is not tolerated. Though the three government representatives were once "presumptively disinterested," the presumption is gone. *Id.* at 311. The union representatives set wages and impose conditions on the nursing home industry with unanimous support from the government representatives, while employer-backed proposals are dead in

---

[5] *See, e.g.*, *State of Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 121–22 (1928) (striking down zoning ordinance that allowed construction of certain facilities only with consent or neighboring property owners); *Eubank v. City of Richmond*, 226 U.S. 137, 143 (1912) (striking down city ordinance that allowed property owners to regulate set-off requirements for their neighbors' lots). *See also State ex rel. Foster v. City of Minneapolis*, 97 N.W.2d 273, 276 (Minn. 1959) (citing *Roberge* and *Eubank*).

the water. (Dkt. 5, at 9–10, 44); (*supra*, at 16–17.)  The legislature's delegation of power here under the Act is just as "obnoxious" as the legislative delegation in *Carter Coal*.

### 2. Defendants cite no case ruling that a comparable scheme to the Board squares with due process of law.

State Defendants cite no case approving the Board's structure, a structure that gives the Board unprecedented powers. Instead, they limit themselves to distinguishing cases cited by Plaintiffs. But even there, they fail to offer meaningful differences. They instead only underline the Board's systemic bias.

Defendants try to distinguish *Ass'n of American Railroads v. U.S. Department of Transportation* by arguing that the Board follows the notice-and-comment process. But that argument is non sequitur. (Dkt. 39, at 21); 821 F.3d 19 (D.C. Cir. 2016) ("*American Railroads I*").  Notice and comment were not central to the court's reasoning in *American Railroads I*.  *American Railroads I* concerned a private market participant (Amtrak) with the effective power to regulate its competitors. The D.C. Circuit concluded such regulation violated due process. *American Railroads I*, 821 F.3d at 27, 31. The due process violation stemmed not from the absence of notice and comment, but from Amtrak's financial interest in the results. And here, the same bias infects the Board: like Amtrak, the Board's effective decisionmakers have a financial stake in their own regulatory handiwork. (Dkt. 5, at 37–40.) So for the same

reasons, the Board falls below due process's minimum safeguards. *See American Railroads I*, 821 F.3d at 31 ("[D]ue process of law is violated when a self-interested entity is '[e]ntrusted with the power to regulate the business . . . of a competitor.'" (quoting *Carter Coal*, 298 U.S. at 311)).

State Defendants next try to undermine Plaintiffs' reliance on *American Railroad*s *I* by invoking a later case involving the same parties, *Ass'n of Am. Railroads v. U.S. Dep't of Transp.,* 896 F.3d 539 (D.C. Cir. 2018) ("*American Railroads II*"), where the D.C. Circuit upheld the provision from the 2016 case because the arbitration clause from the previous provision was eliminated. *Id.* at 541. The D.C. Circuit explained the arbitration provision was the mechanism by which Amtrak could regulate its competitors without the Federal Railroad Administration's ("FRA") involvement. *Id.* Without such a provision, the FRA retained independent authority to reject proposed standards. *Id.* But there is no comparable *neutral* decision maker here. As described above, the union representatives and government representatives work in tandem to advance the union's interests and uniformly vote against the employer representatives' proposals.

SEIU, by contrast, tries to use volume to give the superficial appearance of merit. (Dkt. 56, at 29–31.) Volume and reason are not the same: none of the SEIU's citations involves an entity like the Board. For example, SEIU cites *Gibson v. Berryhill*. But that decision supports Plaintiffs' position. In it, the

21

Court held that a state-affiliated board *can* be biased against individuals in the regulated industry when the board acts to further its own substantial pecuniary interest. 411 U.S. 564, 579 (1973). The pecuniary interest need not be "direct or positive[.]" *Id*. Nor must the state-affiliated board have actual bias; due process of law is violated when there is only "possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law." *Tumey v. Ohio,* 273 U.S. 510, 532 (1927). Here the union representatives, aided by the government, obtain indirect financial benefits[6] due to the Board's existence. One of the reasons for the Board's creation: increase unionization in the nursing home industry. (Dkt. 9, ¶ 54.) Increased unionization naturally leads to increased union membership, which leads to increased dues paying union members. Succumbing to temptation, the union representatives have wielded their power to benefit their respective unions and union members—by spearheading efforts to increase minimum wages in the industry and ensuring that affiliated unions are selected as certified worker organizations ("CWOs")[7]

---

[6] Plaintiffs addressed in their moving memorandum why the employer representatives indirectly benefit from the Board's structure and actions. (Dkt. 5, at 38–39.)

[7] As another example of the union representatives' self-dealing, AFL-CIO is one of the CWOs. (Dkt. 5, at 15.) In 2017, AFL-CIO formed Minnesota Training

to provide statutorily mandated training. In theory, the government representatives must ensure that all those subjected to the Board are treated impartially and fairly, but the Board's history shows the government's pro-union bias.

SEIU also cites *Sunshine Anthracite Coal Co. v. Adkins*, which is inapposite. There, the *government* fixed the minimum prices, and the legislature did *not* delegate legislative authority to any industry official. 310 U.S. 381, 388, 399 (1940). At most, private actors proposed the prices. *Id.* at 388. Here, the union representatives effectively set minimum wages and other employment conditions in the nursing home industry. The government representatives vote to approve whatever the union representatives want. The record is clear; SEIU points to nothing contrary.

Next, SEIU cites *FCC v. Consumers' Research*. But that decision does not apply for similar reasons. There, the USAC (a private, nonprofit corporation) could assist the FCC in an advisory role and make recommendations. But the USAC had no authority to make any policy on its own; it was subordinate to the FCC. 606 U.S. 656, 692–93 (2025). Here the Board's representatives each "must adopt rules establishing minimum nursing home employment standards

---

Partnership ("MTP"), which provides career training to employees. (Dkt. 45, ¶¶ 4–5.) MTP received a grant from the state government to provide the Act's mandated training. (*Id.* ¶ 22.)

that are reasonably necessary and appropriate to protect the health and welfare of nursing home workers[.]" Minn. Stat. § 181.213, subd. 1(a). The union representatives especially do not play an advisory role, nor do they simply provide recommendations. 606 U.S. at 693–94. Gulley is the Board's chairperson. The Board's history shows that the union representatives control the Board and not once has any government representative voted against what the unions wanted.

None of SEIU's other citations comes close to the mark:

- *Hawaii Housing Authority v. Midkiff* is a case about the Takings Clause and has nothing to do with the legislature delegating authority to private individuals who can regulate an entire industry. 467 U.S. 229 (1984).

- *New Motor Vehicle Board of California v. Fox Co.* concerned those within the regulated industry choosing to forgo statutory safeguards. 439 U.S. 96, 109 (1978). That is not at issue here.

- *Nat'l Horsemen's Benevolent and Protective Ass'n v. Black* supports Plaintiffs because "'[i]f the private entity does not function subordinately to the supervising agency, the delegation of power is unconstitutional." 53 F.4th 869, 881 (5th Cir. 2022). The Board's history shows the government representatives are subordinate.

- In *Currin v. Wallace*, the Supreme Court ruled that the Tobacco Inspection Act did not violate the plaintiffs' due process rights because,

"The Act does not affect their rate of charges and does not deprive them of any property." 306 U.S. 1, 18 (1939). Here the opposite is true. The Board's actions affect how much nursing home employers must pay their employees, what training must be provided to the employees, and the corresponding administrative burdens, all of which deprives nursing home employers of their property (*i.e.,* money).

- In *United States v. Rock Royal Co-op*, the government fixed the minimum price for milk "to be determined from time to time by formula." 307 U.S. 533, 554 (1939). The Secretary, after securing the President's approval, could implement the fixed minimum price so long as two-thirds of the producers in the specified market agreed. *Id.* at 577. Here the union representatives on the Board fixed the wages and conditions, and the government simply rubber stamped the union representatives' desires.

- *Friedman v. Rogers* does not apply because Plaintiffs have never argued they have a "constitutional right to be regulated by a Board that is sympathetic to" their desires. 440 U.S. 1, 18 (1979).

- *United States v. Florida East Coast Ry. Co.* does not apply because Plaintiffs are not challenging the difference between administrative rules that apply "across the board" versus those applied to a particular case. 410 U.S. 224, 245–46 (1973).

The entities sharing similarities with the Board have been found unconstitutional. *See Carter Coal*, 298 U.S. at 311; *American Railroads I*, 821 F.3d at 31. The Board should meet the same end.

### C. Plaintiffs Plausibly State the Sherman Act Preempts the Act and Are Likely to Succeed on Their Sherman Act Preemption Claim.

#### 1. The Board is controlled by self-dealing private market participants that pass standards that fix wages and employment conditions.

Six of the nine Board representatives are private industry actors. Minn. Stat. § 181.212, subd. 1. The risk of self-dealing is obvious and significant. As the Supreme Court has explained repeatedly, federal competition policy does not allow competitors to set the ground rules for their own competition. (Dkt. 5, at 40.) Nor does it allow states to simply license collusion. Antitrust applies no less to superficially public conspiracies than it does to private cartels. *See N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 574 U.S. 494, 510 (2015) ("State agencies controlled by active market participants, who possess singularly strong private interests, pose the very risk of self-dealing *Midcal's* supervision requirement was created to address.").

Despite that black-letter principle, State Defendants argue that federal antitrust does not even apply. They contend that the Board is exempt because no one group of private actors controls its decisions.

The record shows otherwise. (Dkt. 39, at 23.) In the Board's short history, the union representatives have already passed proposals fixing wages and

employment conditions for the entire Minnesota nursing home industry. And while the government representatives also voted in favor, their votes were little more than a rubber stamp. There is no evidence—Defendants point to none—that the government representatives ever even pushed back on union policies or proposals. Even SEIU admits the government members consistently vote to approve union proposals. (Dkt. 56, at 33) ("The mere fact that the commissioner members have consistently approved proposals supported by labor unions[.]").The union representatives colluded to fix prices, and the government representatives let them. That is a classic violation of the Sherman Act. (Dkt. 5, at 40–41.)

### 2. Defendants' efforts to invoke *Parker* immunity ring hollow because the government fails to engage in active supervision.

Defendants next argue that the state-action exemption, or *Parker* immunity, shields the Board's anticompetitive policies. But Defendants fail to make out their case. To invoke *Parker* immunity, Defendants must prove the anti-competitive conduct must (1) follow a clearly articulated state policy to replace competition with regulation, and (2) be actively supervised by the state. *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980).

Defendants fail at the second step: active supervision. As the Supreme Court explained in *Midcal*, active supervision requires more than simple

approval. The state cannot "simply authorize[] price setting and enforce[] the prices established by private parties." *Id.* at 105. Instead, the state must actively participate in the substance of the anticompetitive policy and make the policy its own. *See id.*; *see also FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 638 (1992) ("Where prices or rates are set as an initial matter by private parties, subject only to a veto if the State chooses to exercise it, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme.").

The Board fails that test. The Court need not look beyond the Wage Standards. The union representatives, not the government, *originally* proposed the starting hourly minimum wages on May 9, 2024. (Dkt. 5, 11–12; Dkt. 9-1, at 159–60.) Then, the union and government representatives unanimously voted to approve those *exact* starting hourly minimum wages, which later became the Wage Standards. (Dkt. 5, at 11); Minn. R. Admin. 5200.2080–2090. The unlawful wage fixing by the union representatives does not become lawful because the government representatives blessed the violation of the Sherman Act or declared that the union representatives acted lawfully. *Parker v. Brown*, 317 U.S. 341, 351–52 (1943) ("True, a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful[.]") (citations omitted).

28

None of State Defendants' or SEIU's cited meeting minutes show the government performing active supervision through establishing the minimum wages, critically reviewing the union's proposed wages for reasonableness, monitoring the market conditions, or engaging in a "pointed reexamination" of the minimum wages proposed by the union. *Midcal*, 445 U.S. at 105–06. Again, the union representatives, not the government representatives, established the Wage Standards.

The government here did not critically review the union's proposed wages. Nothing the government representatives did gave ""realistic assurance" that a nonsovereign actor's anticompetitive conduct 'promotes state policy, rather than merely the party's individual interests.'" *Dental Examiners*, 574 U.S. at 515 (citations omitted). On May 9, 2024 nursing home employers discussed the potential cost of complying with the Wage Standards and the potential for wage compression. (Dkt. 9-1, at 151–52.) The Board discussed how the "data workgroup should do more digging into the numbers and engage in robust discussion" on the potential cost of compliance. (*Id*. at 152.) The Board nonetheless voted to approve the union's proposed minimum wages *on the same day*, despite alleging needing more research from the data workgroup on the potential costs to employers. (*Id*. at 152.) Blissenbach also voted to approve the Wage Standards, even though she knew the wages set by the Wage Standards exceeded the $15.00 minimum wage requirement that Minneapolis imposed on

nursing home employers. (Dkt. 57-3, at 3.) The meeting minutes cited by Defendants that post-date May 9, 2024 do not show the government representatives pointedly reexamining the reasonableness of the minimum wages or adjusting the wages based on market conditions. (Dkt. 35, at 2–3; Dkt. 39, at 5–6; Dkt. 56, at 5 n.3.) By contrast, on June 9, 2024, the Board had the Department of Labor and Industry's general counsel review the Wage Standards. (Dkt. 9-1, at 156.) The Board then discussed potential revisions to the Wage Standards, but then, "a decision was made to leave the revised rules as they came." (*Id*.) On June 9, 2024, the government had every opportunity to reexamine the reasonableness of the minimum wages, or adjust based on market conditions, yet failed to do so. The government and union representatives then unanimously voted to adopt the Wage Standards without further revision. (*Id*.) The government representatives here, just like the government representatives in *Midcal*, "simply authorized" the minimum wages proposed by the union representatives, and the government will now enforce the Wage Standards.

Moreover, Plaintiffs earlier argued that *FTC v. Ticor Title Ins.* should persuade the Court to conclude that the Board's structure violates the Sherman Act. (Dkt. 5, at 26, 42–43); 504 U.S. 621 (1992). State Defendants do not even try to distinguish *Ticor*. (*See generally* Dkts. 35, 39.) SEIU does try, but unsuccessfully. It argues that because the government representatives

must affirmatively vote for a proposal, *Ticor* cannot apply. (Dkt. 56, at 33.) SEIU is wrong. *Ticor's* holding on active state supervision turned on whether the government "exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." 504 U.S. at 634–35. Following *Ticor*, the government representatives here did not exercise independent judgment or control the details of the Wage Standards. The version of the Wage Standards that the union representatives originally proposed were what the Board later adopted with unanimous government support.

And despite what SEIU argues, the Board cannot be a state commission. (Dkt. 56, at 34.) SEIU claims that the government representatives make up "a significant portion of the Board" and that the Board is not dominated by private interests. (Dkt. 56, at 34–35.) The government makes up *one-third* of the Board, while the private actors make up *two thirds*. Even though the governor appoints the employee and nursing home employer representatives, by statute, the union representatives must represent employee interests, the employer representatives must represent employer interests. Minn. Stat. § 181.212, subd. 1(a)(4)–(5). In other words, the governor appointing six inherently self-dealing private market actors to the Board likens to the dental board in *N. Carolina State Bd. of Dental Examiners v. FTC*, where seven of the

eight representatives were private market actors. 574 U.S. at 499–500. The Supreme Court struck down the dental board due to violation of the Sherman Act, however, because there was no active state supervision promoting state policy. *Id*. at 515. Here the government representatives on the Board do not provide state supervision to promote state policy but simply let the union representatives advance union interests. Following *Dental Examiners*, the Court should include that the Board's structure, and resulting actions, violate the Sherman Act.

At bottom, *Parker* immunity does not apply, because Defendants cannot show the government representatives actively supervised the Board's anticompetitive activity.

**D.     Plaintiffs Plausibly State that the NLRA Preempts the Act and Are Likely to Succeed on Their NLRA Preemption Claim.**

**1.     *Garmon* preemption applies because the Act regulates the relationships between unions, employers, and the government.**

Under *San Diego Building Trades Council, Millmen Union, Local 2020 36 v. Garmon*, any state law that "arguably" regulates activity regulated by the NLRA is preempted. 359 U.S. 236, 243–44 (1959). Most obviously, no state may erect its own system for regulating union organizing, employee representation, or collective bargaining. Yet the Board does exactly that: it sets up an alternative forum for employers and unions to bargain about the terms and conditions of work. That the Board uses different terms is of no moment. Nor

does it matter that the government has a superficial seat at the table. The Board regulates collective bargaining and is therefore preempted. *See, e.g.*, *Guss v. Utah Labor Relations Board*, 353 U.S. 1, 10–11 (1957) (Utah's alternative labor-relations system preempted by NLRA); *Amazon.com Servs. LLC v. N.Y. State Pub. Emp. Rels. Bd.*, No. 1:25-cv-05311, slip op. at 8–11 (E.D.N.Y. Nov. 11, 2025) (same result in New York seventy years later).

Defendants resist that conclusion by challenging Plaintiffs' standing. Nothing prohibits Plaintiffs from asserting that the Act and Board's structure interfere with employees' rights under Section 7 of the NLRA. *St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000) (ruling that trade associations, representing employers, had standing to assert an NLRA preemption under Section 7, and explaining "[w]e know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption."). The Supreme Court has also considered a challenge to state law on federal preemption grounds, even when the federal law does not confer substantive rights to the challenging party. *See California Fed. Sav. & Loan Assoc. v. Guerra*, 479 U.S. 272 (1987) (action for declaratory and injunctive relief brought by employers arguing that California state law was preempted by the Pregnancy

Discrimination Act of 1978, which gives rights to pregnant employees under Title VII).

On the merits, Defendants fare no better. Their arguments focus on labels, not what the Board is doing. For example, they argue that the Board merely sets "minimum labor standards" like any other state agency. (Dkt. 39, at 31; Dkt. 56, at 39.)[8] But that argument fails for two reasons. First, the arguments elide the difference between minimum labor standards and the process for setting those standards. "Minimum labor standard" means nothing more than a baseline right or entitlement in the workplace, such as a minimum wage. These minimum standards can be set by bargaining, legislation, or regulation. Courts have repeatedly held that the NLRA does not preempt minimum standards as such. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754 (1985); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 22 (1987). By contrast, courts have also repeatedly held that the NLRA does preempt laws regulating the bargaining process used to create those standards. *See, e.g., Guss*, 353 U.S. at 10–11 (Utah's alternative labor-relations system preempted by NLRA); *Bethlehem Steel Co. v. N.Y. State Lab. Rels. Bd.*, 330 U.S. 767, 771–72 (1947). For example, a state cannot require an employer to

---

[8] SEIU argues that the Board is like, "countless other government agencies across the country" that set minimum labor standards yet fails to cite a single agency. (Dkt. 56, at 39.)

sign a labor-peace agreement with a labor union setting out ground rules covered by the NLRA. *See Metropolitan Milwaukee Ass'n of Commerce v. Milwaukee County*, 431 F.3d 277, 278–80 (7th Cir. 2005) (stating that there is "no doubt" such a law would be preempted). Nor can a state enforce alternative rules for enforcing good-faith bargaining. *See Bethlehem Steel Co.*, 330 U.S. at 771–72 (concluding that state could not enforce bargaining obligation for employers and workers within NLRA's coverage).

While the Board sets some minimum labor standards, such as minimum wages, Plaintiffs challenge the Board's process for creating standards: the alternative representation and bargaining structure created by the Board's enabling law. That structure is not itself a standard; it is a process. And it is a process covering the same topics as the NLRA. For that reason, it is preempted under *Garmon*, regardless of the merits or demerits of any particular standard adopted by the Board. *See, e.g.*, *Guss*, 353 U.S. at 10–11 (alternative state labor-relations scheme preempted by NLRA); *Bethlehem Steel Co.*, 330 U.S. at 771–72 (same). *See also United Steelworkers of Am., AFL-CIO-CLC v. St. Gabriel's Hosp.*, 871 F. Supp. 335, 343 (D. Minn. 1994) (law requiring successor employer to assume predecessor's contract regulated bargaining process and was preempted).

Second, Defendants err by comparing the Board to other state agencies. The Board is unique, consisting of "three members who represent nursing

home employers or employer organizations" and "three members who represent nursing home workers or worker organizations," bargain and negotiate over "minimum nursing home employment standards," and the government is allegedly present to provide oversight. Minn. Stat. §§ 181.212. subd. 1(a)(4)–(5), 181.213, subd. 1(a). The Board has indisputably passed minimum employment standards governing minimum wages, training, and other employment conditions. Defendants point to no other agency with this mix of powers and functions—because there is none.

Aside from the Board's status as a separate bargaining forum, Plaintiffs identified four specific conflicts between the Act and NLRA, triggering *Garmon* preemption. First, nursing home workers cannot select who bargains on their behalf on the Board. (Dkt. 5, at 48–49.) SEIU argues that nursing home workers are generally free to select a bargaining representative for collective bargaining purposes. (Dkt. 56, at 41.) That is beside the point. The NLRA mandates that employees have the right to choose who bargains on their behalf, and the Act does not allow them to choose who bargains on their behalf before the Board. 29 U.S.C. § 157. State Defendants argue that the Board does not engage in collective bargaining, thus employees are not entitled to select their representative. (Dkt. 39, at 30.) What the Board is doing may not be labeled "collective bargaining," but labels cannot change substance. In substance, the Board oversees and facilitates collective bargaining.

Second and similarly, none of the nursing home employers may select their bargaining representative on the Board. (Dkt. 5, at 50–51.) The NLRA empowers employers with the right to choose their bargaining representative. (*Id*.) SEIU and State Defendants make similar rebuttal arguments here as they do when responding to the employees' right to choose. (Dkt. 39, at 30; Dkt. 56 at 41.) Plaintiffs, likewise, reply with the same arguments.

Third, the Act removes the election safeguards provided by the NLRA for when the workers select a bargaining representative (*i.e.*, secret ballots). (Dkt. 5, at 51.) The workers must accept whoever the governor appoints. Neither SEIU nor State Defendants directly respond to this argument.

Fourth, the Act supplements the remedies provided by the NLRA. (Dkt. 5, at 51–52.) SEIU admits that *Garmon* may preempt supplemental state remedies, but argues, "[t]he only remedies in the Act are for violations of the Board's standards." (Dkt. 56, at 42.) Again, that is beside the point. Workers already have remedies under the NLRA when an unfair labor practice violation occurs. An employer violating the Board's standards is the equivalent of committing an unfair labor practice, because the Board's standards are a product of collective bargaining. But when a nursing home employer violates the Board's standards, the Act's supplemental remedies trigger in addition to what is available under the NLRA. 29 U.S.C. § 160(c); Minn. Stat. § 181.217. The Act providing supplemental remedies for an unfair labor practice violation

conflicts with the NLRA. *Wis. Dep't of Industry, Labor and Human Relations v. Gould,* 475 U.S. 282, 287 (1986).

State Defendants cite three cases to argue that the Act does not provide an alternative enforcement scheme, but none of them concerned supplemental state remedies for violations of the NLRA. *See, e.g., Fort Halifax,* 482 U.S. at 1; *Metro. Life,* 471 U.S. at 724; *N.Y. Tel. Co. v. N.Y. State Dep't of Lab.,* 440 U.S. 519 (1979). All of them involved run-of-the mill minimum labor standards: severance benefits, insurance policies, and unemployment insurance. They are inapposite to Plaintiffs' actual claims.[9]

### 2. *Machinists* preemption applies because the Act interferes with the bargaining process by overwhelmingly shifting power towards the union representatives.

*Machinists* preemption bars the state from regulating areas that "Congress intended be unregulated because left to be controlled by the free play of economic forces." *Chamber of U.S. Commerce v. Brown,* 554 U.S. 60, 65 (2008) (internal citations and quotations omitted). The parties largely control the collective bargaining process, and the state cannot direct the outcome on what the parties agree to or not. (Dkt. 5, at 52–53); *520 South Michigan Ave. Associates v. Shannon,* 549 F.3d 1119, 1137–39 (7th Cir. 2008) (ruling that

---

[9] State Defendants also cite *Nat'l Ass'n of Mfrs. v. Perez,* 103 F. Supp. 3d 7 (D.D.C. 2015). But that case is likewise inapplicable. *Perez* has nothing to do with supplemental remedies provided by a parallel state scheme.

*Machinists* preemption applied over a state-created scheme that "impacts the ability of an employer to discipline or fire employees, pursuant to the terms of a collective bargaining agreement.") The Board here, a creature of statute, has interfered with the collective bargaining process by shifting the balance of power towards the union. *N.Y. Tel.,* 440 U.S. at 548–49 (Blackmun, J., concurring) ("*Machinists* indicates that the States are not free . . . to enhance the self-help capability of one of the parties to such a dispute so as to result in a significant shift in the balance of bargaining power struck by Congress."). Even SEIU admits that the Board has shifted the bargaining power towards labor unions:

> The increased wage rates in the Board's standards also improve SEIU Minnesota's position in bargaining for higher wages rates for its members . . . The new minimum wage standards change this dynamic, setting a floor for wages that interrupts the race to the bottom among nursing home employers, and greatly strengthen the union's ability to negotiate for and obtain higher wages for its members.

(Dkt. 47, ¶ 16.)

The Act here likens to the statutory scheme in *Employers Ass'n, Inc. v. United Steelworkers of America, AFL-CIO*, where the Eighth Circuit ruled that because the state law interfered with the employers' collective bargaining rights by depriving them of the weapon of hiring permanent-replacement workers during an economic strike," *Machinists* preempted the scheme. 32 F.3d 1297, 1299–1300 (8th Cir. 1994).

The Act further likens to the statutory scheme in *Thunderbird Mining Co. v. Ventura.* In *Thunderbird*, the statutory scheme practically allowed the union to withhold disbursement funds and forced employers to make bargaining concessions to obtain the release of funds. 138 F. Supp. 2d 1193, 1196, 1198 (D. Minn. 2001). The statutory scheme granted substantial economic power to the union and thus was preempted by *Machinists. Id.* at 1199.

Applying *Employers Ass'n* and *Thunderbird* here, even though the Act facially appears "neutral," in practice, reality is very different because nursing home employers have been stripped of any meaningful economic power. The union representatives leveraged the government's rubber stamping of their proposals into passing minimum wage standards that are above what the market would otherwise require. The employer representatives' efforts to stop the unions' proposals did not matter, because the union representatives had unanimous backing from the government.

The union representatives ensured that their affiliated unions were selected as the CWOs, so that union officials have mandatory access to employees at unionized locations and to non-unionized employees under the guise of providing them with training. All to bolster one of the Act's overarching goals: increase unionization. (Dkt. 9, ¶ 54.) Nursing home employers cannot object or negotiate away the training requirements or refuse access to their

employees, because doing so would violate the Act. Minn. Stat. § 181.214, subd. 1.

In response, Defendants rely on *Fort Halifax*, *Metro Life*, and *N.Y. Tel. Co.* to also argue that *Machinists* preemption does not apply. (Dkt. 56, at 35–36; Dkt. 35, at 31–32.) None of these cases involved standards issued by a statutorily-created board comprised of representatives from unions, government, and employers, who then bargained and negotiated over minimum employment standards. None of them even suggests that an entity like the Board would pass *Machinists* review.

SEIU also argues that it is "patently false" that the "Act 'empowers the Board to amend every CBA.'" (Dkt. 56, at 38.) That argument confuses the issue. It focuses on whether the Board *expressly* amends an existing CBA, such as through a written amendment or an express oral statement. (*Id.*) But the issue is not whether the Board can directly amend a CBA; it is the *impact* of the Board's standards on existing CBAs. In effect, the Board's negotiated standards require that nursing home employers do more or different from what they already bargained for. (Dkt. 5, at 53.) That is, they supersede agreements negotiated in accordance with the NLRA. *Machinists* preemption exists to prevent this exact situation: improper state influence over what the parties privately negotiated during collective bargaining.

In conclusion, *Machinists* preemption applies.

**E. State Defendants Have Inflicted Irreparable Constitutional Harm on Plaintiffs and Plaintiffs Lack an Adequate Legal Remedy.**

**1. Plaintiffs have suffered irreparable constitutional harm.**

Plaintiffs have shown clear, imminent, and irreparable injuries to their businesses and constitutional rights. It is black-letter law that an injury to constitutional rights is per se irreparable. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). Similarly, courts have found irreparable injury when plaintiffs have shown that they face enforcement under preempted state laws. *See Amazon Servs.*, No. 1:25-cv-05311, slip op. at 12–13 (finding irreparable injury when plaintiff was at risk of enforcement under preempted state labor law). *See also United States v. Ferrara*, No. CIV.A. 92-2869 (NHJ), 1993 WL 405477, at *1 (D.D.C. Feb. 8, 1993). And Plaintiffs have detailed the numerous and likely irreversible steps they will have to take to comply with the Board's standards. (*See* Dk. 5, at 18–20). All of these injuries justify injunctive relief.

Indeed, many of these harms are effectively undisputed. State Defendants do not deny that infringements on a person's First Amendment and due process rights qualify as irreparable constitutional harm. (Dkt. 39, at 36–37); (Dkt. 5, at 54); *Kroupa v. Nielsen*, 731 F.3d 813, 820–21 (8th Cir. 2013) (affirming grant of preliminary injunctive relief because plaintiff showed likelihood of success on her procedural due process claim and likewise showed the corresponding constitutional harm). The Court ruling Plaintiffs are likely

to succeed on their claims under the First and Fourteenth Amendments necessarily means Plaintiffs have also shown they have suffered irreparable constitutional harm. (Dkt. 5, at 54–55.)

State Defendants instead focus on whether presumed constitutional harm may arise out of violations of the Supremacy Clause. (Dkt. 39, at 37.) State Defendants cite *United States v. Iowa*, No. 4:24-CV-00161, 2024 WL 3035430 (S.D. Iowa June 17, 2024), *vacated*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025). And again, other courts have ruled that violations of the Supremacy Clause will trigger presumed irreparable harm to private parties. *United States v. Texas*, 794 F.Supp.3d 427, 452 (W.D. Tex. 2025) (in awarding injunctive relief to private plaintiffs, ruling that "individuals have a constitutional right to be free from enforcement of state laws that are preempted by federal law . . . Irreparable harm thus necessarily results from enforcement of a preempted state law.") (citations omitted); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (affirming district court's finding of irreparable harm to private parties who challenged a state statute on preemption grounds). In conclusion, Plaintiffs are likely to succeed on all of their constitutional claims, and thus, have likewise shown they have suffered irreparable constitutional harm.

### 2. Plaintiffs lack an adequate legal remedy against State Defendants.

One of the key questions before the Court is whether Plaintiffs have an adequate legal remedy (*i.e.*, the recovery of money) *against* State Defendants *in this lawsuit. See Gen. Motors Corp. v. Harry Browns, LLC*, 563 F.3d 312, 318–19 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."). State Defendants do not deny they enjoy sovereign immunity but argue (joined by SEIU) that Plaintiffs can be made whole through the statutory reimbursement procedure, which takes place outside this lawsuit. (Dkt. 39, at 38; Dkt. 56, at 43–44.) LeadingAge's and Care Providers's various association members' supporting declarations make clear that the statutory reimbursement does not fully cover the cost of compliance with the Wage Standards, because there remains a gap in funding even after reimbursement is applied, or reimbursement does not fully cover the operation costs. (Dkts. 9-2, ¶ 12; 9-4, ¶ 12; 9-5, ¶ 16; 22, ¶ 12.) And not all of the Board's standards even trigger statutory reimbursement, for instance, the association members do not receive statutory reimbursement for the costs of providing the Act's mandated training. Yona is not eligible for statutory reimbursement. (Dkt. 9–3, ¶ 13.) In sum, Eighth Circuit law on this point is unambiguous: state entities enjoy sovereign immunity, no recovery of money is possible, and thus

44

supporting a finding of irreparable harm. *Baker Electric Cooperative, Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994); *Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000). Defendants cite no authority to the contrary—because there is none.

SEIU's cited cases are inapplicable. First, in *Beber v. NavSav Holdings, LLC*, the Eighth Circuit found no irreparable harm because the plaintiff could recover money damages from the defendant. 140 F.4th 453, 463 (8th Cir. 2025). That holding says nothing about irreparable injury when the defendant is categorically immune. Second, in *Abdurrahman v. Dayton*, the court found no irreparable harm because the plaintiff's wound was "self-inflicted." No. 16–cv–4279 (PAM/HB), 2016 WL 7428193, at *4 (D. Minn. Dec. 23, 2016). Nothing could be further from this case, where the Board's standards and structure have been foisted on Plaintiffs against their will. In conclusion, Plaintiffs have shown irreparable harm.

## F.     Balance of Harms Weighs in Favor of Plaintiffs.

The Court should weigh the balance of harms towards the party who has suffered violation of its constitutional rights. *D.M. by Bao Xiong v. Minn. State High School League*, 917 F.3d 994, 1004 (8th Cir. 2019) (explaining that "'[T]he public is served by the preservation of constitutional rights.'") (citation omitted). Plaintiffs have shown why the Act, Board's structure, and Board's

actions violate theirs or their association members' constitutional rights. None of the Defendants have shown injury to their constitutional rights.

## III.   RES JUDICATA DOES NOT BAR PLAINTIFFS' CLAIMS.

Res judicata has three elements: "(1) the prior judgment was rendered by a court of competent jurisdiction, (2) the decision was a final judgment on the merits, and (3) the same cause of action and the same parties or their privies were involved in both cases." *Headley v. Bacon*, 828 F.2d 1272, 1274 (8th Cir. 1987) (citation omitted). Res judicata is an affirmative defense where Defendants bear the burden of proof. *Howard v. Green*, 555 F.2d 178, 181 (8th Cir. 1977) ("Res judicata is of course an affirmative defense, Fed. R. Civ. P. 8(c), and the burden of proof is upon the party asserting it."). Plaintiffs first provide the Court with additional background about *LeadingAge I*, explain the new harms suffered by each Plaintiff or their association members that arose after *LeadingAge I*, and then respond to Defendants' legal arguments.

### A.   About *LeadingAge I*.

In *LeadingAge I*, LeadingAge and Care Providers sued Blissenbach in her official capacity as the Commissioner of the Department of Labor and Industry ("DOLI"), challenging the Board's "Expedited Permanent Rules Modifying Certification Criteria, Notice Posting Requirements, and Holiday Pay Rules for Nursing Home Workers, Minnesota Rules, Part 5200.2000 to 5200.2050" ("Holiday Pay Rule") (No. 24-cv-04282-LMP-JFD, Dkt. 22, ¶ 1.) The

46

Holiday Pay Rule mandated holiday pay (at time-and-one-half of their regular wage) for nursing home workers who work on eleven specific holidays. (*Id.* ¶ 36.) LeadingAge and Care Providers argued that the NLRA preempted the Holiday Pay Rule, because the rule effectively imposed a quasi-collective bargaining process to modify holiday pay. (*Id.* ¶¶ 44–45.)[10] LeadingAge and Care Providers sought a preliminary and permanent injunction enjoining enforcement of the Holiday Pay Rule, and a declaration that the Holiday Pay Rule was preempted by the NLRA. (Dkt. 22, at 15–16.)

LeadingAge and Care Providers challenged no other rule or standard issued by the Board in *LeadingAge I*. Yona, Gulley, and SEIU were not parties in *LeadingAge I*. (*See generally id.*)

Blissenbach moved to dismiss asserting, in short, how LeadingAge and Care Providers lacked standing because they did not establish the Holiday Pay Rule inflicted any concrete harm on their association members. (24-cv-4282-LMP-JFD, Dkt. 17, at 8.) On May 23, 2025, the Court dismissed *LeadingAge I* under Rule 12(b)(6) *without prejudice*. (24-cv-4282-LMP-JFD, Dkt. 50.) The *LeadingAge I*-court first ruled that LeadingAge and Care Providers established associational standing after they submitted four declarations in support of

---

[10] LeadingAge and Care Providers initially sued also alleging a void for vagueness claim, which they later withdrew. (24-cv-4282-LMP-JFD, Dkt. 50, at 2 n.1.)

their preliminary injunction motion and in opposition to Blissenbach's motion to dismiss, which demonstrated the harm caused by the Holiday Pay Rule. (*Id.* at 11.) The declarants here are different from the declarants in *LeadingAge I. Compare* (24-cv-04282-LMP-JFD, Dkts. 29-1 (Brown Decl.; nursing home provider, "Cassia"), 29-2 (Hejhal Decl.; nursing home provider, "St. Francis Health Services of Morris"), 29-3 (Greely Decl.; nursing home provider, "American Baptist Homes of the Midwest"), and 40-1 (Davis Decl.; nursing home provider, "The Evangelical Lutheran Good Samaritan Society)) *with* (Dkts. 9-2 (Benham Decl.; nursing home provider, "Glenwood Village Care Center, Inc."), 9-3 (Hill Decl.; Yona); 9-4 (Struzyk Decl.; nursing home provider, "Premier Healthcare Management Services"), 9-5 (Wraalstad Decl.; nursing home provider, "Cook County Hospital District"), and 22 (Carley Decl.; nursing home provider, "Benedictine Health System").) Aside from harm inflicted by the Holiday Pay Rule, none of the declarants in *LeadingAge I* offered any testimony relating to the harm caused by any other rule or action by the Board.

The *LeadingAge-I* court ruled LeadingAge and Care Providers had standing to sue, but concluded that their NLRA-preemption argument failed as matter of law. (24-cv-04282-LMP-JFD, Dkt. 50 at 2.) On June 20, 2025, LeadingAge and Care Providers appealed *LeadingAge I* to the Eighth Circuit, where a decision remains pending.

**B.** **New Harm Caused by the Board's Specific Actions and the Facts Substantiating this Harm did not Exist During *LeadingAge I*.**

**1.** **The Wage Standards inflict new harm on LeadingAge's and Care Providers's association members that post-dates *LeadingAge I*.**

The Board adopting the Wage Standards in October 2024 did not confer standing to LeadingAge and Care Providers. (Dkt. 5, at 12.) Their association members had to suffer harm before suing to seek relief. Their association members did not suffer the requisite harm until after the Court entered judgment in *LeadingAge I* on May 27, 2025. (24-cv-04282-LMP-JFD, Dkt. 51.)

Six months before this lawsuit's filing was September 11, 2025. LeadingAge and Care Providers earlier outlined the new harm their association members have suffered, all within the six months before this lawsuit's filing, because of the Wage Standards and training requirements. (Dkt. 5, at 19–21.) The facts substantiating this new harm did not exist during *LeadingAge I*.

**2.** **The Board's selection of certain unions, which post-dated *LeadingAge I*, inflicted a new due process harm.**

LeadingAge's and Care Providers's constitutional challenge to the Act's training requirements also rests on new facts. They challenge the Board's authority to impose training requirements: they argue that its authority over those requirements is inconsistent with due process because the Board is dominated by private parties with a financial interest in the requirements. They also argue that the Board's selection of a small subset of unions is

anticompetitive self-dealing. *See* Minn. Stat. § 181.214, subd. 1. None of those facts was available when the Court entered judgment in *LeadingAge I.* LeadingAge and Care Providers did not know who the Board would certify as CWOs to provide the Act's required training. The Board did not issue those certifications until July 2025, when it certified SEIU, AFL-CIO, and AFSCME Council 65. (Dkt. 9-1, at 216–18.) The Board's selection of those specific unions, which post-dated *LeadingAge I,* inflicted new injuries on Plaintiffs and triggered the claims raised in this lawsuit. Those claims did not exist during *LeadingAge I* and could not have been raised in that case.

### 3. SEIU bolsters Yona's unique claim of harm.

SEIU argues that Yona lacks any cognizable injury because it can simply recoup increased costs by passing those costs on to Yona's customers. (Dkt. 56, at 46 n.21.) That is incorrect for two reasons. First, courts have long recognized that businesses suffer cognizable injuries when they face increased costs from regulations, even if the business passes some of those costs on to others, it still suffers an injury in its own right. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997) (holding that even parties indirectly affected by higher costs of unconstitutional state regulation had standing to sue); s*ee also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 384–85 (2024) (collecting similar decisions finding standing based on economic injury). Second, the argument ignores Yona's constitutional injuries. For example, Yona pleads an

associational injury under the First Amendment. That injury is independent of any increase in costs. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding that loss of First Amendment freedoms, even for a temporary period, is a per se irreparable injury).

But SEIU's argument is not only wrong; it also confirms Yona's unique harm. Like the other Plaintiffs, Yona must comply with the Board's standards. But unlike those Plaintiffs, Yona cannot receive any state assistance to offset its compliance costs. (Dkt. 9-3, ¶ 13.) Once the Wage Standards become effective, Yona must either absorb the costs or pass them on to its customers. (*Id*.) Nor are such passthroughs guaranteed. Yona cannot unilaterally raise its rates, and its customers are likely to resist higher costs, as they are also facing higher costs because of the Board's standards.

In short, SEIU ignores Yona's unique status in this case. The harm Yona faces did not exist in *LeadingAge I*. Yona was not involved in *LeadingAge I*, nor have Defendants established Yona is in privity with either LeadingAge or Care Providers.

**C.** **LeadingAge's and Care Providers's Claims Before this Court Were Not Ripe in *LeadingAge I*, Depriving Them of Standing to Sue on These Claims and the *LeadingAge I*-court of Subject Matter Jurisdiction.**

**1.** **The claims now before this Court were not ripe during *LeadingAge I*.**

If the first court lacked subject matter jurisdiction over the claims, res judicata cannot apply to bar the same claims in the second lawsuit. *Kulinski*

*v. Medtronic Bio-Medicus, Inc.*, 112 F.3d 368, 373 (8th Cir. 1997) (explaining that res judicata may preclude re-litigation of jurisdictional matters in the second lawsuit, but res judicata does not bar claims in the second lawsuit based on new theories of relief, "even if arising out of the identical set of facts" because the first action "was not [resolved] on the merits of the substantive claim.") (citation omitted); *Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1321 (9th Cir. 1992) ("[A] claim is not barred by res judicata if the forum in which the first action was brought lacked subject matter jurisdiction to adjudicate that claim."). None of the claims before this Court were ripe in *LeadingAge I. Pub. Water Supply Dist. No. 8 of Clay County, Mo. v. City of Kearney*, 401 F.3d 930, 932 (8th Cir. 2005) ("Whether a case is ripe depends on the state of the case at the time of review, not at the time of filing.") (citations omitted). Ripeness is a jurisdictional doctrine, and "'Article III limits courts to deciding actual 'Cases' and 'Controversies,' U.S. Const. art. III, § 2, thereby prohibiting them from issuing advisory opinions.'" *Id.* (citation omitted). A court lacks subject matter jurisdiction over an action if the action is not ripe for resolution. *Dakota, Minn. & E. R.R. Corp. v. S.D.*, 362 F.3d 512, 520 (8th Cir. 2004). A ripe claim must be supported by sufficiently matured harm. *Paraquad, Inc. v. St. Louis Hous. Auth.*, 259 F.3d 956, 958 (8th Cir. 2001) ("To be ripe for decision, the harm asserted must have matured enough to warrant judicial intervention.") (citation omitted). Res judicata does not bar

52

claims that were not ripe in the first action. *See, e.g., Lawler v. Nat'l Screen Service Corp.*, 349 U.S. 322, 328 (1955) ("While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."); *Baker Group, L.C. v. Burlington Northern and Sante Fe Ry. Co.*, 228 F.3d 883, 886–87 (8th Cir. 2000) (explaining that res judicata did not bar a breach of contract claim in the second lawsuit, which was premised on the same contract as the first lawsuit, because the facts of harm substantiating the second breach of contract claim post-dated the first lawsuit's filing); *Lundquist v. Rice Memorial Hosp.*, 238 F.3d 975, 978 (8th Cir. 2001) (ruling that plaintiff's termination claim did not exist she filed the first lawsuit against her employer, and thus, res judicata did not bar her termination claim in the second lawsuit against her employer); *Katt v. Dykhouse*, 983 F.2d 690, 694 (6th Cir. 1992) (holding that res judicata did not bar the First Amendment claim because it was not ripe during the first action).

In *LeadingAge I*, none of the harms listed in Plaintiffs' moving memorandum relating to compliance with the Wage Standards had occurred yet. (Dkt. 5, at 19). LeadingAge's and Care Providers's association members likewise had not yet taken any steps to ensure compliance with the Board's training requirements when the Court decided *LeadingAge I*. (Dkt. 5, at 21.)

And Board did not choose which CWOs to provide the Act-mandated training until July 2025—months after *LeadingAge I* resolved at the district court level. (Dkt. 5, at 15.) In conclusion, because the claims before this Court were not ripe during *LeadingAge I*, the *LeadingAge I*-court lacked subject matter jurisdiction over these claims, and res judicata does not apply to bar the claims before this Court.[11]

### 2. LeadingAge and Care Providers also lacked standing to sue on the claims before this Court in *LeadingAge I.*

Standing and ripeness are closely related and "perhaps overlap entirely." *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975); *School of the Ozarks, Inc.*, 41 F.4th 992, 997 (8th Cir. 2022); *Smith v. Wisconsin Dep't of Agric., Trade & Consumer Protection*, 23 F.3d 1134, 1141 (7th Cir. 1994). Article III standing requires that LeadingAge and Care Providers show: (1) an injury in fact; (2) a causal relationship between the injury and the challenged conduct; and (3) that a favorable decision will likely redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact is the invasion of a legally protected interest that is "actual or imminent, not conjectural or hypothetical." *Id.* at 560. As set forth above, the claims before this Court were not ripe during

---

[11] SEIU alleges that Plaintiffs' claims before this Court are not *still* ripe, which bolsters how these specific claims were not ripe in *LeadingAge I*. (Dkt. 58, ¶ 114.)

*LeadingAge I* therefore LeadingAge and Care Providers lacked standing to sue on these claims in *LeadingAge I*. In short, in *LeadingAge I*, LeadingAge's and Care Providers's association members had not yet suffered any of the harms associated with the Wage Standards or training requirements. Accordingly, because LeadingAge and Care Providers also lacked standing to assert these claims in *LeadingAge I*, the *LeadingAge I*-court lacked subject matter jurisdiction over the claims before this Court, meaning res judicata does not apply here. *Brooks v. City of Des Moines, Iowa*, 844 F.3d 978, 979 (8th Cir. 2016) ("Where a plaintiff lacks standing, the court has no subject matter jurisdiction.") (citation omitted).

**D.** **LeadingAge and Care Providers Seek to Relief Based on New Harms that Post-date *LeadingAge I* and There is no Common Nucleus of Operative Fact.**

As confirmed by the Eighth Circuit and numerous other circuits, res judicata does not apply to claims that are based on new harms arising after the filing of the first lawsuit. *Lundquist*, 238 F.3d at 978; *Baker*, 228 F.3d at 886–87; *Morgan v. Covington Tp.*, 648 F.3d 172, 178 (3d Cir. 2011); *Smith v. Potter*, 513 F.3d 781, 783 (7th Cir. 2008); *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 529 (6th Cir. 2006) (citation omitted); *Mitchell v. City of Moore*, 218 F.3d 1190, 1202–03 (10th Cir. 2000); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 369–70 (2d Cir. 1997); *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992); *Los Angeles Branch NAACP v. Los Angeles Unified Sch.*

*Dist.*, 750 F.2d 731, 739 (9th Cir. 1984). Here the harms that LeadingAge and Care Providers seek to remedy not only post-date *LeadingAge I*'s filing, but also the entry of judgment in *LeadingAge I*. When the *LeadingAge I*-court entered judgment, LeadingAge's and Care Providers's association members had not yet suffered any harm relating to complying with the Wage Standards or the Act's training requirements. Nor had the Board selected the problematic CWOs that further bolster LeadingAge's and Care Providers's due process claim. The new harms supporting LeadingAge's and Care Providers's constitutional claims before this Court did not exist during *LeadingAge I*, and so, res judicata does not bar these claims.

Neither *United States v. Gurley* nor *Midwest Disability Initiative v. JANS Enters.* should change the Court's conclusion. In *Gurley*, the Eighth Circuit quoted a Seventh Circuit decision and wrote, "new evidence of injury differs from a new wrong." 43 F.3d 1188, 1196 (8th Cir. 1994) (quoting *Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1326 (7th Cir. 1992). The plaintiff in *Gurley* filed two lawsuits premised on the same underlying facts: "disposal of hazardous waste in the borrow pit on the Caldwell property in the 1970s and the later release of those wastes." *Id.* In *Midwest*, the trade association, on behalf of one association member, sued a restaurant alleging disability discrimination. 929 F.3d 603, 606 (8th Cir. 2019). The association and restaurant stipulated to dismissal with prejudice. *Id.*

Then, the association, on behalf of a different member, sued the same restaurant alleging the same underlying facts of disability discrimination and sought the same relief. *Id*. at 606, 610.

Here although there may be some overlap relating to the statutory framework, the underlying facts and plea for relief are different. In *LeadingAge I*, LeadingAge and Care Providers solely sought relief because the Holiday Pay Rule was preempted by the NLRA and they demonstrated why the Holiday Pay Rule harmed their association members. (*See generally* 0:24-cv-04282-LMP-JFD, Dkt. 22.) LeadingAge's and Care Providers's claims here do not share a common nucleus of operative fact with the claims in *LeadingAge I*, because the claims here rest on new proof of harm, post-dating *LeadingAge I*, on why the Wage Standards and training requirements violate their association members' constitutional rights. *Poe v. John Deere Co.*, 695 F.2d 1103, 1106 (8th Cir. 1982) (explaining that a common nucleus exists if "the facts are related in time, space, origin, or motivation[.]" (citation omitted)); *Cardona v. Holder*, 754 F.3d 528, 530 (8th Cir. 2014) (declining to apply res judicata because "Cabrera Cardona's manslaughter and tampering with evidence convictions are two different causes of action that arise out of different facts, require different proof, and redress different wrongs."). As a result of the new harms, LeadingAge and Care Providers here also seek different relief to remedy the new harms, compared to the relief sought in

*LeadingAge I.* (*Compare* Dkt. 9, Prayer for Relief *with* 0:24-cv-04282-LMP-JFD, Dkt. 22, at WHEREFORE Clause.) In conclusion, res judicata does not bar LeadingAge's and Care Providers's claims before this Court, which are premised on new harms and a different plea for relief.

### E. Gulley Is not in Privity with Blissenbach Due to Diverging Interests.

Res judicata does not bar LeadingAge's and Care Providers's claims against Gulley. By statute, Gulley's interests on the Board are to "represent nursing home workers or worker organizations," while Blissenbach should act to further public interest. Minn. Stat. § 181.212, subd. 1(a)(5). Privity exists between parties that are "so closely related" and "their interests are so nearly identical, that it is fair to treat them as the same parties for purposes of determining the preclusive effect" of the prior judgment. *Ruple v. City of Vermillion*, 714 F.2d 860, 862 (8th Cir. 1983). Privity is "merely a word used to say that the relationship between the one who is a party on the record, and another is close enough to include that other within the res judicata." *Elbert v. Carter*, 903 F.3d 779, 782 (8th Cir. 2018). Gulley wielding policy-making authority on the Board does not automatically create privity with Blissenbach. *Headley*, 828 F.2d at 1276 ("Not all government employees and officials are in privity with the government . . . Moreover, even persons in such clearly policy-making positions may not be in privity with the government."). Gulley and

Blissenbach both seeking to prevail in this action, standing alone, does not create privity. *Anderson v. City of St. Paul*, 849 F.3d 773, 778 (8th Cir. 2017).

Gulley lacks privity with Blissenbach for res judicata purposes, because his interests here are not "nearly identical" to Blissenbach's interests from *LeadingAge I*. Gulley's interests here diverge from Blissenbach's interests from *LeadingAge I. Headley v. Bacon*, 828 F.2d 1272, 1277 (8th Cir. 1987) (explaining that diverging or adverse interests severs privity). In the first action, LeadingAge and Care Providers did not sue Blissenbach in her capacity as a representative of the Board—they sued her solely in her capacity as the Commissioner of DOLI. (0:24-cv-04282-LMP-JFD, Dkt. 1, 22.) LeadingAge and Care Providers did not seek to prevent Blissenbach from passing new standards in *LeadingAge I*, they solely sought to enjoin Blissenbach from enforcing the Holiday Pay Rule. (*Id.* at 16.) Here LeadingAge and Care Providers sue Gulley, in his capacity as the Board's chairperson, not to enjoin him from *enforcing* any standards, but to enjoin him *passing* additional standards that inflict harm on their association members. (Dkt. 9, at 44.) Gulley, by statute, must represent the employees and has wielded his powers to pass union- and employee-favoring standards that have already inflicted harm on LeadingAge's and Care Providers's association members. Minn. Stat. § 181.212, subd. 1(a)(5). Blissenbach, by contrast and by statute, represents the best interests of the public. SEIU, who Gulley is the president of, even

intervened here because, "the government defendants may not adequately represent *SEIU Minnesota's* and its members' interests because the State must represent the interests of the general public," further confirming the diverging interests between Gulley and Blissenbach. (Dkt. 41 at 5) (emphasis added). In sum, Blissenbach's interests in *LeadingAge I* turned on enforcement of a standard by a public official, while Gulley's interests here turn on him, by statute, acting as a private actor to pass pro-union/pro-employee standards, and thus, diverging interests arise that destroy privity between Blissenbach and Gulley.

SEIU's reliance on *Micklus v. Greer* and *Elbert v. Carter* is misplaced. In *Micklus*, the Eighth Circuit ruled that a plaintiff cannot sue successive government employees on the same claim "solely on the ground that each employee is not 'identical' to previously sued employees." 705 F.2d 314, 317 (8th Cir. 1983). Coupled with how Gulley is not a government employee, LeadingAge and Care Providers do not sue him on the same claims as they sued Blissenbach in *LeadingAge I* and establish above why he has diverging interests from her.

*Elbert* concerned two actions arising out of the same police raid. 903 F.3d 779, 783 (8th Cir. 2018). The plaintiff sued one detective in the first action alleging violation of his Fourth Amendment rights. *Id*. at 780–81. In the second action, the plaintiff sued additional police officials for alleged misconduct

arising out of the same raid. *Id.* at 784. Here LeadingAge and Care Providers establish above why their claims do not arise out of the same underlying facts and they seek to remedy new harms.

LeadingAge and Care Providers originally naming the Board also makes no difference because the *LeadingAge-I* court never had subject matter jurisdiction over any potential claims against the Board in the first place.[12] The Board, as flawed as it is, remains a state-created entity and is entitled to state immunity under the Eleventh Amendment. *Hadley v. North Arkansas Community Technical College*, 76 F.3d 1437, 1442 (8th Cir. 1996) (explaining that the state-controlled community college functioned like a state agency, and the college enjoyed state immunity); *Fromm v. Com'n of Veterans Affairs*, 220 F.3d 887, 890 (8th Cir. 2000) ("Under this rule, either the court or any party may raise an issue of subject-matter jurisdiction at any time, and the Eleventh Amendment is regarded, at least for this purpose, as going to subject-matter jurisdiction."). Again, a court lacking subject matter jurisdiction over a claim bars application of res judicata.

---

[12] This is the reason why LeadingAge and Care Providers voluntarily dismissed the Board as a defendant in *LeadingAge I.*

In conclusion, Gulley is not in privity with Blissenbach from *LeadingAge I*, and LeadingAge's and Care Providers's claims against Gulley should proceed.

**F.** **_LeadingAge I_ Was Dismissed Without Prejudice, and so, There is No Final Judgment on the Merits.**

Defendants gloss over the fact that the *LeadingAge I*-court dismissed the action without prejudice. A dismissal without prejudice does not operate as a final judgment on the merits for res judicata purposes. *Powers v. St. Louis Typographical Union No. 8*, 549 F.2d 60, 61 (8th Cir. 1977) ("The dismissal was without prejudice and was thus not res judicata as to the issues presented."). The *LeadingAge I*-court dismissed the action without prejudice by granting Blissenbach's Rule 12(b)(6) motion. LeadingAge and Care Providers appealed the dismissal without prejudice. The procedural question: does res judicata apply to a dismissal without prejudice that is currently on appeal?

The Eighth Circuit has yet to definitively answer that question. In *U.S. v. Maull*, in a footnote, the Eighth Circuit explained, "[m]oreover, it is well-established that a Rule 12(b)(6) dismissal is a 'judgment on the merits' for res judicata purposes unless the plaintiff is granted leave to amend or the dismissal is reversed on appeal." 855 F.2d 514, 516 n.3 (8th Cir. 1988). Yet that does not answer what the Court should do as to res judicata if the first lawsuit

was dismissed *without* prejudice. In its footnote, *Maull* cited three cases, yet none of them shed any light.[13]

Federated Dep't Stores v. Moitie* did not comment on how a dismissal without prejudice impacts the res judicata analysis. *See generally* 452 U.S. 394 (1981). *Moitie* further explained that "the dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a 'judgment on the merits[,]'" but stopped shy of writing "final" judgment on the merits. *Id.* 399 n.3. In *Carter v. Money Tree Co.*, the Eighth Circuit ruled that the court denying leave to file an amended complaint, with prejudice, acts as a final judgment on the merits. 532 F.2d 113, 115 (8th Cir. 1976). In *Glick v. Ballentine Produce, Inc.*, the first action was dismissed "on the merits" and "with prejudice." 397 F.2d 590, 592 (8th Cir. 1968). Here, however, *LeadingAge I* was dismissed without prejudice. And none of the parties in *Maull*, *Moitie*, Carter, and *Glick* appealed a dismissal without prejudice.

---

[13] In *Maull*, the Eighth Circuit recognized that under Fed. R. Civ. P. 41(b), unless the dismissal order states otherwise, an involuntary dismissal generally operates as a final adjudication on the merits, which can be rebutted. 855 F.2d at 516. Since *Maull*, the Eighth Circuit has recognized that "although there is a presumption that a dismissal under Rule 12(b)(6) is a judgment on the merits made with prejudice . . . such a dismissal can be rendered without prejudice if the court so specifies." *Orr v. Clements*, 688 F.3d 463, 465 (8th Cir. 2012) (case citations omitted).

SEIU again cites *Micklus*, but that case concerned a plaintiff who was repeatedly given opportunities to correct his pleading errors, and eventually, the court stopped giving the plaintiff leeway and expressly dismissed some of his claims with prejudice, and others for failure to a state claim without specifying with prejudice or not. 705 F.2d at 316–17. Indeed, the Eighth Circuit ruled, "*Fahner*, while not explicitly dismissed with prejudice, was dismissed for failure to state a claim on which relief may be granted, which is a dismissal on the merits," suggesting that a dismissal with prejudice matters to the res judicata analysis. *Id*. at 317.

With these open questions,[14] the Court should resort back to the black letter law on res judicata. Here there is no "final" judgment on the merits. If the Eighth Circuit affirms *LeadingAge I*, then the case remains dismissed without prejudice, and LeadingAge and Care Providers can re-file. Re-filing would be a waste of resources, because this is already before the Court and is ripe for resolution. If the Eighth Circuit reverses *LeadingAge I*, then the case continues before the Court, and LeadingAge and Care Providers can seek

---

[14] Plaintiffs located *Pie Development, LLC v. Pie Carrier Holdings* as the "closest" case that shares some overlap with this case's procedural posture. 128 F.4th 657 (5th Cir. 2025). But in *Pie Development*, the Fifth Circuit applied res judicata in the second lawsuit *after* the Fifth Circuit earlier affirmed dismissal of the first lawsuit without prejudice. *Id*. at 660–61. Here the Eighth Circuit has not yet ruled on *LeadingAge I*.

consolidation of the two cases. Either way, there is no final judgment on the merits because the litigation, in some form, continues.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss and grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: April 23, 2026

*/s/ Lehoan T. Pham*
Thomas R. Revnew, MN Bar No. 0295620
Lehoan T. Pham, MN Bar No. 0397635
LITTLER MENDELSON, P.C.
1300 IDS Center
80 South Eighth Street
Minneapolis, MN 55401
612.630.1000
trevnew@littler.com
hpham@littler.com

Alex T. MacDonald
(Admitted Pro Hac Vice)
LITTLER MENDELSON, P.C.
Workplace Policy Institute
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006-4046
202.772.2505
amacdonald@littler.com

***Attorneys for Plaintiffs***