**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| LeadingAge Minnesota, Care Providers of Minnesota, and Yona Northstar LLC, | Civil File No. 26-cv-01816 (NEB/DJF) |
| Plaintiffs, | **STATE DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT** |
| vs. | |
| Nicole Blissenbach, in her official capacity as Commissioner of the Minnesota Department of Labor and Industry, the Minnesota Department of Labor and Industry and as a member of the Minnesota Nursing Home Workforce Standards Board, and Jamie Gulley, in his official capacity as a member and chairperson of the Minnesota Nursing Home Workforce Standards Board, | |
| Defendants, | |
| Service Employees International Union Healthcare Minnesota and Iowa, | |
| Intervenor-Defendant. | |

**INTRODUCTION**

Plaintiffs disagree with the standards set by the Board and thus allege constitutional violations where none exist. Because each of their challenges fails as a matter of law, this Court should dismiss their complaint.

## ARGUMENT

### I.   PLAINTIFFS FAIL TO STATE A FIRST AMENDMENT CLAIM.

Plaintiffs First Amendment claim continues to fail. Plaintiffs rely on *Janus v. AFSCME, Council 31*, 585 U.S. 878 (2018), describing the Board as the "exclusive bargaining agents" of the employers and workers. (ECF No. 60, pp 6-9.) As explained in State Defendants' initial memorandum, the Board is not a collective bargaining entity or union. The Board is comprised of appointed members with authority to investigate working conditions and set statewide standards. The Board does not become a union simply because it has members who may also be union members, and Plaintiffs offer no legal support to suggest otherwise.

Even if the Board somehow created exclusive representation, which it does not, Plaintiffs' attempt to distinguish *Bierman v. Dayton*, 227 F. Supp. 3d 1022 (D. Minn. 2017) and *Minnesota State Board for Community Colleges. v. Knight*, 465 U.S. 271 (1984) fails. Plaintiffs argue the procedures in *Bierman* and *Knight* were more akin to public listening forums than private bargaining. (ECF No. 60, pp 11-12.) This is incorrect. Neither case addresses public listening forums. *See Bierman*, 227 F. Supp. 3d at 1029-31 (determining whether certifying a union to be the exclusive representative to negotiate terms and conditions of employment infringed on nonmembers' First Amendment rights); *Knight*, 465 U.S. at 276, 280 (stating that a "'meet and confer' session [to discuss policy questions] is obviously not a public forum").

Plaintiffs gloss over their ability to voice disapproval of proposed Board rules during Board meetings and the rulemaking process—which they have done—by citing

inapposite cases to suggest they are not free to express their own viewpoints. *See United States v. United Foods, Inc.*, 533 U.S. 405, 411-13 (2001) (holding that requiring a corporate entity to pay an assessment to fund speech with which it disagreed violated First Amendment protections); *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 10-16 (1986) (determining that requiring public utility company to disseminate the viewpoint of others with which it disagreed violated First Amendment protections). Neither the Board nor its rules require Plaintiffs to fund speech or to disseminate the viewpoint of others. Moreover, neither case remotely suggests that Plaintiffs' freedom to not associate is impacted when they can express their viewpoints during Board meetings and the rulemaking process.

Finally, Plaintiffs contend that the Board's structure and authority do not survive "exacting scrutiny" because the legislature can promulgate nursing home standards. (EFC No. 60, pp 13-15.) Plaintiffs' novel contention is unavailing. The legislature authorized the Board's structure and authority. Minn. Stat. § 181.211-.217. Likewise, the legislature authorized the Board to follow an expedited rulemaking process to promulgate nursing home employment standards. Minn. Stat. § 181.215, subd. 2; Minn. Stat. § 14.389. Moreover, none of Plaintiffs' cited authority support their contention that the legislative process is any less restrictive of their First Amendment rights than the expedited rulemaking process utilized by the Board. Expedited rulemaking authorized by the legislature is no more restrictive of First Amendment rights than if the legislature promulgated the nursing home employment standards itself.

## II.   PLAINTIFFS' DUE PROCESS CLAIM FAILS.

Essentially, Plaintiffs argue that the Board is unconstitutional because they disagree with the commissioner members' votes.  Plaintiffs claim the commissioner members are biased because in the past they have voted similarly to the employee representatives. Contrary to the private parties in the cases Plaintiffs cites, government entities are presumed neutral.  *Ass'n of Am. Railroads v. U.S. Dep't of Transp.,* 821 F.3d 19, 32 (D.C. Cir. 2016) (contrasting for-profit corporations with government, stating government entities strive "for an equilibrium of revenues and expenditures"); *Rice v. Vill. of Johnstown, Ohio*, 30 F.4th 584, 590 (6th Cir. 2022) (noting that to date, this due process theory had been applied only once before to a "government entity" (Amtrak), though Amtrak's "unique" status as a for-profit corporation was emphasized).

In an analogous case, the Sixth Circuit rejected a challenge to a zoning commission brought under this due process doctrine.  *Rice v. Vill. of Johnstown*, No. 22-3974, 2023 WL 4977457, at *4 (6th Cir. Aug. 3, 2023).  The commission was a public body comprised of five appointed electors of its municipality, held public meetings per open meeting laws, and acted through resolutions recorded in minutes.  *Id.*  The Sixth Circuit concluded the commission was a regulatory body and, without a showing that "self-interest compromised [the commission's] presumed neutrality" the plaintiffs "face[d] an uphill battle" in establishing their claim.  *Id.* at *3.  Similarly, here, Board members are appointed by the Governor, the Board is public and meets according to open meeting laws, and the Board establishes nursing home standards through votes as directed by statute.  The Board is not a private party.  To the extent Plaintiffs argue that the employer or worker representative

members are private parties, those members cannot act without affirmative votes from at least two commissioner members. Because any Board vote requires majority approval and at least two affirmative commissioner member votes, each Board action accordingly requires neutral, government approval. In addition, multiple standards also require publishing for notice and comment, legislative approval, or federal approval.

Plaintiffs argue they have sufficiently alleged that the board members, specifically the commissioner members, are not neutral. In truth, they allege no actual favoritism, making only conclusory statements that the commissioner members vote with the employee-representatives. (ECF No. 60 at 16.) Plaintiffs suggest the burden should be on Defendants to show the commissioner members' neutrality. (*Id.* at 23.) This is insufficient to allege bias. *See Krentz v. Robertson*, 228 F.3d 897, 905 (8th Cir. 2000) (stating that because a challenge to a public board's decision must "overcome a 'presumption of honesty and integrity in policymakers with decision making power,'" and show the board's decision was "infected with bias," mere accusations of a single member's bias were insufficient).

III.   THE BOARD IS NOT PREEMPTED BY THE SHERMAN ANTITRUST ACT.

The cases Plaintiffs cite for the proposition that the Board is not actively supervised by the State under the second prong of *Parker* immunity are misplaced. The states in those cases provided minimal, if any, supervision over the conduct of active market participants. *See N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 574 U.S. 494, 515 (2015) (noting the state dental board did not contend that it exercised any supervision over the board's conduct); *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 638 (1992) (finding active state supervision did not occur when the prices were set by private parties and became effective

5

unless vetoed by the state within a set time period but the state did not review all the rate filings for accuracy); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980) (concluding active state supervision did not occur over California's wine pricing system because the state did not establish the prices, did not review the reasonableness of the price schedules, and did not regulate the terms of the contracts).

Here, the State's active supervision is much more intensive. First, the legislature retains supervision over the Board by requiring annual reports and conditioning increases to the minimum wage standard on the legislature's appropriation of funds. Minn. Stat. §§ 181.212, subd. 11; 181.213 subd. 2(c). Second, the commissioner members actively supervised the Board's actions by participating in 13 board meetings and 25 workgroup meetings. (ECF No. 9-1, Ex. FF at 1-2.). At least one commissioner member participated in various workgroups.[1] Finally, every Board decision required an affirmative

---

[1] DLI Commissioner Nicole Blissenbach participated in the Certificate and Training Workgroup. *See* Meeting Minutes, https://www.dli.mn.gov/about-department/boards-and-councils/nhwsb-certificationtraining-workgroup (last visited May 8, 2026).

DHS Commissioner (designee) Kim Brenne participated in the Data Workgroup. *See* Meeting Minutes, https://www.dli.mn.gov/about-department/boards-and-councils/nhwsb-data-workgroup (last visited May 8, 2026).

DLI Commissioner Nicole Blissenbach and Maria King participated in the Principles Workgroup. *See* Meeting Minutes, https://www.dli.mn.gov/about-department/boards-and-councils/nhwsb-principles-workgroup (last visited May 8, 2026).

MDH Commissioner (designee) Maria King participated in the Public Hearing Workgroup. *See* Meeting Minutes, https://www.dli.mn.gov/about-department/boards-and-councils/nhwsb-public-hearing-workgroup (last visited May 8, 2026).

vote from two state commissioner members, ensuring that the state actively supervised every Board decision to ensure promotion of state policy.  Accordingly, the second prong of *Parker* immunity is satisfied.

## IV.    THE BOARD IS NOT PREEMPTED BY THE NLRA.

The Board is not preempted under *Garmon.*  Plaintiffs continue to assert without support that the Board's process of setting minimum standards constitutes "bargaining." (ECF. 60 at 36.)  Collective bargaining is defined by the NLRA as "the mutual obligation of the employer and the representative of the employees to meet … and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d).  The Board is not negotiating contracts or agreements for specific employers and workers; rather, it is setting statewide minimum labor standards.  By arguing that the Board facilitates collective bargaining, Plaintiffs ask this Court to stretch the interpretation of collective bargaining to mean that an agency, legislature, or any other government entity could engage in NLRA-preempted "collective bargaining" simply by including industry voices when setting minimum labor standards.  This is contrary to the fact that the NLRA permits states to regulate working conditions.  *See Malone v. White Motor Corp*., 435 U.S. 497, (1978) (determining there is nothing in the NLRA expressly foreclosing all state regulatory power with respect to issues that may be the subject of collective bargaining).  Because the Board is not engaging in collective bargaining,

DHS Commissioner (designee) Kim Brenne and MDH Commissioner (designee) Maria King participated in the Waivers and Variances Workgroup.  *See* Meeting Minutes, https://www.dli.mn.gov/about-department/boards-and-councils/nhwsb-waivers-and-variances-workgroup (last visited May 8, 2026).

Plaintiffs' arguments that the Board members are not selected or elected bargaining representatives likewise fail.

Statutory remedies for violating the Board's standards do not trigger NLRA preemption. Plaintiffs concede that "[t]he Board has indisputably passed minimum employment standards" but then argue that the remedies provided for violating these minimum standards should instead be construed as "remedies for violations of the NLRA." (ECF No. 60 at 36, 38.) However, the statutory remedies are for violations of the minimum standards. *See* Minn. Stat. § 181.213, subd. 3; *see also LeadingAge Minnesota v. Blissenbach*, 791 F. Supp. 3d 913, 941 (D. Minn. 2025) ("The [private] right of action is therefore widely applicable and can be used by nursing home workers to remedy any number of potentially unrelated violations").

Plaintiffs' only argument that the Board is preempted under *Machinists* is their continued contention that the Board's minimum labor standards shift bargaining power toward unions. Plaintiffs' argument, taken to its logical conclusion, would prevent the establishment of any new minimum labor standards – a squarely rejected proposition. *See, e.g.*, *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 755 (1985). ("Minimum state labor standards affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA."). The Act mandates that the Board ensure nursing home employment standards are set at a minimum to "protect the health and welfare" of the workers and ensure workers are properly trained on their rights. Minn. Stat. § 181.213. That the Board raises the minimum labor standards in doing so does not amount to NLRA preemption.

**V.    LEADINGAGE AND CARE PROVIDERS ARE BARRED FROM BRINGING ADDITIONAL FACIAL CONSTITUTIONAL CHALLENGES UNDER RES JUDICATA.**

LeadingAge and Care Providers argue they did not suffer any injury from the Board's rules until after *LeadingAge I* and therefore, their claims were not ripe and they did not have standing to raise their constitutional challenges. (EFC No. 60, pp 51-54.) Pre-enforcement challenges to the constitutionality of a statute are permitted when circumstances render the threatened enforcement sufficiently imminent. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Plaintiffs allege constitutional challenges to the Board's structure and authority to promulgate rules. (EFC No. 9.) The Board's structure and authority was established in 2023, and the minimum wage standards, holiday pay, and training and certification standards were all promulgated in 2024—all before the *LeadingAge I* amended complaint was filed. LeadingAge and Care Providers allege competitive and associational injuries pertaining to the Board's structure and actions; current and future economic injuries for complying with the minimum wage standard; and administrative costs for complying with the Board's training requirements—all of which existed prior to their pre-enforcement challenge in *LeadingAge I*. (EFC No. 9, ¶¶ 56-57, 59-61.) Accordingly, LeadingAge and Care Providers could have and *should have* asserted their pre-enforcement constitutional claims in *LeadingAge I*.

LeadingAge and Care Providers also argue that the inclusion of Board chair Gulley as a defendant overcomes res judicata. (EFC No. 60, pp 58-62.) Pre-enforcement constitutional challenges to a statute are asserted against a party with the authority to enforce the statute. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (citing

*Ex parte Young,* 209 U.S. 123, 159–160 (1908)).  Here, LeadingAge and Care Providers allege the Act is unconstitutional and seek to prevent enforcement of the rules promulgated by the Board—DLI enforces those rules.  Minn. Stat. § 177.27, subd. 4.  While LeadingAge and Care Providers claim to seek an additional remedy preventing the Board from promulgating additional rules, their pre-enforcement challenges could and should have been asserted against DLI in *LeadingAge I.*  LeadingAge and Care Providers do not get multiple attempts to challenge the Board's structure or rulemaking authority.

**CONCLUSION**

For the foregoing reasons, State Defendants respectfully request that the Court dismiss Plaintiffs' complaint with prejudice.

Dated:  May 8, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

s/ Scott A. Grosskreutz
SCOTT A. GROSSKREUTZ
Assistant Attorney General
Atty. Reg. No. 0392714
(651) 757-1402 (Voice)
scott.grosskreutz@ag.state.mn.us

LINNEA VANPILSUM-BLOOM
Assistant Attorney General
Atty. Reg. No. 0403783
(651) 757-1212 (Voice)
linnea.vanpilsum-bloom@ag.state.mn.us

445 Minnesota Street, Suite 600
St. Paul, MN 55101-2131
(651) 297-4139 (Fax)

ATTORNEYS FOR STATE DEFENDANTS