## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

LEADINGAGE MINNESOTA, CARE
PROVIDERS OF MINNESOTA, and
YONA NORTHSTAR LLC,

Court File No. 0:26-cv-01816-NEB-DJF

Plaintiffs,

v.

NICOLE BLISSENBACH, in her official
capacity as the Commissioner of the
Minnesota Department of Labor and
Industry and as a member of the Minnesota
Nursing Home Workforce Standards
Board, and JAMIE GULLEY, in his
official capacity as a member and
chairperson of the Minnesota Nursing
Home Workforce Standards Board,

Defendants,

and SERVICE EMPLOYEES
INTERNATIONAL UNION
HEALTHCARE MINNESOTA AND
IOWA,

Intervenor-Defendant.

---

## REPLY OF INTERVENOR SEIU HEALTHCARE MINNESOTA AND IOWA
## IN SUPPORT OF STATE DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION ............................................................................................................ 1

ARGUMENT.................................................................................................................... 2

    A.   The Act does not violate the First Amendment........................................................ 2

    B.   The Act does not violate due process. ................................................................... 6

    C.   The Act is not preempted by federal antitrust laws.................................................. 8

    D.   The Act is not preempted by the NLRA................................................................ 13

    E.   Association Plaintiffs' claims are barred by claim preclusion. .............................. 15

        1.   Association Plaintiffs could have brought these claims in *LeadingAge I*. ......... 15

        2.   Association Plaintiffs cannot circumvent claim preclusion by suing Board member Gulley. ................................................................................................ 18

        3.   *LeadingAge I* is a final decision on the merits...................................................... 19

CONCLUSION ..............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*520 S. Michigan Ave. Assocs., Ltd. v. Shannon,*
  549 F.3d 1119 (7th Cir. 2008) ................................................................. 15

*Am. Hotel & Lodging Ass'n v. City of Los Angeles,*
  834 F.3d 958 (9th Cir. 2016) ................................................................... 14

*Bi-Metallic Co. v. State Bd. of Equalization,*
  239 U.S. 441 (1915) .................................................................................. 6

*Bierman v. Dayton,*
  900 F.3d 570 (8th Cir. 2018) ........................................................... 1, 3, 4

*Bost v. Illinois State Bd. of Elections,*
  146 S.Ct. 513 (2026) ............................................................................... 16

*Cal. Lab. Fed'n v. Indus. Welfare Com.,*
  63 Cal.App.4th 982 (1998) ........................................................................ 5

*California Retail Liquor Ass'n v. Midcal Aluminum, Inc.,*
  445 U.S. 97 (1980) .................................................................................. 12

*Carter v. Carter Coal Co.,*
  298 U.S. 238 (1936) .................................................................................. 6

*City of Columbia v. Omni Outdoor Advert., Inc.,*
  499 U.S. 365 (1991) ................................................................................ 11

*Emps. Ass'n, Inc. v. United Steelworkers of Am.,*
  32 F.3d 1297 (8th Cir. 1994) .................................................................. 15

*FCC v. Consumers' Research,*
  606 U.S. 656 (2025) .................................................................................. 7

*Federated Dep't Stores, Inc. v. Moitie,*
  452 U.S. 394 (1981) ................................................................................ 19

*Fort Halifax Packing Co. v. Coyne,*
  482 U.S. 1 (1987) .................................................................................... 14

*Friedman v. Rogers*,
    440 U.S. 1 (1979) ................................................................................................ 6

*FTC v. Ticor Title*,
    504 U.S. 621, 638 (1992) ............................................................................ 10, 11

*Gibson v. Berryhill*,
    411 U.S. 564 (1973) ............................................................................................ 6

*Goldstein v. Prof. Staff Cong./CUNY*,
    96 F.4th 345 (2d Cir. 2024), *cert. denied*, 145 S.Ct. 1044 (2025) ............................ 4, 5

*Graham v. Mentor Worldwide LLC*,
    998 F.3d 800 (8th Cir. 2021) ............................................................................ 19

*Hanig v. City of Winner, S.D.*,
    527 F.3d 674 (8th Cir. 2008) ............................................................................ 17

*Headley v. Bacon*,
    828 F.2d 1272 (8th Cir. 1987) .......................................................................... 18

*Janus v. AFSCME, Council 31*,
    585 U.S. 878 (2018) .............................................................................. 1, 2, 3, 4

*Lundquist v. Rice Mem'l Hosp.*,
    238 F.3d 975 (8th Cir. 2001) ............................................................................ 17

*Midwest Disability Initiative v. JANS Enters., Inc.*,
    929 F.3d 603 (8th Cir. 2019) ............................................................................ 17

*Minnesota State Bd. for Cmty. Colleges v. Knight*,
    465 U.S. 271 (1984) ............................................................................................ 4

*Monahan v. New York City Dep't of Corr.*,
    214 F.3d 275 (2d Cir. 2000) ............................................................................. 17

*Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*,
    53 F.4th 869 (5th Cir. 2022) .............................................................................. 7

*Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc.*,
    259 F.3d 949 (8th Cir. 2001) ............................................................................ 19

*North Carolina State Bd. Of Dental Examiners v. FTC*,
    574 U.S. 494 (2015) ..................................................................................... 10, 12

*Pacific Gas & Electricity v. Public Utilities Commission of California*,
475 U.S. 1 (1986) ................................................................................. 3

*Parker v. Brown*,
317 U.S. 341 (1943) ......................................................................... 8, 12

*Pie Dev., L.L.C. v. Pie Carrier Holdings, Inc.*,
128 F.4th 657 (5th Cir. 2025) ............................................................ 19

*Powers v. St. Louis Typographical Union No. 8*,
549 F.2d 60 (8th Cir. 1977) ............................................................... 19

*Rest. L. Ctr. v. City of New York*,
90 F.4th 101 (2d Cir. 2024) ............................................................... 14

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .......................................................................... 2, 3

*School of the Ozarks, Inc. v. Biden*,
41 F.4th 992 (8th Cir. 2022) ............................................................. 16

*Steele v. Louisiana & Nashville RR. Co.*,
323 U.S. 192 (1944) ............................................................................ 4

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) ............................................................................ 7

*In re SuperValu, Inc.*,
870 F.3d 763 (8th Cir. 2017) ............................................................ 16

*Taylor v. Sturgell*,
553 U.S. 880 (2008) .......................................................................... 19

*Thunderbird Mining Co. v. Ventura*,
138 F.Supp.2d 1193 (D. Minn. 2001) ............................................... 15

*Tumey v. Ohio*,
273 U.S. 510 (1927) ............................................................................ 6

*United States v. Maull*,
855 F.2d 514 (8th Cir. 1988) ............................................................ 19

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001) ............................................................................ 3

iv

*Yankton Sioux Tribe v. DHS.*,
  533 F.3d 634 (8th Cir. 2008) ...................................................................... 15

**Statutes**

29 U.S.C.

  §159 .................................................................................................................. 4
  §3111 ................................................................................................................ 4

40 U.S.C.

  §3704(d) ........................................................................................................... 4

Minn. Stat.

  §148.191, subd. 2 ............................................................................................ 5
  §150A.04 ........................................................................................................... 5
  §§181.211-.217 ............................................................................................... 13
  §181.212, subd. 1 ............................................................................................ 3
  §181.212, subd. 7 .......................................................................................... 13
  §181.213 ............................................................................................................ 4
  §181.213, subd. 1 ............................................................................................ 9
  §326B.435 ........................................................................................................ 5
  §626.843 subd. 1 ............................................................................................. 5

N.Y. Lab. Law

  §655 ................................................................................................................... 5

**INTRODUCTION**

In an unsuccessful attempt to defend their implausible legal theories, Plaintiffs mischaracterize both the Act and applicable legal precedent. The Court should dismiss Plaintiffs' Complaint.

Initially, no authority supports Plaintiffs' claim that the Act infringes nursing home employers' First Amendment rights. Board members who are appointed from particular constituencies are not exclusive representatives as that term is used in *Janus v. AFSCME, Council 31*, 585 U.S. 878 (2018). Employers remain free to express their own views to the Board and associate with whomever they wish, and reasonable outsiders would not believe that all individual employers necessarily agree with Board Members' expressive activity. In any event, *Janus* did not hold that exclusive representation in collective bargaining compels or restrains expressive association, and every court to consider that argument since *Janus*—and there have been many (including the Eighth Circuit)—has rejected it. *See, e.g.*, *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018).

Plaintiffs' due process and antitrust claims necessarily fail because by statute the Board is controlled by its three full-time government official members. No action can be taken without the affirmative vote of a majority of these government officials. Plaintiffs complain that, so far, the government officials have voted for proposals made by the labor representatives. But the substantive choices of the Board members are irrelevant to the legal analysis. What matters for due process and antitrust purposes is that full-time government officials must and did affirmatively approve the actions at issue.

Plaintiffs' NLRA preemption claims cannot outrun decades of caselaw holding that the NLRA does not preempt state minimum labor standards like those issued by the Board. The Supreme Court has soundly rejected Plaintiffs' argument that Congress

1

intended to preempt minimum standards because they may provide more favorable background bargaining conditions for labor or management. Plaintiffs also mischaracterize the Act as establishing an alternative forum for collective bargaining. The Board is an administrative body charged with adopting industrywide minimum employment standards pursuant to legislative direction, not a forum for collective bargaining.

Finally, the Association Plaintiffs' claims are barred by res judicata. These Plaintiffs could have raised the same structural constitutional claims presented in this case in *LeadingAge I*, so they cannot raise them in this case. Indeed, the Board's wage standards and training requirements were adopted before Association Plaintiffs filed *LeadingAge I*. Plaintiffs' efforts to articulate new supposed harms and to name different government official defendants does not allow them to evade the preclusion of these claims.

For all of these reasons, the Court should dismiss Plaintiffs' claims.

## ARGUMENT

### A. The Act does not violate the First Amendment.

Plaintiffs' First Amendment arguments rely on their misconstruction of the Act and of *Janus*, 585 U.S. at 878.

The Act does not require Plaintiffs to do or say anything or prevent them from expressing their own message, whether individually or through groups of their own choosing. Nor would reasonable outsiders believe that Plaintiffs necessarily agree with expressive activity by employer representatives who were appointed by the Governor. Therefore, the Act does not compel speech or expressive association. Plaintiffs' "attempt[] to stretch a number of First Amendment doctrines well beyond the sort of

2

activities these doctrines protect" should be rejected. *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 70 (2006) (rejecting claims of compelled speech and association).

*Janus*'s holding was limited: that requiring public employees to *pay fees* to their exclusive bargaining representative impermissibly compelled subsidization of private speech. *See* 585 U.S. at 894-95; *Bierman*, 900 F.3d at 574. That holding is not implicated here because the Act does not require Plaintiffs to subsidize any speech.[1]

Plaintiffs rely on a single sentence of dicta in *Janus* to argue that exclusive representation, even without fees, is an impingement on associational rights. Opp. 6-7. But the Act does not establish "exclusive representation" in any sense, let alone as that term is used in *Janus*. Plaintiffs are free to express their own views to the Board, whereas the existence of an exclusive bargaining representative prevents individual workers from negotiating their own employment contracts. *See Janus,* 585 U.S. at 887 ("Designating a union as the employees' exclusive representative substantially restricts the rights of individual employees.").

The Governor's appointment of three Board members "who represent nursing home employers or employer organizations," Minn. Stat. §181.212, subd. 1, means only that those Board members should be current or former employees or agents of employers or employer organizations. *See Represent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/represent (last visited May 1, 2026). It does not restrict or compel

---

[1] In *Pacific Gas & Electricity v. Public Utilities Commission of California*, 475 U.S. 1, 6-7, 12-18 (1986) (cited in Opp. 9), the plaintiff was forced to disseminate the speech of its political opponent. In *United States v. United Foods, Inc.*, 533 U.S. 405, 408-09, 410 (2001) (cited in Opp. 9-10), the plaintiff had to pay to disseminate an unwanted message.

any speech by nursing home employers on matters addressed by the Board or on any other matters. Insofar as Plaintiffs' First Amendment rights are concerned, the appointment of three employer representatives as Board members is no different than if the Governor appointed them to an advisory group. *See, e.g.*, 40 U.S.C. §3704(d) (creating federal Advisory Committee on Construction Safety and Health and directing Secretary of Labor to appoint members "representative of contractors" and members "representative of employees primarily in the building trades"); 29 U.S.C. §3111 (providing for every state to have a workforce development board that includes "representatives of businesses" appointed by the governor).[2]

Finally, even if the Act were viewed as establishing a structure analogous to exclusive representative collective bargaining (notwithstanding the absence of exclusivity or bargaining or representation in the sense of a legal duty to represent), the single sentence from *Janus* that Plaintiffs rely upon was dicta that does not bear the weight that Plaintiffs try to place on it. The Eighth Circuit has held that *Janus* left undisturbed controlling precedent holding that exclusive representative collective bargaining does not compel expressive association or otherwise violate the First Amendment. *See Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 288 (1984) (holding that designation of a union representative for community college instructors "in no way restrained [instructors] … freedom to associate or not to associate with whom they please, including the exclusive representative"); *Bierman*, 900 F.3d at 574 (holding that,

---

[2] Indeed, once they are appointed, the Act obligates every Board member to "adopt rules establishing minimum nursing home employment standards that are reasonably necessary and appropriate to protect the health and welfare of nursing home workers." Minn. Stat. §181.213. By contrast, a union that serves as exclusive representative has a legal duty to represent its bargaining unit workers. 29 U.S.C. §159; *Steele v. Louisiana & Nashville RR. Co.*, 323 U.S. 192 (1944).

4

notwithstanding the sentence of dicta in *Janus* that Plaintiffs rely upon*,* First Amendment challenges to exclusive representative bargaining are "foreclosed by *Knight*"); s*ee also Goldstein v. Prof. Staff Cong./CUNY*, 96 F.4th 345, 347, 351 (2d Cir. 2024), *cert. denied*, 145 S.Ct. 1044 (2025) (collecting post-*Janus* cases that uniformly reject First Amendment challenges to exclusive representative bargaining).

It also bears emphasis that Plaintiffs' theory that the First Amendment precludes the appointment of industry representatives to a government board would doom other industry standards boards in Minnesota (and elsewhere).[3] Plaintiffs urge that the Board is unique because it can issue wage standards and certify training organizations, but provide no cogent reason why that matters for First Amendment purposes. Opp. 13. Moreover, other boards also have the power to certify training and educational institutions to provide required training. *See, e.g.*, Minn. Stat. §626.843, subd. 1 (authority of the Board of Peace Officer Standards and Training to certify training programs for Minnesota State Patrol officers). Plaintiffs' First Amendment theory also would doom every tripartite board that sets industry standards, even though such boards are used in other states and have long historical precedents. *See* SEIU Br. 3 n.1; *Cal. Lab. Fed'n v. Indus. Welfare Com.*, 63 Cal.App.4th 982, 986 (1998) (wage board with members from labor, employers, and the general public established in 1913); N.Y. Lab. Law §655 (1960 grant of authority to labor commissioner to convene wage boards composed of members from

---

[3] *See, e.g.,* Board of Peace Officer Standards and Training, Minn. Stat. §626.843 subd. 1 (authority to issue standards relating to approved educational institutions, standards of conduct, citizenship requirements for officers); Plumbing Board, *id.* §326B.435 subd. 2 (authority to adopt a mandatory Plumbing Code and regulate the licensure and certification of plumbers); Board of Nursing, *id.* §148.191 subd. 2 (power to set rules for education and licensure of nurses); and Board of Dentistry, *id.* §150A.04 (authority to promulgate rules, including educational and training requirements).

labor, employers, and the public). Plaintiffs proffer no authority that even questions the structure of such boards on First Amendment grounds.

### B. The Act does not violate due process.

Plaintiffs' argument that the Board's structure violates their due process rights misstates the relevant legal tests.

First, Plaintiffs incorrectly extrapolate from a line of cases requiring adjudicators to be economically disinterested to apply the same rule to legislative or quasi-legislative action. *See* Opp. 21-22 (citing *Tumey v. Ohio*, 273 U.S. 510, 514-22, 532 (1927) (judge adjudicating criminal trial may not have economic stake in outcome); *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (violation of due process for biased state optometry board to act as adjudicator)). As previously explained, this line of cases is wholly inapplicable because there is no due process right to be heard before legislative action, and the remedy for alleged bias among lawmakers is political. *See, e.g.*, *Bi-Metallic Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) ("The[] rights [of individuals subject to general laws] are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.").

Indeed, the Supreme Court has rejected an attempt to extend to regulators its due process holdings about disinterested adjudicators, in *Friedman v. Rogers,* 440 U.S. 1 (1979). Contrary to Plaintiffs' contention otherwise, Opp. 25, the challenge in *Friedman* was substantially the same as Plaintiffs': The *Friedman* plaintiff argued that an industry standards board's issuance of regulations violated his due process rights. The Supreme Court dismissed the challenge because the alleged bias related to the issuance of regulations and "[did] not arise from any disciplinary proceeding against [the plaintiff]." *Friedman*, 440 U.S. at 19 (distinguishing *Gibson*).

6

Plaintiffs' second due process argument relies on a different line of authorities about the wholesale delegation to interested private actors of legislative authority to regulate industry. Opp. 19 (citing *Carter v. Carter Coal Co.,* 298 U.S. 238 (1936)). But that authority does not help Plaintiffs either, because full-time government officials serve on the Board and must approve Board actions. *See FCC v. Consumers' Research*, 606 U.S. 656, 695 (2025) (rejecting the same argument).

That the U.S. Constitution allows private parties to participate in the making of regulations, so long as public actors can approve or reject their proposals, has been the rule since at least *Sunshine Anthracite Coal Co. v. Adkins*, which held it constitutional to delegate authority to private actors to determine industry standards so long as the government retains authority to "approve[]" or "disapprove[]" the standards. 310 U.S. 381, 388 (1940); *see also Nat'l Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 887, 881 & n.21 (5th Cir. 2022) (collecting cases for the same point).

Plaintiffs do not argue that the Board's full-time government officials lack sufficient supervisory authority. They instead contend that, in practice, the government officials "rubber stamp" proposals by employee representatives. Opp. 18, 25, 27. But Plaintiffs offer no response to the Supreme Court's rejection of this exact argument in *FCC v. Consumers' Research*, 606 U.S. at 695. The Court upheld the delegation of authority by an agency to a private corporation because the agency retained the power to approve or disprove the corporation's recommendations *despite* the plaintiff's argument that the agency approval amounted to "'rubber-stamping.'" *Id.* at 692, 695 (cleaned up). The Court explained: "[T]he relevant legal question is not how often the FCC revises the [corporation's suggestions], just as in *Sunshine Anthracite* it was not how often the agency rejected the coal companies' pricing advice." *Id.* at 695. Rather, "[i]t is sufficient

7

in such schemes that the private party's recommendations (as is true here) cannot go into effect without an agency's say-so, regardless of how freely given." *Id.*

Finally, while the Court need not reach this issue, Plaintiffs offer no response to the critical distinction between the industry board members here—appointed to a public body and bound by a statutory duty—and the purely private actors in *Carter Coal* and other cases on which Plaintiffs rely. *See* SEIU Br. 17-18.

## C. The Act is not preempted by federal antitrust laws.

Plaintiffs are unable to identify a single case in which regulations issued by a government board, which can be adopted only by the affirmative vote of full-time government officials who serve as board members, were not treated as "state action" exempt from federal antitrust laws. Even if the issue were analyzed as whether the government "actively supervises" private actors, moreover, the Board's structure easily qualifies because full-time government officials are members of the Board, the other Board members represent competing interests, and the government officials must affirmatively approve any regulations. Indeed, Plaintiffs acknowledge that, unlike in the cases they rely upon, there are disputes among the Board members who are not full-time governmental officials (as is commonplace with a tripartite structure), so the government officials have the benefit of competing views before making a decision.

Plaintiffs do not dispute that the three full-time government official Board members cast affirmative votes in favor of the standards that are the subject of their antitrust challenge. *See* Complaint ¶¶42-43; Opp. 30. Plaintiffs' response is that the government officials "rubber stamped" what unions proposed, Complaint ¶¶40, 86,[4] but

---

[4] *See also* Opp. 29-30. Plaintiffs also appear to find it significant that the proposals "originated" with the worker representatives (*see*, *e.g.*, Complaint ¶¶40, 42; Opp. 28, 31), but it is often the case that proposals are made by private parties, including for state

that is just another way of saying that the government officials voted with the labor representatives rather than the employer representatives in the short time the Board has existed. The conclusory assertion that because the government official Board members agreed with the worker representatives they were "rubberstamping" is insufficient to plausibly plead that the government officials are failing to perform their statutory duty to adopt regulations that, in their independent judgment, "are reasonably necessary and appropriate to protect the health and welfare of nursing home workers." Minn. Stat. §181.213, subd. 1. There are legislators who consistently vote to support industry proposals and appellate judges whose votes are predicable in politically charged cases; their voting record does not show they are failing to do their jobs.

Plaintiffs do not contest that their argument rests on *FTC v. Ticor Title*'s disapproval of two states' systems in which government officials had a passive veto authority over the actions of industry actors—*not* an active role where private parties represent different interests and government officials must cast affirmative votes for or against any proposal. Indeed, the Supreme Court was explicit that its holding applied to "negative option" systems in which the state only has a veto right:

> Where prices or rates are *set as an initial matter by private parties*, *subject only to a veto if the State chooses to exercise it*, the party claiming the immunity must show that state officials have undertaken the necessary steps to determine the specifics of the price-fixing or ratesetting scheme. The mere potential for state supervision is not an adequate substitute for a decision by the State.

---

legislation, and not an antitrust problem. *See*, *e.g.*, *Parker v. Brown*, 317 U.S. 341, 351 (1943) (noting that program was proposed by producers but adopted by state commission).

504 U.S. 621, 638 (1992) (emphasis added). Here, of course, private parties did not get to "set" anything "as an initial matter" and government representatives' role went beyond "mere potential for state supervision" and actually involved "a decision by the State," *id.*: The state officials affirmatively voted for the relevant standards. There is no allegation that, for example, the government officials gave their proxy to worker representatives or that they were assumed to vote to approve a standard as long as they did not vote against it. The Complaint acknowledges that the government officials attended the hearings and cast votes in favor of the proposals, rendering *Ticor Title's* holding inapplicable. *See also* SEIU Br. 5 n.3 (citing Board meeting minutes demonstrating participation in discussions).

In *Ticor Title* itself, the Supreme Court did not ask whether the relevant state officials had ever disapproved a rate "set as an initial matter by private parties"; rather, the Court examined only whether the state officials had reviewed the rates or, instead, had passively allowed them to take effect. *See* 504 U.S. at 638 (explaining that "rates became effective unless they were rejected within a set time" and that "at most the rate filings were checked for mathematical accuracy" while "[s]ome were unchecked altogether").[5] Indeed, *Ticor Title* was explicit in warning that the active supervision requirement does not authorize review of the substance or wisdom of state officials' decisions, explaining that its "purpose … is not to determine whether the State has met

---

[5] In *Ticor Title,* the two states' failure to exercise their review and veto rights was apparent. "In Wisconsin the State Insurance Commissioner is required to examine the rating bureau at regular intervals and authorized to reject rates through a process of hearings. Neither has been done." *Id.* at 630. "In Montana … a representative of the rating bureau … was told that the filed rates could go into immediate effect though further profit data would have to be provided. The ALJ found no evidence that the additional data were furnished." *Id.*

some normative standard … in its regulatory practices." 504 U.S. at 634; *see also id.* at 635 ("The question is not how well state regulation works but whether the anticompetitive scheme is the State's own."); *North Carolina State Bd. Of Dental Examiners v. FTC*, 574 U.S. 494, 506 (2015) ("The question is not whether the challenged conduct is efficient, well-functioning, or wise.").[6] By asking this Court to rule that the government officials' allegedly consistent agreement with the Board's worker representatives (rather than the employer representatives) shows they must not be using independent judgment, Plaintiffs request exactly the second-guessing that *Ticor Title* warns against.[7]

Indeed, Plaintiffs do not explain how their rule could possibly work in practice—if the full-time government officials were to vote in favor of an employer proposal next month, would that be just "rubber stamping" also? Just as the conspiracy exception that

---

[6] *Dental Examiners*' reference to a "'realistic assurance'" that a nonsovereign actor's anticompetitive conduct 'promotes state policy, rather than merely the party's individual interests,'" 574 U.S. at 515 (quoted in Opp. 29), did not imply that a state must adopt a particular standard of substantive review. Rather, it immediately preceded this:

> The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy; and the mere potential for state supervision is not an adequate substitute for a decision by the State. Further, the state supervisor may not itself be an active market participant.

*Id.* at 515 (internal quotations and citations omitted).

[7] Similarly, while it is not alleged in their complaint, Plaintiffs' assertion that the minutes show Board members approved wage standards without adequate research into compliance costs and despite the mandated wage exceeding that required by Minneapolis, Opp. 29-30, at most sheds light on Board decisions' wisdom, not their lawfulness. The Board, moreover, received a detailed staff memorandum analyzing the wage proposal. *See* Doc. 9-1 at ECF p. 332.

11

was considered and rejected in *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 375 (1991) "would virtually swallow up the *Parker* rule" because "it is both inevitable and desirable that public officials often agree to do what one or another group of private citizens urges upon them," so too would Plaintiffs' proposed rule. Principles of federalism and separation of powers weigh strongly against interpreting federal antitrust statutes to permit judicial inquiry into whether state officials who attended a meeting, had the opportunity to hear competing views, and affirmatively voted for a regulation, believed that regulation serves the state's interests.

Plaintiffs misstate the holdings of pre-*Ticor Title* cases. Plaintiffs contend that, as in *California Retail Liquor Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980), the state here "'simply authorized' the minimum wages proposed by the union representatives." Opp. 30; *see also* Opp. 27-28. But in *Midcal*, unlike here, the state did *not* review or approve the prices. 445 U.S. at 105-06; *see also id.* at 100 ("The State … does not review the reasonableness of the prices set by wine dealers.").[8] Plaintiffs further contend that *Parker v. Brown*, 317 U.S. 341, 351-52 (1943), deemed it irrelevant that "the government representatives blessed the violation of the Sherman Act." Opp. 28. But *Parker* held merely that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Id.* at 351. No such claim of immunity is made here—Minnesota is not authorizing private parties to violate the antitrust laws but rather, as in *Parker*, Minnesota is providing for government officials to review and then approve or reject proposals to make them the state's own.

---

[8] It was in this context that *Midcal* observed that the state did not "engage in any 'pointed reexamination' of the program." *See id.* at 106.

12

Finally, in countering SEIU Minnesota's argument that even if the Act did not require the affirmative vote of two of the three government officials it would still survive antitrust scrutiny, Opp. 31-32, Plaintiffs ignore the critical distinction between this case and the case they rely upon: In *Dental Examiners*, the overwhelming majority of the members of the state commission were licensed dentists who shared the same interest in excluding unlicensed dentists from certain (teeth-whitening) procedures. 574 U.S. at 499. Here, the private individuals on the Board are equally split between employee and employer representatives with contrary interests, so neither side controls the Board. This structure makes inapplicable the Supreme Court's "hold[ing] … that a state board on which a *controlling number* of decisionmakers are active market participants *in the occupation the board regulates,*" must satisfy the active supervision requirement. *Id.* at 511-12 (emphases added).

### D. The Act is not preempted by the NLRA.

Plaintiffs' *Garmon* claim rests on the faulty premise that the Board is a forum for collective bargaining. Opp. 32-37. The Act contains no provision for nursing home employers and unions to bargain and reach agreement on contracts. *See* Minn. Stat. §§181.211-.217. Rather, the Board is an administrative body charged with adopting generally applicable minimum employment standards pursuant to legislative direction. *Id.* §§181.212-.213; SEIU Br. 2-5. The Board is controlled by full-time government officials; no action can be taken without their affirmative, majority vote. Minn. Stat. §181.212, subd. 7. Nursing home employers and unions remain free to collectively bargain contracts against the backdrop of whatever minimum employment standards the Board adopts, *id.* §181.213, subd. 6, as with all other minimum employment standards. Plaintiffs' *Garmon* claim therefore fails.

13

Plaintiffs' *Machinists* claim fares no better. As Plaintiffs concede, courts "have repeatedly held" that minimum employment standards like those set by the Board are not *Machinists* preempted. Opp. 34. This is because the NLRA is concerned primarily with establishing an "equitable bargaining process," not the "substantive terms" or outcome of bargaining. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20-21 (1987). State standards setting minimum working conditions merely "form a 'backdrop' for [those] negotiations." *Id.* at 21 (quotation omitted).

Plaintiffs nonetheless ask this Court to disregard 40 years of settled law to hold that the Act is *Machinists* preempted because the Board's standards improve employees' substantive working conditions. Opp. 39; *see* SEIU Br. 28-29 (collecting cases). That is not enough to establish preemption. *See Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 112 (2d Cir. 2024) ("the Second Circuit has never applied *Machinists* to invalidate a law regulating the substance, rather than the process, of labor negotiations"); *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016) ("state action that intrudes on the mechanics of collective bargaining is preempted, but state action that sets the stage for such bargaining is not").

Accepting Plaintiffs' argument would mean that *every* state minimum employment standard is preempted, because every standard can be viewed as establishing favorable background conditions for either employees or employers. *See Fort Halifax*, 482 U.S. at 21 ("[b]oth employers and employees come to the bargaining table with rights under state law"); *Am. Hotel & Lodging Ass'n*, 834 F.3d at 963 ("[m]inimum labor standards … may impact labor or management unequally"; for instance, "at-will employment may favor employers over employees"). Similarly, every new employment standard will impose

14

terms that are different from those in at least some existing collective bargaining agreements. *See* Opp 41.

Plaintiffs contend that cases about minimum employment standards are distinguishable because they do not involve standards issued by a board that includes government, employer, and employee members. Opp. 41. But they do not explain why the structure of the Board would matter for *Machinists* preemption, such that the same minimum wage requirements would be valid if adopted by a legislature but not by the Board. *Machinists* preemption looks to whether the law is regulating in an area that Congress, in adopting the NLRA, intended to leave unregulated and "controlled by the free play of economic forces." *Emps. Ass'n, Inc. v. United Steelworkers of Am.*, 32 F.3d 1297, 1300 (8th Cir. 1994) (quotation omitted). Minimum labor standards, regardless of how they are established, do not regulate in such an area.[9]

### E. Association Plaintiffs' claims are barred by claim preclusion.

#### 1. Association Plaintiffs could have brought these claims in LeadingAge I.

Plaintiffs' claims in this case challenge the Act's establishment of the Board to issue minimum employment standards. Complaint ¶¶9-12. Plaintiffs allege that the Board's "structure" is unconstitutional and preempted and, therefore, *all* Board standards are unlawful. *Id.* ¶¶1-2, 6, 8, 15 & Prayer for Relief ¶¶b, c. Association Plaintiffs provide no persuasive reason why they could not have raised those theories in *LeadingAge I.*

---

[9] Plaintiffs' authorities are inapposite because, unlike the Act, they concerned state interference with the bargaining process and its economic weapons. *See Emps. Ass'n*, 32 F.3d at 1298 (state law prohibiting employers from hiring replacements during a strike); *520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1121 (7th Cir. 2008) (state law passed in the middle of a bargaining dispute); *Thunderbird Mining Co. v. Ventura*, 138 F.Supp.2d 1193, 1198-200 (D. Minn. 2001) (state law enabling employees to withhold state funding from their employers).

15

Their theories that the Board's structure is unlawful are independent of any facts or actions post-dating the *LeadingAge I* complaint and would have been grounds to invalidate the holiday pay standard.[10] Thus, Association Plaintiffs are precluded from asserting these claims in this lawsuit. *See Yankton Sioux Tribe v. DHS.*, 533 F.3d 634, 640 (8th Cir. 2008) (claim preclusion applies "not only as to every matter which was offered and received to sustain … the claim [in the first action], but as to any other admissible matter which might have been offered for that purpose") (quotation omitted).

Association Plaintiffs' contention that some of their members only recently incurred harm, Opp. 49, does not help them avoid claim preclusion. Association Plaintiffs could have raised their structural challenges in *LeadingAge I* because other members were affected by the holiday pay standards. Equally to the point, even if one looked to harm only from the adoption of the wage standards and training requirements, the Board had already adopted these standards before *LeadingAge I* was filed. SEIU Br. 13. Association Plaintiffs are wrong that they "had to suffer harm *before* suing to seek relief." Opp. 49 (emphasis added). Standing and ripeness are established so long as "there is a substantial risk that the harm will occur." *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017) (quotation omitted); *School of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 997 (8th Cir. 2022). At the time of *LeadingAge I,* there was a substantial risk that Association Plaintiffs' members would have to comply with the wage/training requirements.[11]

---

[10] Plaintiffs' purported instances of government official Board members "rubber stamping" worker representatives' proposals all pre-date the filing of the *LeadingAge I* complaint. Opp. 16-17, 29-30, 40.

[11] Plaintiffs' *current* standing to challenge the wage standards depends on the risk of future harm. The wage standards are not in effect and cannot become effective without CMS approval. SEIU Br. 34. Plaintiffs contend they are taking actions in anticipation of compliance, but "Plaintiffs cannot manufacture standing by voluntarily incurring costs." *Bost v. Illinois State Bd. of Elections*, 146 S.Ct. 513, 522 (2026) (quotation omitted).

Taking Plaintiffs' own legal arguments at face value, moreover, the Act and Board inherently inflicted "irreparable constitutional harm" on all Association Plaintiffs' members' First Amendment, due process, and other constitutional rights by forcing them to associate with and be regulated by the Board. Opp. 42; PI Br. 50-51; Complaint ¶¶14, 61- 62, 69. Any such purported harms existed at the time of the *LeadingAge I* complaint.

Association Plaintiffs also fail to identify any decision holding that claim preclusion is inapplicable when a party asserts "new harms arising after the filing of the first lawsuit." Opp. 55. The cases they cite state only that preclusion "does not apply to claims that did not exist when the first suit was filed." *Lundquist v. Rice Mem'l Hosp.,* 238 F.3d 975, 977 (8th Cir. 2001). Nor can Association Plaintiffs avoid claim preclusion by arguing they seek "different relief." Opp. 57. *See Hanig v. City of Winner, S.D.,* 527 F.3d 674, 677 (8th Cir. 2008) (plaintiff could not split claims by seeking different relief); *Midwest Disability Initiative v. JANS Enters., Inc.*, 929 F.3d 603, 607-08 (8th Cir. 2019) (new injuries from actions challenged in first lawsuit did not bar preclusion); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 293 (2d Cir. 2000) ("the mere assertion of new incidents arising from the application of the challenged policy is insufficient to bar … *res judicata*").

Finally, the only after-arising Board action Plaintiffs identify is the certification of training organizations by unanimous vote (including employers). Opp. 49-50; SEIU Br. 7. Plaintiffs do not raise any challenge specific to that certification; they simply rely on their generic due process challenge to the structure of the Board itself. Opp. 49. Plaintiffs also

---

"They must incur those costs to mitigate or avoid a substantial risk of … harm." *Id.* (quotation omitted). If, as Association Plaintiffs contend, standing/ripeness based on the wage standards did not exist at the time of *LeadingAge I*, they would not exist now, so this case would have to be dismissed for lack of jurisdiction.

17

insist Yona's claims are not precluded, Opp. 50-51, but that does not save Association Plaintiffs' claims.

### 2. Association Plaintiffs cannot circumvent claim preclusion by suing Board member Gulley.

Association Plaintiffs' strategy to name Gulley as a Defendant does not avoid the same claim preclusion that applies to their claims against Defendant Blissenbach (the main defendant in *LeadingAge I*). Plaintiffs bring exactly the same claims—facial challenges to the Act—against Blissenbach and Gulley. Plaintiffs could obtain all the relief they seek by enjoining Blissenbach, in in her capacity as Commissioner, from enforcing any Board standards. Complaint at 44. Defendant Gulley is superfluous.

Plaintiffs' arguments that Gulley has "diverging interests" from those of Blissenbach in *LeadingAge I* also depend on mischaracterizing Gulley as a "private actor." Opp. 60. As relevant here, Gulley was appointed by the Governor to a state administrative board. Plaintiffs have sued him in his "official capacity" as a Board member. Complaint at 1-2. Cases holding that government officials sued in their *individual* capacities are not bound by judgments for or against their government employers are inapposite. *See Headley v. Bacon*, 828 F.2d 1272, 1279 (8th Cir. 1987).

Even if Gulley and Blissenbach have different policy views about the substance of employment standards, *see* Opp. 60, they have the same interests in defending the constitutionality of the Act in their official capacities, and they are represented together by the Minnesota Attorney General. *Cf. Headley*, 828 F.2d at 1279 (parties' interests diverged because they had incentives to take different positions in their lawsuits). As such, Association Plaintiffs cannot avoid claim preclusion simply by naming an additional Board member as an official-capacity defendant in a challenge to the Act.

18

### 3. *LeadingAge I* is a final decision on the merits.

It is beyond dispute that *LeadingAge I*'s "dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a 'judgment on the merits.'" *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981) (quotation omitted). That dismissal was also final—especially given that Plaintiffs appealed that dismissal as a final decision. *See Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc.*, 259 F.3d 949, 952 (8th Cir. 2001) (a dismissal without prejudice is a final, appealable decision); *Graham v. Mentor Worldwide LLC*, 998 F.3d 800, 804 (8th Cir. 2021) (same); *Pie Dev., L.L.C. v. Pie Carrier Holdings, Inc.*, 128 F.4th 657, 662 (5th Cir. 2025) (applying claim preclusion because "[t]he judgment dismissing the claims … without prejudice was indisputably final. [The plaintiff] admitted as much when it appealed that judgment, expressly invoking our appellate jurisdiction from '*final* decisions of the district courts'") (quoting 28 U.S.C. §1291) (emphasis in original); *United States v. Maull*, 855 F.2d 514, 516 n.3 (8th Cir. 1988) (claim preclusion applies to Rule 12(b)(6) dismissal "unless the plaintiff is granted leave to amend or the dismissal is reversed on appeal"). Although some cases that have held a dismissal without prejudice does not implicate claim preclusion, in those cases the decision dismissing the first case *did not reach the merits* of the claims but turned on other issues—unlike here. *See Powers v. St. Louis Typographical Union No. 8*, 549 F.2d 60, 61 (8th Cir. 1977) (first case dismissed for lack of jurisdiction).

Claim preclusion "protect[s] against the expense and vexation attending multiple lawsuits, conserve[s] judicial resources, and … minimize[es] the possibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (cleaned up). Remarkably, Association Plaintiffs assert that *LeadingAge I*'s dismissal without prejudice

19

means that not only can they bring this second case, but even if the Eighth Circuit affirms *LeadingAge I*, they can "re-file" their dismissed *LeadingAge I* legal theories in a *third* case. Opp. 64-65. Such serial litigation is what claim preclusion is intended to prevent.

## **CONCLUSION**

State Defendants' motion to dismiss should be granted.

Dated: May 8, 2026                    Respectfully submitted,

*/s/ Stacey M. Leyton*
Scott A. Kronland (CA Bar #171693)*
Stacey M. Leyton (CA Bar #203827)*
Barbara J. Chisholm (CA Bar #224656)*
Corinne F. Johnson (CA Bar #287385)*
Katherine G. Bass (CA Bar #344748)*
Altshuler Berzon LLP
177 Post St., Ste. 300
San Francisco, CA 94108
(415) 421-7151
skronland@altshulerberzon.com
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
cjohnson@altshulerberzon.com
kbass@altshulerberzon.com

*Pro hac vice granted*

Justin D. Cummins, #276248
Cummins & Cummins, LLP
920 Second Avenue South, Suite 1245
Minneapolis, MN 55402
(612) 465-0108
justin@cummins-law.com

***Attorneys For Intervenor SEIU Minnesota***

20