**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

LEADINGAGE MINNESOTA, CARE PROVIDERS OF MINNESOTA, and YONA NORTHSTAR LLC,

Plaintiffs,

v.

NICOLE BLISSENBACH, in her official capacity as the Commissioner of the Minnesota Department of Labor and Industry and as a member of the Minnesota Nursing Home Workforce Standards Board, and JAMIE GULLEY, in his official capacity as a member and chairperson of the Minnesota Nursing Home Workforce Standards Board,

Defendants.

Case No. 26-CV-1816 (NEB/DJF)

ORDER ON MOTION TO DISMISS AND MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs contend that the Minnesota Nursing Home Workforce Standards Board is unconstitutional and preempted by federal law. The Court disagrees, so the Court grants the Board's motion to dismiss and denies Plaintiffs' motion for preliminary injunction.

**BACKGROUND**

The Board establishes minimum nursing home employment standards. Minn. Stat. § 181.213, subdiv. 1(a). The Board has nine members. First, the agency members: three state agency officials (the Commissioners of the Department of Human Services, the Department of Health, and the Department of Labor and Industry). Second, the

appointed members: three representatives of nursing home employers or employer organizations and three representatives of nursing home workers or worker organizations, all appointed by the Governor. § 181.212, subdivs. 1(a), 2(b).

Any measure needs five total affirmative votes to pass, and two affirmative votes from agency members. § 181.212 subdiv. 7. The Board has recently taken several actions, including increasing the minimum wage and establishing a training program. *See* § 181.213 subdiv. 1(b).

Plaintiffs challenge the Board's structure: They assert First Amendment, due process, and preemption claims. (ECF No. 9.) Plaintiffs move for a preliminary injunction. (ECF No. 3.) The Board moves to dismiss. (ECF No. 32.)

**ANALYSIS**

The Court starts and ends with the motion to dismiss. To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When reviewing a Rule 12(b)(6) motion, a court must "tak[e] all facts alleged in the complaint as true, and mak[e] reasonable inferences in favor of the nonmoving party." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014).

**I. First Amendment**

The freedom to associate is "an indispensable means of preserving other individual liberties," including the right to speak, assemble, and worship. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). That freedom includes the freedom not to associate. *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018). According to Plaintiffs, the Board

violates Plaintiffs' freedom to associate because employer groups are forced into an exclusive representative relationship with the appointed members of the Board.

The Court disagrees; Plaintiffs remain free to associate and voice their views of the Board and its actions. *See Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018). Plaintiffs analogize to the union context: As with unions, the appointed members are exclusive representatives for employers because they speak for all employers, regardless of the employers' preferences. (ECF No. 5 at 26.) This analogy fails. The Board is not a union; the appointed members do not speak for all employers; and any representative relationship is not exclusive because employers remain free to share their thoughts with the Board through comments and public meetings. *See* Minn. Stat. § 181.212, subdivs. 6, 8; *see also* Minn. Stat. § 14.389. This scheme does not repress Plaintiffs' right to associate.

Moreover, even if the appointed members were exclusive representatives for employers, that would still be constitutional because the government may choose to listen to only an exclusive representative. *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 285 (1984) (explaining that "the state must be free to consult or not to consult whomever it pleases," even an exclusive representative). That choice does not violate the freedom of association when, as here, others remain free to speak. *Id.* at 288–89; *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018).

*Janus*, decided in 2018, does not alter the Court's reasoning. Under *Janus*, non-union members cannot be forced to pay union fees. 585 U.S. at 884–85. *Janus* is inapplicable because the Board does not collect fees or require contribution to a fund. *Bierman*, 900 F.3d at 574. Although *Janus* characterized an exclusive bargaining agent as "a significant impingement on associational freedoms that would not be tolerated in other contexts," 585 U.S. at 916, the potentially troubling aspects of exclusive

representation, as contemplated by *Janus*, are not present here: Employers who disagree with someone on the Board may speak out for other standards. *Id.* at 878 ("Among other things, this designation [of exclusive representative] means that individual employees may not be represented by any agent other than the designated union; nor may individual employees negotiate directly with their employer."); *see also Bierman*, 900 F.3d at 574 (explaining that *Janus* did not overrule *Knight*, which "summarily affirmed the constitutionality of exclusive representation for subjects of mandatory bargaining"). *Janus* does not affect the analysis.

Plaintiffs do not plausibly allege that they are compelled to speak, that they are forced to accept a member into their groups, or that they have been punished for associating with a group. The Court dismisses the First Amendment claim.

## II. Due Process

Plaintiffs' due process claim fares no better. The claim is an amalgamation of several different challenges: Plaintiffs alternatively contend that the Board unconstitutionally delegates to private entities, that it is a rubber stamp for employee representatives, and that it is biased. All fail.

First, there is no delegation problem. The appointed members act in their capacity as regulators when they promulgate rules. Minn. Stat. § 181.213, subdiv. 1 (requiring standards to "protect the health and welfare of nursing home workers"); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (noting that an official body is "presumptively disinterested"). Even characterizing appointed members as private parties participating in rulemaking, the governmental oversight cures any constitutional problem—a majority of the agency members must approve of any action. Minn. Stat. § 181.212, subdiv. 7. That power—for which Plaintiffs have no answer—gives agency members final say over any

action the Board takes. *Currin v. Wallace*, 306 U.S. 1, 15–19 (1939) (holding scheme where Secretary of Agriculture set standards that two-thirds of market had to approve was constitutional); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399 (1940) (upholding statute that allowed private party to propose minimum prices as "unquestionably valid" because the governmental commission could approve, disapprove, or modify the proposals); *see also Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 881 & n.21 (5th Cir. 2022) ("From these decisions, courts have distilled the principle that a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it."). Any delegation is thus constitutional.

Second, Plaintiffs' "rubber stamp" theory fails. "It is sufficient in such schemes that the private party's recommendations . . . cannot go into effect without an agency's say-so, regardless of how freely given." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 695 (2025) ("[T]he relevant legal question is not how often the FCC revises the Administrator's projections, just as in *Sunshine Anthracite* it was not how often the agency rejected the coal companies' pricing advice."). The agency members must approve of any action the Board takes, so it does not violate due process.

Third, the Court sees no due process violation based on alleged bias. Plaintiffs draw on jurisprudence concerning bias in judicial bodies, but there are meaningful differences between judicial bodies and regulators. *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19, 27 n.3 (D.C. Cir. 2016) (declining to transplant standard for unconstitutional bias from adjudicatory to rulemaking context because courts review allegations of bias with a far lighter touch in the rulemaking context). Proceedings designed to adjudicate disputed facts in a particular case come with higher standards of impartiality. *Id.*; *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245–46 (1973).

Regulators pass judgment upon prospective state or nationwide policy for which they have preconceived views; in fact, regulators are often selected because of their views. *See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) (noting that a decisionmaker is not "disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute"); *FTC v. Cement Inst.*, 333 U.S. 683, 703 (1948) (explaining that judges need not recuse themselves after opining as to whether certain kinds of conduct were prohibited, and "[c]ertainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court"). As regulators, the appointed members need not be a blank slate, and any preconceived views on issues regulated by the Board do not render the appointed members unconstitutionally biased.

Plaintiffs point to *Association of American Railroads*, 821 F.3d at 27–36, which concluded that Amtrak—a self-interested entity—had unconstitutional regulatory control over its competitors. Plaintiffs ignore that central to that decision was that the federal agency was "powerless to overrule Amtrak." *Id.* at 35. The court fixed the constitutional defect by giving final say to the agency. *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 896 F.3d 539, 543, 547 (D.C. Cir. 2018). The Board faces no similar constitutional defect. The agency members of the Board retain final say—a majority of agency members must approve any action the Board takes—so the Board is constitutional.

Plaintiffs do not plausibly allege a violation of their due process rights, so the claim must be dismissed.

## III. Preemption

Plaintiffs assert that the Board is preempted by the Sherman Antitrust Act and the National Labor Relations Act.

### *A. Sherman Act*

Antitrust laws prohibit entities from engaging in anticompetitive behavior. The standard for Sherman Act preemption is high: The Sherman Act preempts a state statute "only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 661 (1982).

Congress did not intend antitrust laws to "compromise the States' ability to regulate their domestic commerce," so states may be immune from suit under *Parker* immunity. *S. Motor Carriers Rate Conf., Inc. v. United States*, 471 U.S. 48, 56 (1985); *Parker v. Brown*, 317 U.S. 341, 350–51 (1943). The standard for *Parker* immunity depends on the situation; because the Board is entitled to immunity under the standard advanced by Plaintiffs, the Court does not decide if a more lenient standard applies.[1] To be immune, the state must show: "First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself." *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980) (citation modified).

---

[1] The standard depends on the identity of the actors who participated in the challenged conduct. For example, an agency dominated by active market participants must be actively supervised by the state. *N.C. State Bd. of Dental Examiners v. FTC*, 574 U.S. 494, 515 (2015). But a prototypical state agency need not be actively supervised. *Id.* The Court need not resolve which standard applies to the Board.

First, the Legislature clearly articulated its policy by delegating to the Board authority to establish compensation and employment standards. Minn. Stat. § 181.213, subdiv. 1. Plaintiffs do not dispute this element.

Second, the state government officials actively supervise the policy. Active supervision requires "that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *N.C. State Bd. of Dental Examiners*, 574 U.S. at 515 (citation omitted). The Board's structure requires supervision: The state has final say because two of the three agency members must approve any measure before it takes effect. This approval means that the agency members review the substance of any decision, rather than merely the procedures followed.

This structure requires more oversight than the structures in the cases that Plaintiffs point to. For example, under *Ticor*, a government does not actively supervise private parties' rate setting when it has veto power but fails to review the decision. *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 637–38 (1992). Unlike *Ticor*, the agency members hold more than a veto power—a majority of the agency members must affirmatively approve of any action. That affirmative vote means they reviewed the substance of the decision. *Parker* immunity applies, so the Court dismisses the Sherman Act preemption claim.

### *B. National Labor Relations Act*

To implement federal labor policy, the NLRA implicitly mandates two kinds of preemption: *Garmon* and *Machinists* preemption. *See San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236 (1959); *Lodge 76, Int'l. Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Rel. Comm'n*, 427 U.S. 132 (1976).

*1.* Garmon *Preemption*

Garmon preemption prevents conflict between state or local regulation and the "comprehensive regulation of industrial relations by Congress." *Garmon*, 359 US at 239, 246 ("The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy."). Under *Garmon*, states cannot regulate conduct arguably protected or prohibited by the NLRA. *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould*, 475 U.S. 282, 286 (1986).

According to Plaintiffs, the Board is a collective bargaining forum that encroaches on rights protected by the NLRA—employees' right to join a union of their own choosing[2] and employers' right to select a representative for collective bargaining. Not so.

Plaintiffs' attempt to frame the Board as a forum for collective bargaining is a square-peg-round-hole exercise. Collective bargaining is the process between an employer and a union to create an agreement on working terms and conditions. *See* 29 U.S.C. § 158(d) (defining collective bargaining). The Board is a public body that establishes statewide minimum working standards for nursing home employees. The Board does not negotiate agreements for specific employers or workers, nor does the Board intrude on the collective bargaining process. *See Fort Halifax Packing Co. v. Coyne*,

---

[2] It is unclear whether Plaintiffs can assert a preemption argument based on Section 7 of the NRLA, 29 U.S.C. § 157. Section 7 confers rights on employees, and Plaintiffs represent employers. "Consequently, some courts have refused to entertain Section 7 preemption arguments made by employers." *LeadingAge Minn. v. Blissenbach*, 791 F. Supp. 3d 913, 932–33 (D. Minn. 2025), *appeal docketed* Case No. 25-2252 (8th Cir. June 24, 2025); *compare Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 489 (9th Cir. 1996) *and Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d 87, 96 (2d Cir. 2006) *with St. Thomas–St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000).

482 U.S. 1, 22 (2006) (holding that state law requiring severance pay was not preempted by NLRA); *cf. Bethlehem Steel Co. v. N.Y. State Lab. Rels. Bd.*, 330 U.S. 767, 775–76 (1947) (concluding that the NLRA preempts a state board that mirrors the NLRB). And the appointed members act in their capacity as government officials, not in their capacity as an employer or employee representative. At any rate, most agency members must approve any vote, meaning the appointed members do not have ultimate authority to reach an agreement establishing wages or other working conditions.

Employees remain free to join a union of their choosing, and employers remain free to select a representative for collective bargaining. The Board is not *Garmon* preempted.[3]

2. Machinists *Preemption*

Congress was intentionally silent on certain matters that it wanted to leave to free market forces. *See Machinists*, 427 U.S. at 140 & n.4. *Machinists* preemption forbids regulation of such matters, including restrictions on strikes and lockouts. *Id.* at 140–41. The NLRA does not preempt states from issuing minimum employment standards. *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 750–58 (1985); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20–23 (1987).

---

[3] Plaintiffs also suggest that the Board's remedies are preempted by the NLRA. *See* 29 U.S.C. § 160(c); Minn. Stat. § 181.217, subdiv. 3(b). The Court disagrees. The Board's standards and the NLRA govern different things: minimum labor standards versus employees' right to organize, form unions, and collectively bargain. The Board's remedies thus do not authorize other remedies for violations of the NLRA, and *Garmon* does not apply.

Plaintiffs assert that the Board may effectively amend all collective bargaining agreements by raising minimum employment standards. United States District Judge Laura M. Provinzino rejected Plaintiffs' nearly identical argument in *LeadingAge Minnesota v. Blissenbach*, 791 F. Supp. 3d 913. 935–42 (D. Minn. 2025), *appeal docketed* Case No. 25-2252 (8th Cir. June 24, 2025). The argument fares no better here.

*Machinists* does not preempt a state law that "establishes a minimum labor standard that does not intrude upon the collective-bargaining process." *Fort Halifax*, 482 U.S. at 7. A minimum labor standard includes "regulations that mandate benefits that 'affect union and nonunion employees equally,' 'neither encourage nor discourage the collective-bargaining processes,' and 'have [only] the most indirect effect on the right of self-organization.'" *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 113 (2d Cir. 2024) (quoting *Metro. Life*, 471 U.S. at 755). That ambit includes minimum wage laws, like the one Plaintiffs take issue with. *Metro. Life Ins.*, 471 U.S. at 756.

Plaintiffs try to save their argument by citing two cases: *Employers Association, Inc. v. United Steelworkers of America, AFL-CIO-CLC*, 32 F.3d 1297 (8th Cir. 1994) and *Thunderbird Mining Co. v. Ventura*, 138 F. Supp. 2d 1193 (D. Minn. 2001). *Steelworkers* involved a state law prohibiting employers from hiring replacements during a strike; this law thus concerned an economic weapon central to *Machinists* preemption, so *Steelworkers* is distinguishable. 32 F.3d at 1300–01. In *Thunderbird*, the Legislature gave employees authority to withhold state funding from the company—a formidable weapon in labor negotiations. 138 F. Supp. 2d at 1196–98. Unlike *Steelworkers* and *Thunderbird*, the Board is not equipped with any similar economic weapon. While the standards promulgated by the Board may have latent effects on collective bargaining by raising the minimum conditions, any latent effects on collective bargaining do not bring the Board's standards within *Machinists*' purview. *Metro. Life*, 471 U.S. at 755 ("Minimum state labor standards

affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA."). The Board—which is delegated authority to establish minimum working conditions—is not preempted by *Machinists* because *Machinists* does not touch laws that establish minimum labor standards.[4]

The Court grants the motion to dismiss in its entirety and denies as moot the motion for preliminary injunction.

**CONCLUSION**

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion to Dismiss (ECF No. 32) is GRANTED;

2. The Complaint (ECF No. 9) is DISMISSED WITH PREJUDICE; and

3. Plaintiffs' Motion for Preliminary Injunction (ECF No. 3) is DENIED AS MOOT.

---

[4] The Board also moves to dismiss based on claim preclusion. *See LeadingAge*, 791 F. Supp. 3d 913. The Court addressed the merits of the claims first because claim preclusion would not apply to all Plaintiffs. Because the complaint is dismissed, the Court does not consider claim preclusion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 17, 2026

BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge